**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Joel D. Smith (State Bar No. 244902)
Yeremey O. Krivoshey (State Bar No. 295032)
Thomas A. Reyda (State Bar No. 312632)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail:  ltfisher@bursor.com
         jsmith@bursor.com
         ykrivoshey@bursor.com
         treyda@bursor.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEREMIAH REVITCH, on Behalf of Himself and all Others Similarly Situated,<br><br>                              Plaintiff,<br><br>        v.<br><br>CITIBANK, N.A.,<br><br>                              Defendant. | Case No.  3:17-cv-06907-WHA<br><br>**PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br>Date:   February 7, 2019<br>Time:  8 a.m.<br>Court:  Courtroom 12, 19th Floor<br><br>Judge William Alsup |

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1    **TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

2       **PLEASE TAKE NOTICE THAT** on February 7, 2019 at 8:00 a.m. or as soon thereafter as

3    counsel may be heard by the above-captioned Court, located at 450 Golden Gate Avenue, San

4    Francisco, CA, 94102, Courtroom 12, 19th Floor in the Courtroom of Judge William Alsup,

5    Plaintiff Jeremiah Revitch ("Plaintiff") will and hereby does move the Court for an order granting

6    his motion to certify the Class described herein, appoint Mr. Revitch as class representative, and

7    appoint Bursor & Fisher, P.A. as class counsel.

8       This motion is made on the grounds that Plaintiff has met each requirement of Rule 23(a),

9    Rule 23(b)(3) and Rule 23(b)(2).

10       This Motion is based on this Notice of Motion, the attached Memorandum of Points and

11    Authorities, the Declarations of Thomas Reyda, Randal Snyder, and Colin Weir, all supporting

12    exhibits, the pleadings and papers on file, and upon such matters as may be presented to the Court at

13    the time of the hearing.

14             **CIVIL LOCAL RULE 7-4(a)(3) STATEMENT OF ISSUE TO BE DECIDED**

15       Whether the Court should certify a class, appoint Plaintiff as class representative, and

16    appoint Bursor & Fisher, P.A. as class counsel.

17    Dated: November 28, 2018                    **BURSOR & FISHER, P.A.**

18                                       By:  ___*/s/ Joel D. Smith*_____
19                                              Joel D. Smith

20                                       L. Timothy Fisher (State Bar No. 191626)
                                         Joel D. Smith (State Bar No. 244902)
21                                       Yeremey O. Krivoshey (State Bar No.295032)
                                         Thomas A. Reyda (State Bar No. 312632)
22                                       1990 North California Blvd., Suite 940
                                         Walnut Creek, CA  94596
23                                       Telephone: (925) 300-4455
                                         Email:  ltfisher@bursor.com
24                                                 jsmith@bursor. com
                                                   ykrivoshey@bursor.com
25                                                 treyda@bursor.com

26                                       *Attorneys for Plaintiff*

27

28

# TABLE OF CONTENTS

**PAGE(S)**

I. INTRODUCTION ...................................................................................................1

II. LEGAL AND FACTUAL BACKGROUND ...........................................................3

    A. Wrong Number Calls And The TCPA .......................................................3

    B. Citibank Makes Numerous Wrong Number Debt-Collection Calls
       With Its Autodialing System .....................................................................4

    C. Identifying Class Members Is A Straightforward Process And
       Consistent With *West* ................................................................................7

III. CLASS CERTIFICATION IS WARRANTED HERE .........................................10

    A. Each Of Rule 23(a)'s Requirements Are Satisfied ..................................10

       1. The Numerosity Requirement Is Satisfied ..................................10

       2. The Commonality Requirement Is Satisfied ...............................11

       3. The Typicality Requirement Is Satisfied .....................................12

       4. The Adequacy Requirement Is Satisfied .....................................12

    B. The Proposed Class Satisfies Rule 23(**b**)(3) ...........................................14

       1. Common Questions Of Fact Or Law Predominate.......................14

       2. Citibank's Affirmative Defense Of Consent Does Not Defeat
          The Predominance Requirement .................................................15

          a. *West*, *Lavigne* And Other Wrong Number Class
             Certification Decisions Support Certification Of A
             "Wrong Number" Class..............................................16

          b. The Question Of Whether Citibank Customers
             Consented To Receive Wrong Number Calls Does Not
             Defeat Certification .....................................................18

       3. The Question Of Whether Citibank Customers Agreed To
          Arbitrate Their Claims Does Not Defeat Certification.................22

       4. A Class Action Is Superior To Numerous Individual TCPA
          Actions.........................................................................................23

IV. THE PROPOSED CLASS SATISFIES RULE 23(**b**)(2) ....................................23

V. CONCLUSION .....................................................................................................24

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Abante Rooter & Plumbing, Inc. v. Alarm.com Inc.*,
    2017 WL 1806583 (N.D. Cal. May 5, 2017)....................................................................23

*Abdeljalil v. Gen. Elec. Capital Corp*,
    306 F.R.D. 303 (S.D. Cal. 2015) ..............................................................12, 17, 21

*Abdullah v. United States Sec. Assocs., Inc.*,
    731 F.3d 952 (9th Cir. 2013) ..............................................................10, 11, 14, 15

*Ahmed v. HSBC Bank USA, Nat'l Assn.*,
    2017 WL 5720548 (C.D. Cal. Nov. 6, 2017) ....................................................................3

*Amchem Prod., Inc. v. Windsor*,
    521 U.S. 591 (1997) ....................................................................23

*Berger v. Property I.D. Corp.*,
    2008 WL 11334980 (C.D. Cal. Apr. 28, 2008)....................................................................22

*Blair v. Rent-A-Center, Inc.*,
    2018 WL 5728924 (N.D. Cal. Nov. 1, 2018) ....................................................................13

*Briseno v. ConAgra Foods Inc.*,
    844 F.3d 1121 (9th Cir. 2017)..............................................................7, 21

*Bruton v. Gerber Prod. Co.*,
    703 Fed. App'x 468 (9th Cir. 2017)..............................................................7

*Californians for Disability Rights, Inc. v. Cal. Dep't of Transp.*,
    249 F.R.D. 334 (N.D. Cal. 2008) ..............................................................10, 11

*Cameron v. E.M. Adams & Co.*,
    547 F.2d 473 (9th Cir. 1976)..............................................................17, 18

*Clemens v. Hair Club for Men, LLC*,
    2016 WL 1461944 (N.D. Cal. Apr. 14, 2016)..............................................................14, 15

*Dulberg v. Uber Technologies, Inc.*,
    2018 WL 932761 (N.D. Cal. Feb. 14, 2018) ....................................................................10

*Ehret v. Uber Techs., Inc.*,
    148 F. Supp. 3d 884 (N.D. Cal. 2015)....................................................................22

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    563 U.S. 804 (2011) ....................................................................15

*Etter v. Allstate Ins. Co.*,
    323 F.R.D. 308 (N.D. Cal. 2017) ..............................................................7, 11, 12, 13

*Fields v. Mobile Messengers Am., Inc.*,
    2013 WL 6774076 (N.D. Cal. Dec. 23, 2013) ....................................................................5

*Gutierrez-Rodriguez v. R.M. Galicia, Inc.*,
  2017 WL 4621188 (S.D. Cal. Oct. 16, 2017) ...................................................................11

*Hanlon v. Chrysler Corp.*,
  150 F.3d 1011 (9th Cir. 1998) ...............................................................................11, 12

*Hawkins v. S2Verify*,
  2016 WL 3999458 (N.D. Cal. July 26, 2016) .................................................................10

*Heinrichs v. Wells Fargo Bank, N.A.*,
  2014 WL 985558 (N.D. Cal. Mar. 7, 2014) ......................................................................4

*Herrera v. First National Bank of Omaha, N.A.*,
  2017 WL 6001718 (C.D. Cal. Dec. 4, 2017) ...................................................................15

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
  2013 WL 5429718 (N.D. Cal. June 20, 2013) .................................................................18

*In re Jiffy Lube Int'l, Inc., Text Spam Litig.*,
  847 F. Supp. 2d 1253 (S.D. Cal. 2012) ...........................................................................22

*In re Lendingclub Sec. Litig..*,
  282 F. Supp. 3d 1171 (N.D. Cal. 2017) ...........................................................................13

*In re Yahoo Mail Litig.*,
  308 F.R.D. 577 (N.D. Cal. 2015) ....................................................................................24

*Johansen v. One Planet Ops, Inc.*,
  2018 WL 1558263 (S.D. Ohio Mar. 5, 2018) ..................................................................20

*Johnson v. Navient Solutions, Inc.*,
  315 F.R.D. 501 (S.D. Ind. 2016) ...............................................................................12, 17

*Jordan v. Nationstar Mortgage LLC*,
  2014 WL 5359000 (N.D. Cal. Oct. 20, 2014) ...................................................................4

*Kelly v. City & Cnty. of San Francisco*,
  2005 WL 3113065 (N.D. Cal. Nov. 21, 2005) ...........................................................17, 18

*Lavigne v. First Comm. Bancshares, Inc.*,
  2018 WL 2694457 (D.N.M. June 5, 2018)..............................................................passim

*Lee v. Stonebridge Life Ins. Co.*,
  289 F.R.D. 292 (N.D. Cal. 2013) ....................................................................................15

*Leyse v. Bank of Am. Nat. Ass'n*,
  804 F.3d 316 (3d Cir. 2015) .............................................................................................4

*Lucero v. SolarCity Corp.*,
  2018 WL 573593 (N.D. Cal. Jan. 26, 2018).....................................................................14

*Magallon v. Robert Half Int'l., Inc.*,
  311 F.R.D. 625 (D. Or. 2015).........................................................................................23

*Manno v. Healthcare Revenue Recovery Grp., LLC*,
  289 F.R.D. 674 (S.D. Fla. 2013) ....................................................................................20

*Marks v. Crunch San Diego, LLC*,
  904 F.3d 1041 (9th Cir. 2018) ................................................................................5, 6, 7

*McMillion v. Rash Curtis & Assoc.*,
  2017 WL 3895764 (N.D. Cal. Sept. 6, 2017) ...............................................9, 10, 14, 24

*Meyer v. Bebe Stores, Inc.*,
  2016 WL 8933624 (N.D. Cal. Aug. 22, 2016) ...........................................................3

*Meyer v. Portfolio Recovery Assocs., LLC*,
  707 F.3d 1036 (9th Cir. 2012) .............................................................................19, 24

*Nevarez v. Forty Niners Football Co., LLC*,
  326 F.R.D. 562 (N.D. Cal. 2018) ....................................................................7, 8, 9, 13

*Osorio v. State Farm Bank, F.S.B.*,
  746 F.3d 1242 (11th Cir. 2014) ...........................................................................4

*O'Shea v. Am. Solar Solutions, Inc.*,
  318 F.R.D. 633 (S.D. Cal. 2017) .........................................................................12

*Pieterson v. Wells Fargo Bank, N.A.*,
  2018 WL 3241069 (N.D. Cal. July 2, 2018) ...........................................................4

*Revitch v. DirecTV, LLC*,
  2018 WL 4030550 (N.D. Cal. Aug. 23, 2018) ........................................................22

*Ritchie v. Van Ru Credit Corp.*,
  2014 WL 956131 (D. Ariz. Mar. 12, 2014) ............................................................11

*Rodman v. Safeway, Inc.*,
  2015 WL 2265972 (N.D. Cal. May 14, 2015) .........................................................17, 21

*Saechao v. Landry's Inc.*,
  2016 WL 1029479 (N.D. Cal. Mar. 15, 2016) .........................................................11

*Sali v. Corona Regional Medical Center*,
  889 F.3d 623 (9th Cir. 2018) ...............................................................................15

*Smilow v. Sw. Bell Mobile Sys., Inc.*,
  323 F.3d 32 (1st Cir. 2003) ................................................................................17, 20

*Soppet v. Enhanced Recovery Company., LLC*,
  679 F.3d 637 (7th Cir. 2012) ..............................................................................4

*Staton v. Boeing Co.*,
  327 F.3d 938 (9th Cir. 2003) ..............................................................................13

*Stockwell v. City & Cty. of San Francisco*,
  749 F.3d 1107 (9th Cir. 2014) .............................................................................11

*Tomeo v. CitiGroup, Inc.*,
  2018 WL 4627386 (N.D. Ill. Sept. 27, 2018) .........................................................2, 18

*True Health Chiropractic, Inc. v. McKesson Corp.*,
  896 F.3d 923 (9th Cir. 2018) ...............................................................................20, 21

*Van Patten v. Vertical Fitness Grp., LLC,*
   847 F.3d 1037 (9th Cir. 2017) ...................................................................................17, 19

*Wal–Mart Stores, Inc. v. Dukes,*
   564 U.S. 338, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011) ...........................................11

*West v. California Services Bureau, Inc.,*
   323 F.R.D. 295 (N.D. Cal. 2017) ........................................................................passim

*White v. E-Loan, Inc.,*
   2006 WL 2411420 (N.D. Cal. Aug. 18, 2006) ..........................................................14

*Wolin v. Jaguar Land Rover N. Am., LLC,*
   617 F.3d 1168 (9th Cir. 2010) ...................................................................................12

*Zeidel v. A&M (2015), LLC,*
   2017 WL 1178150 (N.D. Ill. Mar. 30, 2017) ...........................................................15

**STATUTES**

47 U.S.C. § 227 ....................................................................................................... 1, 3, 4

47 U.S.C. § 227(b)(1)(A) ............................................................................................. 3, 4

**RULES**

Fed. R. Civ. P. 23(a) ..............................................................................................10, 11, 12

Fed. R. Civ. P. 23(a)(2) .....................................................................................................11

Fed. R. Civ. P. 23(a)(3) .....................................................................................................12

Fed. R. Civ. P. 23(a)(4) .........................................................................................12, 13, 14

Fed. R. Civ. P. 23(b) ..........................................................................................................10

Fed. R. Civ. P. 23(b)(3) ..........................................................................................14, 15, 17

Fed. R. Civ. P. 23(g) ..........................................................................................................14

**OTHER AUTHORITIES**

*In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991,*
   23 F.C.C. Rcd. 559 (2008) ........................................................................................19

*In re Rules & Regs. Implementing the Tel. Cons. Prot. Act of 1991,*
   30 FCC Rcd. 7961 (2015) ............................................................................................3

# I.   INTRODUCTION

Citibank employs ██████ of call operators for its debt-collection operations, driving them to meet ████████ while using an automated dialing system to maintain the ██████. Many people receive wrong-number debt collection calls from Citibank—even after asking Citibank to stop calling them. Citibank's records show this is a common problem, and that its operators can be unresponsive or hostile when call recipients tell them they reached a wrong number.

Citibank made a misstatement to this Court that highlights its inability to get a handle on the problem. On July 16, 2018—more than half a year into this case—Citibank told this Court that it "spoke to Plaintiff only once" and stopped calling as soon as he told Citibank it was calling the wrong number. Ex. 1, July 16, 2018 Letter, p.1 (Dkt. No. 40).[1] That statement was false. Citibank later produced several recordings of Plaintiff telling Citibank debt collectors they had reached a wrong number, and the calls only stopped after he threatened a lawsuit. In one of the recordings, a manager first said Citibank's customer may have purposefully given a wrong number to avoid calls from Citibank, and then admitted that Citibank does nothing to confirm that its customers provide correct phone numbers. That is the crux of the problem: Citibank knows its customers sometimes provide wrong numbers, but does nothing to confirm the accuracy of those numbers before calling, and then often ignores complaints by the wrong party called. The aggregate impact of this problem is significant. By taking a sample set from Citibank's call logs and account records, Plaintiff's expert identified approximately 176 class members who received wrong-number calls from Citibank, most of whom received multiple calls. Based on the volume calls made by Citibank, the total number of class members is estimated to be approximately 10,560.

Certification of wrong number classes in the context of debt collection calls has become relatively common. Last year in *West v. California Services Bureau, Inc.*, 323 F.R.D. 295 (N.D. Cal. 2017), Judge Gonzalez-Rogers certified a "Cell Phone Wrong Number Class" under both Rule 23(b)(2) and 23(b)(3) alleging claims under the Telephone Consumer Protection Act, 47 U.S.C. § 227 et seq. ("TCPA"). By definition, call recipients in a "wrong number" class did not consent to

---

[1] Unless otherwise noted, all exhibits referenced in this brief are attached to the concurrently-filed declaration of Thomas A. Reyda.

receive calls, thereby defeating any argument that individualized issues of consent preclude certification under Rule 23(b)(3).  *See id.* at 301-302; *see also*, *e.g.*, *Lavigne v. First Comm. Bancshares, Inc.*, 2018 WL 2694457, at *3 (D.N.M. June 5, 2018) (certifying wrong number class against bank).  Here, Plaintiff's experts are utilizing nearly the same procedure used in *West* to identify class members in a "wrong number" class.  In a nutshell, that process starts with Citibank's own records of wrong number calls it made.  Plaintiff's expert then does two things to confirm the accuracy of those records.  First, if Defendant's records show that a number was first flagged as a wrong number, but later changed to another flag suggesting that the prior wrong number flag was incorrect, then that number is removed from the class list.  Second, Plaintiff's expert then cross-references Citibank's records with a historical database identifying the user of the phone number at the time of the call (sometimes referred to as a "reverse number lookup service"), and compares the name of the person Citibank intended to call, with the name of the person who Citibank actually called.  In *West*, the plaintiff only engaged in the second step, but that was still sufficient to grant certification over the defendant's argument that call recipients sometimes lie when they tell a call operator that he or she reached a wrong number.

In opposing certification, Citibank will lean heavily on a recent contrary decision in Illinois, *Tomeo v. CitiGroup, Inc.*, 2018 WL 4627386 (N.D. Ill. Sept. 27, 2018), where the district court denied certification of a wrong number class.  But the plaintiffs in that case did not use the same or similar procedure used in *West*.  The plaintiffs in *Tomeo* relied only on the defendant's records indicating a wrong number call, without doing anything more to test the accuracy of those records.  That is not the case here.  Plaintiff excluded all call recipients who Citibank later identified as providing some form of consent, and independently verified Citibank's own conclusion that these were wrong number calls.  As Judge Gonzalez-Rogers' decision in *West* shows, these additional steps make all the difference for purposes of class certification.

Plaintiff therefore asks the Court to certify a class of persons who received these "wrong-number" calls from Citibank to assert claims under the TCPA.  The Federal Communications Commission ("FCC") has "ma[d]e clear that such calls are exactly the types that the TCPA is

designed to stop." *In re Rules & Regs. Implementing the Tel. Cons. Prot. Act of* 1991, 30 FCC Rcd. 7961, 8003 ¶ 80 (2015) (the "2015 FCC Order").  Plaintiff seeks certification of the following class:

> All persons in the United States who (1) between March 17, 2014, through August 21, 2018; (2) were called on their cellular telephone by Defendant or its agent/s using its Aspect Unified dialer; and (3) where such person was not listed in Defendant's records as the intended recipient of the calls.[2]

(the "Class").  Plaintiff also asks the Court to appoint Mr. Revitch as Class Representative, appoint Bursor & Fisher, P.A. as Class Counsel, and award other relief as the Court deems just.

## II.    LEGAL AND FACTUAL BACKGROUND

### A.    Wrong Number Calls And The TCPA

The Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA"), prohibits callers from using an automatic telephone dialing system ("ATDS" or "autodialer") to contact cellular customers without their prior express consent.  *See* 47 U.S.C. § 227(b)(1)(A)(iii).  For companies that make calls, "the TCPA is a strict liability statute."  *Meyer v. Bebe Stores, Inc.*, 2016 WL 8933624, at *7 (N.D. Cal. Aug. 22, 2016) (internal quotation omitted); *see also*, *e.g.*, *Ahmed v. HSBC Bank USA, Nat'l Assn.*, 2017 WL 5720548, at *3 (C.D. Cal. Nov. 6, 2017) (citing numerous authorities holding that "[t]he TCPA is essentially a strict liability statute").  Companies can avoid strict liability by not using autodialers or, barring that, minimize risk by handling automated calls responsibly.  Yet illegal automated calls persist as a low-cost, high-volume way of contacting consumers.  Earlier this year, several news agencies reported a record-breaking surge in automated calls, specifically calling out banks and debt collectors for using autodialing technology for debt collection purposes.[3]

In the wrong-number context, a violation occurs if consent was not given by the "called party."  *See* 47 U.S.C. § 227(b)(1)(A).  The Seventh, Eleventh and Third Circuits have ruled that "called party" means the current subscriber who was actually called (like Plaintiff here), not the

---

[2] This class definition is modeled on the definition of the certified class in *West.  See West*, 323 F.R.D. at 307.

[3] *E.g.*, Ex. 2, Tony Romm, *Robo-Calls Are Getting Worse.  And Some Big Businesses Soon Could Start Calling You Even More*, Washington Post, July 12, 2018; Ex. 3, Tara Siegel Bernard, *Yes, It's Bad.  Robocalls, and Their Scams, Are Surging*, New York Times, May 6, 2018.

person the caller was attempting to call.  *Soppet v. Enhanced Recovery Company., LLC,* 679 F.3d 637, 643 (7th Cir. 2012); *Osorio v. State Farm Bank, F.S.B.,* 746 F.3d 1242, 1252 (11th Cir. 2014) (We accordingly reject State Farm's argument that the 'intended recipient' is the 'called party' referred to in 47 U.S.C. § 227(b)(1)(A)"); *Leyse v. Bank of Am. Nat. Ass'n*, 804 F.3d 316, 326 (3d Cir. 2015) (citing *Soppet* and *Osorio* with approval and explaining "It is the actual recipient, intended or not, who suffers the nuisance and invasion of privacy.").

In *Heinrichs v. Wells Fargo Bank, N.A.*, 2014 WL 985558, *2 (N.D. Cal. Mar. 7, 2014) (J. Alsup), this Court stated that it was "inclined to agree with the analysis set forth in [*Soppet*]," where the Seventh Circuit held that the TCPA requires consent from the person who was actually called, not the person the caller asserts it was attempting to call.  Although the statute does not define the term "called party," the term appears seven times in § 227.  For the seven uses of the phrase "called party," "[f]our unmistakably denote the current subscriber (the person who pays the bills or needs the line in order to receive other calls); one denotes whoever answers the call (usually the subscriber); and the others (the two that deal with consent) have a referent that cannot be pinned down by context."  *Soppet*, 679 F.3d at 639-40.  None of the uses refer to the "intended recipient of the call," which is how the defendant in *Soppet* defined the term, and the court declined to read such a concept into the statute.  *Id.* ("The phrase 'intended recipient' does not appear anywhere in § 227, so what justification could there be for equating 'called party' with 'intended recipient of the call'?").  Following *Soppet* and *Osorio*, "district courts in [the Ninth Circuit] have generally rejected the 'intended recipient' definition" of the term "called party."  *Jordan v. Nationstar Mortgage LLC*, 2014 WL 5359000, *11 (N.D. Cal. Oct. 20, 2014); *see also*, *e.g.*, *Pieterson v. Wells Fargo Bank, N.A.*, 2018 WL 3241069, at *3 (N.D. Cal. July 2, 2018) ("In the Ninth Circuit, district courts have generally rejected the "intended recipient" definition, which counsels against a conclusion that Defendant can rely on a good faith exemption to the consent requirement.").

## B.  Citibank Makes Numerous Wrong Number Debt-Collection Calls With Its Autodialing System

Citibank operates its own debt collection call centers ▮▮▮▮▮▮▮▮, which are supplemented by ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 22, Mullahey Dep., 11:9-13:22;

21:1-16.  There are ███████████████████████ but the true number may be closer to ███████████████████████████████████████████████. *Id.* at 22:5-13; *see also id.* 13:23-16:12.  Every call center operator must meet certain goals relating to "████████████████████████████████████ *Id.* at 48:6-17.

The engine of Citibank's debt-collection operations is an autodialer called the Aspect Unified IP 7.3 SP 3 system ("Aspect dialer").  *See id.* at 20:2-20;  Ex. 21, Roe Depo., 85:2-6; Ex. 4, Supp. Response to Interrogatory Nos. 5-6.  This technology has several dialing modes including ████████████████████████████████.  Ex. 14, CITI_REVITCH000531; *see also* Ex. 21, Roe Depo., 59:1-63:3; Ex. 22, Mullahey Dep., 45:10-18.  The Aspect system allows Citibank's call center operators ████████████████████████████████████████████████ *See* Ex. 21, Roe Depo., 59:17-60:3; 62:16-24; Ex. 22, Mullahey Dep., 22:16-18.  The system ████████████████████████████████████████████████████████████ ████████████████████████████ Ex. 22, Mullahey Dep., 26:7-11.  Citibank's representatives refer to the Aspect system as an ████████████ *See id.* at 41:6-14; Ex. 11, Complaint Log No. 2, at Row 134 (referring to Citibank's ████████████); Ex. 12, Complaint Log No. 3, at Row 4 (same).  This evidence, along with Plaintiff's expert's opinions on the capabilities of the Aspect system, furnish classwide proof that the system meets the definition of an "automatic telephone dialing system" ("ATDS" or "autodialer") within the meaning of the TCPA.  *See* Snyder Decl., ¶¶ 9, 32-54, 90-91; *see also Fields v. Mobile Messengers Am., Inc.*, 2013 WL 6774076, at *3 (N.D. Cal. Dec. 23, 2013) (J. Alsup) (". . . the FCC found that predictive dialers fall into the statutory definition of an ATDS"); *see also Marks v. Crunch San Diego, LLC*, 904 F.3d 1041, 1052-53 (9th Cir. 2018) (addressing the statutory definition of an ATDS).

Call operators who use the Aspect dialing system can flag a phone number as either a ██████ ██████████████████████ when they learn that the number "does not belong to our customer, ██████████████████████ Ex. 15, CITI_REVITCH001508, 1510; *see also* Ex. 22, Mullahey Dep. 30:3-13; Snyder Decl., ¶¶ 68-73.  However, Citibank's records reveal scores of people who complained about receiving multiple wrong-number calls from Citibank, but continued

1

2

to receive calls anyway.  *See generally*, Exs. 10-13, Complaint Logs.  The records also show that

Citibank call operators do not always respond well when customers ask them to stop calling:



- 

Like the people described above, Plaintiff Jeremy Revitch also continued to receive calls after telling Citibank it had reached a wrong number.  Citibank says "it made nine calls, and sent two text messages" to Mr. Revitch.  Ex. 1, July 16, 2018 Letter, p.1.  Although the parties dispute the number of calls made, there is no dispute they were intended for someone else.  *See id.*; *see also* Ex. 9, Revitch Dep., 35:22-24.  Citibank produced six audio recordings from at least three calls between Mr. Revitch and Citibank, and another where either Mr. Revitch or Citibank immediately hung up.  *Id.*, at 76:5-78:14; Reyda Decl. ¶ 9.  In one of the recordings, a Citibank manager told Mr. Revitch that its customer had given the phone number "knowing that it wasn't theirs because they didn't want to receive calls or whatever the situation may be," and that "[w]e don't verify that these numbers belong to the person [i.e., the Citibank customer who gave the number]."  Revitch Dep., 105:25-106:5 (transcribing call recording).

### C.   Identifying Class Members Is A Straightforward Process And Consistent With *West*

As this Court held when granting certification in another TCPA case, "Rule 23 does not require an administratively feasible way to identify members of the class."  *Etter v. Allstate Ins. Co.*, 323 F.R.D. 308, 314 (N.D. Cal. 2017) (J. Alsup) (citing *Briseno v. ConAgra Foods Inc.*, 844 F.3d 1121, 1126 (9th Cir. 2017).  The Ninth Circuit also clarified in *Bruton v. Gerber Prod. Co.*, 703 Fed. App'x 468, 470 (9th Cir. 2017), that "administrative feasibility" and "ascertainability" are the same thing.  *See also Nevarez v. Forty Niners Football Co., LLC*, 326 F.R.D. 562, 576 (N.D. Cal. 2018) (citing *Bruton* for the proposition that "'ascertainability' is synonymous with 'administrative feasibility'").  Nonetheless, Plaintiff's experts have deployed a court-tested procedure for identifying "wrong number" class members in this case, and that procedure also address Citibank's contention that individualized issues of consent bar certification.

Citibank placed numerous calls with its Aspect dialing system during the class period. *See* Weir Decl., ¶ 19; Snyder Decl., ¶ 64. Citibank's call logs show details about each call made, such as ████████████████████████████████████ *See* Ex. 16, Excerpts/exemplars of call logs; Ex. 21, Roe Dep., 17:9-18:3; 49:8-25; 50:15-52:1; Weir Decl., ¶ 13; Snyder Decl., ¶¶ 62-63. Users ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Ex. 22, Mullahey Dep., 42:13-17.

With these logs, identifying wrong number class members is a relatively straightforward procedure, and is similar to the procedure used in *West*. <u>First</u>, Plaintiff's expert Colin Weir identifies any number marked as a wrong number. Weir Decl., ¶ 18. Mr. Weir filters out any number that was at one point marked as a wrong number, but then later given another flag indicating the call recipient later said something else (such as, for instance, consenting to receive

████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████

calls).  *Id.*  This is an additional step that was not taken in *West*, and was done here to address

Citibank's anticipated argument that call recipients are not always truthful when they tell Citibank

that it reached the wrong number.  *See also Lavigne v. First Comm. Bancshares, Inc.*, 2018 WL

2694457, at *3 (D.N.M. June 5, 2018) (granting class certification where plaintiffs utilized similar

procedure).  The first step results in a preliminary list of wrong numbers, and Mr. Weir then filters

that list to reveal each unique telephone number that Citibank's records identify as wrong numbers.

*Id.*; *see also* Snyder Decl., ¶¶ 75-76.[7]

        Second, Mr. Weir then uses information from TransUnion to determine which calls were

made to cell phones and which were made to landline numbers, and excludes the landline calls from

the list.  Weir Decl., ¶ 22; Snyder Decl., ¶ 77.  Plaintiff's expert witness, Randall Snyder has opined

that these types of databases "enable organizations to definitively determine whether any telephone

numbers in a list of numbers are cellular or not, and if they were cellular numbers at a certain

historical point in time."  Snyder Decl. ¶ 60; *see id.* at ¶¶ 55-59.  Courts have likewise recognized

that using databases such as these make it feasible to "determin[e] whether a telephone number

belongs to a cell phone or landline" in the class member identification process.  *McMillion v. Rash

Curtis & Assoc.*, 2017 WL 3895764, at *5 (N.D. Cal. Sept. 6, 2017).  The end result of this step is a

preliminary list of wrong numbers that were cell phones.  Weir Decl., ¶¶ 20-21.

        Third, Mr. Weir scrubs the preliminary list of wrong-number calls against TransUnion's

historical database lookup service to identify the customary users of those numbers when the calls

were made.  Weir Decl., ¶¶ 22, 24.  The names of the users identified from the historical

database/reverse lookup service are then compared with the names of the account holders listed in

Defendant's records.  *Id.*; Snyder Decl. ¶ 79-83.  Discrepancies between Defendant's records and

the historical database/reverse lookup service indicate that a wrong number was called.  Snyder

Decl. ¶ 84.  This is not a novel procedure.  The FCC recommends that companies use reverse

---

[7] Defendant's call logs included ███████████████████████████████████████

██████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ Weir Decl., ¶ 19;

Snyder Decl., ¶ 78.

1  number lookup services to avoid TCPA liability from calling wrong numbers.  *See* 2015 FCC Order

2  at 8007 ¶ 86 ("Callers have a number of options available that, over time, may permit them to learn

3  of reassigned numbers.  For example, at least one database can help determine whether a number

4  has been reassigned"); *id.* at n.301 (noting that the database allows users to "confidently verify that

5  the phone number still belongs to the individual who gave consent").  Again, this part of procedure

6  is consistent with the procedure used in *West*.  *See West*, 323 F.R.D. at 302 (granting certification

7  where plaintiffs' expert explained "how a reverse number lookup service could be used to resolve

8  consent issues on a classwide basis").

9  **III.    CLASS CERTIFICATION IS WARRANTED HERE**

10        Federal Rule of Civil Procedure 23(a) provides, "One or more members of a class may sue

11  or be sued as representative parties on behalf of all members only if: (1) the class is so numerous

12  that joinder of all members is impracticable; (2) there are questions of law or fact common to the

13  class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of

14  the class; and (4) the representative parties will fairly and adequately protect the interests of the

15  class."  "Rule 23(b) sets forth three conditions under which, if the prerequisites of Rule 23(a) are

16  satisfied, a class action may be maintained.  Class certification is appropriate if a plaintiff meets all

17  the prerequisites of Rule 23(a) and at least one condition of Rule 23(b)."  *Dulberg v. Uber*

18  *Technologies, Inc.*, 2018 WL 932761, at *2 (N.D. Cal. Feb. 14, 2018) (J. Alsup) (citing *Abdullah v.*

19  *United States Sec. Assocs., Inc.*, 731 F.3d 952, 956–57 (9th Cir. 2013)).  As set forth below, each of

20  these requirements are satisfied here.

21        **A.    Each Of Rule 23(a)'s Requirements Are Satisfied**

22             **1.    The Numerosity Requirement Is Satisfied**

23        "The numerosity requirement is not tied to any fixed numerical threshold, but courts

24  generally find the numerosity requirement satisfied when a class includes at least forty members."

25  *Hawkins v. S2Verify*, 2016 WL 3999458, *3 (N.D. Cal. July 26, 2016) (J. Alsup).  "[P]laintiffs are

26  not required to quantify with precision the number of class members."  *Id.*  Moreover, "[i]n

27  analyzing numerosity, a court may make common-sense assumptions and reasonable inferences."

28  *West*, 323 F.R.D. at 303 (internal quotation omitted); *Californians for Disability Rights, Inc. v. Cal.*

*Dep't of Transp.*, 249 F.R.D. 334, 347 (N.D. Cal. 2008) ("[w]here the exact size of the class is unknown but general knowledge and common sense indicate that it is large, the numerosity requirement is satisfied").

Using the methodology described in Section II(C) above, a sample set of 20,000 telephone numbers showed that approximately 176 people fall within the putative wrong number class, at least.  Weir Decl., ¶ 25.  If the wrong number rate is representative of the call log database as a whole, then Citibank made wrong number calls to approximately 10,560 people.  *Id*.  As other courts have concluded when presented with a similar analysis based on sample data, "even if only a fraction of the [identified people] are in fact class members, the numerosity requirement here is readily satisfied."  *Lavign*e, 2018 WL 2694457 at *4; *accord West*, 323 F.R.D. at 304-305.

### 2.    The Commonality Requirement Is Satisfied

To satisfy Rule 23(a)(2)'s commonality requirement, "the party seeking class certification must show that their claims depend on a common contention 'capable of classwide <u>resolution</u>— which means that determination of its <u>truth or falsity</u> will resolve an issue that is central to the validity of each one of the claims in one stroke.'"  *Stockwell v. City & Cty. of San Francisco*, 749 F.3d 1107, 1112 (9th Cir. 2014) (quoting *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011)) (emphasis in original).  "'All questions of fact and law need not be common to satisfy the rule.  The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class.'"  *Etter*, 323 F.R.D. at 312 (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998)).  As this Court has held, "Rule 23(a)(2) . . . only requires the presence of at least one significant question common to each class . . . ."  *Saechao v. Landry's Inc.*, 2016 WL 1029479, at *2 (N.D. Cal. Mar. 15, 2016) (J. Alsup) (citing *Abdullah*¸ 731 F.3d at 956).

Here, the first "central question is whether [Citibank] violated the TCPA by calling putative class members."  *Ritchie v. Van Ru Credit Corp.*, 2014 WL 956131, at *3 (D. Ariz. Mar. 12, 2014).  In addition, "whether [Citibank] used an ATDS. . . to call cellular telephones in violation of the TCPA involves a common question of law that satisfies Rule 23(a)'s commonality requirement."  *Gutierrez-Rodriguez v. R.M. Galicia, Inc.*, 2017 WL 4621188, *4 (S.D. Cal. Oct. 16, 2017); *see also*

1    *O'Shea v. Am. Solar Solutions, Inc.*, 318 F.R.D. 633, 637 (S.D. Cal. 2017) (issue of whether

2    defendant used an autodialer was "central to the validity of each [class members'] claims" and

3    therefore satisfied commonality requirement).  Numerous courts have held the commonality

4    requirement is satisfied in TCPA "wrong number" cases, and there is no reason to reach a different

5    outcome here.  *See, e.g., West¸* 323 F.R.D. at 301-02; *Lavigne*, 2018 WL 2694457 at *3-4;

6    *Abdeljalil v. Gen. Elec. Capital Corp*, 306 F.R.D. 303, 309 (S.D. Cal. 2015); *Johnson v. Navient*

7    *Solutions, Inc*., 315 F.R.D. 501, 502-03 (S.D. Ind. 2016).

### 3.      The Typicality Requirement Is Satisfied

9           Typicality is satisfied if "the claims or defenses of the representative parties are typical of

10   the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3). "The test of typicality is whether other

11   members have the same or similar injury, whether the action is based on conduct which is not

12   unique to the named plaintiff[ ], and whether other class members have been injured by the same

13   course of conduct."  *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010)

14   (quotations omitted).  This Court held that "'[u]nder the rule's permissive standards, representative

15   claims are 'typical' if they are reasonably co-extensive with those of absent class members; they

16   need not be substantially identical.'"  *Etter*, 323 F.R.D. at 312 (quoting *Hanlon*, 150 F.3d at 1019).

17          Here, Citibank previously argued that Mr. Revitch's claims are "atypical of putative class

18   members" because Citibank was trying to call someone else.  Ex. 1, July 16, 2018 Letter, p.2.  If

19   anything, that fact supports typicality in a wrong number putative class like this one.  *See*, *e.g.¸*

20   *Johnson*, 315 F.R.D. at 503 ("Mr. Johnson claims that he received calls after Navient was told that

21   the party with whom they wished to communicate was no longer available at the number called.

22   This is typical of the described class members.").  Like other putative class members, Citibank

23   called Mr. Revitch with its Aspect autodialer without Mr. Revitch's consent.  Accordingly,

24   Mr. Revitch's claims satisfy the typicality requirement of Rule 23(a).

### 4.      The Adequacy Requirement Is Satisfied

26          The Ninth Circuit has a two-prong test for Rule 23(a)(4)'s adequacy requirement: "(1) do the

27   named plaintiffs and their counsel have any conflicts of interest with other class members and (2)

28   will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"

*Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003); *accord Etter*, 323 F.R.D. at 312. As to the second prong, this Court has held that "F.R.C.P. 23(a)(4) imposes only a modest burden," requiring only that the plaintiffs be "familiar with the basis for the suit and their responsibilities as lead plaintiffs." *In re Lendingclub Sec. Litig..*, 282 F. Supp. 3d 1171, 1182 (N.D. Cal. 2017) (J. Alsup). Earlier this month, this Court held that "a named plaintiff need not have a detailed understanding of the legal or factual basis of a class action suit so long as she has some minimal familiarity with the litigation." *Blair v. Rent-A-Center, Inc.*, 2018 WL 5728924, at *3 (N.D. Cal. Nov. 1, 2018) (internal quotation omitted).

Rule 23(a)(4)'s requirements are satisfied here. Mr. Revitch understands that this is a class action and the basis for the suit; and also understands that he is seeking to represent people "who have experienced similar calls." Ex. 9, Revitch Dep., 135:2-4; *see also id.* at 30:9-32:6; 99:13-20; 110:20-111:16; 138:2-4; 143:9-23; 160:3-18; 168:5-169:7. Prior to filing this lawsuit, he did independent research to obtain a general, layperson's understanding of the TCPA. *Id.* at 38:6-22; 79:20-80:10; 106:15-107:2; 114:9-22; 118:1-15; 139:19-24; 141:1-6. He understands his responsibilities as a class representative, including his responsibility to "represent[] the interests of the class." *Id.* at 32:11-22; *see also id.* at 124:24-125:8; 127:18-128:6; 131:18-132:21; 158:25-159:3. His work schedule is flexible enough to allow him to be present for anything that may be required of him in connection with prosecuting the class action. *See id.* at 131:14-17; 134:16-135:1. He is in regular contact with his attorneys and has kept abreast of the status of the case. For example, he reviewed the complaint before it was filed, and when asked at his deposition what the current status of the case was, he correctly testified, "I believe we're trying to achieve class certification," and knew that other people in the case had recently been deposed. *Id.* at 57:5-11; 125:20-126:11. He has no personal relationship with the attorneys at Bursor & Fisher, and contacted them after researching prior class actions against Citibank. *Id.* at 128:24-131:3. He has no financial interests that conflict with the class. *Id.* at 136:17-137:19.[8]

---

[8] Citibank may attempt to attack Mr. Revitch's adequacy by noting that twenty-five years ago, when he was a minor, he was arrested and later a defendant in a related civil case. Unrelated incidents occurring a quarter-century ago are legally insufficient to establish inadequacy. *See Nevarez*, 326

1    Mr. Revitch's lawyers are also qualified to serve as class counsel.  Rule 23(g) requires that a

2    district court appoint class counsel for any class that is certified.  *See* Fed. R. Civ. P. 23(g)(1)(A).  In

3    appointing class counsel, Rule 23(g) lists four factors for consideration: (1) the work counsel has

4    done in identifying or investigating potential claims in the action; (2) counsel's experience in

5    handling class actions or other complex litigation and the type of claims in the litigation; (3)

6    counsel's knowledge of the applicable law; and (4) the resources that counsel will commit to

7    representing the class.  Fed. R. Civ. P. 23(g); *see also Clemens v. Hair Club for Men, LLC*, 2016

8    WL 1461944, *3 (N.D. Cal. Apr. 14, 2016) (J. Alsup) (analyzing adequacy of counsel based on

9    factors set forth in Rule 23(g)).  Plaintiff's counsel are lawyers who have experience litigating class

10   action claims, including TCPA class actions like this one.  *See* Ex. 5 (Bursor & Fisher, P.A. Firm

11   Resume); *see also*, *e.g.*, *McMillion*, 2017 WL 3895764, at *7 ("Bursor & Fisher, P.A., have

12   experience litigating class action claims in both federal and state courts, and appear to have been

13   prosecuting this action vigorously"); *West*, 323 F.R.D. at 306 (certifying class in TCPA case and

14   holding that Bursor & Fisher, P.A. satisfied adequacy requirement under Rule 23(a)(4)); *Lucero v.*

15   *SolarCity Corp.*, 2018 WL 573593, at *1 (N.D. Cal. Jan. 26, 2018) (referencing final approval of

16   settlement in TCPA action litigated by Bursor & Fisher).  Counsel has prosecuted this action

17   vigorously, and, as other courts have found, have the resources necessary to pursue class actions.

18       **B.      The Proposed Class Satisfies Rule 23(b)(3)**

19            **1.      Common Questions Of Fact Or Law Predominate**

20   Class certification under Rule 23(b)(3) requires a showing that "questions of law or fact

21   common to class members predominate over any questions affecting only individual members . . . ."

22   Rule 23(b)(3) assumes "'some variation' among individual plaintiffs' claims," but "tests whether

23   the proposed class is sufficiently cohesive to warrant adjudication by representation."  *Abdullah*,

24   ───────────────────────────────────────

25   F.R.D. at 583 (surveying relevant authorities and holding that a prior criminal incident having no
     relationship to the case does not impact adequacy, and would likely be inadmissible in any event);
     *White v. E-Loan, Inc.*, 2006 WL 2411420, at *3 (N.D. Cal. Aug. 18, 2006) ("The last of White's

26   convictions occurred almost 30 years ago. It is a stretch to say that they remain strongly probative of
     a lack of personal integrity").  Mr. Revitch is married with two children, the CFO of his own

27   business, and an exemplary representative for the putative class. Ex. 9, Revitch Dep., 9:6-17; 33:7-

28   10; 54:15-24.

731 F.3d at 963-64; *see also Sali v. Corona Regional Medical Center*, 889 F.3d 623, 636 (9th Cir. 2018) ("The main concern of the predominance inquiry under Rule 23(b)(3) is the balance between individual and common issues.").  The predominance inquiry "'begins, of course, with the elements of the underlying cause of action.'"  *Abdullah*, 731 F.3d at 964 (quoting *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011)).  It is not necessary at class certification for the plaintiff to <u>prove</u> the elements of each claim.  As this Court has explained, "[a]t this stage, plaintiffs need only show that there are bona fide questions capable of class-wide resolution."  *Clemens*, 2016 WL 1461944, at \*3.

Here, the predominance requirement is satisfied because there are only two elements to the TCPA claim, and both are subject to common proof.  A "plaintiff must establish that (1) Defendant called her [and other class members'] cellphone (2) using an ATDS."  *Herrera v. First National Bank of Omaha, N.A.*, 2017 WL 6001718, \*3 (C.D. Cal. Dec. 4, 2017).  Citibank's records and the opinions of Mr. Revitch's expert witnesses furnish classwide proof of who Citibank called and whether the call was made to a cell phone.  *See* Section II(C) above.  Likewise, Citibank's admissions and the expert opinions of Plaintiff's expert Randall Snyder furnish classwide proof that Citibank used an ATDS.  *See* Section II(B) above; *see also Lee v. Stonebridge Life Ins. Co.*, 289 F.R.D. 292, 295 (N.D. Cal. 2013) (rejecting argument that a dispute over whether defendant used an ATDS defeated class certification); *Zeidel v. A&M (2015), LLC*, 2017 WL 1178150, at \*5 (N.D. Ill. Mar. 30, 2017) (defendant's "alleged use of an ATDS" subject to common proof).  As set forth in Sections III(B)(2) and (3) below, the questions of whether people somehow "consented" to receive wrong number calls, or whether they agreed to arbitrate their claims, do not defeat the predominance requirement.

### 2. Citibank's Affirmative Defense Of Consent Does Not Defeat The Predominance Requirement

Citibank will argue that the question of whether any putative class members consented to receive "wrong number" calls raises individualized issues.  As a preliminary matter, Plaintiff has moved to strike Citibank's affirmative defense of consent and exclude all evidence offered to support that defense pursuant to Rules 37(b)(2)(A) and 37(c)(1).  *See* Dkt. No. 79.  Even if the

1    Court denies that motion, however, the outcome will be the same for purposes of class certification

2    because the issue of consent does not raise individualized issues.  As set forth in greater detail

3    below, several courts have granted certification in wrong number cases like this one.  Citibank's

4    contention that its own customers somehow consented to receive wrong number calls is incorrect,

5    and in any event does not support denial of class certification.

6              a.    *West*, *Lavigne* **And Other Wrong Number Class
                     Certification Decisions Support Certification Of A
7                    "Wrong Number" Class**

8              In *West*, Judge Gonzales Rogers of this District rejected the argument that individualized

9    issues of consent defeated certification when she certified a "wrong number" class in a TCPA

10   action.  In that case, the defendant unsuccessfully argued that call recipients sometimes lie when

11   they tell call operators they reached a wrong number in order to evade debt collection calls.  *See*

12   *West*, 323 F.R.D. at 301.  The *West* court first explained that "several district courts have deemed

13   commonality and predominance satisfied in TCPA cases despite the possibility that a <u>substantial</u>

14   <u>proportion</u> of the phone numbers marked as "wrong number" in defendant's call log databases

15   "'may not have actually been a wrong number.'"  *West*, 323 F.R.D. at 301 (quoting *Johnson*, 315

16   F.R.D. at 503) (emphasis added).  The *West* court then explained that even if consent were an issue,

17   the use of a reverse number lookup service could resolve consent issues on a classwide basis.  *See*

18   *West*, 323 F.R.D. at 302.  Mr. Revitch has deployed a similar method here to identify class members

19   and resolve the consent issue with common proof.

20             The court in *Lavigne* likewise certified a wrong number class over the defendant's

21   arguments that there were individualized issues of consent.  2018 WL 2694457, at *7-8.  The court

22   first held that to the extent any class members happened to be bank customers (and therefore

23   potentially consented to receive calls), those people could be weeded out by reviewing defendant's

24   records, or by requiring class members to aver they were not defendant's customers.  *Id.* at *7.  As a

25   result, the fact that the plaintiff's methodology for identifying class members "may inadvertently

26   include some customers that consented is not fatal to the predominance inquiry, especially since

27   they can be weeded out."  *Id.* at *7.  The court also rejected the argument that defendant's records

28   might sometimes inaccurately flag a call as a "wrong number."  *Id.* at *8.  Citing *West* and other

1    decisions, the court explained that "a number of courts have rejected this theory in 'Wrong Number'

2    cases, under similar factual circumstances, at the class certification stage." *Id.*

3          Finally, in both *Abdeljalil* and *Johnson*, the district courts certified wrong number classes

4    were the plaintiffs' methodologies for identifying class members and resolving consent were far less

5    robust than the methodology employed here.  In both cases, the plaintiffs relied only on defendant's

6    records of "wrong number" or "incorrect number" notations.  *See Abdeljalil*, 306 F.R.D. at 311;

7    *Johnson*, 315 F.R.D. at 502-03.  The district courts nonetheless found that this methodology was

8    sufficient to support the predominance and manageability requirements.  *Abdeljalil*, 306 F.R.D. at

9    307, 310-11; *Johnson*, 315 F.R.D. at 502-03.  Here, the fact that Plaintiff took additional steps to

10   confirm the accuracy of the wrong number indicators makes this a much stronger case for

11   certification than *Abdeljalil* and *Johnson.*

12         The rule that certification is proper <u>even if</u> the class includes some people who may have

13   consented to calls is consistent with Ninth Circuit authority.  The Ninth Circuit holds that "express

14   consent is not an element of a plaintiff's prima facie case but is an affirmative defense …." *Van*

15   *Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1044 n.3 (9th Cir. 2017).  "'[C]ourts

16   traditionally have been reluctant to deny class action status under Rule 23(b)(3) simply because

17   affirmative defenses may be available against individual members … After all, Rule

18   23(b)(3) requires merely that common issues predominate, not that all issues be common to the

19   class.'"  *Rodman v. Safeway, Inc.*, 2015 WL 2265972, at *3 (N.D. Cal. May 14, 2015) (quoting

20   *Smilow v. Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32, 39 (1st Cir. 2003) (internal citations omitted).

21   "Instead, where common issues otherwise predominated, courts have usually certified Rule

22   23(b)(3) classes even though individual issues were present in one or more affirmative defenses."

23   *Smilow*, 323 F.3d at 39 (*citing Cameron v. E.M. Adams & Co.*, 547 F.2d 473, 478 (9th Cir. 1976)).

24         The Ninth Circuit's decision in *Cameron*, 547 F.2d at 478, governs here and supports the

25   principle that "[u]nique affirmative defenses that require some individualized inquiry do not present

26   a per se bar to certification."  *Kelly v. City & Cnty. of San Francisco*, 2005 WL 3113065 (N.D. Cal.

27   Nov. 21, 2005).  In *Cameron*, the lower court decertified a class after concluding that class

28   members' compliance with the statute of limitations, an affirmative defense in that case, raised

1   individualized issues.  The Ninth Circuit reversed because there was a "sufficient nucleus of

2   common questions," and even if there were individual issues of compliance, "they are not sufficient,

3   on balance, to negate the predominance of the common issues."  *Id.*; *see also*, *e.g.*, *In re Cathode*

4   *Ray Tube (CRT) Antitrust Litig.*, 2013 WL 5429718, at *8-*9 (N.D. Cal. June 20, 2013) ("[A] class

5   will often include persons who have not been injured by the defendant's conduct but [this] . . . does

6   not preclude class certification.").  The rule articulated in *Cameron* and other decisions applies here

7   because as shown in Section III(B)(1), every element of Mr. Revitch's TCPA claim is subject to

8   common proof, thus creating a "sufficient nucleus of common questions."

9         Citibank will rely on the contrary decision in *Tomeo*, where, in contrast to *West*, *Lavigne*,

10   *Abdeljalil*, and *Johnson*, an Illinois district court denied certification of a wrong number class after

11   the defendant Citigroup argued that some wrong number flags might be inaccurate.  But Citibank

12   cannot legitimately challenge the accuracy of its records here after its 30(b)(6) witness admitted,

13   ████████████████████████████████████████████████████████████████████████ Ex.

14   22, Mullahey Dep., 42:13-17.  Putting that aside, *Tomeo* is distinguishable because the plaintiff

15   relied solely on Citigroup's records of wrong number flags, without taking additional steps to check

16   their accuracy.  *See Tomeo*, 2018 WL 4627386, at *2 (describing plaintiff's expert's methodology);

17   Ex. 6, Excerpts of Opening Class Cert. Brf. in *Tomeo*, at 16-17.  The plaintiff was unprepared for

18   Citigroup's argument that some wrong number flags might be inaccurate, and after Citigroup made

19   that argument, every proposal plaintiff offered for resolving that issue required an individualized

20   inquiry through Citigroup's account notes.  *See Tomeo*, 2018 WL 4627386, at *9-10.  Here, in

21   contrast, Plaintiff has a specific system to weed-out customers with potentially conflicting "bad

22   number" information in Citibank's records, and cross-references Citibank's records with a reverse-

23   lookup service.  *See id.*  That fact makes this case is more like *West* and *Lavigne*, where the district

24   courts granted certification in wrong number cases.

### b.   The Question Of Whether Citibank Customers Consented To Receive Wrong Number Calls Does Not Defeat Certification

27         Citibank will argue there are individual issues surrounding whether its own customers

28   received wrong number calls, and whether they somehow consented to receive wrong number calls.

For example, if Citibank attempted to reach John Doe about his Citibank account, but made wrong number calls to Jane Smith, who happened to have a Citibank credit card, then Citibank's position is that Ms. Smith consented to receive the wrong number calls. That position lacks legal support, and does not support denial of certification for three reasons.

First, nobody consents to receive wrong number calls. In *Van Patten*, 847 F.3d at 1045, the Ninth Circuit rejected the proposition that "providing a phone number in itself means that the consumer has expressly consented to contact for any purpose whatsoever." Instead, "the scope of a consumer's consent depends on the transactional context in which it is given. The call or text message must be based on the circumstance in which the consumer gave his or her number." *Id.* at 1040. For example, if someone gives their phone number to an internet or cable television company for "service calls," that does not mean they also consented to receive telemarketing or other calls unrelated to service calls. *See id.* at 1046.

The Ninth Circuit has twice addressed this principle in the context of debt collection calls. In *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1042 (9th Cir. 2012), the Ninth Circuit cited a 2008 FCC Order when it held that "prior express consent is consent to call a particular telephone number in connection with a particular debt that is given before the call in question is placed." (Emphasis added) (citing *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 23 F.C.C. Rcd. 559, 565 (2008) (hereinafter, "2008 Order"). The Ninth Circuit later reiterated that principle in *Van Patten* when, citing the same 2008 Order, it emphasized that "'the provision of a cell phone number . . . as part of a credit application, reasonably evidences prior consent by the cell phone subscriber to be contacted at that number regarding the debt.'" *Van Patten*, 847 F.3d at 1045 (quoting 2008 Order, at 564) (emphasis in original). Hence, when Citibank customers consent to receive calls about their own accounts, that does not mean they consent to receive wrong number calls about someone else's account. Adopting Citibank's position here would be contrary to Ninth Circuit law, and reduce incentive for Citibank to avoid making wrong number calls.

Second, even if it were possible for Citibank customers to consent to receive wrong number calls, that is a legal issue that can be resolved in one stroke for all Citibank customers. The issue of

1    consent does not defeat predominance when customers are presented with uniform forms or

2    paperwork for obtaining consent, because in that instance, the validity or scope of the consent can

3    be addressed on a classwide basis.  In *True Health Chiropractic, Inc. v. McKesson Corp.*, 896 F.3d

4    923, 932 (9th Cir. 2018) ("*True Health*"), for example, the Ninth Circuit held that to the extent

5    certain class members purportedly consented by entering into software-licensing agreements, the

6    predominance requirement was satisfied because "[c]onsent, or lack thereof, is ascertainable by

7    simply examining the product registrations and the EULAs."  *See also*, *e.g.*, *Johansen v. One Planet*

8    *Ops, Inc*., 2018 WL 1558263, *5 (S.D. Ohio Mar. 5, 2018) ("When a TCPA defendant

9    obtains consent in a 'uniform manner' such as an online form, consent can be resolved on a class-

10   wide basis.") (internal quotation omitted); *Manno v. Healthcare Revenue Recovery Grp., LLC*, 289

11   F.R.D. 674, 695 (S.D. Fla. 2013) (no individualized issues of consent where class members "filled

12   out the same paperwork" requesting consent).

13            That rule governs here.  Citibank produced a 30(b)(6) witness designated to testify on its

14   behalf about, among other topics, all facts and documents supporting Citibank's consent defense.

15   Ex. 20, Meeks Depo., 10:9-12; Ex. 8, 30(b)(6) Depo. Notice.  When first asked for the factual basis

16   for the defense, the witness had difficulty answering (Ex. 20, Meeks Depo., 26:8-28:10), but after

17   taking a short break with Citibank's attorney, he returned to the conference room and testified that

18   the factual basis for the defense is that when ████████████████████████████████████

19   ███████████████████ *Id.* at 31:15-16; *see also id.* at 30:18-31:24.  He could identify only two

20   specific categories of documents that support that defense: ███████████████████████████

21   ███████████████████████████████████████████████████████████

22   ███████████████████████████████████ *Id.* at 35:23-37:22; 38:21-39:1("███████████

23   ███████████████████████████████████████████████████████████████

24   ███████████████████████████████████████████████████████████████

25   ███████████████████ ; *see also* Exs. 18-19, Deposition Exhibits 2-3.  The consent language on the

26   forms and website is the same or substantially the same:

27

28   ███████████████████████████████████████████████████████

1

██████████████████████████

2

Ex. 18, Deposition Exhibit 2, at CITI_REVITCH003124; *see also e.g.*, Ex. 19, Deposition Exhibit

3

3, CITI_REVITCH003095; Ex. 20, Meeks Depo., 36:5-11.  Since this consent language is the same

4

or substantially the same for all Citibank customers who may have received wrong number calls, the

5

Court can decide whether this language applies to wrong number calls.

6

   <u>Third</u>, even if there are individualized issues over consent from Citibank customers, the

7

proper solution is to exclude them from the class rather than deny certification outright.  "If, at any

8

stage in the class litigation, it becomes clear that an affirmative defense is likely to bar claims

9

against at least some class members, then a court has available adequate procedural mechanisms,

10

such as placing class members with potentially barred claims in a separate subclass."  *Rodman*,

11

2015 WL 2265972, at *3 (internal quotations omitted).  That is what the Ninth Circuit did in *True*

12

*Health*, 896 F.3d at 932, a TCPA decision, when it reversed in part the lower court's denial of class

13

certification based on the defendant's consent arguments.  The Ninth Circuit held that denial was

14

improper with respect to certain class members, proper with respect to another subset, and

15

remanded for further consideration with respect to a third subset.  *Id.* at 933.  *True Health* therefore

16

teaches that even if there are individualized issues with respect to <u>some</u> putative class members, that

17

does not necessarily support denial of certification with respect to <u>all</u> putative class members.

18

   Moreover, *Lavigne* (a TCPA case) shows that if this Court decides that it is necessary to

19

exclude Citibank customers from the class, there are mechanisms for weeding them out from the

20

class, such as reviewing Citibank's records or requiring class members to aver they are not Citibank

21

customers.  *Lavigne*, 2018 WL 2694457, at *7-8.  That is not a novel solution.  In *Briseno*, the Ninth

22

Circuit explained that defendants can "challenge the claims of absent class members if and when

23

they file claims for damages," and that parties have "long relied on claim administrators, various

24

auditing processes, sampling for fraud detection, follow-up notices to explain the claims process,

25

and other techniques tailored by the parties and the court' to validate claims."  *Briseno*, 844 F.3d at

26

1131.  Although the *Briseno* court was addressing manageability concerns, *Lavigne* shows that the

27

reasoning applies equally here.  *See also Abdeljalil*, 306 F.R.D. at 311 (noting that individualized

28

issues concerning a safe harbor defense in a TCPA action was "not an obstacle to certification because, if it is determined to be applicable to a class member, that person can easily be excluded").

### 3.     The Question Of Whether Citibank Customers Agreed To Arbitrate Their Claims Does Not Defeat Certification

Citibank might argue that to the extent its own customers received wrong number calls, the fact that they agreed to arbitrate their claims defeats the predominance or superiority requirements. That position is similar to Citibank's consent arguments, and fails for similar reasons.

First, an arbitration agreement cannot defeat predominance unless it applies to the dispute. *Berger v. Property I.D. Corp.*, 2008 WL 11334980, at *6 (C.D. Cal. Apr. 28, 2008) (arbitration agreement did not defeat predominance requirement because it "applies only to disputes over the brokerage fee, which have no relevance here."). Here, Citibank's arbitration agreement is limited to claims or controversies "arising out of or related to your Account, a previous related Account or our relationship." Ex. 7 at CITI_REVITCH002395. Here, however, any wrong number call sent to someone who happened to be a Citibank customer is, by definition, related to someone else's account and relationship with Citibank. Many courts have rejected overbroad interpretations of arbitration agreements to TCPA claims having nothing to do with the contractual relationship that gave rise to the arbitration agreement in the first place. In *In re Jiffy Lube Int'l, Inc., Text Spam Litig.*, 847 F. Supp. 2d 1253, 1263 (S.D. Cal. 2012), for example, the defendant argued that when the plaintiff signed a contract for an engine oil change, he agreed to arbitrate "any and all disputes" with Jiffy Lube. The district court rejected that argument, explaining the text messages at issue had nothing to do with an oil change. *See also Revitch v. DirecTV, LLC*, 2018 WL 4030550, at *13-16 (N.D. Cal. Aug. 23, 2018) *appeal filed* Sept. 24, 2018 (surveying authorities and holding that arbitration agreements must be "construed to avoid absurd results").

Second, even if the Court was willing to entertain such an expansive interpretation of Citibank's arbitration agreement, this issue can be resolved on a classwide basis. *See Ehret v. Uber Techs., Inc.*, 148 F. Supp. 3d 884, 902 (N.D. Cal. 2015) ("whether an absent class member is bound by the arbitration clause is a question that can be dealt with on a class-wide basis, as it does not appear that there will need to be an individualized inquiry as to whether the arbitration clause is

generally enforceable").  Here, Defendant produced a single arbitration agreement (Ex. 7) and cannot show how the interpretation of the plain language of this agreement would raise individual questions of fact.  Equally important, there are no individual questions of law because the arbitration agreement is governed by "Federal law and the law of South Dakota."  *Id*. at 9.

Third, even if arbitration applies or there are individualized issues arising from the arbitration agreement, the issue can be resolved by excluding Citibank customers from the class. *See Magallon v. Robert Half Int'l., Inc.*, 311 F.R.D. 625, 640 (D. Or. 2015) (granting class certification but excluding individuals who had signed an arbitration agreement).

### 4.  A Class Action Is Superior To Numerous Individual TCPA Actions

The TCPA does not provide for statutory fee-shifting, so any potential individual judgment would likely be dwarfed by the attorneys' fees and costs incurred to obtain that judgment.  As a result, without certification, class members will lose their rights by attrition, and Citibank will have little incentive to improve its procedures to avoid wrong-number nuisance calls.  *See Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 617 (1997) ("The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights."); *Abante Rooter & Plumbing, Inc. v. Alarm.com Inc.*, 2017 WL 1806583, at \*10 (N.D. Cal. May 5, 2017) ("the Court notes the statutory damages provided by the TCPA are "not sufficient to compensate the average consumer for the time and effort that would be involved in bringing a small claims action against a national corporation."). Citibank also cannot legitimately argue that purported difficulties in identifying class members defeats the superiority or manageability requirements.  From a factual perspective, the argument fails in light of the methodology described in Section II(C) above.  From a legal perspective, "such manageability concerns are alone insufficient to defeat superiority of the proposed classes here." *West*, 323 F.R.D. at 306 (holding superiority requirement satisfied when certifying wrong number class).

### IV.  THE PROPOSED CLASS SATISFIES RULE 23(b)(2)

Rule 23(b)(2) permits certification where the prerequisites of Rule 23(a) are satisfied and

"the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Predominance and superiority are not required.  *See In re Yahoo Mail Litig.*, 308 F.R.D. 577, 597 (N.D. Cal. 2015).

Here, Defendant's use of an autodialer to call class members is a uniform practice that "appl[ies] generally to the class."  *See Meyer*, 707 F.3d at 1043-45 (affirming provisional certification of a 23(b)(2) class in TCPA action against a debt collector).  Mr. Revitch therefore seeks an injunction precluding Citibank from calling class members using its Aspect dialer or any other ATDS.  The plaintiffs in *McMillion* and *West* successfully certified a 23(b)(2) class seeking the same relief Mr. Revitch seeks here.  In both cases, the courts explained that "certifying the classes here as both damages-seeking classes under Rule 23(b)(3) and injunctive relief only classes under Rule 23(b)(2) is appropriate and promotes judicial efficiency.  In the event that plaintiffs are able to demonstrate liability under the TCPA, but ultimately fail to establish classwide damages, the Court may still enter an injunction against defendant."  *McMillion*, 2017 WL 3895764, at *10; *accord West*, 323 F.R.D. at 307.  The same outcome should occur here.

## V.        CONCLUSION

Mr. Revitch respectfully asks the Court to enter an order (i) certifying the proposed class; (ii) appointing Mr. Revitch as Class Representative; and (iii) appointing Bursor & Fisher, P.A. as Class Counsel.

Dated: November 28, 2018

**BURSOR & FISHER, P.A.**

By:   */s/      Joel D. Smith*
                Joel D. Smith

L. Timothy Fisher (State Bar No. 191626)
Joel D. Smith (State Bar No.244902)
Thomas A. Reyda (State Bar No. 312632)
1990 North California Blvd., Suite 940
Walnut Creek, CA  94596
Telephone: (925) 300-4455
Email:  ltfisher@bursor.com
            jsmith@bursor.com
            treyda@bursor.com

*Attorneys for Plaintiff*