**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Joel D. Smith (State Bar No. 244902)
Yeremey O. Krivoshey (State Bar No. 295032)
Thomas A. Reyda (State Bar No. 312632)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail:  ltfisher@bursor.com
        jsmith@bursor.com
        ykrivoshey@bursor.com
        treyda@bursor.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEREMIAH REVITCH, on Behalf of Himself and all Others Similarly Situated,<br><br>                        Plaintiff,<br>     v.<br><br>CITIBANK, N.A.,<br><br>                        Defendant. | Case No.  3:17-cv-06907-WHA<br><br>**PLAINTIFF'S OPPOSITION TO MOTION TO EXCLUDE TESTIMONY OF RANDAL SNYDER AND COLIN WEIR**<br><br>Date:   February 14, 2019<br>Time:   8 a.m.<br>Court:  Courtroom 12, 19th Floor |

# TABLE OF CONTENTS

**PAGE(S)**

I.    INTRODUCTION ................................................................................................ 1

II.    ARGUMENTS ................................................................................................... 2

    A.    Citibank's Motion Violates Local Rules 7-3(a) ........................................ 2

    B.    Citibank's Arguments Concerning The Methodology Lack Merit ............................ 3

        1.    Snyder and Weir Are Qualified to Opine About TransUnion's TLOxp Data ................................................................................ 4

            a.    Randal Snyder Is Qualified to Opine About TransUnion's TLOxp ...................................................... 4

            b.    Colin B. Weir Is Qualified to Opine About TransUnion's TLOxp ...................................................... 7

        2.    Plaintiff's Methodology For Identifying Class Members Is Reliable .............................................................................. 10

            a.    TLOxp Data Provides a Sufficiently Reliable Basis for Class Certification ............................................... 10

            b.    Mr. Weir's Implementation of the Methodology is Reliable .............................................................. 12

            c.    The Methodology Can Be Adapted to Address Citibank's Concerns Regarding Name Matching ........................... 16

            d.    Mr. Revitch and the Methodology .................................... 17

    C.    Citibank's Arguments For Excluding Snyder's Opinions About Its Dialing System Are Irrelevant And Lack Merit ...................................... 18

        1.    Citibank's Arguments Are Irrelevant Under *Tait* Because They Have Nothing To Do With Class Certification ................................. 18

        2.    Citibank's Arguments For Excluding Mr. Snyder's Opinions About Its Dialing System Lack Legal And Factual Support ........................ 19

III.    CONCLUSION ................................................................................................ 23

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Abante Rooter & Plumbing, Inc. v. Alarm.com Inc.*,
  2018 WL 3707283 (N.D. Cal. Aug. 3, 2018) ........................................................ 20, 21

*Abante Rooter & Plumbing, Inc. v. Alarm.com, Inc.*,
  2017 WL 1806583 (N.D. Cal. May 5, 2017) .......................................................... 12

*Apple iPod iTunes Antitrust Litig.*,
  2014 WL 4809288 (N.D. Cal. Sept. 26, 2014) ....................................................... 10

*Bee, Denning, Inc. v. Capital All. Grp.*,
  310 F.R.D. 614 (S.D. Cal. 2015) ............................................................................ 11

*Birchmeier v. Caribbean Cruise Line, Inc.*,
  302 F.R.D. 240 (N.D. Ill. Aug. 11, 2014) .............................................................. 18

*Booth v. Appstack, Inc.*,
  2015 WL 1466247 (W.D. Wash. Mar. 30, 2015) ................................................... 11

*Cabrales v. County of Los Angeles*,
  864 F.2d 1454 (9th Cir.1988) ................................................................................. 7

*Clemens v. Hair Club for Men, LLC*,
  2016 WL 1461944 (N.D. Cal. Apr. 14, 2016) ........................................................ 1, 2

*Corcoran v. CVS Health*,
  2017 WL 1065135 (N.D. Cal. Mar. 21, 2017) ....................................................... 5

*Daubert v. Merrell Dow Pharmas., Inc.*,
  509 U.S. 579 (1993) ............................................................................................... 4, 10

*Hangarter v. Provident Life & Acc. Ins. Co.*,
  373 F.3d 998 (9th Cir. 2004) .................................................................................. 4

*Ikuseghan v. MultiCare Health Sys.*,
  2015 WL 4600818 (W.D. Wash. July 29, 2015) .................................................... 11

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
  264 F.R.D. 603 (N.D. Cal. 2009) ........................................................................... 18

*Johnson v. Navient Solutions, Inc.*,
  315 F.R.D. 501 (S.D. Ind. 2016) ............................................................................ 17

*Kamakahi v. Am. Society for Reproductive*,
  Med., 2014 WL 7183629 (N.D. Cal. Dec. 15, 2014) ............................................. 2

*Kennedy v. Collagen Corp.*,
  161 F.3d 1226 (9th Cir. 1998) ................................................................................ 10

*Krakauer v. Dish Network, L.L.C.*,
  2015 WL 5227693 (M.D.N.C. Sep. 8, 2015) ......................................................... 12

*Kristensen v. Credit Payment Servs.*,
  12 F. Supp. 3d 1292 (D. Nev. 2014) ................................................................. 18

*Lee v. Stonebridge Life Ins. Co.*,
  289 F.R.D. 292 (N.D. Cal. 2013) ................................................................. 2, 19

*Marks v. Crunch San Diego, LLC*,
  904 F.3d 1041 (9th Cir. 2018) ...................................................................... 22

*McLean v. Air Methods Corps., Inc.*,
  2014 WL 280343 (D. Vt. Jan. 24, 2014) ........................................................ 20

*Meyer v. Bebe Stores, Inc.*,
  2015 WL 431148 (N.D. Cal. Feb. 2, 2015) ................................................... 22

*Meyer v. Bebe Stores, Inc.*,
  2017 WL 558017 (N.D. Cal. Feb. 10, 2017) .............................................. 2, 19

*Nanda v. Ford Motor Co.*,
  509 F.2d 213 (7th Cir. 1974) ...................................................................... 20

*Perez v. San Miguel Homes for the Elderly, LLC*,
  2016 WL 3709622 (N.D. Cal. Feb. 9, 2016) .................................................. 3

*PixArt Imaging, Inc. v. Avago Tech. Gen. IP (Singapore) Pte. Ltd.*,
  2011 WL 5417090 (N.D. Cal. Oct. 27, 2011) ................................................ 4

*Primiano v. Cook*,
  598 F.3d 558 (9th Cir. 2010) ...................................................................... 10

*Ramirez v. ITW Food Equip. Grp., LLC*,
  686 F. App'x 435 (9th Cir. 2017) ................................................................. 6

*Sali v. Corona Regional Med. Ctr.*,
  909 F.3d 996 (9th Cir. 2018) ........................................................................ 4

*Satterfield v. Simon & Schuster, Inc.*,
  569 F.3d 946 (9th Cir. 2009) ...................................................................... 22

*Saulsberry v. Meridian Fin. Servs., Inc.*,
  2016 WL 3456939 (C.D. Cal. Apr. 14, 2016) ............................................... 17

*Sementilli v. Trinidad Corp.*,
  155 F.3d 1130 (9th Cir. 1998) ...................................................................... 4

*Shaw v. AMN Healthcare, Inc.*,
  326 F.R.D. 247 (N.D. Cal. 2018) ............................................................... 1, 3

*Sherman v. Yahoo! Inc.*,
  2015 WL 5604400 (S.D. Cal. Sept. 23, 2015) .............................................. 11

*Soppet v. Enhanced Recovery Co., LLC*,
  679 F.3d 637 (7th Cir. 2012) ...................................................................... 11

*Stalley v. ADS Alliance Data Sys., Inc.*,
  296 F.R.D. 670 (M.D. Fla. 2013) ............................................................................... 12

*Stemple v. QC Holdings, Inc.*,
  2016 WL 4059345 (S.D. Cal. Apr. 25, 2016) .......................................................... 11

*Tait v. BSH Home Appliances Corp.*,
  289 F.R.D. 466 (C.D. Cal. 2012).............................................................. 2, 18, 19

*Thomas v. Newton Int'l Enterprises*,
  42 F.3d 1266 (9th Cir. 1994).......................................................................... 4

*United States v. Abonce-Barrera*,
  257 F.3d 959 (9th Cir.2001) ......................................................................... 8

*United States v. Diaz*,
  2006 WL 2699042 (N.D. Cal. Sept. 19, 2006)........................................................ 8

*United States v. Garcia*,
  7 F.3d 885 (9th Cir.1993) ........................................................................... 5

*United States v. Herrera*,
  2011 WL 175887 (N.D. Cal. Jan. 19, 2011)...................................................... 10, 14

*United States v. Little*,
  753 F.2d 1420 (9th Cir. 1984) ...................................................................... 6

*West v. California Servs. Bureau, Inc.*,
  323 F.R.D. 295 (N.D. Cal. 2017) .................................................................. 11

*Wilson v. Badcock Home Furniture*,
  2018 WL 6660029 (M.D. Fla. Dec. 19, 2018) ...................................................... 12

*Zyburo v. NCSPlus, Inc.*,
  44 F. Supp. 3d 500 (S.D.N.Y. 2014) .............................................................. 17

**RULES**

Federal Rule of Evidence 702 ..................................................................... *passim*

1

## I. INTRODUCTION

2      Defendant Citibank, N.A. ("Citibank" or "Defendant") moves to exclude the testimony of

3  Plaintiff's experts Randall Snyder and Colin Weir.  The Court should deny the motion.

4      First, Citibank's motion violates Local Rule 7-3(a), which requires any evidentiary

5  objections—including those under *Daubert* and Federal Rule of Evidence 702—to be contained

6  within Defendant's class certification opposition.  This Court criticized another defendant for doing

7  the same thing Citibank did here.  *Clemens v. Hair Club for Men, LLC*, 2016 WL 1461944 (N.D.

8  Cal. Apr. 14, 2016) (Alsup, J.).  Violation of 7-3(a) is a sufficient basis to deny and strike an

9  improperly-filed *Daubert* motion.  *See*, *e.g.*, *Shaw v. AMN Healthcare, Inc.*, 326 F.R.D. 247, 255

10  n.4 (N.D. Cal. 2018) (striking defendant's motion to strike expert filed in conjunction with

11  opposition to class certification).

12      Second, Citibank attacks Plaintiff's experts' methodology for identifying putative class

13  members, claiming the experts are unqualified and the methodology is unreliable.  Citibank

14  contends, based solely on the opinions of its expert Margaret Daley, that all 176 phone numbers

15  identified in the sample set of numbers "were associated with a Citibank accountholder."  Motion to

16  Exclude the Testimony of Randall Snyder and Colin Weir ("Mot.") at 3.  But here is what

17  Ms. Daley testified at her deposition yesterday, January 24, 2019:

18          Q.     Is it your opinion that the overwhelming majority of calls marked
19                 as wrong numbers appear to have been made by accountholders?

          A.     … I have no idea who actually received those calls."
20

21  Ex. 1, Daley Dep. (Rough), 112:16-22; *see also* 233:5-236:23 (testifying that she never determined

22  whether anyone associated the sample set of 176 telephone numbers received a wrong number call).

23      Plaintiff's evidence is not hypothetical.  Citibank itself identified the 176 telephone numbers

24  in question as wrong numbers.  *Compare* Snyder Report. ¶¶ 84 and 89 (Doc. No. 83-5) *with* Weir

25  Report. ¶ 25 (Doc. No, 84-3).  Citibank's 30(b)(6) witness testified that "[i]f a customer tells us – or

26  anybody tells us the number is wrong, then we consider it wrong."  Ex. 5, Mullahey Dep., 42:13-17.

27  Mr. Snyder and Mr. Wier then cross-referenced these wrong phone numbers with TransUnion's

28  TLOxp data, which is the same tool used by law enforcement agents to locate and identify people,

1   and which is specifically used by other companies "to help improve … TCPA compliance and

2   contact strategy."  Ex. 7, "TLOxp for Law Enforcement"; Ex. 8, TransUnion brochure re: TCPA

3   compliance.  Ms. Daley disagrees with Mr. Snyder's and Mr. Weir's opinions about the reliability

4   and proper use of TransUnion's information, but that does not mean Mr. Snyder's and Mr. Weir's

5   opinions are inadmissible; it just means this case involves a garden-variety disagreement of opinions

6   between competing experts.  It is the jury's job to decide which experts to believe.

7          **Third**, Citibank seeks to exclude Mr. Snyder's opinions about the capabilities of Citibank's

8   Aspect dialing system.  At class certification, the only issue under *Daubert* is whether an expert's

9   opinions are "sufficiently reliable to admit for . . . proving or disproving Rule 23 criteria."  *Tait v.*

10  *BSH Home Appliances Corp.*, 289 F.R.D. 466, 495 (C.D. Cal. 2012).  Citibank's arguments

11  concerning its dialing system have nothing to do with class certification.  Either the Aspect system

12  qualifies as an automatic telephone dialing system or it does not, and the answer to that question

13  presents a merits issue applicable to the entire putative class.  Other courts in this District have

14  correctly held that *Daubert* challenges to an expert's opinions regarding the autodialer issue are

15  irrelevant at class certification.  *See Lee v. Stonebridge Life Ins. Co.*, 289 F.R.D. 292, 295 (N.D. Cal.

16  2013) ("If Lee ultimately cannot prove an ATDS was used … then summary judgment or perhaps

17  decertification may be in order. At this juncture, however, such merits issues do not warrant denial

18  of class certification."); *accord Meyer v. Bebe Stores, Inc.*, 2017 WL 558017, at *4–5 (N.D. Cal.

19  Feb. 10, 2017).

20  **II.  ARGUMENTS**

21      **A.    Citibank's Motion Violates Local Rules 7-3(a)**

22          Civil Local Rule 7-3(a) provides, in pertinent part, "Any opposition to a motion may include

23  a proposed order, affidavits or declarations, as well as a brief or memorandum under Civil L.R. 7-4.

24  Any evidentiary and procedural objections to the motion must be contained within the brief or

25  memorandum" filed in opposition to the motion.  "Local Rule 7-3(a) governs evidentiary objections

26  based on *Daubert*" and Federal Rule of Evidence 702.  *Kamakahi v. Am. Society for Reproductive*

27  *Med.*, 2014 WL 7183629, at *2 (N.D. Cal. Dec. 15, 2014).  In *Clemens v. Hair Club for Men, LLC*,

28  2016 WL 1461944 (N.D. Cal. Apr. 14, 2016) (Alsup, J.), this Court explained that a "standalone

motion to strike" the declaration of an expert witness filed with an opposition to class certification violated Local Rule 7-3 and was an improper "attempt to circumvent the page limit for [the] opposition." A standalone *Daubert* motion that violates Local Rule 7-3(a) should be denied or stricken. *See Shaw v. AMN Healthcare, Inc.*, 326 F.R.D. 247, 255 n.4 (N.D. Cal. 2018) ("In [Defendant's] motion [to strike], Defendants contend 'Dr. Crowninshield's report is neither reliable nor relevant, fails to meet the standards for admissible expert opinion, and should be disregarded for purposes of deciding whether a class should be certified in this case.' The Court STRIKES DEFENDANTS' MOTION TO STRIKE").

Here, Citibank filed a 14-page standalone motion that is explicitly based on Federal Rule of Evidence 702 and *Daubert*. *See generally* Motion to Strike (Doc. No. 107). The motion is prejudicial because it: (a) circumvents the page limits of Citibank's opposition brief; (b) purports to reduce Mr. Revitch's time to respond to evidentiary objections from three weeks (when his class certification reply is due), down to two weeks (when this opposition is due); and (c) improperly diverted efforts from Mr. Revitch's reply brief and depositions of Citibank's experts.[1] Citibank should not benefit from violating Local Rule 7-3(a) and prejudicing Plaintiff.

## B.     Citibank's Arguments Concerning The Methodology Lack Merit

Citibank contends that Mr. Snyder's and Mr. Weir's opinions regarding the methodology for identifying class members should be excluded under Federal Rule of Evidence 702 and *Daubert* because: (1) they are purportedly not qualified to use TransUnion's TLOxp data and (2) Citibank believes the methodology used for identifying class members is unreliable. As set forth below, Citibank's objections are without merit, and at most go to the weight of the evidence, not its admissibility. The motion to exclude therefore should be denied.

In determining whether expert testimony is admissible under Rule 702, the Court must keep in mind the rule's "broad parameters of reliability, relevancy, and assistance to the trier of fact."

---

[1] Citibank also did not notice the motion in compliance with Local Rule 7-2(a), which requires that "[a]ll motions must be filed, served and noticed in writing on the motion calendar of the assigned Judge for hearing not less than 35 days after filing of the motion," nor did it ask for an order shortening time. That violation furnishes an independent basis to deny the motion. *See, e.g., Perez v. San Miguel Homes for the Elderly, LLC*, 2016 WL 3709622, at *1 (N.D. Cal. Feb. 9, 2016) (denying motion for non-compliance with Local Rule 7-2(a)).

*Sementilli v. Trinidad Corp.*, 155 F.3d 1130, 1134 (9th Cir. 1998) (citation omitted); *see also*

*Daubert v. Merrell Dow Pharmas., Inc.*, 509 U.S. 579, 588 (1993) (Rule 702 must be applied with

the liberal thrust of the Federal Rules and their "general approach of relaxing the traditional barriers

to opinion testimony") (citation omitted); Fed. R. Evid. 702, Adv. Comm. Notes (2009) ("The

rejection of expert testimony is the exception rather the rule.").  Moreover, last year, the Ninth

Circuit instructed that at class certification, "admissibility must not be dispositive.  Instead, an

inquiry into the evidence's ultimate admissibility should go to the weight that evidence is given at

the class certification stage." *Sali v. Corona Regional Med. Ctr.*, 909 F.3d 996, 1006 (9th Cir.

2018).

### 1. Snyder and Weir Are Qualified to Opine About TransUnion's TLOxp Data

Rule 702 only requires an expert must be minimally qualified.  "The threshold for

qualification is low for purposes of admissibility; minimal foundation of knowledge, skill, and

experience suffices." *PixArt Imaging, Inc. v. Avago Tech. Gen. IP (Singapore) Pte. Ltd.*, 2011 WL

5417090, at \*4 (N.D. Cal. Oct. 27, 2011); *see also Hangarter v. Provident Life & Acc. Ins. Co.*, 373

F.3d 998, 1015 (9th Cir. 2004) (Rule 702 "contemplates a *broad conception* of expert

qualification.") (emphasis in the original, citation and internal quotation marks omitted).  In *Thomas*

*v. Newton Int'l Enterprises*, 42 F.3d 1266, 1269 (9th Cir. 1994), the Ninth Circuit held that Rule 702

is broadly phrased and intended to embrace more than a narrow definition of qualified expert." As

set forth below, Mr. Snyder's and Mr. Weir's knowledge and experience is more than sufficient to

meet this standard.

### a. Randal Snyder Is Qualified to Opine About TransUnion's TLOxp

Citibank argues that Mr. Snyder is not qualified to give his opinions regarding the use of

TLOxp because he has not *personally* used the data and executed the administrative function of

cross-referencing phone numbers to identify class members and because.  Mot. at 6.[2]  This argument

---

[2] Defendant also notes, without explanation or citation to authority, that Mr. Snyder is neither "private detective nor is his company Wireless Research a licensed detective agency." Mot. at. 6:8-10; see also Mot. at 7:8-9 (same point made as to Mr. Weir).

is focused on Snyder's testimony that he is not an expert in the specific mechanics of the process that others, like Mr. Weir, execute to identify class members based their telephone numbers. *See e.g* Ex. 2, Snyder Dep., 29:21-25 ("I am not an expert in the way that my expert colleague, Colin Weir, is performing the functions through the data, but I've worked side by side with Colin and other experts that do this for a living"). But the argument misses the mark.

Mr. Snyder has successfully supervised this exact process in numerous other cases. *Id*., at 29:13-17 ("I consider myself an expert in the overall methodology that I've opined on in my declaration that these data processing companies and the information service companies that use them are reliable"). The "database administrators that provide these services have informed me that they're well over 90 percent reliable." *Id*., at 31:2-4. In this case, he took a direct role in supervising and reviewing Mr. Weir's execution of the data. *Id*., at 32:3-9 ("I have seen the results of those queries as compared to account records that were provided by the defendant, and call logs as provided by the defendant. I have reviewed the source code of the scripting language, structured query language, SQL, that was used to filter and sort these records."). And he reviewed Mr. Weir's ultimate results in this matter. *Id*., at 52:10-14. Snyder thus knows through firsthand experience that this methodology can be successfully utilized. In addition, Mr. Snyder has knowledge that courts have accepted this methodology "in dozens and dozens of TCPA class action[s.]" *Id*., at 30:15-17.

Snyder's experiences supervising the class member identification process are enough to qualify him as an expert regarding the reliability of reverse lookup venders generally, and TLOxp specifically. In *Corcoran v. CVS Health*, the court rejected the argument that an experts general experience in "developing, managing, and consulting on pharmacy programs" did not qualify him to testify "concerning pharmacy membership programs and how that pricing is treated by [pharmacy benefit managers]" despite lacking specific experience with this aspect of the business. 2017 WL 1065135, at *11 (N.D. Cal. Mar. 21, 2017). Indeed, an expert need not be officially credentialed in the specific matter under dispute. *United States v. Garcia,* 7 F.3d 885, 889-90 (9th Cir.1993) (not an abuse of discretion to permit expert testimony from a child mental health specialist on the likely emotional effects on children of testifying in court, even where the specialist lacks "particularized

expertise"). At the very most, a question regarding "specific experience ... goes to the weight of []
testimony, not to its admissibility." *United States v. Little*, 753 F.2d 1420, 1445 (9th Cir. 1984).
Excluding Snyder's testimony for want of more specific experience would be an abuse of discretion
and reversible error. *See, e.g.*, *Ramirez v. ITW Food Equip. Grp., LLC*, 686 F. App'x 435, 440 (9th
Cir. 2017) (holding the "district court abused its discretion in excluding the testimony … [of an]
experienced mechanical engineer … because he lacked familiarity with the grinder in its intended,
pristine condition and had no experience with commercial food equipment.") (quotation omitted).
*See also Landmark Builders, Inc. v. Cottages of Anderson, LP*, WL 21508229, at *3 (S.D. Ind. May
20, 2003) ("Landmark's arguments would require Defendants to call a plumber, a water heater
installer, and a roofer to testify about each specific area. However, this is too strict an application of
Rule 702. Winchell has supervised and managed the construction of apartment buildings and other
facilities . . . This experience illustrates that he has specialized knowledge about topics such as
kitchen faucet fixtures, hot water heaters, and roofing.") (emphasis added).

　　　　As an expert consultant in the telecom industry, Mr. Snyder is also intimately familiar with
the reputation of different data vendors and knows that TLOxp is "considered very reliable by many
industries in the country that regularly use their service." Ex. 2, Snyder Dep., 33:6-7. He is aware
that "Transunion provides many case studies of their data being used by law enforcement, the FBI,
to locate missing children, and for other types of investigative searches for individuals." *Id*. at
38:13-17.

　　　　Mr. Snyder's testimony regarding the TLOxp's reliability is buttressed by Citibank's expert
Margaret Daley, who testified she has relied on TLOxp and similar services for "decades," and
continues to use it today. Ex. 1, Daley Dep. (Rough), 65:4-13 ("Q: Since joining [BRG in 2015],
have you ever personally used TransUnion's TLOxp service, not counting any time where you may
have directed someone else to do it, but you personaly? A: Sure, all the time … Did it yesterday.");
*see also id.* at 113:13-16. Ms. Daley attached as exhibits to her report several documents discussing
the reliability and benefits of TransUnion's TLOxp service, and describing the use of the service by
law enforcement, and at her deposition she testified that all the exhibits to her report were accurate.
*See id.* at 13:1-4 ("Q: Is there anything in your report, the exhibits to that report or your opinions

that you believe to be inaccurate?  A: No."); Exs. 7-9 (TransUnion documents that were originally attached as exhibits to Daley report).  Plaintiff's methodology proposes to use the TLOxp data as it is marketed and used by other experts – to verify phone ownership.   The TLOxp data is thus the type of evidence "reasonably relied upon by experts in the field."  *See Cabrales v. County of Los Angeles*, 864 F.2d 1454, 1460 (9th Cir.1988), vacated, 490 U.S.1987 (1989), reinstated on remand by 886 F.2d 235 (1989) (finding that Rule 703 permits expert testimony on data which need not be admissible if it is of the type reasonably relied upon by experts in the field).

### b.   Colin B. Weir Is Qualified to Opine About TransUnion's TLOxp

Citibank also argues that Mr. Weir is not qualified to give his opinions regarding the use of TLOxp.  Mot. at 7.  Similar to Mr. Snyder, Mr. Weir has successfully implemented this process in numerous other cases.  Despite Citibank's characterizations to the contrary (Mot. at. 7), Mr. Weir has "15 years of experience of analyzing this type of data."  Ex. 3, Weir Dep., 288:25-289:1. Citibank argues that Mr. Weir has only had a TLO subscription for two years, but at his deposition he explained how his experience informed his use of the TLOxp data:

> Q:    And that experience with data other than TLO, historic lookup, allows you to be an expert in TLO historic lookup?
>
> A.    Yes. The Lexis data is very similar, so my experience with Lexis informs that. My experience in looking at how other people used this data informs that. My experience in looking at how courts have accepted the use of this data in this type of circumstance informs that experience. My experience working with companies like AT&T and Pacific West and Global Maps informs my experience of how this type of data is used.

*Id*. at 290:1-6.  Nonetheless, Citibank attacks Mr. Weir as a "recently style[d]" expert.  Mot. at 7.[3] The Ninth Circuit is clear, however, that Rule 702 does not require an expert to have a long history of being qualified as an expert because—as this Court has explained—"such an approach would

---

[3] Citibank's critique is disingenuous.  Its own expert, Mr. Kalat, only started to review "dialer guides over the last [] three years."  Ex. 4, Kalat Dep., 21:7-13.  *See also id*. at 57:12-58:16 (Q. Do you believe you are qualified to testify about the capabilities of the Aspect unified dialing system? A. Yes, I do … [because of m]y professional experience reviewing dialers specifically in connection with TCPA actions.  Q. How long have you been doing that?  A. About three years.").

1  lead to absurd results." *United States v. Diaz*, 2006 WL 2699042, at *4 (N.D. Cal. Sept. 19, 2006)

2  (Alsup, J.) (quoting *United States v. Abonce-Barrera,* 257 F.3d 959, 965 (9th Cir.2001)).

3       Mr. Weir has personally observed the accuracy of the TLOxp and other data vendors,

4  because when "we are often comparing the TLO data against a set of information, and those

5  matches occur very frequently [] I am assessing the accuracy of the data."  Ex. 3, Weir Dep.,

6  106:20-107:6[4]; *see also id*. at 55:18-56:16 ("other cases where I have been looking for matches of

7  names and find those matches, you know, well upwards of 90 percent of the time.").

8       Mr. Weir is also familiar with how industry participants use TLOxp and is able to draw

9  conclusions about the reliability of the data when institutions are paying large sums of money to use

10  the TLOxp data for the same purpose Plaintiff proposes – verification of phone ownership:

> Q.  You also say that businesses, like my client, use it. How do my
>       clients use it?
>
> A.  So when I said businesses like your clients, I meant to differentiate
>       from saying your client uses it. I don't know whether Citibank does
>       or does not use TLOxp, but I'm aware that other people who are
>       looking for information about debtors rely on this type of
>       information.
>
> Q.  Do you know how they use that data?
>
> A.  They use the same -- the data in a similar way to understand how a
>       name is associated with a phone number or a phone number is
>       associated with a name and how those things are attached to other
>       information, for example, like to addresses.

Ex. 3, Weir Dep., 322:3-21.  This accepted use should not be in dispute.  As discussed above,

exhibits to Ms. Daley's report explicitly show that TransUnion markets TLOxp for verification of

phone ownership.  *See* Exs. 7-10 (TransUnion documents that were originally attached as exhibits to

Daley report).

     Citibank's other criticisms of Mr. Weir's qualifications are also based on

mischaracterizations of the record and law.  <u>First</u>, Citibank contends, without basis or explanation,

that "Mr. Weir has the lowest level of TLO's subscription service."  Mot. at 7 (citing Daley Report ¶

186 (citing Weir Dep., 28:2-29:16 ).  But the cited portion of Mr. Weir's transcript contains no evidence that Mr. Weir has the "lowest level" of service and does not define what such a designation would entail.  Instead, in the cited portion of transcript, Mr. Weir merely comments that he pays a "standard minimum [of $25 a month] for the [TLO] service."  *Id.* at 28:21.  Citibank's expert Ms. Daley admitted at her deposition that paying that amount does not "equate with inferior tools from TransUnion," and that she does not know what information Mr. Weir has access to in connection with his use of TransUnion.  Ex. 1 Daley Dep. (Rough), 158:23-163:12.  Citibank does not (because it cannot) explain how the argument is relevant or supports exclusion under *Daubert.*  Citibank is *implying* that Mr. Weir does not have access to certain information from TransUnion, but that is incorrect, and in fact its counsel never inquired into that subject.

<u>Second</u>, Citibank claims that the only TLOxp report "Weir ever attempted to verify for accuracy—his own—was unreliable and inaccurate."  Mot. at. 7.  But Defendant misses the point – Plaintiff's proposed methodology would properly exclude the record in question from the putative class:

> Q.   Mr. Weir, under your methodology, because this first-seen date
>      under Jeremy Brann Weir is earlier than this first-seen date under
>      Colin B. Weir, you would be listed in the 176 accounts, wouldn't
>      you?
>
> …
>
> A.   Right. But my last name would match Jeremy Weir's last name, so
>      this record would not fall into the 176 records.

Ex. 3, Weir Dep.,  374:7-21.

<u>Third</u>, Citibank contends that Mr. Weir is not offering an opinion regarding whether the calls made to putative class members were wrong numbers.  Mot. at 8:5-9.  But in reality, the ultimate opinion is outside the scope of the work that Mr. Weir was hired to do, which is to execute Mr. Snyder's methodology.  Wier Dep., at 238:23-230:5; *see also* Snyder Report, ¶¶ 84 and 89 (Doc. No. 83-5) (opining that the methodology identifies wrong number calls).  Mr. Weir's experiences implementing the class member identification process, as well as his extensive experience in data analytics generally, his direct observation of the TLOxp accuracy, and his indirect observation of

the TLOxp's success in the marketplace are a sufficient basis to qualify him as an expert.

### 2. Plaintiff's Methodology For Identifying Class Members Is Reliable

Citibank contends that even if "Snyder and Weir could satisfy the threshold 'qualification' requirement of Rule 702 to offer any opinion on the use of TLOxp … the methodology, and its implementation are replete with flaws." Mot. at 8:19-22. Citibank is wrong.

When faced with a proffer of expert testimony, a district court must determine whether the testimony is reliable. *Daubert*, 509 U.S. at 589. "The Ninth Circuit has reiterated that the 'test of reliability is flexible…. When an expert meets the threshold established by Rule 702 as explained in *Daubert*, the expert may testify and the jury decides how much weight to give that testimony.'" *In re Apple iPod iTunes Antitrust Litig.*, 2014 WL 4809288, at *4 (N.D. Cal. Sept. 26, 2014) (quoting *Primiano v. Cook*, 598 F.3d 558, 564-65 (9th Cir. 2010)). Even "[s]haky but admissible evidence is to be attacked by cross-examination, contrary evidence, and attention to the burden of proof, not exclusion." *Id.* "Disputes as to the strength of [an expert's] credentials, faults in his use of [a particular] methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony." *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1231 (9th Cir. 1998) (internal citation omitted); *United States v. Herrera*, 2011 WL 175887, at *2 (N.D. Cal. Jan. 19, 2011) (Alsup, J.) (whether the "number of corresponding points" used in a finger print analysis was reliable went to the "weight of [expert] testimony, rather than its admissibility.").

### a. TLOxp Data Provides a Sufficiently Reliable Basis for Class Certification

Citibank contends, "the TLOxp data is not a reliable means of determining the customary user of a given number on a given date in the past." Mot. at 9:7-9. To the contrary, TLOxp is a reliable means of verifying phone ownership because that is exactly what the product is designed and marketed to do. Exs. 7-10 (TransUnion documents that were originally attached as exhibits to Daley report). Ms. Daley has used TLO, LexisNexis, and other data vendors for decades and claims to be intimately familiar with the information these services provide. Ex. 1, Daley Dep. (Rough), 65:4-13. Despite being a presumably satisfied customer for decades, Ms. Daley how argues the service is unreliable – her testimony and actions are at odds.

1  Citibank's critique of the TLOxp data is based on its misapprehension that "courts routinely

2  reject class certification motions because the type of methodology Snyder proposes (cross

3  referencing dialer data to reverse lookup data) is unreliable and inaccurate."  Mot. 6:24-25.  In fact,

4  the cases relying on reverse lookup services like TLOxp are legion.  *See West v. California Servs.*

5  *Bureau, Inc.*, 323 F.R.D. 295, 302 (N.D. Cal. 2017) ("a reverse lookup will generate a list of all

6  individuals who customarily use each phone number."); *Bee, Denning, Inc. v. Capital All. Grp.*, 310

7  F.R.D. 614, 624 (S.D. Cal. 2015) ("These call recipients are readily identifiable using the same

8  reverse look-up approach that Plaintiffs plan to use to identify members of the junk fax class.");

9  *Ikuseghan v. MultiCare Health Sys.*, 2015 WL 4600818, at *4 (W.D. Wash. July 29, 2015) ("class

10  members can be readily identified through objective criteria.  Ikuseghan intends to rely on

11  MultiCare's patient accounts, Hunter Donaldson's call records, and reverse directory look ups to

12  identify class members."); *Booth v. Appstack, Inc.,* 2015 WL 1466247, at *4 (W.D. Wash. Mar. 30,

13  2015) (granting class certification where "[p]laintiffs intend to rely on additional records, such as

14  telephone carrier records and reverse-lookup directories, to identify class members and establish

15  elements of the claims."); *Stemple v. QC Holdings, Inc.*, 2016 WL 4059345, at *4 (S.D. Cal. Apr.

16  25, 2016) (approving settlement where "Claims Administrator perform a reverse telephone number

17  look-up to determine the address information for class members for whom address information is

18  not available."); *Soppet v. Enhanced Recovery Co.*, LLC, 679 F.3d 637, 642 (7th Cir. 2012)

19  (mentioning the defendant could "[u]se a reverse lookup to identify the current subscriber to Cell

20  Number.").

21  Citibank's cases are unable to overcome the widespread endorsements of such databases.

22  In *Sherman v. Yahoo! Inc.*, the court rejected plaintiff's "belated proposal to utilize a reverse

23  lookup" because the plaintiff had "not explained how it would verify that the current owners of the

24  numbers were the owners over two and a half years ago."  2015 WL 5604400, at *6 (S.D. Cal. Sept.

25  23, 2015).  This is a critique of the plaintiff's presentation of evidence, not the underlying

26  methodology.  Moreover, unlike the subscriber analysis proposed in *Sherman*, Plaintiff's

27  methodology proposes to identify customary users and does explain how it would identify the

28  customary user at the time of the call in question.  Snyder Report ¶ 84.  In *Stalley v. ADS Alliance*

*Data Sys., Inc.*, the Court did not reject the type of methodology Snyder proposes. *See* 296 F.R.D. 670, 679 (M.D. Fla. 2013). Rather, in *Stalley* the plaintiff did not propose **any** methodology for identifying who answered a call - instead the "only evidence on the issue of ascertaining the identities of potential class members [came] from [defendant] and demonstrates that no manner exists by which the person who actually answered a call from [defendant] can be identified. *Id.* Even Citibank's main case in support of its position, *Wilson v. Badcock Home Furniture*, acknowledged that "reverse directory databases can be cross-referenced against Defendant's customer records and only names that appear on both lists will proceed to the next stage of the certification process." 2018 WL 6660029, at *3 (M.D. Fla. Dec. 19, 2018). "This additional step would provide some indicia of reliability, here concerning the subscriber/user distinction, notably absent in other cases." *Id.*

Some courts have considered the limitations of historical lookup databases in deciding class certification, but these decisions have ultimately concluded the error rate is acceptable. For instance, in *Krakauer v. Dish Network, L.L.C.*, the court "considered the potential error rate [of the Lexus Nexus historical lookup database] and [did] not find it unreasonably high for these particular circumstances." 2015 WL 5227693, at *9 (M.D.N.C. Sep. 8, 2015). Similarly, this argument was again made in this district in *Abante Rooter & Plumbing, Inc. v. Alarm.com, Inc.*, 2017 WL 1806583, at *4 (N.D. Cal. May 5, 2017), where a historical look-up database was also used to identify class members. There too, the Court rejected the defendant's claim that historical look-up services are unreliable for these particular purposes. *Id.* Like Mr. Snyder, courts have recognized that "[n]othing is 100 percent," and instead have holistically evaluated the implementation of the reverse lookup services. Ex. 2, Snyder Dep., 45:7.

### b. Mr. Weir's Implementation of the Methodology is Reliable

Citibank contends that Mr. Weir's implementation of the methodology is flawed. Mot. 8:22. Most notably, Citibank attacks Mr. Weir's reliance on the most recent "First Seen" dates included in the TLOxp data. Mot. at 10:10-21. The "First Seen" date identifies the first time TLOxp's records show an individual's name appear with a phone number. Daley Report ¶ 74. The "Last Seen" date represents the last time such an association occurs. *Id.* Citibank contends, without explanation, that

the "Last Seen" dates are reliable enough to exclude 120 of the 176 class members the methodology identified.  Mot. at 10:10-21.

As a preliminary matter, Citibank is clearly taking inconsistent positions regarding TransUnion's data, because it first argues that the data is unreliable for purposes of identifying class members, and then it relies on TransUnion's data to identify people that Citibank contends should *not* be class members (although that was before Ms. Daley's later admission that she has no idea either way).  At his deposition, Mr. Weir explained why he considers the "First Seen" date to be more reliable:

> Based upon my prior experience, I have relied upon the first-seen dates because it would be very difficult for someone to become associated with a phone number before they actually were associated with the phone number. So let's say you are about to go get a cell phone, TransUnion is not going to know what number you are going to get in advance. So I believe the most accurate information about the most current customary user is the first-seen date data, which is what I used, and in the conservative maximum first-date fashion that we have discussed.

Ex. 3, Weir Dep., at 275:23-276:12.

Mr. Weir went on to explain the hazard of an analysis, like Ms. Daley's, that relies on the "Last Seen" date contained in the TLOxp data:

> Again, because of the way that I use the data, I haven't given full consideration to the last-seen date and have been warned that that date can reflect basically ongoing apparent affiliation with a number when the number is no longer affiliated with a person.  So, for example, you go online and you sign up for a utility and you discontinue your cell phone, but you never changed the number associated with the account, and so, again, I rely upon the first-seen dates since those are going to be more reliable indicia of when a new person is affiliated with a number than the last seen dates.

Ex. 3, Weir Dep., at 326:9-327:4.  Citibank's expert, Ms. Daley, has no basis to rebut the risk of outdated information polluting the "Last Seen" date in the TLOxp data.  Ex. 1, Daley Dep. (Rough) 126:24-127:6 ("Q. Do you have an opinion, one way or the other, about whether outdated information from companies can be one cause for unreliable information in the last seen date? … A. It's possible, but I don't really have an opinion."); see also *id*. at 98:19-20 ("I do not believe that these dates are accurate, just period, under any circumstances.").  Nonetheless, Ms. Daley still attacks Mr. Weir for not including the "Last Seen" date in his analysis, even though she does not

believe "last seen" dates are accurate.  The experts simply disagree about how to apply the data.

In *United States v. Herrera*, this Court refused to take an active role in resolving the methodological dispute of two competing experts.  There, two fingerprint examiners disputed "the number of points of correspondence and non-correspondence between fingerprints before declaring a 'match[.]'"  2011 WL 175887, at *2 (N.D. Cal. Jan. 19, 2011).  This Court appropriately held that the movant's criticism of an expert's matching analysis went to the "weight of [expert] testimony, rather than its admissibility."  2011 WL 175887, at *2 (N.D. Cal. Jan. 19, 2011).  Here too, Mr. Weir has provided a reasoned explanation for his treatment of "First Seen" and "Last Seen" dates.  His testimony does not become inadmissible because Ms. Daley disagrees with it.

Defendant next relies on an out-of-context quotation to conclude that the sample set used in Mr. Weir's report is unreliable because Mr. Weir "would not opine to the jury that [his] extrapolation is the correct answer." Mot. at 10:4-6 (citing Daley Report ¶ 54 (citing 41:17-43-23)).[5] In fact, in the cited portions of Mr. Weir's testimony he is specifically referring to the estimate of total class damages contained in his report and Plaintiff's motion for class certification.  Ex. 3, Weir Dep., 44:13-21 ("I think that it is a reasonable reflection that there will be many such instances of both phone calls and individual telephone numbers at issue in this case and that it is reasonable for the purpose of understanding the dataset. But I would not use that number personally to calculate the damages in this case.").  Mr. Weir, however, is willing to confidently tell a jury that he can reliably preform Mr. Snyder's process.  *Id*. at 46:16-19 ("Q. Would you say that you have a reliable method of performing Mr. Snyder's process?  A. Yes, I would say that.").  This is a process that Mr. Snyder has unequivocally testified "can clearly and definitively obtain information to contact class members based on the administrative process."  Ex. 2, Snyder Dep., 74:13-16.

Citibank also makes inconsistent arguments concerning TransUnion's so-called "Probability of Ownership" score, which purports to assign a percentage of probability that a person is the

---

[5] Despite the back and forth regarding Mr. Weir's sampling process, even Citibank's expert admits that Mr. Weir "pulled a random set from the contact utilities database."  Daley Dep. (Rought) at 40:12-13.  The contact utilities database refers to Citibank's audit report of phone indicator changes (like wrong numbers) that it began keeping in November 2017—after Mr. Revitch threatened to file this lawsuit.  Daley Report ¶¶ 27-29.

customary user of a phone.  On the one hand, Citibank and its experts criticize Mr. Weir for not

using that service in connection with the methodology.  Mot. at 10:22-26 (citing Daley Report ¶ 96).

On the other hand, Citibank's expert opines that the "Probability of Ownership" is unreliable.

Daley Report ¶ 175 ("The one cellular telephone number that [Ms. Daley has] continuously and

exclusively used since the 1990s is only assigned a 3% Probability of Ownership"); Daley Dep.

(Rough), 131:16-17 ("Q.  Any of what, the probability score?  A.  I wouldn't use the probability

score[.]").  If as Citibank's expert contends that the "Probability of Ownership" service is

unreliable, then Mr. Weir's decision not to use it cannot support exclusion of his opinions.  Mr.

Weir explained his decision during his deposition, and neither Citibank nor its expert have offered

any rebuttal to that explanation:

> If you have a phone number for 20 years and give it up and somebody
> takes it over, that other person is going to have less history and so they
> will have a lower phone score, even though they are the customary user.
> So it is my understanding that you cannot use that per se to rank the
> underlying reliability of the relationship that TransUnion has established.

Ex. 3, Weir Dep. 333:21-25.  This is a wrong number case - many putative class members were

reassigned numbers of Citibank customers.  *See* Daley Report ¶ 99 (acknowledging that individual

could receive calls due to telephone number reassignment).  A score that is calculated based on the

length of time an individual is associated with a phone number would exclude recently reassigned

phone numbers in almost all circumstances.  Ms. Daley's claim that the phone score is also

calculated based on the "number of sources [that TransUnion] considered highly reliable linking the

person to the number" is unsupported by the evidence.  Daley Report ¶ 95.   Indeed, Ms. Daley

acknowledges, "TLO does not publish the methodology" and she provides no other source for her

apparent insights into the phone score.  *Id*. ¶ 93-95.  Despite her lack of information, Ms. Daley

confidently relies on the phone score number to indicate the percentage chance a phone number is

used by and individual.  *Id*. ¶ 96.  But Ms. Daley needs "to understand that it's not saying if it's 99

percent, that it is 99 percent likely to be accurate."  Ex. 3, Weir Dep., 333:21-23.  This is self-

evident when the phone scores associated with a phone number are viewed holistically – the total

scores often exceed 100, and 200 in total.  But Ms. Daley fails to grasp this basic concept.  Ex. 1,

Daley Dep. (Rough) 22:2-7 ("Q.  Okay.  Just by way of example, is it possible that the probability of raining on a [] day can be 125 percent? A.  I -- I don't know. Q. Okay.  A.  I'm not a weatherman.").  Clearly Ms. Daley neither is a weatherman nor is she "pretending to be a [] probability expert or statistical expert."  *Id.* at 23:7-11.

### c.       The Methodology Can Be Adapted to Address Citibank's Concerns Regarding Name Matching

Citibank criticizes the name matching undertaken in the methodology because the step "never compared for first name matches."   Daley Report ¶ 77.  Citibank's criticism is meritless: Citibank uses Neustar to track when a cell phone has been reassigned, and that service relies on last names only.  *Id.* ¶ 36.  This is another example where Citibank makes inconsistent arguments (i.e., when they rely on last names only, they are using "robust" methods to avoid wrong number calls; when Plaintiff's experts use last names only, the method is unreliable.  Nonetheless, Mr. Weir acknowledged that it would be very simple to also run the name matching software against first names in addition to last names.  Ex. 3, Weir Dep., 347:15-17.  Similarly, it would also be very simple to adjust the name matching process to eliminate business names form the class.  *Id*. at 357:7-16 ("I have not been asked to account separately for businesses, but I have given some consideration, again, if I was asked to do this, the Citibank notation for businesses has the business name in the first name and last name field.  I would search, again, to match those records where the first and last names match and remove them from the dataset.").

Ms. Daley also contends "Citibank's records [] identified the additional names of authorized persons for each of the accounts" (Daley Report ¶ 114), but that was the result of its misapplication of the "Last Seen" date as discussed above in Section B(3).  Further, Citibank cannot rely on secondary users to challenge the methodology because it never produced documents showing the names of those people, despite being ordered to produce any documents it intended to rely on in support of its consent defense.  Even if that were not enough to resolve the issue, Plaintiff's experts could incorporate this additional step of name matching into the methodology if Citibank complied with its obligation to produce documents supporting its consent defense.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### d.     Mr. Revitch and The Methodology

Citibank and its expert Ms. Daley claim there is an error in the methodology because Plaintiff was not identified through it.  Mot. at 12:20-22.  This is the same position Ms. Daley unsuccessfully advanced in *Johnson v. Navient Solutions, Inc*., 315 F.R.D. 501, 502-03 (S.D. Ind. 2016), where the court granted certification of a wrong number class.  Daley Dep. (Rough), 60:18-61:18.  As an initial matter, the methodology is not required to capture Mr. Revitcth.  It is undisputed that Citibank called Mr. Revitch's cell phone without his consent.  Citibank produced several recordings of Plaintiff telling Citibank debt collectors they had reached a wrong number, and the calls only stopped after he threatened a lawsuit.  Motion for Class Certification at 1:10-12.  Unfortunately, Citibank's record keeping is flawed.

The reason the methodology does not identify Mr. Revitch is because Citibank only started keeping a database of phone numbers that had been flagged as wrong numbers in November 2017—after Mr. Revitch threatened to file this lawsuit.  Daley Report ¶ 29.  Defendant was ordered to produce "records pertaining to phone numbers identified by defendant as wrong numbers or do-not-call requests [during the class period]."  (Doc. No. 52).  Instead of identifying the deficiency in its own record keeping, Defendant produced a massive data file that only contained the wrong number and do-not-call requests from November 2017 onwards.  In his reply in support of class certification, Mr. Revitch will rely on the proposed methodology for calls made from November 2017 forward; and, as in *West*, must rely only on the reverse-look up data for calls made before then.

Citibank's request that the Court consider the methodology unreliable because of this missing data "is in effect asking the Court to reward its imperfect record-keeping practices by precluding class certification."  *Zyburo v. NCSPlus, Inc.*, 44 F. Supp. 3d 500, 503–04 (S.D.N.Y. 2014). *See also Saulsberry v. Meridian Fin. Servs., Inc.*, 2016 WL 3456939, at *9 (C.D. Cal. Apr. 14, 2016)("In essence, Meridian argues that because it did not keep easily accessible records of which consumers had consented to ATDS calls, it should be immune from class-wide repercussions when it calls consumers without consent.").

Further, if necessary, "[c]lass members could provide individual affidavits averring lack of consent[.]"  *Kristensen v. Credit Payment Servs.*, 12 F. Supp. 3d 1292, 1307 (D. Nev. 2014).

1    "Reviewing these affidavits would not be unduly burdensome for the Court, especially in light of

2    the alternative of dealing with thousands of individual lawsuits." *Id.*  As explained by Judge

3    Kennelly in *Birchmeier*, "limiting the classes only to those person's whose membership can be

4    proved by reference to some other party's records is fundamentally unfair to potential class

5    members." *Birchmeier v. Caribbean Cruise Line, Inc*., 302 F.R.D. 240, 249 (N.D. Ill. Aug. 11,

6    2014).  Here, Defendant should not be rewarded for (1) not keeping any record of consent prior to

7    making calls and then (2) being allowed to argue class members cannot self-identify as being part of

8    the classes.

9              **C.**    **Citibank's Arguments For Excluding Snyder's Opinions About**

10                   **Its Dialing System Are Irrelevant And Lack Merit**

                       **1.**    **Citibank's Arguments Are Irrelevant Under *Tait* Because**

11                               **They Have Nothing To Do With Class Certification**

12          Citibank disputes that its Aspect Unified dialing system qualifies as an "automatic telephone

13   dialing system" ("ATDS") within the meaning of the TCPA, and moves to exclude Mr. Snyder's

14   opinions about the technical capabilities of that system.  None of Citibank's arguments on this

15   subject relate to class certification or Rule 23's requirements.  At class certification, the only issue

16   under *Daubert* is whether an expert's opinions are "sufficiently reliable to admit for . . . proving or

17   disproving Rule 23 criteria." *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 495 (C.D. Cal.

18   2012).  Arguments for exclusion under *Daubert* that go to the merits are "irrelevant."  *Id.* at 497.  In

19   *Tait*, for example, the court denied motions to exclude expert testimony where the defendant's

20   motion focused on merits issues, and "[did] not even mention the Rule 23 requirements that are

21   relevant to [the expert's] testimony, much less explain the purported problems with his testimony in

22   relation to Rule 23." *Id.*  Courts in this District follow the same rule.  *See*, *e.g.*,  *Rai v. Santa Clara*

23   *Valley Transp. Auth.*, F.R.D. 245, 264 (N.D. Cal. 2015) (following *Tait* and denying motion to

24   exclude expert testimony); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 264 F.R.D.

25   603, 616 (N.D. Cal. 2009) ("The question for the court is whether the expert evidence is sufficiently

26   probative to be useful in evaluating whether class certification requirements have been met.").

27          The rule in *Tait* applies here because the question of whether the Aspect dialer qualifies as

28   an ATDS is a merits issue susceptible to resolution on a class wide basis.  *See*, *e.g.*, *Lee v.*

*Stonebridge Life Ins. Co.*, 289 F.R.D. 292, 295 (N.D. Cal. 2013) (disputes over whether a defendant used an ATDS are "merits issues" that "do not warrant denial of class certification"). In *Meyer v. Bebe Stores, Inc.*, 2017 WL 558017, at *4-5 (N.D. Cal. Feb. 10, 2017), the district court denied a motion to decertify classes where, as here, the defendant argued that Mr. Snyder's opinions about its dialing systems were unreliable, because that argument goes to the merits. Citibank does not argue in its opposition to class certification that the question of whether its Aspect dialing system qualifies as an ATDS presents an individualized issue. The Aspect system either qualifies as an ATDS or it does not, and the answer to that question will be the same for all class members.

### 2. Citibank's Arguments For Excluding Mr. Snyder's Opinions About Its Dialing System Lack Legal And Factual Support

Citibank makes four arguments for excluding Mr. Snyder's opinions. <u>First</u>, Citibank argues that "what qualifies as an ATDS under the TCPA is in flux and varies by jurisdiction." Mtn. to Exclude, at 13:11-20. That is not a legal basis to exclude an expert's opinions. Indeed, after contending the law is "in flux," Citibank immediately cites its own expert witness' contrary opinion that Citibank's system does not meet the definition of an ATDS under the TCPA. *Id.* at 13:20 (citing Declaration of David Kalat).

<u>Second</u>, Citibank notes that Mr. Snyder reviewed the dialing system manuals, records from the system, and campaign names before forming his opinions about what the Aspect dialer can do. Then, without explanation, Citibank pivots and claims that "an expert may not provide opinion on a purely legal matter." *Id.* at 13:24. That argument is a non-sequitur. Citibank does not (because it cannot) explain how Mr. Snyder offered a legal opinion. Nor does Citibank explain how Mr. Snyder's opinions about the functionalities of its dialer constitute a legal opinion, but the opinions of its own expert do not.

<u>Third</u>, Citibank briefly argues that Snyder's opinions about the Aspect dialing system should be excluded because he "never examined the dialing system or observed the actual process by which calls are placed." Mtn. to Exclude, at 14:8. There is no rule requiring an expert to perform an inspection for his or her opinions to be admissible. *See, e.g.*, *Nanda v. Ford Motor Co.*, 509 F.2d 213, 221 (7th Cir. 1974) ("Defendant argues that 'an actual examination of the vehicle or at a bare

minimum some physical evidence is absolutely essential' as a basis for expert testimony.  There is of course no such rule.... That the expert did not have the advantage of an inspection of the vehicle goes to the weight of his testimony, not its admissibility"); *McLean v. Air Methods Corps., Inc.*, 2014 WL 280343, at *3 (D. Vt. Jan. 24, 2014) (expert's lack of inspection went "to the weight of his testimony, not to its admissibility").  Last year, Judge Gonzalez-Rogers denied a motion to exclude Mr. Snyder's testimony where the defendant made the same argument Citibank makes here, stating:

> Further, the fact that Mr. Snyder did not physically inspect the Ytel Dialer does not preclude Mr. Snyder's testimony about its nature. Alarm.com does not contest plaintiffs' assertion that the Ytel Dialer had predictive capacities, which were often utilized.

*Abante Rooter & Plumbing, Inc. v. Alarm.com Inc.*, 2018 WL 3707283, at *9 (N.D. Cal. Aug. 3, 2018).  As in *Abante Rooter*, Citibank does not (because it cannot) contest that its Aspect dialer has predictive capabilities.  *See* Exhibit B to Snyder Report (Doc. No. 83-5) (describing "predictive dialing" and other modes available on the Aspect Unified dialing system); Ex. 4, Kalat Dep., 16:13:-16 ("Q: Do you know whether or not the Aspect dialing system used by Citibank can be used to call numbers with [the] predictive dialing mode? A: Yes, it can."); 43:22-44:3 ("I did see a campaign that was predictively dialed").

The fact that Mr. Snyder did not physically inspect the Aspect dialer is irrelevant to his understanding of its capacity and how it operates.  Mr. Snyder based his opinions on numerous factors, including the Aspect dialing system's 1000+ page manual, the call logs, and admissions by Citibank's 30(b)(6) witnesses who use the system every day.  Snyder Report, at ¶ 8 (Doc. No. 83-5).  As Mr. Snyder explains in his expert report, the Aspect software manuals and user guides are "the most important piece of information to understand how a dialing system functions, as well as the totalities of its capabilities."  Snyder Report, at ¶ 27 (Doc. No. 83-5).  "The dialing system documentation is essential and must be reliable and truthful; otherwise, it would not be possible [for users] to successfully troubleshoot problems, perform successful campaigns, or properly operate and manage real-time telecommunications dialing calling functions."  *Id.*  Mr. Snyder has "reviewed hundreds of dialing system manuals," and "never encountered any manufacturer's

technical manual that was accused of being inaccurate or unreliable by the manufacturer, customer, or defendant in a TCPA case."  *Id.* at ¶ 28.

Citibank's own expert witness corroborated Mr. Snyder's opinions about the Aspect manuals.  *See* Ex. 4, Kalat Dep., 20:3-25; 22:3-14 (testifying about why he read the Aspect guides and that he did not believe the information in the guides was false).  When asked what he believed was the "most useful information" he gleaned from his so-called "inspection" of the Aspect system, he testified that he was able to confirm that "as actively used by Citibank that there were no meaningful deviations from what was described in the software guides [aka the manuals]."[6]  *Id.*, at 47:6-15; *see also id.*, at 26:8-27:6 (describing how information obtained from the inspection was already evident from the Aspect guides).  Citibank offers no explanation why a site inspection would have provided critical information unavailable from the evidence Mr. Snyder did examine.

<u>Fourth</u>, Citibank claims Mr. Snyder cannot rely on dialing campaign names to determine whether any particular call was "automatically dialed within the meaning of the TCPA."  Mtn., 13:23.  For context, telephone numbers to be dialed are often organized in a "campaign," which is a stored electronic list of telephone numbers to be called for a specific purpose, such as, for example, calls to people who owe debts on a Home Depot or Best Buy credit card.  *See* Snyder Report, at ¶ 11 (Doc. No. 83-5).  The call logs from Citibank's Aspect dialer identify the names of various campaigns, and those names often include a reference to automatic dialing modes such as "predictive," "automatic," or "blaster," etc.).  *Id.* at ¶ 36 and Exhibit B.  Citibank does not deny that the Aspect system has the capacity to dial each of those modes.  Instead, it would have this Court believe that campaign names do not necessarily accurately describe the dialing mode that was used for a particular campaign.

Citibank's argument is irrelevant.  Whether a system qualifies as an ATDS does not turn on how the defendant used the system or how any particular call was made (i.e., manually or automatically).  The issue turns solely on whether the system has the "<u>capacity</u> to dial stored numbers automatically."  *Marks v. Crunch San Diego, LLC*, 904 F.3d 1041, 1052 (9th Cir. 2018)

---

[6] The "inspection" consisted of a remote WebX meeting, conducted from Mr. Kalat's home office. Ex. 4, Kalat Dep., 35:12-22.

(emphasis added).  A system qualifies as an ATDS if it has it has the requisite "capacity" to function as an ATDS, "regardless of whether it was actually used in that manner."  *Meyer v. Bebe Stores, Inc.*, 2015 WL 431148, at *4 (N.D. Cal. Feb. 2, 2015); *see also   Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 951 (9th Cir. 2009) ("a system need not actually store, produce, or call randomly or sequentially generated telephone numbers, it need only have the capacity to do it.").  Here, Mr. Revitch never argued, and Mr. Snyder never opined, that the Aspect dialing system sometimes qualifies as an ATDS and sometimes does not depending on which dialing mode was used.  Citibank's expert witness David Kalat does not offer that opinion either.  *See* Ex. 4, Kalat Dep., 18:13-19 ("Q: … Is it safe to say that no matter what dialing mode Citibank may or may not have used with its Aspect dialing system, it doesn't change your opinion, regardless of the mode, the system doesn't have the capacities you describe in Paragraph 1 of your report?  A:  That's correct."); *see also* Expert Report of David Kalat, Summary of Opinions, ¶ 1.  Citibank's focus on which dialing mode was used for any particular campaign is therefore irrelevant to the class certification *and* to the merits.

Apart from being irrelevant, Citibank's speculation that its campaign names might sometimes misidentify the dialing mode used is contrary to the facts.  Citibank's 30(b)(6) witness first equivocated when asked whether dialing campaign names that included words like "automatic," "blaster" or "predictive" referred to the dialing names used for a particular campaign.  When pressed, however, the witness could not think of any reason why a campaign name would include the word "predictive" in the name if the calls made during that campaign were not predictively dialed.  Ex. 6, Roe Dep., 54:18-23 (Q: Can you think of a reason why a target template name would use the word 'predictive' if the calls were not made under the predicted [sic] dialing mode?  A: I don't know.").  Later in the deposition, the same witness was presented with a long list of campaign names, and could readily identify various details about the campaigns, including dialing modes associated with those campaigns.  *See id.* at 80:12-16 ("Okay.  And then going back to page 2 of Exhibit 10, I'd asked you about 'BC_auto_test.'  You told me what BC signifies to you.  You told me what 'test' signifies to you.  What does 'auto' signify to you?  A:  Automatic dialing mode."); 81:15-19 ("Q: …So we've got CHE is Citi Home Equity.  We've got BE equals back end.

What does the phrase 'predictive' signify to you, if anything?  A: To me what it would signify to me is predictive dialing mode").

**III.  CONCLUSION**

 For the foregoing reasons, Citibank's motion to exclude the expert opinions of Randall Snyder and Colin Weir should be denied.

Dated: May 24, 2019     **BURSOR & FISHER, P.A.**

         By: /s/ Thomas A. Reyda
            Thomas A. Reyda

         L. Timothy Fisher (State Bar No. 191626)
         Joel D. Smith (State Bar No.244902)
         Thomas A. Reyda (State Bar No. 312632)
         1990 North California Blvd., Suite 940
         Walnut Creek, CA  94596
         Telephone: (925) 300-4455
         Email:  ltfisher@bursor.com
             jsmith@bursor.com
             treyda@bursor.com

         *Attorneys for Plaintiff*