**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Joel D. Smith (State Bar No. 244902)
Yeremey O. Krivoshey (State Bar No. 295032)
Thomas A. Reyda (State Bar No. 312632)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail:  ltfisher@bursor.com
         jsmith@bursor.com
         ykrivoshey@bursor.com
         treyda@bursor.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEREMIAH REVITCH, on Behalf of Himself and all Others Similarly Situated,<br><br>                              Plaintiff,<br>        v.<br><br>CITIBANK, N.A.,<br><br>                              Defendant. | Case No.  3:17-cv-06907-WHA<br><br>**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**<br><br>Date:   February 14, 2019<br>Time:  8 a.m.<br>Court:  Courtroom 12, 19th Floor |

# TABLE OF CONTENTS

PAGE(S)

I.   INTRODUCTION ................................................................................................................1

II.  ARGUMENT ....................................................................................................................2

    A.   The Predominance Requirement Is Satisfied .........................................................2

        1.   Citibank's Consent Defense Cannot Support Denial Of Certification ...............................................................................................2

            a.   Daley Testified She Has "No Idea" Who Received A Wrong Number Call. ........................................................2

            b.   Citibank's Account-Level Documents Cannot Support Its Consent Defense ............................................................3

        2.   Citibank's Legal Authorities Do Not Support Denial Of Certification ...............................................................................................7

        3.   Citibank's Criticisms Of Plaintiff's Experts Do Not Support Denial Of Certification .................................................................8

            a.   Daley Altered The Method And Then Testified That Her Alterations Were Based On Unreliable Data..............................8

            b.   Daley Admitted That Weir Obtained Reliable Name And Phone Number Data From TransUnion...................................10

            c.   Daley's Criticisms Concerning First Names And Business Names Ignore Weir's Testimony ...............................11

    B.   Citibank's Manageability/ Superiority Arguments Ignore *Briseno*........................11

    C.   Plaintiff Satisfies Rule 23(a)'s Requirements ......................................................12

        1.   Citibank Does Not Contest Commonality Or Adequacy ...........................12

        2.   Plaintiff Satisfies The Typicality Requirement .......................................12

        3.   Plaintiff Satisfies The Numerosity Requirement......................................13

    D.   The Arbitration Agreement Does Not Preclude Certification....................................13

    E.   The Court May Certify A Class Under Rule 23(b)(2)..............................................14

III. CONCLUSION ..............................................................................................................15

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Abante Rooter & Plumbing, Inc. v. Alarm.com, Inc.*,
  2017 WL 1806583 (N.D. Cal. May 5, 2017)................................................................ 11

*Abdeljalil v. Gen. Elec. Capital Corp.*,
  306 F.R.D. 303 (S.D. Cal. 2015)........................................................................ 2, 13

*Babineau v. Federal Exp. Corp.*,
  576 F.3d 1183 (11th Cir. 2009)................................................................................. 7

*Blair v. Rent-A-Center, Inc.*,
  2018 WL 5728924 (N.D. Cal. Nov. 1, 2018)............................................................ 15

*Briseno v. ConAgra Foods Inc.*,
  844 F.3d 1121 (9th Cir. 2017)................................................................................. 12

*Buchanan v. Tata Consultancy Servs., Ltd.*,
  2017 WL 6611653 (N.D. Cal. Dec. 27, 2017) ......................................................... 15

*Cameron v. E.M. Adams & Co.*,
  547 F.2d 473 (9th Cir. 1976)............................................................................... 1, 7

*Campanelli v. Image First Healthcare Laundry Specialists, Inc.*,
  2018 WL 6727825 (N.D. Cal. Dec. 21, 2018) ......................................................... 14

*Chiron Corp. v. Ortho Diagnostic Sys., Inc.*,
  207 F.3d 1126 (9th Cir. 2000)................................................................................. 14

*Davis v. Astrue*,
  250 F.R.D. 476 (N.D. Cal. 2008) ............................................................................ 13

*Davis v. AT&T Corp.*,
  2017 WL 1155350 (S.D. Cal. Mar. 28, 2017) ........................................................... 7

*Del Valle v. Glob. Exch. Vacation Club*,
  320 F.R.D. 50 (C.D. Cal. 2017)............................................................................... 12

*Doe v. Reddy*,
  2004 WL 5512966 (N.D. Cal. Mar. 24, 2004) ........................................................... 4

*Ellis v. Costco Wholesale Corp.*,
  285 F.R.D. 492 (N.D. Cal. 2012) ............................................................................ 15

*Etter v. Allstate Ins. Co.*,
  323 F.R.D. 308 (N.D. Cal. 2017) ................................................................. 1, 8, 9, 12

*Fields v. Mobile Messengers Am., Inc.*,
  2013 WL 6073426 (N.D. Cal. Nov. 18, 2013) ........................................................... 8

*Ford Motor Credit Co. v. Agrawal*,
  71 N.E.3d 671 (Ohio Ct. App. 2016) ...................................................................... 14

*In re Qualcom Antitrust Litig.*,
  328 F.R.D. 280 (N.D. Cal. 2018) ................................................................ 15

*Johnson v. Navient Sols., Inc.*,
  315 F.R.D. 501 (S.D. Ind. 2016) ........................................................ 11, 12

*Kirkpatrick v. J.C. Bradford & Co.*,
  827 F.2d 718 (11th Cir. 1987) ................................................................ 14

*Kohler v. Inter-Tel Techs.*,
  244 F.3d 1167 (9th Cir. 2001) ................................................................ 12

*Krakauer v. Dish Network, L.L.C.*,
  2015 WL 5227693 (M.D.N.C. Sep. 8, 2015) ......................................... 11

*Kristensen v. Credit Payment Servs.*,
  12 F. Supp. 1292 (D. Nev. 2014) ............................................................. 4

*Lozano v. AT&T Wireless Servs., Inc.*,
  504 F.3d 718 (9th Cir. 2007) ................................................................... 14

*Makaron v. Enagic USA, Inc.*,
  324 F.R.D. 228 (C.D. Cal. 2018) ............................................................ 15

*McMillion v. Rash Curtis & Assoc.*,
  2017 WL 3895764 (N.D. Cal. Aug. 22, 2016) ...................................... 15

*Meyer v. Portfolio Recovery Assocs., LLC*,
  707 F.3d 1036 (9th Cir. 2012) ................................................................... 2

*Monotype Corp. PLC v. Int'l Typeface Corp.*,
  43 F.3d 443 (9th Cir. 1994) ....................................................................... 5

*O'Connor v. Uber Techs., Inc.*,
  904 F.3d 1087 (9th Cir. 2018) ................................................................ 14

*Oracle Am., Inc. v. Google Inc.*,
  2016 WL 5393938 (N.D. Cal. Sept. 27, 2016) ......................................... 4

*Pablo v. ServiceMaster Glob. Holdings, Inc.*,
  2011 WL 3476473 (N.D. Cal. Aug. 9, 2011) ........................................ 14

*Reyes v. Educ. Credit Management Corp.*,
  322 F.R.D. 552 (S.D. Cal. 2017) ............................................................... 2

*Shelter Mortg. Corp. v. Castle Mortg. Co., L.C.*,
  117 Fed. Appx. 6 (10th Cir. 2004) ................................................... 4, 5, 6

*Smith v. Univ. of Wash. Law Sch.*,
  233 F.3d 1188 (9th Cir. 2000) .......................................................... 14, 15

*Southwell v. Mortg. Inv'rs Corp. of Ohio*,
  2014 WL 3956699 (W.D. Wash. Aug. 12, 2014) .................................. 13

*Tan v. Grubhub, Inc.*,
2016 WL 4721439 (N.D. Cal. July 19, 2016) ............................................................... 14

*Tomeo v. Citigroup, Inc.*,
2018 WL 4627386 (N.D. Ill. Sep. 27, 2018) ................................................................... 7

*True Health Chiropractic, Inc. v. McKesson Corp.*,
896 F.3d 923 (9th Cir. 2018) ............................................................................... 1, 2, 7

*Van Patten v. Vertical Fitness Grp., LLC*,
847 F.3d 1037 (9th Cir. 2017) ................................................................................... 8

*West v. Cal. Service Bureau, Inc.*,
323 F.R.D. 295 (N.D. Cal. 2017) ....................................................................... 7, 13, 15

*Wilson v. Badcock Home Furniture*,
2018 WL 6660029 (M.D. Fla. Dec. 19, 2018) ................................................................ 7

*Wolin v. Jaguar Land Rover N. Am., LLC*,
617 F.3d 1168 (9th Cir. 2010) ................................................................................. 12

*Zepeda v. Paypal, Inc.*,
2017 WL 1113293 (N.D. Cal. Mar. 24, 2017) ............................................................. 15

**RULES**

Federal Rule of Evidence 803(6) ................................................................................. 4, 5

**OTHER AUTHORITIES**

2 Newberg on Class Actions § 4:38 .............................................................................. 15

1   **I.  INTRODUCTION**

2        Citibank's opposition brief is most notable for ignoring two key Ninth Circuit decisions that

3   govern whether an affirmative defense defeats certification:  *Cameron v. E.M. Adams & Co.*, 547

4   F.2d 473, 478 (9th Cir. 1976), and *True Health Chiropractic, Inc. v. McKesson Corp.*, 896 F.3d 923,

5   932 (9th Cir. 2018) ("*True Health*").  Testimony from Citibank's expert Margaret Daley, and

6   admissions in Citibank's opposition brief, establish that Citibank's consent defense is based on

7   speculation and inadmissible hearsay, and therefore the defense cannot defeat certification.  Instead

8   of focusing on the governing law, Citibank's opposition is devoted almost entirely to Daley's

9   criticisms of Plaintiff's experts' method for identifying class members and calculating damages

10  ("the method").  At her deposition, however, Daley made one damaging concession after another,

11  including that she relied on data that she believes is inaccurate to challenge the method, and that she

12  has "no idea" whom Citibank called or whether Citibank made wrong number calls.

13       However, one important fact came out after Plaintiff filed his motion for class certification,

14  which is relevant to the method:  Citibank systematically deleted consent information and did not

15  maintain a database of consent change requests (aka the "Contact Utilities Database"), until

16  November 2017, shortly after Plaintiff threatened to file this lawsuit.  *See* Opposition to Class

17  Certification ("Opp'n Brf."), at 5:14-25.  Citibank tries to exploit this fact as a basis for denying

18  certification, but that is a tactic this Court has rejected before.  *Etter v. Allstate Ins. Co.*, 323 F.R.D.

19  308, 313 (N.D. Cal. 2017) (a defendant "should not benefit from their poor recordkeeping by

20  dodging a class action on that basis.").  To account for this development, Plaintiff proposes the

21  following alternative class definition:

22           Jeremiah Revitch and all persons in the United States (1) whose cellular telephone
             is identified in Defendant's Contact Utilities Database; (2) who between March
23           17, 2014, through August 21, 2018; (3) were called on their cellular telephone by
             Defendant or its agent/s using its Aspect Unified dialer; and (4) where such
24           person was not listed in Defendant's records as the intended recipient of the calls.[1]

25

26  _____

27  [1] The August 21, 2018 date identified in the class definition is dictated by the dates covered by the
    call logs and Contact Utilities Database produced by Citibank.  If the Court ordered Citibank to
28  provide a supplemental production of its call logs and Contact Utilities Database records, the class
    definition could be modified to include more recipients of wrong number calls.

## II.  ARGUMENT

### A.      The Predominance Requirement Is Satisfied

#### 1.      Citibank's Consent Defense Cannot Support Denial Of Certification

A defendant in a TCPA case cannot defeat certification based on speculation that some class members might have consented.[2]  Last year, in *True Health*, 896 F.3d at 932, the Ninth Circuit reaffirmed that rule, and held that in the context of class certification and the TCPA, "we do not consider the consent defenses that [the defendant] might advance or for which it has presented no evidence."  The question, therefore, is what evidence has Citibank presented that putative class members consented to receive wrong number calls?  The answer is "none."  As set forth below, the defense is necessarily speculative because Citibank's expert witness Margaret Daley disclaims any knowledge of whom Citibank called or whether they received a wrong number call.  Instead, Citibank relies on speculation that account level documents *might* resolve that issue.  Yet Daley and her team reviewed <u>hundreds</u> of those documents, and she still could not say whether anyone received a wrong number call or an authorized call.  The documents also cannot support Citibank's defense because they are inadmissible double hearsay.

#### a.      Daley Testified She Has "No Idea" Who Received A Wrong Number Call.

Citibank relies on the opinions of its expert Daley to argue that individualized issues of consent defeat certification.  *See, e.g.*, Opp'n Brf., 18:13-18; 19:15; *see also id.* at 12:17-15:7; Daley Report, ¶¶ 57, 152, 183.  Daley, however, disclaims any knowledge of who was called, and does not contend that anybody associated with the 176 telephone numbers identified in Plaintiff's sample set consented to receive calls.  During her deposition, Daley was asked about a statement in her expert

---

[2] *See, e.g.*, *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1042 (9th Cir. 2012) (rejecting argument "that individualized issues of consent should have precluded a finding of typicality or commonality because some debtors might have agreed to be contacted" where the defendant "did not show a single instance where express consent was given before the call was placed"); *Reyes v. Educ. Credit Management Corp.*, 322 F.R.D. 552, 561 (S.D. Cal. 2017) (granting class certification because "without evidence of actual consent during the class period, the evidence before the Court on the issue of consent during the Class Period is merely speculative"); *Abdeljalil v. Gen. Elec. Capital Corp.*, 306 F.R.D. 303, 311 (S.D. Cal. 2015) (granting certification of TCPA action where "defendant's argument concerning a spouse or agent providing express consent is pure speculation.").

report that "the overwhelming majority of calls marked as wrong numbers appear to have been made to account holders."  Daley Report, ¶ 70.  Daley conceded, "I have no idea who actually received those calls … I don't know who received those calls."  Ex. 1, Daley Dep., 124:21-24. Daley also made a list of names of people she believed were associated with the sample set of 176 telephone numbers identified by Plaintiff's experts.  *See id.* at 257:6-258:20.  Daley never determined whether anybody identified on the list received a wrong number call:

> Q.   But my question is:  Did you make the determination whether or not
>       Carlos Davila received a wrong number call from Citibank?
>
> A.   Nobody made that determination. …
>
> Q.   A moment ago when you said nobody made that determination, were you
>       referring just to Carlos Davila specifically or all the names on – itemized
>       on Exhibit 63?
>
> A.   I think all of them. …

*See id.* at 260:2-18.  She also testified, "I certainly have not been retained to say that any individual consented in any particular situation for any particular call."  *Id.* 22:12-14.  In her report, Daley also states that Citibank has "outdated information for some people" because it is not informed when numbers are reassigned, and that "[i]t is impossible to determine which numbers are subject to this problem."  Daley Report, ¶ 80.  Given that Citibank's expert disclaims any knowledge of who was called and whether they received a wrong number call, and believes it is impossible to make that determination, any contention that putative class members consented to receive wrong number calls is necessarily speculative.

> **b.    Citibank's Account-Level Documents Cannot
>         Support Its Consent Defense**

Citibank argues that the predominance requirement cannot be satisfied here because "the only way to reliably resolve the question of consent is by individually reviewing account-level documents [aka 'account notes'] relating to each putative class member."  Opp'n Brf., 17:15-17 (emphasis added); *see also id.* at 9:23 (arguing "an individual manual examination of the account notes is needed."); *accord*, *e.g.*, *id.* at 13:6-7; 18:22-24.  That argument assumes that the account notes can "reliably resolve the question of consent," but the evidence shows they cannot.  Daley conducted a "direct manual examination of the account notes pertaining to a randomly selected

sample of 430 accounts, and the account notes pertaining to the 176 accounts identified in Weir's declaration." Daley Report, ¶ 32, fn. 18; *id.* at ¶ 33 ; Ex. 1, Daley Dep., 280:9-11 ("Q: So you and your team reviewed account level documents, correct? A: Yes, we did."). Citibank described her work as a "painstaking account-by-account review." Opp'n Brf., 5:28. Yet she still testified that she has no idea whom Citibank called, or whether putative class members received a wrong number call or consented to receive the calls. *See* Section II(A)(1)(a) above.

Citibank also cannot rely on account notes to support its consent defense at trial because they are inadmissible double hearsay. The outcome in *Kristensen v. Credit Payment Servs.*, 12 F. Supp. 1292, 1307 (D. Nev. 2014), is instructive. There, the defendant in a TCPA class action sought to support its consent defense with the declarations of two individuals, but the court concluded "neither [had] personal knowledge whether [the plaintiff] or the other purported class members consented" to receive calls. *Id.* The court then reasoned that "[i]f … Defendants can provide no evidence of consent, Defendants will probably lose on this issue regardless of who carries the burden at trial. Class members could provide individual affidavits averring lack of consent, and Defendants would be unable to rebut with anything other than the unfounded testimony of James Gee and Michael Ferry." *Id.*; *see also Shelter Mortg. Corp. v. Castle Mortg. Co., L.C.*, 117 Fed. Appx. 6, 10 (10th Cir. 2004) (holding lower court correctly excluded inadmissible hearsay offered in support of affirmative defense).

The reasoning in *Kristensen* applies here because Citibank relies an inadmissible double hearsay to support its consent defense. Even if any statements by people described in the account notes are probative of consent, they represent a first level of hearsay. *See Doe v. Reddy*, 2004 WL 5512966, at *5 (N.D. Cal. Mar. 24, 2004) (Alsup, J.) (explaining that business records may have a "'hearsay within hearsay' problem"). The account notes themselves represent a second level of hearsay, and do not qualify for the business records hearsay exception under Federal Rule of Evidence 803(6). Under Rule 803(6)(E), the business records exception to the hearsay rule does not apply if "the source of information or the method or circumstances of preparation indicate lack of trustworthiness." As this Court has held, "Rule 803(6) is not an open window through which any self-serving in-house internal hearsay sails into evidence at the author's behest." *Oracle Am., Inc. v.*

*Google Inc.*, 2016 WL 5393938, at *13 (N.D. Cal. Sept. 27, 2016) (Alsup, J.), *reversed on other grounds in* 886 F.3d 1179 (Fed. Cir. 2018).  "[O]ff-hand impressions" of employees are not trustworthy business records.  *Monotype Corp. PLC v. Int'l Typeface Corp.*, 43 F.3d 443, 450 (9th Cir. 1994).

There are two reasons Citibank cannot dispute this reasoning.  <u>First</u>, in its opposition brief, Citibank argues that its own records of customer complaints about wrong number calls, submitted as Exhibits 10-13 to the Reyda Declaration in Support of the Motion for Class Certification, are all "inadmissible hearsay."  Opp'n Brf., 11:21-22.  Citibank cannot have it both ways.  If the records of customer complaints are inadmissible hearsay, then it necessarily follows that account notes that purportedly contain similar information from call recipients also must be inadmissible hearsay.

<u>Second</u>, the evidence also shows that the account notes do not meet the trustworthiness requirement of Federal Rule of Evidence 803(6)(E).  Daley agreed that account notes have incorrect information as a result of "human error" because an agent may "misinterpret what's being told to them, and they make a decision to change an indicator code that isn't accurately reflecting what the customer wanted or instructed to, then the phone indicator database would reflect that error.  That's because there's no perfect system when you're dealing with human beings."  Ex. 1, Daley Dep., 113:10-24; *see also id.* at 111:15-19 ("THE WITNESS:  So people may say 'Hey, this is the wrong number.'  Or what they say might be interpreted by the – the customer service agent is it's a bad number, it's a wrong number may be incorrectly.").  In her report, Daley explains that the account notes "include free-text entered by customer service agents, who make frequent use of shorthand text and abbreviations (which are inconsistently applied)," and which "include numerous typographical errors."  Daley Report, ¶ 34.

Daley describes in her report several examples of agent error affecting information in the account notes, and she further testified as follows:

> Q:  Did you conduct any analysis of how frequently agents make mistakes in terms of flagging wrong numbers or any other consent codes?
>
> A:  Well, we looked at the -- the data of the account records and we noted it where we saw it.  Obviously, it happened with Revitch.  It happens here.  I mean, it -- it's something that occurs.

1

Q:      Where did you note it?  Did you keep a running tally?

2

A:      In the report we've identified it [*i.e.*, Daley's expert report].

3

Q:      So this report contains every instance where you found an example of
        agent error?

4

5

A:      No.

6

Ex. 1, Daley Dep., 168:8-23; *see also* Daley Report, ¶ 134 (describing how a phone number "had

7

been improperly marked as a 'wrong number' on his account"); *id.* at ¶ 121 ("The agent reported

8

that they were unable to update the consent flag on one of the customer's accounts despite multiple

9

attempts and completing troubleshooting steps including logging out and back into the system").

10

Daley also volunteered that revoking consent often involves "a communication with an individual

11

and so it's more likely to have room for error …."  Ex. 1, Daley Dep., 121:7-11.

12

        Plaintiff's experience provides an example of why the account-level documents are

13

untrustworthy.  Daley acknowledged that both before and <u>after</u> Plaintiff asked not to be called,

14

Citibank's account notes contained incorrect information.  *Id.* at 95:5-13 ("… we know in particular

15

with regard to Revitch that he asked not to be called and there was a delay in putting the bad

16

number code in.  So I would presume that in the time and – between when he made that request and

17

it wasn't fulfilled – and it was fulfilled, but there was a code that was not correct with regard to his

18

consent."); *see also id.* at 138:11-23 (testifying about "outdated" information concerning Revitch's

19

phone number in account records).  Citibank's opposition brief, and a supporting declaration,

20

provide further admissions that the account notes for Plaintiff contained incorrect information.  *See*

21

Mullahey Decl., ¶ 18 ("the agents that handled the calls [from Plaintiff] did not disposition the calls

22

in the system as 'wrong,' as required by Citibank's 'wrong' number policies and procedures.")

23

Opp'n Brf., 10:8-10; 10:25-26 (first stating, "the notes for Mr. Exerod's account do not reflect any

24

conversation or contact with anyone [including Plaintiff]," and then acknowledging in a footnote

25

that the conversations with Plaintiff occurred).  In short, the evidence establishes that the account

26

notes that Citibank relies on to support its consent defense are inadmissible double hearsay.  Under

27

*True Health* and *Kristensen*, Citibank's consent defense therefore cannot defeat certification.

28

1

2

### 2.   Citibank's Legal Authorities Do Not Support Denial Of Certification

3

Citibank primarily relies on three "wrong number" cases in support of its opposition:

4

*Wilson*, *Davis*, and *Tomeo*.  All are distinguishable.  Unlike this Court, the Florida district court in

5

*Wilson* was bound by and followed an Eleventh Circuit decision that did not distinguish between

6

how claims and affirmative defenses are analyzed for purposes of the predominance requirement.

7

*Wilson v. Badcock Home Furniture*, 2018 WL 6660029, at \*4 (M.D. Fla. Dec. 19, 2018) (citing

8

*Babineau v. Federal Exp. Corp.*, 576 F.3d 1183, 1191 (11th Cir. 2009)).  In his opening brief,

9

Plaintiff argued that the Ninth Circuit's decisions in *Cameron* and *True Health* govern whether and

10

under what circumstance an affirmative defense can defeat the predominance requirement.[3]

11

Citibank rebuts none of Plaintiff's arguments, and says nothing about these decisions.

12

*Davis v. AT&T Corp.*, 2017 WL 1155350 (S.D. Cal. Mar. 28, 2017), also is distinguishable

13

because, as Judge Gonzalez-Rogers explained when distinguishing *Davis* in *West*, "the court's

14

holding as to predominance was based largely on plaintiffs' failure to articulate how a reverse

15

number lookup service could be utilized to resolve 'consent or lack thereof' on a classwide basis."

16

*West v. Cal. Service Bureau, Inc.*, 323 F.R.D. 295, 306 (N.D. Cal. 2017).  "By contrast, in [*West*, as

17

here,] plaintiffs' TCPA expert … explains precisely how a reverse number lookup service could be

18

used to resolve consent issues on a classwide basis."  *See also* Snyder Report, ¶ 89; *see id.* at ¶¶ 61-

19

88.

20

As for *Tomeo v. Citigroup, Inc.*, 2018 WL 4627386 (N.D. Ill. Sep. 27, 2018), Citibank does

21

not respond to arguments in Plaintiff's opening brief about that case.  In its opposition, Citibank

22

states that the "court found the issue of consent is decisive and predominance lacking because <u>the</u>

23

<u>evidence</u> showed that a significant percentage of the putative class consented to receiving calls."

24

Opp'n Brf., 22:1-3 (emphasis added).  "Evidence" is the operative word here because, as shown in

25

Section II(A)(1) above, Citibank's expert disclaims any knowledge of who received calls and relies

26

on speculation that unreliable hearsay records can resolve the consent issue.

27

---

28

[3] *See generally* Opening Brf., at pp. 14, 17-18; *see also Cameron*, 547 F.2d at 478 (holding individualized issues concerning defense did not preclude certification); *True Health*, 896 F.3d at 932 (defense cannot defeat predominance without supporting evidence).

3fa8925ce8bd4d54

Finally, other cases cited by Citibank are not instructive because they did not involve wrong number calls and predate the Ninth Circuit's more recent decisions governing the affirmative defense of consent in TCPA actions.  For instance, Citibank cites this Court's decision in *Fields v. Mobile Messengers Am., Inc.*, 2013 WL 6073426 (N.D. Cal. Nov. 18, 2013), without disclosing that it has a red flag on Westlaw.  This Court later explained in *Etter*, 323 F.R.D. at 313, that its earlier decision in *Fields* was not controlling in light of the Ninth Circuit's subsequent decision in *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037 (9th Cir. 2017).

### 3.     Citibank's Criticisms Of Plaintiff's Experts Do Not Support Denial Of Certification

Citibank's criticisms of Plaintiff's experts are irrelevant for the reasons set forth in Section II(A)(1) above.  They also are wrong.  For starters, Citibank states twice in its brief that Snyder does not opine that the method identifies recipients of wrong number calls, but cites no supporting evidence.  Opp'n Brf., 2:15-16; 20:11-14.  The reason Citibank cites no evidence is that its statement is false.  Snyder Report, ¶ 89; *see id.* at ¶¶ 61-88; Ex. 2, Snyder Dep., 71:15-72:9; 92:20-93:18; 114:12-20; Daley Report, ¶ 46.  Citibank's expert Daley cannot evaluate the method because she is not familiar with the software used to conduct the method, or the underlying algorithms, and she never replicated the method.  Ex. 1, Daley Dep., 27:6-8; 28:10-12; 224:3-6; 246:21-247:5; Ex. 5, Weir Rebuttal Decl., ¶¶ 5-7.  Instead, as explained more fully below, Daley changed the method to get an extreme result Citibank wanted (zero wrong number calls in the sample set of 176), but then testified that her application of the method was based on unreliable data.

#### a.     Daley Altered The Method And Then Testified That Her Alterations Were Based On Unreliable Data

Citibank and Daley criticize Plaintiff's expert Weir for not using the "last seen" date in TransUnion's TLOxp data, which they claim is "critical information."  Daley Report, ¶¶ 81-82; Opp'n Brf., 14:5-8.  For context, the "first seen" date identifies the earliest date an individual's name is associated with a phone number, based on, for instance, credit card applications or new utility accounts.  Daley Report ¶ 74; Ex. 5, Weir Rebuttal Decl., ¶ 31.  The "last seen" date represents the last time an individual's name was associated with a number.  *Id.*  TLOxp's data may show multiple first and last seen dates.  Citibank and Daley first claim Snyder's method required

1    Weir to use the "last seen" date and to exclude any name where there was "inconsistent data," and

2    then claim Weir did not execute the method "according to Snyder's expectations."  Daley Report, ¶

3    56.  Based on that false premise and relying on the "last seen" date, they claim that 120 of the 176

4    telephone numbers identified in connection with Plaintiff's method must be excluded from the list

5    of numbers that received wrong number calls.  Opp'n Brf., 14:11-15.  That is wrong.

6          <u>First</u>, Snyder did not testify that Weir must use the "last" seen dates; Citibank's counsel

7    never asked Snyder what he considered to be "inconsistent" data; and Snyder did not dictate that

8    purported conflicts can only be resolved by excluding people from the class list.  Ex. 4, Snyder

9    Rebuttal Decl., ¶¶ 10, 12-14.  Daley admitted she had no idea what Snyder considered to be

10   "inconsistent data," and interpreted the term to suit her purposes.  Ex. 1, Daley Dep., 212:20-24

11   ("Q: Do you know what Mr. Snyder meant when he used the term 'inconsistencies in data'?  A: I

12   know what I interpreted it to mean.  What was inside his head you would have to ask him.").  The

13   steps that Weir took are consistent with Snyder's method.  Ex. 4, Snyder Rebuttal Decl., ¶¶ 9, 14.

14         <u>Second</u>, contrary to what Daley did, Plaintiff's experts used the most recent "first seen" date

15   to determine the name of person Citibank called, and Weir explained why:

> it would be very difficult for someone to become associated with a phone number
> before they actually were associated with the phone number.  So let's say you are
> about to go get a cell phone, TransUnion is not going to know what number you
> are going to get in advance. So I believe the most accurate information about the
> most current customary user is the first-seen date data ....

Ex. 3, Weir Dep., at 275:23-276:12.  Weir also explained he did not rely on the "last seen" date

contained in the TLOxp data because it often contains outdated information:

> So, for example, you go online and you sign up for a utility and you discontinue
> your cell phone, but you never changed the number associated with the account,
> and so, again, I rely upon the first-seen dates since those are going to be more
> reliable indicia of when a new person is affiliated with a number than the last seen
> dates."

*Id.* at 326:9-327:4; *see also* Ex. 5, Weir Rebuttal Decl., ¶¶ 31-34; *see also* Ex. 4, Snyder Rebuttal

Decl., ¶¶ 13-14.  When asked about whether the "last seen" dates can have outdated information,

Daley testified, "[i]t's possible, but I don't really have an opinion."  Ex. 1, Daley Dep., 140:21-22.

         <u>Third</u>, although Citibank and Daley represent to the Court that the "last seen" dates are

"critical" information that must not be ignored, at her deposition Daley testified she does not believe the "last seen" dates (or the first seen dates) are "accurate, just period, under any circumstances." Ex. 1, Daley Dep., 98:19-20; *see also id.* at 99:3-5 ("…my personal view and my opinion [is] that those dates are inaccurate in general and unreliable").  Yet Daley relied on the "last seen" dates to challenge the results of Plaintiff's method.  Citibank therefore has no evidentiary basis to claim that Daley's results are correct and Plaintiff's experts are wrong.[4]

### b. Daley Admitted That Weir Obtained Reliable Name And Phone Number Data From TransUnion

One of Citibank's primary criticisms is that TransUnion's TLOxp reverse lookup service is purportedly unreliable overall, and unsuitable for the purpose used here.  However, here is what Daley said when asked about the use of TLOxp in connection with the "proof of concept" sample described in Weir's expert report:

> Q. Okay.  Do you know for the 20,000 Citibank customers that were sampled by Mr. Weir how many were accurately matched by name and number through TransUnion?
>
> A. I -- oh, it was a really high number.  It was like 98 percent, something like that …

Ex. 1, Daley Dep., 242:1-6.[5]  Daley also attached several documents to her report discussing the reliability and uses of TransUnion's TLOxp reverse lookup service, including its use by law enforcement personnel to identify people.  Exs. 6-8 (TransUnion documents that were originally attached as exhibits to Daley report).  Daley testified that the documents are accurate, and that consideration should be given to what TransUnion says about its products.  Ex. 1, Daley Dep. 14:5-8 ("Q: Is there anything in your report, the exhibits to that report or your opinions that you believe

---

[4] In her report, Daley similarly criticizes Weir for not using a certain TransUnion feature called "probability of ownership scores," but then testified that the feature is unreliable and should not be used.  *See* Daley Report, ¶¶ 94-95 (criticizing Weir regarding probability of ownership scores); Ex. 1, Daley Dep., 131:17-22 ("I wouldn't use the probability score.  I wouldn't be use any of it.  I don't think it's capable in any way, shape or form of identifying the class members ….").  Daley also has no basis to opine on this issue because she admitted she is not an expert in probability or statistics. Ex. 1, Daley Dep., 23:19-24:15; *see also* Ex. 5, Weir Rebuttal Decl., ¶¶ 35-42.

[5] Daley also testified that the TLOxp data accurately identified the mobile status of the sample telephone numbers.  Ex. 1, Daley Dep., 211:5-8; Ex. 7, Weir Rebuttal Decl., ¶ 20.

1    to be inaccurate?  A: No."); 145:6-9 ("Q: Okay.  [Weir] should not ignore what TransUnion says

2    about its products?  A:  I think it's -- I think it's a data point that he should be considering.").

3           Daley's opinions about the purported unreliability of TransUnion's data are similar to

4    opinions she unsuccessfully offered in *Johnson v. Navient Sols., Inc.*, 315 F.R.D. 501, 502–03 (S.D.

5    Ind. 2016), where the court granted certification of a wrong number class.  *Id.* at 68:19-69:13

6    (testifying about Daley's opinions in *Johnson*).  Other courts have rejected similar arguments about

7    the reliability of reverse lookup services where the defendant claimed a much higher error rate than

8    the 2% identified in Daley's testimony above.  *See Abante Rooter & Plumbing, Inc. v. Alarm.com,*

9    *Inc.*, 2017 WL 1806583, at *4 (N.D. Cal. May 5, 2017) (rejecting argument that a possible 14%

10   error rate for the LexisNexis reverse lookup service supported denial of certification); *Krakauer v.*

11   *Dish Network, L.L.C.*, 2015 WL 5227693, at *9 (M.D.N.C. Sep. 8, 2015) (same).

12                        **c.      Daley's Criticisms Concerning First Names And**
                                   **Business Names Ignore Weir's Testimony**
13

14          Citibank briefly argues that Plaintiff's method is unreliable because, for purposes of the

15   proof of concept sample, the name matching step did not exclude businesses.  Opp'n Brf., 21:1-4.

16   Citibank also complains that the name matching step only considered whether the last names were

17   the same or similar, and thus anybody who changed their last name could be misidentified as

18   someone who received a wrong number call.  *Id.* at 20:19-21; Daley Report, ¶ 77.  Weir testified

19   that the method could easily be modified to address those criticisms, and neither Daley nor Citibank

20   have ever offered any rebuttal to that testimony.  *Compare* Ex. 3, Weir Dep., 267:14-268:23;

21   272:14-273:2; 357:5-20 *with* Ex. 1, Daley Dep., 222:3-224:6; *see also* Ex. 5, Weir Rebuttal Decl.,

22   ¶¶ 9-13; Ex. 4, Snyder Rebuttal Decl., ¶ 11.  In fact, he has already done so, and the method

23   continued to identify a large number of calls to a large number of unique telephone numbers.  Ex. 5,

24   Weir Rebuttal Decl., ¶¶ 62-65.

25          **B.      Citibank's Manageability/ Superiority Arguments Ignore *Briseno***

26          Citibank's arguments about manageability and superiority rehash and rely on its arguments

27   that Plaintiff's expert's method purportedly cannot "identify" class members.  That is really an

28

argument about ascertainability, which is not a requirement here.  *See Briseno v. ConAgra Foods Inc.*, 844 F.3d 1121, 1126 (9th Cir. 2017).

### C.   Plaintiff Satisfies Rule 23(a)'s Requirements

#### 1.   Citibank Does Not Contest Commonality Or Adequacy

Citibank does not address the adequacy prong of Rule 23(a)(4).  Citibank also offers only a conclusory statement, without supporting argument, that Plaintiff failed to meet Rule 23(a)(2)'s commonality requirement (Opp'n Brf., 4:7), but that is insufficient to raise the issue.  *See Kohler v. Inter-Tel Techs.*, 244 F.3d 1167, 1182 (9th Cir. 2001) ("Issues raised in a brief which are not supported by argument are deemed abandoned.").  Plaintiff has satisfied Rule 23(a)(2) and (4).

#### 2.   Plaintiff Satisfies The Typicality Requirement

Citibank argues that Plaintiff's claims are not "typical" because application of his expert's method would not identify him.  That argument has nothing to do with the "permissive" standard for typicality, which turns on whether the named plaintiff has "the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiff[ ], and whether other class members have been injured by the same course of conduct."  *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010).  The defendant in *Johnson*, 315 F.R.D. at 501, unsuccessfully made a similar argument Citibank makes here, and the court certified a wrong number class.  Ex. 1, Daley Dep., 67:8-12 (describing her opinions in *Johnson*).

The method does not capture Plaintiff because Citibank did not start keeping track of consent change data until November 2017—after Plaintiff threatened a class action lawsuit.[6]  Opp'n Brf., 5:18-25 (describing change in policy).  Citibank deleted consent data by overwriting pre-November 2017 consent data in its dialer systems.  Ex. 1, Daley Dep., 274:11-276:19.  As this Court and many other courts have held, a defendant "should not benefit from their poor recordkeeping by dodging a class action on that basis."  *Etter*, 323 F.R.D. at 315; *see also, e.g., Del Valle v. Glob. Exch. Vacation Club*, 320 F.R.D. 50, 61 (C.D. Cal. 2017) ("[c]lass certification cannot be defeated by Defendants' poor record-keeping" because that "would incentivize companies to not keep

---

[6] For the record, TransUnion information provides correct information for Revitch.  Ex. 5, Weir Rebuttal Decl., ¶ 29.

records, or not require that their vendors keep records, in an attempt to circumvent TCPA

liability.").  As noted in the Introduction, Plaintiff has proposed an alternative class definition to

account for Citibank's destruction of consent records.

### 3.   Plaintiff Satisfies The Numerosity Requirement

Citibank's numerosity arguments rely on Citibank's criticisms of Plaintiff's method, which

are already addressed above.  Even putting those criticisms aside, Citibank does not deny the rule

that "[i]n analyzing numerosity, a court may make common-sense assumptions and reasonable

inferences." *West*, 323 F.R.D. at 303.  Citibank's expert Daley testified that the total number of

calls Citibank made was "substantially more than 70 million." Ex. 1, Daley Dep., 17:10-18:10.  She

also stated that "cellular telephone numbers turn over at a substantial rate," "100,000 numbers are

reassigned by wireless carriers every day," and that "this churn rate is even higher for cellular

number owners experiencing financial distress." *Id.* at 14:16-16:18.  Daley does not opine, and

Citibank does not contend, that Citibank never makes wrong number calls. *Id.* at 19:6-8.  Given the

huge number of calls, it is reasonable to infer that at least forty wrong number calls were made. *See*

*Abdeljalil*, 306 F.R.D. at 308 ("it is clearly reasonable that at least 40 class members or more can be

identified from defendant's 340 million account holders").[7]

### D.   The Arbitration Agreement Does Not Preclude Certification

Citibank does not respond to Plaintiff's argument that the scope of Citibank's arbitration

agreement does not apply to wrong number calls.  Instead, Citibank appears to take the position that

the mere existence of an arbitration agreement is sufficient to defeat certification, regardless of

whether it applies to the dispute at issue. *See* Opp'n Brf., 23:2-18.  None of the cases Citibank cites

---

[7] Citibank cites *Davis v. Astrue*, 250 F.R.D. 476, 485 (N.D. Cal. 2008), for its numerosity argument, but that case is distinguishable because unlike here, the plaintiff relied on no evidence from the defendant of how many putative class members there were.  Citibank also cites *Southwell v. Mortg. Inv'rs Corp. of Ohio*, 2014 WL 3956699, at *2 (W.D. Wash. Aug. 12, 2014), but unlike here, the plaintiffs "fail[ed] to present any factual support for the numerosity element in their opening brief … [and] only a single sentence [in their reply] indicated that they were prepared to submit any evidence in support of this element."

1  support that position.  Unlike here, in each case Citibank cites, there was no dispute that the scope

2  of the arbitration agreement covered the claims of putative class members.[8]

3         Citibank also argues, without explanation, that individualized determinations are required to

4  resolve any challenges to the enforceability and scope of the arbitration agreement.  Citibank

5  produced only one arbitration agreement in response to discovery requests.  *See* Exhibit 7 to Reyda

6  Decl. ISO Class Certification (Doc. No. 84-1) and Grayot Ex. 1 (Doc. No. 105-4).  Citibank does

7  not deny that the governing law for that agreement is the same for all class members (i.e., "Federal

8  law and the law of South Dakota"), and does not explain how the interpretation of the agreement

9  would differ from one class member to the next.  The cases that Citibank cites where arbitration

10  agreements defeated certification are distinguishable because there was no uniform choice-of-law

11  provision, and therefore the need to apply different state laws to different class members defeated

12  predominance.  *See Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 728 (9th Cir. 2007)

13  ("predominance was defeated because AWS's intent to seek arbitration of the class would

14  necessitate a state-by-state review of contract conscionability jurisprudence"); *Ford Motor Credit*

15  *Co. v. Agrawal*, 71 N.E.3d 671, 681 (Ohio Ct. App. 2016) (following the reasoning in *Lozano*).[9]

16         **E.      The Court May Certify A Class Under Rule 23(b)(2)**

17         Citibank argues that certification under Rule 23(b)(2) is inappropriate unless the claims for

18  monetary damages are incidental.  That argument is an incomplete statement of the law, and also is

19  beside the point because Plaintiff does not seek to certify a class under Rule 23(b)(2) for purposes of

20  monetary damages.  In *Smith v. Univ. of Wash. Law Sch.*, 233 F.3d 1188, 1196 (9th Cir. 2000), the

21

22  [8] *See Campanelli v. Image First Healthcare Laundry Specialists, Inc.*, 2018 WL 6727825, at *1
   (N.D. Cal. Dec. 21, 2018) (explaining there was "uncontroverted evidence that the vast majority of
   putative class/collective action members are subject to" arbitration); *Tan v. Grubhub, Inc.*, 2016 WL
23  4721439, at *1 (N.D. Cal. July 19, 2016) (describing scope of arbitration agreement); *O'Connor v.
   Uber Techs., Inc.*, 904 F.3d 1087, 1095 (9th Cir. 2018) (concluding that arbitration agreement
24  applied and was enforceable).

25  [9] Other decisions cited by Citibank are inapposite.  *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207
   F.3d 1126, 1130 (9th Cir. 2000), is not a class certification decision and did not address the issue at
26  all.  *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 725 n.5 (11th Cir. 1987) noted in dicta that
   class members who were subject to arbitration could not be class members, but did not hold that the
27  issue involved an individualized issue.  Similarly, in *Pablo v. ServiceMaster Glob. Holdings, Inc.*,
   2011 WL 3476473 (N.D. Cal. Aug. 9, 2011), there was no argument that the interpretation of an
28  arbitration agreement involved individualized issues.

1    Ninth Circuit held that Rules 23(b)(2) and (b)(3) "are not mutually exclusive."  Hence, "[courts]

2    may certify a damages-seeking class under Rule 23(b)(3), and an injunction-seeking class

3    under Rule 23(b)(2)."  *Buchanan v. Tata Consultancy Servs., Ltd.*, 2017 WL 6611653, at *23 (N.D.

4    Cal. Dec. 27, 2017); *see also Makaron v. Enagic USA, Inc.*, 324 F.R.D. 228, 234 (C.D. Cal. 2018)

5    ("courts may, and often do, utilize this type of 'hybrid' certification."); 2 Newberg on Class Actions

6    § 4:38 (5th ed.) (discussing hybrid class actions).  That is what Plaintiff seeks here.

7          Although not cited by Citibank, it has come to Plaintiff's counsel's attention that in *Blair v.*

8    *Rent-A-Center, Inc.*, 2018 WL 5728924 (N.D. Cal. Nov. 1, 2018) (Alsup, J.), this Court denied

9    certification of an injunctive relief class under Rule 23(b)(2) where the defendant made the same

10    argument Citibank makes here.  However, the briefing in that case shows that plaintiffs did not

11    respond to the defendant's argument on reply.  *Compare* Opposition to Class Certification, Case No.

12    3:17-cv-02335-WHA, Doc. No. 119, at p. 25 *with* Reply ISO Class Certification, Doc. No. 127, at

13    p. 15.  Nor did the plaintiff cite the Ninth Circuit's decision in *Smith*, or the numerous decisions in

14    this District holding that hybrid certification is proper.[10]  This Court therefore did not have the

15    benefit of a full briefing on the issue in *Blair*, supporting a different outcome here.

16    **III.  CONCLUSION**

17          For the reasons set forth above and in his opening brief, the Court should grant Plaintiff's

18    Motion for Class Certification.

19    Dated: May 24, 2019                **BURSOR & FISHER, P.A.**

20                                       By:   /s/  *Joel D. Smith*

21                                             Joel D. Smith

22                                       L. Timothy Fisher (State Bar No. 191626)
                                         Joel D. Smith (State Bar No.244902)
23                                       Thomas A. Reyda (State Bar No. 312632)
                                         1990 North California Blvd., Suite 940
24                                       Walnut Creek, CA  94596
                                         Telephone: (925) 300-4455
25                                       Email:  ltfisher@bursor.com
                                                 jsmith@bursor.com
26    _____

27    [10] *See, e.g.*, *In re Qualcom Antitrust Litig.*, 328 F.R.D. 280 (N.D. Cal. 2018); *Buchanan*, 2017 WL
      6611653, at *23; *Zepeda v. Paypal, Inc.*, 2017 WL 1113293, at *17 (N.D. Cal. Mar. 24, 2017);
      *West*, 323 F.R.D. at 306; *McMillion v. Rash Curtis & Assoc.*, 2017 WL 3895764 (N.D. Cal. Aug.
28    22, 2016); *Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 535-544 (N.D. Cal. 2012).

treyda@bursor.com

*Attorneys for Plaintiff*