**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Joel D. Smith (State Bar No. 244902)
Yeremey O. Krivoshey (State Bar No. 295032)
Thomas A. Reyda (State Bar No. 312632)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail:  ltfisher@bursor.com
         jsmith@bursor.com
         ykrivoshey@bursor.com
         treyda@bursor.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEREMIAH REVITCH, on Behalf of Himself and all Others Similarly Situated,<br><br>                                   Plaintiff,<br>         v.<br><br>CITIBANK, N.A.,<br><br>                                   Defendant. | Case No.  3:17-cv-06907-WHA<br><br>**DECLARATION OF JOEL D. SMITH  IN SUPPORT OF PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**<br><br>Date:   February 14, 2019<br>Time:  8 a.m.<br>Court:  Courtroom 12, 19th Floor |

1    I, Joel D. Smith, declare as follows:

2    1.    I am an attorney at law licensed to practice in the State of California.  I am a partner

3    at Bursor & Fisher, P.A., counsel of record for Plaintiff.  I have personal knowledge of the facts set

4    forth in this declaration, and, if called as a witness, could and would competently testify thereto

5    under oath.  I make this declaration in support of Plaintiff's Reply in Support of Motion for Class

6    Certification.  I have personal knowledge of the facts set forth herein, and if called upon to do so, could

7    and would testify truthfully and competently with respect thereto.

8    2.    Attached hereto as **Exhibit 1** is a true and correct copy of excerpts of the deposition

9    of Citibank's expert witness Margaret Daley, taken in this matter on January 24, 2019.  The document

10   is filed under seal.

11   3.    .Attached hereto as **Exhibit 2** is a true and correct copy of excerpts of the deposition

12   of Plaintiff's expert witness Randall Snyder, taken in this matter on December 23, 2018.  The

13   document is filed under seal

14   4.    Attached hereto as **Exhibit 3** is a true and correct copy of excerpts of the deposition

15   of Plaintiff's expert witness Colin B. Weir, taken in this matter on December 28, 2018.  The document

16   is filed under seal.

17   5.    Attached hereto as **Exhibit 4** is a true and correct copy of the February 1, 2018 Reply

18   Declaration of Randall A. Snyder.  Portions of the document is filed under seal.

19   6.    Attached hereto as **Exhibit 5** is a true and correct copy of the February 1, 2018 Reply

20   Declaration of Colin B. Weir.  Portions of the document is filed under seal.

21   7.    Attached hereto as **Exhibit 6** is a true and correct of exhibit 8 attached to the Expert

22   Report of Margaret Daley (Doc. No. 110-8).

23   8.    Attached hereto as **Exhibit 7** is a true and correct copy of exhibit 9 attached to the

24   Expert Report of Margaret Daley (Doc. No. 110-8).

25   9.    Attached hereto as **Exhibit 8** is a true and correct copy of exhibit 11 attached to the

26   Expert Report of Margaret Daley (Doc. No. 110-8).

27

28

1    I declare under penalty of perjury that the foregoing is true and correct.  Executed on

2   January 25, 2019, in Walnut Creek, California,

3                                                          */s/ Joel D. Smith*
                                                              Joel D. Smith

# EXHIBIT 1

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1              UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF CALIFORNIA

2

JEREMIAH REVITCH, on          )
3  Behalf of Himself and All    )
Others Similarly Situated,    )
4                              )
                              )  Case No.
5          Plaintiffs,         )  3:17-cv-06907-WHA
                              )
6      vs.                     )
                              )
7  CITIBANK, N.A.,             )
                              )
8          Defendant.          )

9

10        The videotaped deposition of MARGARET

11  DALEY, called for examination, taken pursuant to

12  the Federal Rules of Civil Procedure of the United

13  States District Courts pertaining to the taking of

14  depositions, taken before JANET L. ROBBINS,

15  CSR No. 84-2207, Certified Shorthand Reporter of

16  the State of Illinois, at One North Franklin,

17  Suite 3000, Chicago, Illinois, on

18  January 24, 2019, at 8:58 a.m.

19

20      ***THIS DEPOSITION CONTAINS CONFIDENTIAL

21   INFORMATION PURSUANT TO THE PROTECTIVE ORDER***

22

23

24  PAGES 1 - 291

                                        Page 1

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | Q.    Okay.  Do you understand or agree that | 09:10:23 |
| 2 | providing inaccurate information to the Court is | 09:10:32 |
| 3 | not helpful? | 09:10:35 |
| 4 | A.    Yes. | 09:10:36 |
| 5 | Q.    Is there anything in your report, the | 09:10:37 |
| 6 | exhibits to that report, or your opinions that you | 09:10:40 |
| 7 | believe to be inaccurate? | 09:10:42 |
| 8 | A.    No. | 09:10:44 |
| 9 | (Daley Exhibit 58 was marked for | 09:11:18 |
| 10 | identification.) | 09:11:29 |
| 11 | BY MR. SMITH: | 09:11:29 |
| 12 | Q.    Ms. Daley, you should have a document | 09:11:36 |
| 13 | in front of you that has been marked Exhibit 58. | 09:11:38 |
| 14 | Do you see that document? | 09:11:42 |
| 15 | A.    Yes. | 09:11:43 |
| 16 | Q.    What is the document that's been marked | 09:11:44 |
| 17 | as Exhibit 58? | 09:11:46 |
| 18 | A.    It's an article that I wrote. | 09:11:47 |
| 19 | Q.    And was it your intention to provide | 09:11:50 |
| 20 | truthful information in the article that's been | 09:11:59 |
| 21 | marked as Exhibit 58? | 09:12:01 |
| 22 | A.    Yes. | 09:12:02 |
| 23 | Q.    I want to direct your attention to the | 09:12:02 |
| 24 | bottom of Page 2 of Exhibit 58. | 09:12:13 |

Page 14

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | Is it a true statement that cellular | 09:12:19 |
| 2 | telephone numbers turn over at a substantial rate? | 09:12:25 |
| 3 | A.   Yes. | 09:12:30 |
| 4 | Q.   Is it a true statement that | 09:12:31 |
| 5 | approximately 1,000 numbers are reassigned by | 09:12:35 |
| 6 | wireless carriers every day? | 09:12:39 |
| 7 | A.   I think you misspoke. | 09:12:51 |
| 8 | THE WITNESS:  Can you reread his -- | 09:12:54 |
| 9 | BY MR. SMITH: | |
| 10 | Q.   Let's -- I'm looking at the bottom | 09:12:55 |
| 11 | paragraph at the bottom of Page 2 of Exhibit 58. | 09:12:59 |
| 12 | You have a sentence there that starts "The FCC," | 09:13:05 |
| 13 | and then there's a hyperlink, "in 2017." | 09:13:08 |
| 14 | Do you see that? | 09:13:11 |
| 15 | A.   Yes, but I think you said 1,000 numbers | 09:13:11 |
| 16 | and I believe it's 100,000. | 09:13:13 |
| 17 | Q.   Thank you -- thank you for that. | 09:13:15 |
| 18 | 100,000 numbers are reassigned by | 09:13:17 |
| 19 | wireless carriers every day; is that a true | 09:13:20 |
| 20 | statement? | 09:13:23 |
| 21 | A.   I believe it is, if the FCC -- if you | 09:13:23 |
| 22 | have the FCC report. | 09:13:24 |
| 23 | Q.   Okay. | 09:13:26 |
| 24 | A.   I mean, the true statement is that I | 09:13:26 |

Page 15

| | | |
|---|---|---|
| 1 | believe 35 million numbers are disconnected and | 09:13:29 |
| 2 | aged. | 09:13:36 |
| 3 | Q.   Okay. | 09:13:36 |
| 4 | A.   I mean, this is information that I | 09:13:36 |
| 5 | received -- that I looked -- that I sourced from | 09:13:37 |
| 6 | somewhere else. | 09:13:41 |
| 7 | Q.   All right.  Further down that paragraph | 09:13:41 |
| 8 | you say, "This churn rate is even higher for | 09:13:45 |
| 9 | cellular number owners experiencing financial | 09:13:48 |
| 10 | distress." | 09:13:52 |
| 11 | Do you see that? | 09:13:53 |
| 12 | A.   Yes. | 09:13:53 |
| 13 | Q.   Did I read that one correctly? | 09:13:53 |
| 14 | A.   Uh-huh. | 09:13:54 |
| 15 | Q.   Okay.  And are you aware of any | 09:13:55 |
| 16 | information that suggests that sentence is | 09:13:56 |
| 17 | incorrect? | 09:13:59 |
| 18 | A.   No. | 09:14:00 |
| 19 | Q.   Have you looked at the call logs in | 09:14:00 |
| 20 | this case? | 09:14:05 |
| 21 | A.   Yes. | 09:14:07 |
| 22 | Q.   Okay.  Do you have any understanding | 09:14:08 |
| 23 | about the volume of calls made in the last four | 09:14:11 |
| 24 | years? | 09:14:14 |

Page 16

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | A.    Yes. | 09:14:14 |
| 2 | Q.    What is your understanding? | 09:14:14 |
| 3 | A.    It's quite substantial.  It's a large | 09:14:16 |
| 4 | bank. | 09:14:22 |
| 5 | Q.    Okay.  If -- | 09:14:23 |
| 6 | THE COURT REPORTER:  It's a large? | |
| 7 | THE WITNESS:  It's a large bank. | |
| 8 | THE COURT REPORTER:  Thanks. | |
| 9 | BY MR. SMITH: | |
| 10 | Q.    If Mr. Weir were to testify at trial | 09:14:24 |
| 11 | that the call log showed upward of 70 million call | 09:14:26 |
| 12 | detail records, would you have a basis to dispute | 09:14:34 |
| 13 | that? | 09:14:36 |
| 14 | THE WITNESS:  Can read that over? | 09:14:37 |
| 15 | MR. SMITH:  Do you mind reading the | 09:14:38 |
| 16 | question back. | 09:14:39 |
| 17 | (The reporter read the record as | 09:14:49 |
| 18 | requested.) | |
| 19 | THE WITNESS:  I believe that's not as | 09:14:51 |
| 20 | many.  I believe that's wrong. | 09:14:54 |
| 21 | BY MR. SMITH: | 09:14:55 |
| 22 | Q.    What is the basis for that belief? | 09:14:55 |
| 23 | A.    That I -- we -- we took the entire | 09:14:57 |
| 24 | amount of the calls and -- that was produced and | 09:15:00 |

Page 17

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1    it was more than 70 million.                   09:15:04

 2         Q.   Oh, you think the number is higher than   09:15:06

 3    70 million?                                     09:15:08

 4         A.   Yes, I do.                            09:15:09

 5         Q.   Okay.  Do you have any sense of how   09:15:09

 6    much higher?                                    09:15:12

 7         A.   I just know that it's substantially   09:15:12

 8    more than 70 million.                           09:15:14

 9         Q.   In the billions?                      09:15:17

10         A.   Potentially.                          09:15:18

11         Q.   Okay.                                 09:15:19

12         A.   I don't know where Mr. Weir would get 09:15:22

13    70 million.  But we may be talking about different 09:15:24

14    data sources, so it's important to understand what 09:15:27

15    data source he's looking at to get to the       09:15:31

16    70 million.                                     09:15:33

17         Q.   I see.  Okay.                         09:15:34

18         A.   I don't think that he ever uploaded the 09:15:35

19    entire database, but I may be wrong about that. 09:15:37

20         Q.   Well, let's just assume hypothetically 09:15:43

21    that the call is 70 million or a billion,       09:15:47

22    whichever the case may be.                      09:15:51

23              Is it your opinion that Citibank called 09:15:53

24    or reached the intended recipient of the call   09:15:56
```

Page 18

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | 100 percent of the time? | 09:15:59 |
| 2 | A.    I have no way of knowing that -- | 09:16:01 |
| 3 | Q.    Okay. | |
| 4 | A.    -- except Mr. Revitch apparently got a | 09:16:03 |
| 5 | wrong number call. | 09:16:08 |
| 6 | Q.    Are you offering the opinion that | 09:16:09 |
| 7 | Citibank never makes wrong number calls? | 09:16:11 |
| 8 | A.    No. | 09:16:14 |
| 9 | Q.    What's your best estimate of the number | 09:16:14 |
| 10 | of calls placed by Citibank that reached the | 09:16:18 |
| 11 | intended recipient? | 09:16:21 |
| 12 | A.    I have none. | 09:16:24 |
| 13 | Q.    Okay.  You wouldn't know if it's more | 09:16:26 |
| 14 | than 50 or less than 50? | 09:16:29 |
| 15 | A.    I have -- that was outside the scope of | 09:16:30 |
| 16 | my work. | 09:16:32 |
| 17 | Q.    Okay.  And you wouldn't know if it's | 09:16:32 |
| 18 | more than 10 percent or less than 10 percent? | 09:16:33 |
| 19 | A.    Again, outside the scope of my work. | 09:16:35 |
| 20 | But my work would tend to show you that it's | 09:16:36 |
| 21 | impossible to make that determination without | 09:16:38 |
| 22 | doing an account-by-account review. | 09:16:41 |
| 23 | Q.    Okay.  Do you have any reason to | 09:16:44 |
| 24 | question or doubt that Citibank made more than | 09:16:44 |

Page 19

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | 40 wrong number calls in the course of four years? | 09:16:48 |
| 2 | A.    I don't have an opinion on that. | 09:16:51 |
| 3 | Q.    Okay. | 09:16:54 |
| 4 | A.    I didn't -- I can state that none of | 09:16:59 |
| 5 | the records that were produced and reviewed by -- | 09:17:03 |
| 6 | by Mr. Weir as his class, there aren't 40 in that | 09:17:10 |
| 7 | proposed class.  And he did a pull of 20,000.  So | 09:17:14 |
| 8 | there's been -- there has not been produced in | 09:17:18 |
| 9 | this record evidence of 40 wrong number calls. | 09:17:22 |
| 10 | Q.    Okay.  And what is the basis for that | 09:17:26 |
| 11 | statement? | 09:17:31 |
| 12 | A.    All of the work that I did that's | 09:17:32 |
| 13 | represented in my report. | 09:17:33 |
| 14 | Q.    Okay.  Are you offering any opinion | 09:17:34 |
| 15 | about how many people might have received wrong | 09:17:36 |
| 16 | number calls? | 09:17:39 |
| 17 | A.    No. | 09:17:40 |
| 18 | Q.    Are you offering any opinion that | 09:17:40 |
| 19 | people can consent to receive wrong number calls? | 09:17:48 |
| 20 | A.    Can you repeat that? | 09:17:51 |
| 21 | Q.    Sure.  Is it your opinion that it is | 09:17:54 |
| 22 | possible for people to consent to receive wrong | 09:17:57 |
| 23 | number calls intended for someone else? | 09:18:01 |
| 24 | A.    Well, I don't know what -- what your | 09:18:03 |

Page 20

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | definition of a wrong number call is at that | 09:18:04 |
| 2 | point. | 09:18:08 |
| 3 | Q.    Intended for someone else. | 09:18:08 |
| 4 | A.    So your question is:  Is it -- is it | 09:18:11 |
| 5 | possible for me to consent to receive a call that | 09:18:12 |
| 6 | was intended for someone other than myself? | 09:18:17 |
| 7 | Q.    Are you offering an opinion on that | 09:18:20 |
| 8 | subject? | 09:18:22 |
| 9 | A.    Am I offering an opinion on that? | 09:18:22 |
| 10 | I think "consent" is a legal opinion | 09:18:25 |
| 11 | and something that -- you know, whether or not | 09:18:27 |
| 12 | someone consents is -- is a -- that's a | 09:18:30 |
| 13 | definition, it's a legal issue that would be up to | 09:18:32 |
| 14 | the Judge. | 09:18:38 |
| 15 | But from a personal perspective, I | 09:18:38 |
| 16 | certainly can consent to receive calls from my | 09:18:40 |
| 17 | husband.  If we're both on a -- on an -- accounts | 09:18:44 |
| 18 | or I'm identified as a contact and I know that | 09:18:48 |
| 19 | I've been identified as a contact and I pick up | 09:18:53 |
| 20 | his phone instead of somebody else, then sure. | 09:18:56 |
| 21 | Q.    Okay.  And is that an opinion that | 09:18:58 |
| 22 | Citibank has asked you to put forward in this | 09:19:00 |
| 23 | case? | 09:19:04 |
| 24 | A.    Well, there are -- there's certainly | 09:19:04 |

Page 21

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | instances of consent or apparent consent that are | 09:19:08 |
| 2 | addressed in my report on an anecdotal basis, | 09:19:15 |
| 3 | which has to do with the review that I did of the | 09:19:19 |
| 4 | 176 alleged class members that were identified by | 09:19:21 |
| 5 | Mr. Weir. | 09:19:25 |
| 6 | And so to the extent that I reviewed | 09:19:26 |
| 7 | the account records and was able to identify | 09:19:32 |
| 8 | language within the account records or activity | 09:19:35 |
| 9 | within the account records or aspects of the | 09:19:38 |
| 10 | account records which would indicate the consent | 09:19:44 |
| 11 | was potentially there, the answer is yes. | 09:19:47 |
| 12 | However, I certainly have not been retained to say | 09:19:50 |
| 13 | that any individual consented in any particular | 09:19:53 |
| 14 | situation for any particular call. | 09:19:58 |
| 15 | Q.   Okay.  Are you offering an opinion that | 09:20:01 |
| 16 | Mr. Revitch consented to receive calls in this | 09:20:08 |
| 17 | case? | 09:20:12 |
| 18 | A.   No. | 09:20:12 |
| 19 | Q.   Are you offering any opinions regarding | 09:20:13 |
| 20 | Citibank's arbitration agreement? | 09:20:18 |
| 21 | A.   No. | 09:20:21 |
| 22 | Q.   Are you offering any opinions regarding | 09:20:21 |
| 23 | the subject of whether or not Citibank knowingly | 09:20:26 |
| 24 | or willingly violated the TCPA? | 09:20:30 |

Page 22

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1        A.    No.                                    09:20:33

 2        Q.    Are you offering any opinions on the   09:20:34

 3   subject of calculating the amount of statutory    09:20:40

 4   damages at issue in this case?                    09:20:43

 5        A.    Well, I'm a data analytics expert, and 09:20:46

 6   I have certainly been retained to review the data. 09:20:55

 7   And it's quite possible that at some point they    09:20:59

 8   may come back to me and say "do this calculation." 09:21:03

 9        My report certainly does not have            09:21:08

10   anything to that effect because Mr. Weir was       09:21:11

11   unable to identify, in my opinion, any class       09:21:14

12   members, which would mean that, at least based on  09:21:18

13   the sample that he did, there are no damages,      09:21:23

14   there are none.  But I wasn't asked to give a      09:21:26

15   damages calculation, nor would I.                  09:21:29

16        Q.    Are you offering any opinions about how 09:21:33

17   Citibank's Aspect dialing system works?            09:21:38

18        A.    No.  Mr. Kalat is providing that.      09:21:43

19        Q.    Do you view yourself as an expert in    09:21:45

20   the area of probability?                           09:21:56

21        A.    You mean from a statistical standpoint? 09:21:59

22        Q.    (Nodding head.)

23        A.    No.  I'm a -- I'm familiar and fluent   09:22:03

24   with statistics, and I'm very familiar with the    09:22:06
```

Page 23

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | probability statistics or probability of ownership | 09:22:09 |
| 2 | scoring that is produced by various data vendors | 09:22:15 |
| 3 | relating to the data that they produce.  I've used | 09:22:21 |
| 4 | that.  I don't calculate it, for sure, nor do I | 09:22:23 |
| 5 | know how they calculate it because they don't | 09:22:28 |
| 6 | produce it. | 09:22:32 |
| 7 | And I certainly use statistics in my -- | 09:22:32 |
| 8 | in my work, but I -- I am not a statistician and I | 09:22:35 |
| 9 | don't claim to be an expert in statistics. | 09:22:39 |
| 10 | Q.   Okay.  You've never taught any courses | 09:22:42 |
| 11 | in statistics? | 09:22:45 |
| 12 | A.   No. | 09:22:46 |
| 13 | Q.   You've never wrote any textbooks on the | 09:22:46 |
| 14 | subject? | 09:22:50 |
| 15 | A.   No. | 09:22:50 |
| 16 | Q.   Okay.  When you speak about | 09:22:50 |
| 17 | probabilities, do you prefer to refer to them as | 09:22:51 |
| 18 | percentages or decimals? | 09:22:57 |
| 19 | For instance, if we're talking about a | 09:23:00 |
| 20 | probability of 50/50, would you -- do you prefer | 09:23:02 |
| 21 | to say 50 percent or .5? | 09:23:05 |
| 22 | A.   I don't have a preference. | 09:23:08 |
| 23 | Q.   Okay.  Do you have any understanding | 09:23:09 |
| 24 | about whether or not the probability of something | 09:23:12 |

Page 24

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | can exceed 100 percent? | 09:23:16 |
| 2 | A.   I don't have an opinion on that. | 09:23:18 |
| 3 | Q.   Okay.  All right. | 09:23:19 |
| 4 | A.   And I'm not sure I understand the | 09:23:26 |
| 5 | question, honestly. | 09:23:28 |
| 6 | Q.   Okay.  All right.  Well, just by way of | 09:23:28 |
| 7 | example, is it possible that the probability of | 09:23:30 |
| 8 | raining on a given day can be 125 percent? | 09:23:36 |
| 9 | A.   I -- I don't know. | 09:23:43 |
| 10 | Q.   Okay. | 09:23:47 |
| 11 | A.   I'm not a weatherman. | 09:23:48 |
| 12 | Q.   Well, let's stick with the weather a | 09:23:50 |
| 13 | little bit. | 09:24:06 |
| 14 | On any given day it can be sunny, | 09:24:07 |
| 15 | rainy, foggy, snowy, whatever, right?  You have a | 09:24:10 |
| 16 | number of possibilities that you can choose from, | 09:24:12 |
| 17 | right? | 09:24:15 |
| 18 | A.   Yes. | 09:24:15 |
| 19 | Q.   Okay.  Assuming that you've got all the | 09:24:16 |
| 20 | possible outcomes in terms of weather, can the | 09:24:25 |
| 21 | probabilities be more than 100 of any particular | 09:24:28 |
| 22 | outcome? | 09:24:35 |
| 23 | A.   Of any particular outcome? | 09:24:35 |
| 24 | Q.   Uh-huh. | 09:24:38 |

Page 25

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | A. So you're talking about multiple inputs | 09:24:39 |
| 2 | coming in and scoring each one by their unique | 09:24:42 |
| 3 | probability -- | 09:24:46 |
| 4 | Q. Yes. | 09:24:47 |
| 5 | A. -- and then scoring them against each | 09:24:47 |
| 6 | other? | 09:24:48 |
| 7 | Q. Yes. | 09:24:48 |
| 8 | A. So yes. The answer's yes. | 09:24:49 |
| 9 | Q. It can be more than 100? | 09:24:50 |
| 10 | A. Yes. | 09:24:53 |
| 11 | Q. Okay. All right. And why do you say | 09:24:53 |
| 12 | that? | 09:24:54 |
| 13 | A. Well, my understanding would be that | 09:24:54 |
| 14 | when you're scoring them against each other -- I | 09:25:00 |
| 15 | mean, if you've got -- this is not my area. I'm | 09:25:03 |
| 16 | not pretending to be -- | 09:25:08 |
| 17 | Q. Okay. | 09:25:10 |
| 18 | A. -- a probability expert or a | 09:25:11 |
| 19 | statistical expert. | 09:25:12 |
| 20 | But when you've got multiple inputs, | 09:25:14 |
| 21 | you're essentially working on an algorithm. | 09:25:18 |
| 22 | Q. Okay. Anything more to say about that | 09:25:23 |
| 23 | subject? | 09:25:27 |
| 24 | A. Not really. | 09:25:27 |

Page 26

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | Q.   All right.  Are you familiar with | 09:25:27 |
| 2 | software called Stata -- | 09:25:29 |
| 3 | A.   Yes. | 09:25:31 |
| 4 | Q.   -- or Stata? | 09:25:31 |
| 5 | A.   Uh-huh. | 09:25:32 |
| 6 | Q.   Have you ever used Stata prior to this | 09:25:33 |
| 7 | litigation? | 09:25:36 |
| 8 | A.   No. | 09:25:36 |
| 9 | Q.   And you don't have a license to use it | 09:25:37 |
| 10 | then, correct? | 09:25:41 |
| 11 | A.   My firm does. | 09:25:41 |
| 12 | Q.   Okay.  Do you believe that the Stata | 09:25:42 |
| 13 | software is reliable? | 09:25:49 |
| 14 | A.   I don't have an opinion on it one way | 09:25:51 |
| 15 | or the other. | 09:25:53 |
| 16 | Q.   Have you ever heard anyone in your firm | 09:25:53 |
| 17 | say they think that the firm should stop using | 09:25:56 |
| 18 | Stata because it's unreliable? | 09:25:59 |
| 19 | A.   That wouldn't affect whether or not I | 09:26:01 |
| 20 | had an opinion upon whether it was reliable. | 09:26:05 |
| 21 | In order for me to personally have an | 09:26:08 |
| 22 | on its reliability, I would have to personally use | 09:26:11 |
| 23 | it and observe it and to make determinations on | 09:26:13 |
| 24 | how it works. | 09:26:16 |

Page 27

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | My firm uses Stata because other people | 09:26:17 |
| 2 | within my firm want to use it.  And, therefore, | 09:26:19 |
| 3 | they have an opinion on its reliability or its use | 09:26:22 |
| 4 | for a particular purpose. | 09:26:26 |
| 5 | And we also have licenses for many | 09:26:28 |
| 6 | different types of programs, data programs, | 09:26:31 |
| 7 | because our clients use them.  And, therefore, for | 09:26:35 |
| 8 | us to work on our client's data in an efficient | 09:26:39 |
| 9 | way, we use the same software that they do. | 09:26:41 |
| 10 | I have no opinion on it.  I'm not an | 09:26:44 |
| 11 | expert in Stata.  And I did not personally do the | 09:26:46 |
| 12 | work on Stata in this matter.  I used somebody in | 09:26:48 |
| 13 | our firm to do that at my supervision because they | 09:26:53 |
| 14 | were fluent in it. | 09:26:57 |
| 15 | Q.   Okay.  Have any of your clients who use | 09:26:58 |
| 16 | Stata told you they believe it's unreliable? | 09:27:01 |
| 17 | A.   I don't have any clients that use it. | 09:27:05 |
| 18 | Q.   Okay.  Has anyone at your firm told you | 09:27:06 |
| 19 | they stopped using Stata because they decided it | 09:27:10 |
| 20 | was unreliable? | 09:27:13 |
| 21 | A.   No. | 09:27:14 |
| 22 | Q.   After Mr. Weir applied the methodology | 09:27:14 |
| 23 | that's described in his report, he came up with a | 09:27:31 |
| 24 | list of 176 telephone numbers. | 09:27:36 |

Page 28

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | thoughts? | 10:14:14 |
| 2 | A.    That it's exceptionally hard to try and | 10:14:14 |
| 3 | identify wrong number call recipients for many of | 10:14:18 |
| 4 | the reasons that are outlined in my report here. | 10:14:26 |
| 5 | A lot of it is driven by the business records that | 10:14:30 |
| 6 | are maintained by the individual companies. | 10:14:33 |
| 7 | And those are just extremely complex, | 10:14:39 |
| 8 | and each one is very different for each of the | 10:14:42 |
| 9 | cases that I've worked on.  Even though they're | 10:14:44 |
| 10 | similar financial institutions and that they're | 10:14:47 |
| 11 | collecting on similar types of debt, they have | 10:14:51 |
| 12 | incredibly different business systems. | 10:14:55 |
| 13 | Q.    And have you ever thought about ways to | 10:14:57 |
| 14 | address those difficulties if you wanted to | 10:14:59 |
| 15 | certify a wrong number class? | 10:15:01 |
| 16 | A.    No, I haven't been asked. | 10:15:02 |
| 17 | Q.    Okay. | 10:15:05 |
| 18 | A.    And I would add that the current data | 10:15:10 |
| 19 | that exists to try and identi- -- to associate | 10:15:12 |
| 20 | people with telephone numbers, that's really the | 10:15:16 |
| 21 | biggest problem, is identifying people with the | 10:15:20 |
| 22 | telephone numbers.  It's very unreliable. | 10:15:25 |
| 23 | Q.    When was the last time you researched | 10:15:26 |
| 24 | or looked into the current state of technology or | 10:15:29 |

Page 63

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | services that are available as of 2018, let's say, | 10:15:32 |
| 2 | that might facilitate identifying people, | 10:15:36 |
| 3 | associating people with phone numbers? | 10:15:42 |
| 4 | A.     Well, we do it all -- we do it as a | 10:15:44 |
| 5 | general course of business.  We're looking at the | 10:15:45 |
| 6 | TLO and LexisNexis data as well as other types of | 10:15:47 |
| 7 | data vendors that sell cellular lookup services. | 10:15:52 |
| 8 | I issued a number of reports last year and we | 10:15:57 |
| 9 | tested the data. | 10:15:59 |
| 10 | Q.     Okay.  A number of reports in | 10:16:03 |
| 11 | connection with litigation? | 10:16:04 |
| 12 | A.     Uh-huh. | 10:16:05 |
| 13 | Q.     I see.  Okay. | 10:16:06 |
| 14 | Have you ever testified as a witness in | 10:16:10 |
| 15 | trial before? | 10:16:12 |
| 16 | A.     Preliminary injunction. | 10:16:13 |
| 17 | Q.     Okay.  And was that as a fact witness | 10:16:16 |
| 18 | or as an expert witness? | 10:16:20 |
| 19 | A.     Expert. | 10:16:21 |
| 20 | Q.     Have you ever testified as a nonexpert | 10:16:22 |
| 21 | in trial? | 10:16:28 |
| 22 | A.     I've testified at hearings.  I don't | 10:16:29 |
| 23 | know what "trial" means, you know, if you're | 10:16:42 |
| 24 | talking about civil litigation going to trial. | 10:16:43 |

Page 64

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | involved a putative class of people who received | 10:21:23 |
| 2 | wrong number calls? | 10:21:26 |
| 3 | A.   That's correct. | 10:21:27 |
| 4 | Q.   And did the plaintiffs' expert in | 10:21:29 |
| 5 | Johnson v. Navient propose using LexisNexis and | 10:21:32 |
| 6 | TransUnion to find class members? | 10:21:37 |
| 7 | A.   Yes. | 10:21:38 |
| 8 | Q.   And in the Johnson v. Navient case, did | 10:21:39 |
| 9 | you offer the opinion that the methodology used by | 10:21:42 |
| 10 | the plaintiffs' expert in that case did not find | 10:21:45 |
| 11 | the named plaintiff? | 10:21:48 |
| 12 | A.   That's correct. | 10:21:50 |
| 13 | Q.   And you offer a similar opinion in this | 10:21:53 |
| 14 | case, correct? | 10:21:55 |
| 15 | A.   Yes, but for different reasons. | 10:21:56 |
| 16 | Q.   In the Johnson v. Navient case, did you | 10:21:57 |
| 17 | opine that the cellular reverse lookup services | 10:22:05 |
| 18 | like TransUnion and LexisNexis are unreliable? | 10:22:08 |
| 19 | (Witness viewed said document.) | |
| 20 | THE WITNESS:  I believe in that case -- | 10:22:59 |
| 21 | I'm just looking through.  I'm trying to | 10:23:02 |
| 22 | refresh my recollection here. | 10:23:05 |
| 23 | I think the idea that they're | 10:24:05 |
| 24 | unreliable is baked into this report, but I | 10:24:08 |

Page 67

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | don't have a unique opinion that | 10:24:10 |
| 2 | identifies -- that sets out that they are | 10:24:14 |
| 3 | unreliable on their face. | 10:24:16 |
| 4 | I'm looking at paragraph 5.  It | 10:24:18 |
| 5 | says, Should she find any name associated | 10:24:23 |
| 6 | with a cellular telephone number for the | 10:24:26 |
| 7 | relevant time frame, she declares them a | 10:24:27 |
| 8 | class member, and presumably plaintiff's | 10:24:30 |
| 9 | class [sic] will seek damages, despite having | |
| 10 | no proof that they ever received a single | 10:24:34 |
| 11 | wrong telephone call. | 10:24:35 |
| 12 | I'm still reading. | 10:24:42 |
| 13 | BY MR. SMITH: | |
| 14 | Q.    Okay. | 10:24:46 |
| 15 | A.    I also say here that the data brokers | 10:24:46 |
| 16 | rely on undisclosed source, the accuracy of which | 10:24:50 |
| 17 | varies widely.  So the reliability is called into | 10:24:54 |
| 18 | question, in my opinion. | 10:24:58 |
| 19 | Q.    And I just want to direct your | 10:25:00 |
| 20 | attention to paragraph 75, which is on Page 30. | 10:25:02 |
| 21 | And you can find the page numbers at the very top | 10:25:06 |
| 22 | on the page. | 10:25:11 |
| 23 | You'll see a header there that says | 10:25:18 |
| 24 | "Cellular Telephone Reverse Lookup Services Cannot | 10:25:21 |

Page 68

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | Identify Who Received a Wrong-Number Called." | 10:25:24 |
| 2 | Do you see that? | 10:25:27 |
| 3 | A.   Uh-huh. | 10:25:27 |
| 4 | Q.   Did I read that correctly? | 10:25:27 |
| 5 | A.   Yes. | 10:25:29 |
| 6 | Q.   And is that a fair summary of at least | 10:25:29 |
| 7 | one of the opinions that you set forth in the | 10:25:33 |
| 8 | Johnson v. Navient case? | 10:25:38 |
| 9 | A.   Well, it's a verbatim recitation of one | 10:25:40 |
| 10 | of the headers, so I assume it's fair. | 10:25:42 |
| 11 | Q.   Okay.  All right.  Are you offering a | 10:25:48 |
| 12 | similar opinion in this case? | 10:25:52 |
| 13 | A.   I would say so. | 10:25:53 |
| 14 | Q.   Okay.  And do you recall in the | 10:25:57 |
| 15 | Johnson v. Navient case explaining that LexisNexis | 10:26:08 |
| 16 | disclaims the reliability of its telephone lookup | 10:26:15 |
| 17 | service? | 10:26:17 |
| 18 | A.   Say it again, please. | 10:26:17 |
| 19 | Q.   Do you recall if in the Johnson v. | 10:26:18 |
| 20 | Navient case, as part of your opinions offered in | 10:26:20 |
| 21 | that case, you explain that LexisNexis has a | 10:26:24 |
| 22 | disclaimer regarding the reliability of its | 10:26:29 |
| 23 | service or accuracy of its service? | 10:26:33 |
| 24 | A.   I'd have to look if that particular | 10:26:35 |

Page 69

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | Q.   -- I mean Berkeley Research Group? | 10:27:48 |
| 2 | A.   Uh-huh. | 10:27:50 |
| 3 | Q.   Okay.  And you've worked for or with | 10:27:50 |
| 4 | BRG since 2015? | 10:27:54 |
| 5 | A.   Correct. | 10:27:58 |
| 6 | Q.   Since joining BRG in 2015, have you | 10:27:58 |
| 7 | ever personally used TransUnion's TLOxp service, | 10:28:00 |
| 8 | not counting any time where you may have directed | 10:28:06 |
| 9 | someone else to do it, but, I mean, you | 10:28:10 |
| 10 | personally? | 10:28:13 |
| 11 | A.   Sure, all the time. | 10:28:13 |
| 12 | Q.   All the time.  Okay. | 10:28:14 |
| 13 | A.   Did it yesterday. | 10:28:16 |
| 14 | Q.   Was that in connection with this case | 10:28:16 |
| 15 | or another case? | 10:28:18 |
| 16 | A.   Just in general. | 10:28:19 |
| 17 | Q.   Okay.  How frequently?  Once a week? | 10:28:20 |
| 18 | Twice a week?  Every day? | 10:28:23 |
| 19 | A.   It -- there isn't an average.  It | 10:28:25 |
| 20 | depends upon the need.  So I would just say more | 10:28:29 |
| 21 | often than not I'm directing other people to pull | 10:28:36 |
| 22 | something in particular and they send the report | 10:28:38 |
| 23 | to me, but I personally use it maybe once a month. | 10:28:40 |
| 24 | Q.   Okay.  Prior to working at BRG, you | 10:28:48 |

Page 71

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | results of your test on Lexis to anyone for | 10:40:41 |
| 2 | independent peer review? | 10:40:47 |
| 3 | A.    No. | 10:40:48 |
| 4 | Q.    Did you ever ask anyone outside of BRG | 10:40:49 |
| 5 | to try and do the tests and see if they got the | 10:40:57 |
| 6 | same results? | 10:40:59 |
| 7 | A.    No. | 10:41:00 |
| 8 | Q.    In your report, you describe checking | 10:41:01 |
| 9 | TLO reports for yourself and Mr. Weir, is that | 10:41:09 |
| 10 | correct? | 10:41:14 |
| 11 | A.    Correct. | 10:41:14 |
| 12 | Q.    Okay.  Is that the only test of TLO | 10:41:14 |
| 13 | that you describe in your report? | 10:41:18 |
| 14 | A.    I guess I'm going to need to know what | 10:41:20 |
| 15 | you mean by "test," because I talk quite a bit | 10:41:32 |
| 16 | about the TLO results and the first seen and the | 10:41:37 |
| 17 | last seen and the probability and so forth, so... | 10:41:40 |
| 18 | I mean, the report speaks for itself. | 10:41:44 |
| 19 | Q.    Okay.  Have you ever tried to do, | 10:41:48 |
| 20 | independent of any specific litigation, a test | 10:41:50 |
| 21 | with respect to TransUnion data similar or akin to | 10:41:53 |
| 22 | what you did with Lexis in 2016? | 10:41:57 |
| 23 | A.    No, we have not. | 10:42:00 |
| 24 | Q.    Are you aware of any other independent | 10:42:01 |

Page 81

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | testing of the TLOxp service? | 10:42:10 |
| 2 | A. No. | 10:42:14 |
| 3 | Q. Do you believe you used the TLOxp for a | 10:42:14 |
| 4 | permissible purpose when you ran a report on | 10:42:25 |
| 5 | Mr. Weir? | 10:42:29 |
| 6 | A. Yes. | 10:42:29 |
| 7 | Q. And why is that? | 10:42:29 |
| 8 | A. Because it's part of the litigation, | 10:42:30 |
| 9 | and I'm also a private detective, licensed. | 10:42:34 |
| 10 | Q. Any other reason? | 10:42:40 |
| 11 | A. He put it at issue, the reliability of | 10:42:41 |
| 12 | it. So I think based on his report, it was part | 10:42:50 |
| 13 | of the case. | 10:42:54 |
| 14 | Q. Did you run any other TLOxp reports in | 10:42:55 |
| 15 | connection with this case, apart the one -- for | 10:43:06 |
| 16 | the one that you ran on yourself and on Mr. Weir? | 10:43:08 |
| 17 | A. Can you repeat that? | 10:43:12 |
| 18 | Q. Did you run any other TLOxp reports, | 10:43:14 |
| 19 | apart from the one that you described doing for | 10:43:17 |
| 20 | yourself and the one you described doing for | 10:43:20 |
| 21 | Mr. Weir? | 10:43:23 |
| 22 | A. As part of this litigation? | 10:43:23 |
| 23 | Q. Uh-huh. | 10:43:24 |
| 24 | A. I don't think so. We would have run | 10:43:25 |

Page 82

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | it for.  And then, it was only then, that the risk | 10:44:43 |
| 2 | serv- -- the risk and in-house gave me permission. | 10:44:47 |
| 3 | So they were very well aware of what I was doing. | 10:44:49 |
| 4 |     Q.   Are you familiar with a company called | 10:44:54 |
| 5 | Neustar? | 10:45:02 |
| 6 |     A.   Yes. | 10:45:02 |
| 7 |     Q.   And do you have any information about | 10:45:03 |
| 8 | whether or not Citibank uses Neustar to help | 10:45:06 |
| 9 | Citibank avoid making calls to phone numbers that | 10:45:12 |
| 10 | had been reassigned? | 10:45:17 |
| 11 |     A.   My understanding is that they check the | 10:45:19 |
| 12 | Neustar data to determine whether or not numbers | 10:45:21 |
| 13 | may have been reassigned.  I think there's a | 10:45:27 |
| 14 | probability of ownership score, and that comes | 10:45:30 |
| 15 | into play and is part of their decision-making and | 10:45:35 |
| 16 | part of their compliance policy and practice | 10:45:38 |
| 17 | regarding what numbers they're going to call. | 10:45:42 |
| 18 |     Q.   Do you have any criticisms of | 10:45:47 |
| 19 | Citibank's use of Neustar? | 10:45:50 |
| 20 |     A.   Well, I think as a bank that's making | 10:45:52 |
| 21 | calls that are potentially subject to the TCPA, | 10:45:56 |
| 22 | it's good that they're trying -- using the best -- | 10:46:00 |
| 23 | trying the best they can to identify reassigned | 10:46:03 |
| 24 | numbers. | 10:46:07 |

Page 84

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | A.    Uh-huh. | 10:53:11 |
| 2 | Q.    -- 2017, is that correct? | 10:53:12 |
| 3 | A.    That's what it says. | 10:53:13 |
| 4 | Q.    Okay.  And did you look at the account | 10:53:15 |
| 5 | level notes associated with this number? | 10:53:17 |
| 6 | A.    Yes. | 10:53:18 |
| 7 | Q.    And is that how you were able to | 10:53:19 |
| 8 | determine that on July 19, 2017 a Citibank agent | 10:53:22 |
| 9 | had changed the Phone Indicator Code to a bad | 10:53:31 |
| 10 | number? | 10:53:38 |
| 11 | A.    Yes. | 10:53:38 |
| 12 | Q.    I want you to assume that Citibank has | 10:53:39 |
| 13 | taken the position in this case that prior to | 10:53:54 |
| 14 | July 19th, it thought it had consent to call | 10:53:57 |
| 15 | Mr. Revitch's number. | 10:54:02 |
| 16 | A.    Uh-huh. | 10:54:03 |
| 17 | Q.    Have you seen anything to contradict | 10:54:03 |
| 18 | that? | 10:54:06 |
| 19 | A.    I'd have to look at the dates on the | 10:54:07 |
| 20 | account records, because I recall that there were | 10:54:12 |
| 21 | conversations where Mr. Revitch said "stop calling | 10:54:18 |
| 22 | me," and he was called again because there was an | 10:54:22 |
| 23 | error by the customer service agent where it | 10:54:24 |
| 24 | appears that she should have called it a bad | 10:54:30 |

Page 90

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | number and didn't. | 10:54:33 |
| 2 | Q.   Okay. | 10:54:35 |
| 3 | A.   And I don't recall the precise dates. | 10:54:36 |
| 4 | It's in the account notes when he made that | 10:54:38 |
| 5 | objection. | 10:54:40 |
| 6 | So there was a -- an error by the | 10:54:41 |
| 7 | customer service agent that was rectified by Pearl | 10:54:45 |
| 8 | Baca because she's the one that changed the | 10:54:50 |
| 9 | indicator data to bad.  That's when it happened. | 10:54:56 |
| 10 | Q.   Do you recall what the phone indicator | 10:54:58 |
| 11 | data was for Mr. Revitch's number prior to | 10:55:00 |
| 12 | July 19, 2017? | 10:55:05 |
| 13 | A.   I'd be guessing.  I know what it was | 10:55:05 |
| 14 | afterwards. | 10:55:10 |
| 15 | Q.   Okay.  There was -- | 10:55:10 |
| 16 | A.   It's in the account.  It's totally in | 10:55:14 |
| 17 | the account data. | 10:55:15 |
| 18 | Q.   Okay.  Some kind of consent record | 10:55:16 |
| 19 | prior to July 19, 2017? | 10:55:17 |
| 20 | A.   It will say in the account records | 10:55:19 |
| 21 | changes J to B or N to V.  I mean, it tells you | 10:55:22 |
| 22 | what it was and what it is, and it's in the | 10:55:27 |
| 23 | capital letters when it happens. | 10:55:30 |
| 24 | Q.   And do you know if prior to July 19, | 10:55:32 |

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | THE VIDEOGRAPHER:  This is the end of | 10:57:56 |
| 2 | DVD No. 1.  The time is 10:57 a.m.  We are | 10:57:58 |
| 3 | off the record. | 10:58:05 |
| 4 | (Whereupon, a recess was had | 11:06:36 |
| 5 | from 10:57 a.m. to 11:06 a.m.) | 11:06:38 |
| 6 | THE VIDEOGRAPHER:  This is the | 11:06:38 |
| 7 | beginning of DVD No. 2.  The time is | 11:06:44 |
| 8 | 11:06 a.m.  We are back on the record. | 11:06:48 |
| 9 | BY MR. SMITH: | 11:06:51 |
| 10 | Q.    Ms. Daley, on paragraph 21, you were | 11:06:51 |
| 11 | just describing a moment ago a variety of consent | 11:06:56 |
| 12 | codes that are -- | 11:06:59 |
| 13 | A.    Right. | 11:06:59 |
| 14 | Q.    -- that Citibank uses? | 11:07:00 |
| 15 | A.    Uh-huh. | 11:07:01 |
| 16 | Q.    And can these consent codes generally | 11:07:01 |
| 17 | be found in the account level notes that you were | 11:07:08 |
| 18 | also describing? | 11:07:12 |
| 19 | A.    Yes. | 11:07:15 |
| 20 | Q.    Okay.  And do you know if the codes in | 11:07:17 |
| 21 | the account level documents that were associated | 11:07:18 |
| 22 | with Mr. Revitch's phone number were accurate | 11:07:22 |
| 23 | prior to July 19, 2017? | 11:07:26 |
| 24 | A.    By "accurate," what do you mean? | 11:07:29 |

Page 94

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | Q.   Did they indicate consent, lack of | 11:07:34 |
| 2 | consent, wrong number? | 11:07:37 |
| 3 | A.   I can say that they would include | 11:07:38 |
| 4 | whatever number was assigned. | 11:07:44 |
| 5 | My hesitancy is that we know in | 11:07:52 |
| 6 | particular with regard to Mr. Revitch that he | 11:07:56 |
| 7 | asked not to be called and there was a delay in | 11:07:59 |
| 8 | putting the bad number code in. | 11:08:01 |
| 9 | So I would presume that in the time and | 11:08:11 |
| 10 | -- between when he made that request and it wasn't | 11:08:14 |
| 11 | fulfilled -- and it was fulfilled, but there was a | 11:08:17 |
| 12 | code that was not correct with regard to his | 11:08:20 |
| 13 | consent. | 11:08:29 |
| 14 | Q.   Okay. | |
| 15 | A.   But that's the only one that I could | 11:08:29 |
| 16 | ever opine on because we have notes and telephone | 11:08:30 |
| 17 | calls that we've listened to and et cetera. | 11:08:34 |
| 18 | Q.   I want to direct your attention to your | 11:08:37 |
| 19 | expert report, Page 16, Footnote 35. | 11:09:24 |
| 20 | And the last sentence -- | 11:09:31 |
| 21 | A.   Just give me a second -- | 11:09:36 |
| 22 | Q.   Okay. | 11:09:38 |
| 23 | A.   -- so I can read it. | 11:09:39 |
| 24 | Q.   Go ahead. | 11:09:41 |

Page 95

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | first seen date that may only exist for one date | 11:14:53 |
| 2 | in time. | 11:14:57 |
| 3 | That is why we have the 120 that end up | 11:14:59 |
| 4 | being identified by him as being potential class | 11:15:05 |
| 5 | members when they are, in fact -- the TLO data | 11:15:09 |
| 6 | itself shows you that it is more likely than | 11:15:12 |
| 7 | not -- or at least the best association that they | 11:15:16 |
| 8 | have is -- for the person using that phone, best | 11:15:19 |
| 9 | association TLO gives you is the same name as the | 11:15:24 |
| 10 | accountholder. | 11:15:27 |
| 11 | Q.    You believe Mr. Weir should have looked | 11:15:27 |
| 12 | at the last seen date? | 11:15:30 |
| 13 | A.    I believe -- well, I don't believe he | 11:15:31 |
| 14 | should be using TLO at all because I think it's | 11:15:34 |
| 15 | highly unreliable.  I find all of the dates bad. | 11:15:38 |
| 16 | But at least if you look at the last | 11:15:41 |
| 17 | seen date, that means that they have a -- TLO is | 11:15:43 |
| 18 | reporting back that it's an indication, "Hey, I | 11:15:46 |
| 19 | have something somewhere.  I won't tell you what | 11:15:50 |
| 20 | it is.  I won't tell you -- you know, I can't tell | 11:15:53 |
| 21 | you how reliable this particular piece of data is. | 11:15:54 |
| 22 | However, I've got something that is associating | 11:15:58 |
| 23 | them with this number as of this date." | 11:16:04 |
| 24 | If I were Mr. Weir and I was advocating | 11:16:07 |

Page 99

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | Q.    All right.  Now, I think you said | 11:25:42 |
| 2 | before, you eliminated 120 numbers or people from | 11:25:43 |
| 3 | the sample set based on the last date seen, is | 11:25:47 |
| 4 | that correct? | 11:25:51 |
| 5 | A.    No, that wasn't -- if we go back -- I | 11:25:51 |
| 6 | want to make sure I get this correct. | 11:25:56 |
| 7 | Yeah, that is correct.  Removing the | 11:26:17 |
| 8 | 120 phone numbers, it actually matched the | 11:26:20 |
| 9 | Citibank accountholders once the reported last | |
| 10 | seen dates are accounted for, using his data. | 11:26:29 |
| 11 | And that indicated -- and we also | 11:26:30 |
| 12 | wanted to make sure that the first and the last | 11:26:34 |
| 13 | seen dates had some overlap with the date that the | 11:26:36 |
| 14 | calls were made.  So we baked into it as well, the | 11:26:40 |
| 15 | thing that Mr. Weir did not, which is, is there a | 11:26:44 |
| 16 | correlation between these first seen and last seen | 11:26:47 |
| 17 | dates and the time the calls were made.  That is | 11:26:50 |
| 18 | something that he completely did not take into | 11:26:53 |
| 19 | consideration. | 11:26:55 |
| 20 | Q.    When you say that, do you mean you | 11:26:56 |
| 21 | wanted the call -- you had a first seen date and | 11:26:58 |
| 22 | you had a last seen date and you wanted the call | 11:27:01 |
| 23 | to have occurred at some point in between those | 11:27:03 |
| 24 | two dates? | 11:27:06 |

Page 107

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | A.    Correct. | 11:27:07 |
| 2 | Q.    I see. | 11:27:11 |
| 3 | A.    Or -- or -- I mean, it's probably a | 11:27:11 |
| 4 | little bit broader than that in that some of the | 11:27:12 |
| 5 | calls -- because there were many calls.  We didn't | 11:27:15 |
| 6 | do an analytic on every one, but it had to bracket | 11:27:17 |
| 7 | within the first and last seen date. | 11:27:22 |
| 8 | So there might have been a call, let's | 11:27:26 |
| 9 | say, prior to the last seen date.  And the last | 11:27:29 |
| 10 | seen date might have been, let's say, November of | 11:27:33 |
| 11 | 2018.  And there might have been another call | 11:27:36 |
| 12 | after that, but we don't have another last seen | 11:27:39 |
| 13 | date.  But it would have been banded within; there | 11:27:44 |
| 14 | was a correlation.  We did not count anywhere it | 11:27:47 |
| 15 | was -- to the left of the first seen date or to | 11:27:50 |
| 16 | the right of the last seen date. | 11:27:53 |
| 17 | Does that make sense? | 11:27:55 |
| 18 | Q.    Yes. | 11:27:56 |
| 19 | A.    Okay. | 11:27:57 |
| 20 | Q.    And when you engaged in that process, | 11:27:57 |
| 21 | did you assume that the first seen date and the | 11:27:59 |
| 22 | last seen dates were accurate? | 11:28:01 |
| 23 | A.    No, we used his data.  We just said -- | 11:28:03 |
| 24 | I mean, I do not believe that these dates are | 11:28:07 |

Page 108

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | accurate, just period, under any circumstances. | 11:28:10 |
| 2 | But we're testing his methodology and we're trying | 11:28:14 |
| 3 | to determine, based on his stated goals of what | 11:28:19 |
| 4 | he's trying to do, does he do that, right? | 11:28:25 |
| 5 | So our use of the first seen and last | 11:28:29 |
| 6 | seen date is our way of testing what he did to see | 11:28:33 |
| 7 | if it holds water based on what he's claiming | 11:28:36 |
| 8 | it's -- the results are, okay?  So it is | 11:28:39 |
| 9 | independent of my personal view and my opinion | 11:28:45 |
| 10 | that those dates are inaccurate in general and | 11:28:47 |
| 11 | unreliable. | 11:28:50 |
| 12 | Q.    I'd like to direct your attention to | 11:28:52 |
| 13 | Page 22, paragraph 70. | 11:29:35 |
| 14 | (Witness viewed said document.) | 11:30:14 |
| 15 | THE WITNESS:  Uh-huh. | 11:30:19 |
| 16 | BY MR. SMITH: | 11:30:20 |
| 17 | Q.    In paragraph 70 of your report, you | 11:30:21 |
| 18 | note or you opine that Mr. Snyder acknowledged | 11:30:23 |
| 19 | that the wrong number codes do not always indicate | 11:30:28 |
| 20 | the literal truth that the wrong person was, in | 11:30:32 |
| 21 | fact, contacted or that a call was made without | 11:30:36 |
| 22 | consent. | 11:30:40 |
| 23 | Do you see that? | 11:30:40 |
| 24 | A.    Uh-huh. | 11:30:41 |

Page 109

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1        Q.    Now, in that sentence, are you        11:30:41

 2   referring to wrong number codes in the phone     11:30:44

 3   indicator database or the account notes or both? 11:30:49

 4        A.    Well, the account notes go back in    11:30:52

 5   time.  It has the audit trail essentially.  The  11:30:59

 6   Contact Utilities Database does not.  That just   11:31:05

 7   starts in November of 2017.                       11:31:08

 8              Mr. Snyder only included data in the   11:31:11

 9   Contact Utilities Database.  So I'm referring to  11:31:14

10   Mr. Snyder's conclusion of this step.             11:31:17

11              Now, I believe that he didn't          11:31:21

12   understand what was in the Contact Utilities      11:31:24

13   Database, the date ranges that it contained.  And 11:31:29

14   so when you bake that error in, it's -- you know, 11:31:32

15   I don't know what he would have -- his -- he --   11:31:37

16   the statement is his methodology presumes -- and I 11:31:47

17   think he thought the Contact Utilities Database   11:31:53

18   went all the way back in time, okay?              11:31:55

19              So if you put that as a -- you know, if 11:31:57

20   we agree that that's what he thought, my answer is 11:32:01

21   his inclusion of this change in the con-- -- in   11:32:07

22   the indicator codes was an acknowledgment that    11:32:12

23   over time wrong numbers -- the same wrong number  11:32:15

24   can be then changed to be a consent to call, that 11:32:17
```

Page 110

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | they're not always accurate as a wrong number. | 11:32:24 |
| 2 | Because somebody may say -- these are | 11:32:29 |
| 3 | debt collection calls, right?  So you're getting a | 11:32:32 |
| 4 | phone call that you don't necessarily want because | 11:32:36 |
| 5 | somebody is telling you you owe them money, right? | 11:32:39 |
| 6 | So, "Hi, this is Citibank.  Please -- are you | 11:32:42 |
| 7 | aware your payment is late?" | 11:32:45 |
| 8 | And, oops, do we need to stop? | 11:32:49 |
| 9 | THE VIDEOGRAPHER:  The time is | 11:32:55 |
| 10 | 11:32 a.m.  We are off the record. | 11:32:56 |
| 11 | (A pause was had in the | 11:33:02 |
| 12 | proceedings.) | 11:33:05 |
| 13 | THE VIDEOGRAPHER:  The time is | 11:33:05 |
| 14 | 11:33 a.m.  We are back on the record. | 11:33:33 |
| 15 | THE WITNESS:  So people may say, "Hey, | 11:33:37 |
| 16 | this is the wrong number."  Or what they say | 11:33:39 |
| 17 | might be interpreted by the -- the customer | 11:33:42 |
| 18 | service agent is it's a bad number, it's a | 11:33:47 |
| 19 | wrong number may be incorrectly.  It gets | 11:33:50 |
| 20 | coded that way. | 11:33:53 |
| 21 | And they may call back in and say, | 11:33:54 |
| 22 | "I want to make a payment."  And then they'll | 11:33:57 |
| 23 | say, "Is it okay to talk to you on this | 11:33:59 |
| 24 | phone?  Is this an okay number?"  And they'll | 11:34:02 |

Page 111

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | say, "Yes." | 11:34:03 |
| 2 | So there's -- the decisions and | 11:34:03 |
| 3 | the statements by the customers who are | 11:34:08 |
| 4 | answering the phone can change over time, and | 11:34:09 |
| 5 | that was being acknowledged by Mr. Snyder and | 11:34:12 |
| 6 | Mr. Weir by trying to exclude telephone | 11:34:16 |
| 7 | numbers that originally had a bad number but | 11:34:22 |
| 8 | subsequently got changed to consent.  That | 11:34:25 |
| 9 | was their -- my understanding was that was | 11:34:27 |
| 10 | their acknowledgment of that reality. | 11:34:29 |
| 11 | BY MR. SMITH: | 11:34:32 |
| 12 | Q.    So is it the case, this problem that | 11:34:35 |
| 13 | you're describing, does that suggest that | 11:34:39 |
| 14 | sometimes the -- the focusing on the consent | 11:34:41 |
| 15 | indicator change database, that wrong number in | 11:34:45 |
| 16 | the codes -- wrong number codes in that database | 11:34:50 |
| 17 | may not actually accurately reflect the notion | 11:34:54 |
| 18 | that a wrong number call had been made? | 11:35:00 |
| 19 | A.    That's correct. | 11:35:03 |
| 20 | Q.    Does that also hold true for the | 11:35:03 |
| 21 | account notes? | 11:35:07 |
| 22 | I mean, if there's a wrong number code | 11:35:10 |
| 23 | in the database, would there also -- and let's | 11:35:12 |
| 24 | say -- strike that. | 11:35:15 |

Page 112

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | Let's say there's an incorrectly marked | 11:35:17 |
| 2 | wrong number code in the database.  Would you | 11:35:19 |
| 3 | expect to find that same code in the account | 11:35:22 |
| 4 | notes? | 11:35:26 |
| 5 | A.   Not necessarily, because the phone | 11:35:26 |
| 6 | indicator data sometimes is updated automatically. | 11:35:31 |
| 7 | Let's say if a phone number is disconnected and so | 11:35:35 |
| 8 | it's a bad number now.  So there isn't any | 11:35:41 |
| 9 | interaction with a customer service agent. | 11:35:43 |
| 10 | Q.   Well, let's put aside that scenario.  I | 11:35:45 |
| 11 | mean, is it -- is it -- is it possible that | 11:35:48 |
| 12 | incorrect wrong number codes are also reflected in | 11:35:51 |
| 13 | the account level notes? | 11:35:55 |
| 14 | A.   Yeah, I think -- I think that is | 11:35:57 |
| 15 | certainly possible because you're dealing with | 11:36:01 |
| 16 | human error.  So if a -- if there's a customer | 11:36:04 |
| 17 | service call with an individual and they | 11:36:08 |
| 18 | misinterpret what's being told to them, and they | 11:36:10 |
| 19 | make a decision to change an indicator code that | 11:36:14 |
| 20 | isn't accurately reflecting what the customer | 11:36:18 |
| 21 | wanted or instructed them to, then the phone | 11:36:21 |
| 22 | indicator database would reflect that error.  But, | 11:36:27 |
| 23 | you know, that's because there's no perfect system | 11:36:30 |
| 24 | when you're dealing with human beings. | 11:36:32 |

Page 113

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | Q. Okay. So going back to the consent | 11:36:36 |
| 2 | codes you identify in paragraph 21 of your report. | 11:36:48 |
| 3 | A. Uh-huh. | 11:37:06 |
| 4 | Q. At the end of the chart, you've got the | 11:37:07 |
| 5 | codes for not valid/bad number, which is N or B, | 11:37:13 |
| 6 | depending on whether or not you're looking at FDR | 11:37:18 |
| 7 | or IBS, is that right? | 11:37:22 |
| 8 | A. Yes. | 11:37:25 |
| 9 | Q. Okay. So those -- those number -- or | 11:37:26 |
| 10 | those letter codes that you see in the account | 11:37:28 |
| 11 | level documents may or may not be accurate because | 11:37:32 |
| 12 | sometimes people lie about receiving a wrong | 11:37:37 |
| 13 | number? | 11:37:39 |
| 14 | A. Well, these are the same things -- they | 11:37:39 |
| 15 | reflect exactly what is in the phone indicator | 11:37:41 |
| 16 | data except it goes back in time. | 11:37:45 |
| 17 | Q. Right. | 11:37:47 |
| 18 | A. So to the extent you believe that some | 11:37:47 |
| 19 | of the phone indicator data is not accurate -- | 11:37:50 |
| 20 | like Mr. Revitch is an example. He asked this is | 11:37:54 |
| 21 | a wrong number. It should have been updated the | 11:37:57 |
| 22 | first time he said that. It wasn't. It was a | 11:38:00 |
| 23 | customer service error. | 11:38:05 |
| 24 | But I've seen nothing -- my review of | 11:38:06 |

Page 114

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1    changes that your experts themselves have          11:43:59

 2    indicated or warranted is by doing an account      11:44:02

 3    level review because that's the only place you can 11:44:05

 4    find it.                                            11:44:09

 5         Q.   By the same token, could you -- would    11:44:09

 6    it be problematic to rely on codes to identify if  11:44:17

 7    there was consent to call?                         11:44:22

 8              For instance, looking at the top of the  11:44:24

 9    chart on paragraph 21, you've got an entry that    11:44:28

10    says "Consent to Call Only."                       11:44:31

11              And if you looked for the codes V or A,  11:44:32

12    would that be a reliable or an unreliable method   11:44:34

13    for trying to identify whether calls were made     11:44:38

14    with consent?                                      11:44:41

15         A.   I haven't undertaken any kind of         11:44:42

16    analysis, so I don't have an opinion on that.      11:44:44

17         Q.   Okay.  So you can't say one way or       11:44:45

18    another today?                                     11:44:48

19         A.   No, because you would have to go         11:44:48

20    through an account level review and determine --   11:44:50

21    you'd have to take a sample, a statistically sound 11:44:53

22    sample and review the account notes and determine  11:44:58

23    whether or not the codes, as they are identified,  11:45:01

24    match the information in the account records.       11:45:08
```

Page 120

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | However, I will say a lot of this is | 11:45:13 |
| 2 | automated.  And so, for example, when somebody | 11:45:16 |
| 3 | puts in their telephone number on an online | 11:45:21 |
| 4 | application, that's a consent to call and that's | 11:45:25 |
| 5 | probably going to have a very high reliability -- | 11:45:28 |
| 6 | high level of reliability. | 11:45:31 |
| 7 | When they revoke it, that's a very | 11:45:34 |
| 8 | different situation because often that is a | 11:45:37 |
| 9 | communication with an individual and so it's more | 11:45:40 |
| 10 | likely to have room for error.  Whatever that | 11:45:43 |
| 11 | level of error is I have no idea. | 11:45:48 |
| 12 | Q.   Do you know whether or not the reason | 11:45:50 |
| 13 | Mr. Revitch started receiving wrong number calls | 11:45:53 |
| 14 | in this case was because a gentleman named | 11:45:56 |
| 15 | Mr. Axlerod had input his wrong phone number on | 11:45:59 |
| 16 | the Internet? | 11:46:02 |
| 17 | A.   Yes, I'm sure that's -- I know that's | 11:46:02 |
| 18 | the case.  Most people know their phone number, | 11:46:04 |
| 19 | though. | 11:46:06 |
| 20 | Q.   If plaintiffs' expert modified the | 11:46:06 |
| 21 | methodology to focus on wrong number account | 11:46:11 |
| 22 | information in the account level documents instead | 11:46:18 |
| 23 | of the database and the codes, would that be, in | 11:46:22 |
| 24 | your view, a more reliable method for identifying | 11:46:28 |

Page 121

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | Daley.  I am not Marcos Sasso, your | 11:48:07 |
| 2 | accountholder," and they're typing all of that | 11:48:11 |
| 3 | information in. | 11:48:14 |
| 4 | The call recipient on wrong number call | 11:48:15 |
| 5 | is typically not captured in the account records. | 11:48:18 |
| 6 | It's not a part of the business records of the | 11:48:22 |
| 7 | bank. | 11:48:25 |
| 8 | What they need to know is, ooh, this is | 11:48:25 |
| 9 | a bad number, don't call it anymore.  They click | 11:48:29 |
| 10 | the button and they put it into the system not to | 11:48:33 |
| 11 | call. | 11:48:35 |
| 12 | They don't capture the name of the | 11:48:35 |
| 13 | wrong number recipient.  Nine times out of ten | 11:48:37 |
| 14 | those people are angry that they're getting phone | 11:48:43 |
| 15 | calls and they're not trying to give their name. | 11:48:44 |
| 16 | They're just saying, "Stop it."  So that is not | 11:48:45 |
| 17 | part of the records. | 11:48:46 |
| 18 | The only way you can identify the | 11:48:47 |
| 19 | recipient of the call records is to know who got | 11:48:50 |
| 20 | that call.  Your experts are suggesting that they | 11:48:55 |
| 21 | can do that by using TLO.  My report demonstrates | 11:48:59 |
| 22 | how -- how highly unreliable that is.  You will | 11:49:03 |
| 23 | not be compensating the right people by using TLO. | 11:49:08 |
| 24 | You will not get the call recipients of a wrong | 11:49:14 |

Page 123

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | number call by using the methodology that's been | 11:49:16 |
| 2 | outlined by your -- your experts. | 11:49:20 |
| 3 | Q.   Back to paragraph 70. | 11:49:24 |
| 4 | A.   Just give me a sec.  Let me read it. | 11:50:32 |
| 5 | (Witness viewed said document.) | |
| 6 | THE WITNESS:  Oh, yes, uh-huh. | 11:50:46 |
| 7 | BY MR. SMITH: | |
| 8 | Q.   At the end of the paragraph, you say, | 11:50:48 |
| 9 | "Mr. Snyder apparently concedes that the | 11:50:50 |
| 10 | overwhelming majority of calls marked as wrong | 11:50:53 |
| 11 | numbers appear to have been made to account | 11:50:56 |
| 12 | holders." | 11:51:00 |
| 13 | Do you see that? | 11:51:00 |
| 14 | A.   Yes. | 11:51:00 |
| 15 | Q.   And is it your opinion that the | 11:51:00 |
| 16 | overwhelming majority of calls that were marked as | 11:51:02 |
| 17 | wrong numbers appeared to have been made to | 11:51:06 |
| 18 | accountholders? | 11:51:09 |
| 19 | A.   "Appear" is the operative word here. | 11:51:10 |
| 20 | There's a reason that was drafted the way it is. | 11:51:13 |
| 21 | I have no idea who actually received | 11:51:16 |
| 22 | those calls.  Mr. Snyder does not know who | 11:51:18 |
| 23 | received those calls.  I don't know who received | 11:51:21 |
| 24 | those calls. | 11:51:23 |

Page 124

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | But when you use the TLO data, it is -- | 11:51:24 |
| 2 | as I talk about the feedback loop, they're just | 11:51:27 |
| 3 | giving you back the same name as the | 11:51:30 |
| 4 | accountholder, based on the fact they're pulling | 11:51:34 |
| 5 | that kind of data. | 11:51:36 |
| 6 | And it's typically not updated.  So if | 11:51:38 |
| 7 | indeed one of the accountholders abandoned their | 11:51:41 |
| 8 | telephone call -- their telephone number and it | 11:51:45 |
| 9 | was reassigned, TLO isn't giving you the name of | 11:51:48 |
| 10 | that new -- new cellular telephone number owner or | 11:51:51 |
| 11 | subscriber. | 11:51:57 |
| 12 | And I think there's another sentence in | 11:52:03 |
| 13 | my report that talks about that particular issue | 11:52:05 |
| 14 | somewhere that -- saying -- saying just what I | 11:52:08 |
| 15 | just said. | 11:52:11 |
| 16 | Q.   In paragraph 72 of your report, you | 11:52:13 |
| 17 | note that you have decades of experience using | 11:52:39 |
| 18 | TLO, LexisNexis, and other data -- data vendors? | 11:52:43 |
| 19 | A.   Yes. | 11:52:46 |
| 20 | Q.   Do you have decades of experience with | 11:52:46 |
| 21 | TransUnion in particular? | 11:52:53 |
| 22 | A.   Well, TransUnion is a -- well, | 11:52:53 |
| 23 | TransUnion is an interesting company, because | 11:52:59 |
| 24 | TransUnion bought TLO back in like 2012, 2013. | 11:53:01 |

Page 125

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | A.    Yes. | 11:58:19 |
| 2 | Q.    Okay. | |
| 3 | A.    Yeah, not a different one.  Sorry if I | 11:58:21 |
| 4 | wasn't clear. | 11:58:23 |
| 5 | Q.    Is one of your critiques of the | 11:58:25 |
| 6 | methodology employed by Mr. Weir in this case that | 11:59:02 |
| 7 | he only took into account last names as opposed to | 11:59:04 |
| 8 | first and last name? | 11:59:08 |
| 9 | A.    Yes. | 11:59:10 |
| 10 | Q.    And on paragraph 78 of your report, you | 11:59:10 |
| 11 | have an anecdote about Veronica Cabrales and | 11:59:19 |
| 12 | another person named Veronica Martinez, who may or | 11:59:24 |
| 13 | may not be the same person? | 11:59:30 |
| 14 | A.    Correct.  They are the same person. | 11:59:31 |
| 15 | Q.    You believe they are the same person? | 11:59:33 |
| 16 | A.    They are the same person. | 11:59:34 |
| 17 | Q.    Okay. | |
| 18 | A.    TLO tells you they're the same person. | 11:59:36 |
| 19 | He just didn't get the alias report. | 11:59:38 |
| 20 | Q.    And you trust TLO's information for the | 11:59:41 |
| 21 | purposes of determining that these two people are | 11:59:43 |
| 22 | the same person? | 11:59:46 |
| 23 | A.    Well, they've got the data that would | 11:59:46 |
| 24 | show that they -- over time, so... | 11:59:48 |

Page 130

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1              And I believe we also did Internet        11:59:50

 2    research that confirmed it --                       11:59:53

 3         Q.    So --                                    11:59:56

 4         A.    Because --                               11:59:57

 5         Q.    I'm sorry.  Go ahead.                    11:59:57

 6         A.    I'm not sure with this particular one.   11:59:58

 7    I'm trying to see.                                  12:00:01

 8              Yeah, this one we're relying on the --    12:00:02

 9    we're relying on the TLO report, which is -- which  12:00:06

10    is -- which identifies them as an alias.            12:00:13

11              So I certainly wouldn't -- if I'm         12:00:18

12    relying -- if I'm relying on TLO, which Mr. Weir    12:00:20

13    is, if TLO is telling me they're the same person,   12:00:22

14    I don't know how you say that they aren't.          12:00:26

15    Because it's Mr. Weir that's saying that they're    12:00:30

16    highly reli- -- that TLO is highly reliable and     12:00:32

17    they know what they're talking about.  And so I     12:00:34

18    don't know how he would discount TLO's association  12:00:37

19    of these two people being the same person.          12:00:41

20         Q.    Who else on the list of phone numbers    12:00:43

21    or people identified in the sample set do you       12:00:48

22    think were misidentified as potential class         12:00:51

23    members as a result of looking only at last names?  12:00:58

24         A.    Actually, we found another one           12:01:02
```

Page 131

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | Q.    Uh-huh. | 12:09:37 |
| 2 | A.    Like companies in general? | 12:09:38 |
| 3 | Q.    Companies in general. | 12:09:39 |
| 4 | A.    I don't have any opinion about | 12:09:40 |
| 5 | companies in general. | 12:09:42 |
| 6 | Q.    Do you have any opinion about banks in | 12:09:43 |
| 7 | general? | 12:09:45 |
| 8 | A.    I have not undertaken any analysis that | 12:09:45 |
| 9 | would be able to allow me to form an opinion as to | 12:09:52 |
| 10 | how prevalent that is. | 12:09:58 |
| 11 | Q.    Do you have any understanding about | 12:10:00 |
| 12 | whether or not Citibank sometimes has outdated | 12:10:01 |
| 13 | information about people? | 12:10:07 |
| 14 | A.    Well, if you look at Mr. Revitch, the | 12:10:09 |
| 15 | information in the Contact Utilities Database was | 12:10:16 |
| 16 | outdated because he had told them his number was | 12:10:21 |
| 17 | that number and that it was not the account | 12:10:26 |
| 18 | numbers.  So for a particular period of time, that | 12:10:28 |
| 19 | Contact Utilities Database was outdated in terms | 12:10:32 |
| 20 | of its information relating to him. | 12:10:35 |
| 21 |       So anecdotally, if you go through the | 12:10:38 |
| 22 | account records, you can find circumstances in | 12:10:42 |
| 23 | which that may be the case. | 12:10:46 |
| 24 | Q.    Earlier today I think you testified you | 12:10:48 |

Page 138

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | years.  And they only give -- it's towards | 12:12:05 |
| 2 | the back.  I can't remember what the date is, | 12:12:08 |
| 3 | but it's old. | 12:12:11 |
| 4 | They don't know that I've been | 12:12:12 |
| 5 | using this phone in continuous use.  Despite | 12:12:14 |
| 6 | the fact that if you put that telephone | 12:12:19 |
| 7 | number on the Internet and Google it, you | 12:12:21 |
| 8 | will come up with my name because my cell | 12:12:24 |
| 9 | phone is listed in our directory, our online | 12:12:27 |
| 10 | directory.  So how come they don't get that, | 12:12:30 |
| 11 | right?  I -- there just aren't studies done | 12:12:34 |
| 12 | because they don't disclose anything about | 12:12:40 |
| 13 | the nature of the data that they're pulling | 12:12:42 |
| 14 | from. | 12:12:45 |
| 15 | BY MR. SMITH: | 12:12:45 |
| 16 | Q.   Do you have an opinion, one way or | 12:12:45 |
| 17 | another, about whether outdated information from | 12:12:48 |
| 18 | companies can be one cause for unreliable | 12:12:53 |
| 19 | information in the last seen date? | 12:12:56 |
| 20 | MR. SASSO:  Object to the form. | 12:13:00 |
| 21 | THE WITNESS:  It's possible, but I | 12:13:01 |
| 22 | don't really have an opinion.  I have no idea | 12:13:04 |
| 23 | of where they're getting their data from. | 12:13:06 |
| 24 | /// | |

Page 140

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | the data, the Metadata per se, the TLO reports, | 12:15:11 |
| 2 | that all of the pieces of the information should | 12:15:16 |
| 3 | have been considered unless he had a reason to | 12:15:20 |
| 4 | believe that it was irrelevant or unreliable. | 12:15:23 |
| 5 | Now, the probability of ownership | 12:15:29 |
| 6 | scoring is TLO's own assessment of the reliability | 12:15:32 |
| 7 | of what it is reporting.  TLO is the only one that | 12:15:36 |
| 8 | knows what the source of that association is. | 12:15:41 |
| 9 | They -- they know whether or not it's a | 12:15:45 |
| 10 | document -- it's coming from a document they | 12:15:51 |
| 11 | consider to be reliable or it's from some junkie | 12:15:56 |
| 12 | lead list that they bought five years ago from God | 12:15:58 |
| 13 | knows who.  I don't know where this data is coming | 12:16:01 |
| 14 | from, but TLO does. | 12:16:04 |
| 15 | And one of the things that it tries to | 12:16:05 |
| 16 | do, I would argue poorly, but at least it's | 12:16:06 |
| 17 | trying, is to advise its clients how reliable a | 12:16:11 |
| 18 | particular association is that it's reporting, | 12:16:19 |
| 19 | because they make the decision that we're going to | 12:16:21 |
| 20 | report everything; you're going to get the whole | 12:16:23 |
| 21 | kitchen sink, everything.  And so I'm going to | 12:16:26 |
| 22 | report to you the -- the gossip that I got from | 12:16:29 |
| 23 | my -- my mother, and I'm going to report to you | 12:16:36 |
| 24 | information that I received from a government | 12:16:38 |

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | probability of ownership includes with it the | 12:17:59 |
| 2 | totality of associations, the quality of | 12:18:04 |
| 3 | associations. | 12:18:09 |
| 4 | So his methodology, which is the "I'm | 12:18:10 |
| 5 | just going to pick the most recent first seen | 12:18:16 |
| 6 | date," makes zero sense, absolutely zero sense, | 12:18:21 |
| 7 | because it is saying I'm going to ignore the | 12:18:27 |
| 8 | totality of the documentation that TLO has, the | 12:18:31 |
| 9 | quality of the association, the sources, and TLO's | 12:18:35 |
| 10 | own view of how reliable this is.  I'm going to | 12:18:41 |
| 11 | substitute my own judgment.  I'm just going to | 12:18:46 |
| 12 | pick this one weird little thing that, according | 12:18:49 |
| 13 | to me at least, nobody told me it is unreliable, | 12:18:52 |
| 14 | because they told him -- apparently they told him | 12:18:56 |
| 15 | the other things were unreliable.  And it | 12:18:57 |
| 16 | substitutes his own judgment and ignores | 12:19:01 |
| 17 | overwhelming evidence that an individual is, like | 12:19:04 |
| 18 | usually the bank, accountholder, is still | 12:19:09 |
| 19 | associated with a phone number. | 12:19:11 |
| 20 | So that -- that is what those | 12:19:14 |
| 21 | paragraphs attempt to articulate. | 12:19:16 |
| 22 | Q.   Do you think Mr. Weir should have given | 12:19:19 |
| 23 | more weight to what TransUnion says about its | 12:19:21 |
| 24 | products? | 12:19:25 |

Page 144

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | A.   I think that ignoring it based on the | 12:19:25 |
| 2 | statements of some unnamed account executive is -- | 12:19:28 |
| 3 | is troubling.  I think that, at the very least, if | 12:19:34 |
| 4 | he believes that it is reliable data to begin | 12:19:39 |
| 5 | with, he should be taking it into consideration. | 12:19:43 |
| 6 | Q.   Okay.  He should not ignore what | 12:19:48 |
| 7 | TransUnion says about its products? | 12:19:50 |
| 8 | A.   I think it's -- I think it's a data | 12:19:52 |
| 9 | point that he should be considering.  What weight | 12:19:55 |
| 10 | he gives it, I don't know, but I can tell you that | 12:19:57 |
| 11 | ignoring it leads to the results that he has. | 12:20:00 |
| 12 | Q.   Apart -- | 12:20:09 |
| 13 | A.   He's just cherry picking -- | 12:20:10 |
| 14 | Q.   I'm sorry. | |
| 15 | A.   He's cherry picking one data point and | 12:20:13 |
| 16 | creating a class based on it, and the results are | 12:20:14 |
| 17 | very unreliable as a result.  But I think all of | 12:20:18 |
| 18 | this data is unreliable. | 12:20:20 |
| 19 | Q.   All -- | |
| 20 | A.   I wouldn't use any of it. | 12:20:23 |
| 21 | Q.   Any of what?  The probability score? | 12:20:24 |
| 22 | A.   I wouldn't use the probability score. | 12:20:26 |
| 23 | I wouldn't use any of it.  I don't think it's | 12:20:29 |
| 24 | capable in any way, shape or form of identifying | 12:20:31 |

Page 145

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | the class members that are -- that would be the | 12:20:35 |
| 2 | members of the class as defined by the plaintiffs. | 12:20:40 |
| 3 | I don't think it can be done. | 12:20:45 |
| 4 | Q.    Apart from anything you did in | 12:20:46 |
| 5 | connection with this case, have you ever used | 12:20:49 |
| 6 | TransUnion's probability of ownership score? | 12:20:53 |
| 7 | A.    I don't think so. | 12:20:56 |
| 8 | Q.    So the only time you used it was to run | 12:20:59 |
| 9 | a report on yourself and Mr. Weir? | 12:21:02 |
| 10 | A.    No.  We've used -- I mean, it's been | 12:21:04 |
| 11 | part of the data that we've received in other | 12:21:08 |
| 12 | cases. | 12:21:10 |
| 13 | Because Verkhovskaya has -- I've been | 12:21:11 |
| 14 | in a number of cases with her, and she uses a | 12:21:15 |
| 15 | completely different methodology than Mr. Weir and | 12:21:20 |
| 16 | Mr. Snyder.  And she uses both LexisNexis and TLO. | 12:21:24 |
| 17 | I think she calls it a reverse waterfall. | 12:21:29 |
| 18 | And so she has produced to us TLO data, | 12:21:33 |
| 19 | and I'm not sure if it had the probability score, | 12:21:38 |
| 20 | but it may well have.  So this wouldn't have | 12:21:41 |
| 21 | been -- if it did, this isn't the only time we've | 12:21:46 |
| 22 | seen it.  This is the case in which I've given it | 12:21:48 |
| 23 | the most attention. | 12:21:50 |
| 24 | Q.    I see.  Okay. | 12:21:52 |

Page 146

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | I could take a break in a little bit, | 12:32:44 |
| 2 | if you have a good stopping point, like five, ten | 12:32:45 |
| 3 | minutes. | 12:32:48 |
| 4 | Q.    Yeah, I have just a few more questions. | 12:32:49 |
| 5 | A.    Whatever is convenient for you. | 12:32:51 |
| 6 | Q.    Yeah.  On the last sentence of | 12:32:56 |
| 7 | paragraph 102, you note that the -- Citibank uses | 12:32:58 |
| 8 | a TCPA compliance mechanism that updates some | 12:33:04 |
| 9 | telephone numbers that appear in multiple accounts | 12:33:11 |
| 10 | to conform them to the lowest common level of | 12:33:14 |
| 11 | consent. | 12:33:17 |
| 12 | Do you see that? | 12:33:19 |
| 13 | A.    Uh-huh. | 12:33:19 |
| 14 | Q.    Can you explain what you meant by that? | 12:33:19 |
| 15 | What is -- what do you mean by the lowest level of | 12:33:22 |
| 16 | consent? | 12:33:25 |
| 17 | A.    Well, I would refer you back to | 12:33:26 |
| 18 | Mr. Andrew Meeks' -- Todd Andrew Meeks' | 12:33:28 |
| 19 | declaration because he's really the expert there | 12:33:34 |
| 20 | and I'm referencing his statements. | 12:33:37 |
| 21 | But in terms of what I meant when I | 12:33:41 |
| 22 | drafted it, the lowest level of consent would be | 12:33:43 |
| 23 | "don't call me, you have no consent." | 12:33:47 |
| 24 | Q.    Okay. | 12:33:51 |

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | A.    So if somebody says "do not call me" or | 12:33:52 |
| 2 | "this is a bad number," that means no consent.  No | 12:33:56 |
| 3 | consent would be the lowest level of consent. | 12:34:01 |
| 4 | Middle range would be you can text me, | 12:34:04 |
| 5 | but don't call me; you can call me, but don't text | 12:34:07 |
| 6 | me. | 12:34:11 |
| 7 | Highest level would be, call me, text | 12:34:11 |
| 8 | me, this number is yours to communicate with me in | 12:34:15 |
| 9 | any way you want. | 12:34:17 |
| 10 | Q.    And does that lowest level of consent | 12:34:19 |
| 11 | track to the account or the telephone number or | 12:34:21 |
| 12 | the customer name or something else or all of the | 12:34:25 |
| 13 | above? | 12:34:27 |
| 14 | A.    I'm not sure -- well, this is all | 12:34:27 |
| 15 | specific to each individual account.  You can | 12:34:32 |
| 16 | have -- I mean, people have multiple accounts with | 12:34:36 |
| 17 | Citibank.  You can have multiple credit cards. | 12:34:38 |
| 18 | You got -- you can have ten credit cards that | 12:34:43 |
| 19 | they're -- that they're servicing either as a | 12:34:46 |
| 20 | Citibank credit card or your kid has a card and | 12:34:48 |
| 21 | you signed on as a signatory for him. | 12:34:52 |
| 22 | I mean, people have very different | 12:34:57 |
| 23 | relationships with the bank.  Some of them are | 12:34:59 |
| 24 | very complex because there are a lot of different | 12:35:01 |

Page 156

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
1    they -- while they appear to have different names,    01:45:36

2    they clearly are related.  They are on each           01:45:39

3    other's accounts and they share the same telephone    01:45:41

4    number.                                               01:45:44

5         Q.   Did you --                                  01:45:50

6         A.   None of which you would know without        01:45:50

7    digging into the account notes.                       01:45:52

8         Q.   Did you conduct any analysis of how         01:45:55

9    frequently agents make mistakes in terms of           01:45:57

10   flagging wrong numbers or any other consent codes?    01:46:01

11        A.   Well, we looked at the -- the data of       01:46:05

12   the account records and we noted it where we saw      01:46:08

13   it.  I mean, obviously, it happened with              01:46:14

14   Mr. Revitch.  It happens here.  I mean, it -- it's    01:46:17

15   something that occurs.                                01:46:20

16        Q.   Where did you note it?  Did you keep a      01:46:21

17   running tally?                                        01:46:24

18        A.   In the report where we've identified       01:46:25

19   it.                                                   01:46:27

20        Q.   So this report contains every instance     01:46:28

21   where you found an example of agent error?            01:46:30

22        A.   No.                                         01:46:33

23        Q.   Okay.  What other documents could I        01:46:34

24   look at to discern other examples where you found    01:46:37
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1   Database recorded a change in consent from B        01:49:37

 2   to N.                                               01:49:40

 3        A.    Let me go back and read the context      01:49:41

 4   here and I'll answer that.                          01:49:43

 5                   (Witness viewed said document.)      01:49:46

 6             THE WITNESS:  I don't know for sure,       01:49:47

 7        but it wouldn't surprise me if it had          01:50:33

 8        something to do with the name change, that     01:50:39

 9        they received information that it was a        01:50:42

10        different last name, voicemail message,        01:50:47

11        et cetera, but that's speculation.             01:50:53

12   BY MR. SMITH:                                       01:50:56

13        Q.    On Page 186 of your report, you note,    01:52:06

14   "Mr. Weir has the lowest level of TLO's             01:52:11

15   subscription service."                              01:52:17

16        A.    You mean paragraph 186?                  01:52:23

17        Q.    Did I say page?                          01:52:25

18        A.    Yes.                                      01:52:25

19        Q.    I meant paragraph, yes.  Thank you.

20        A.    That's why I didn't include all that     01:52:29

21   other analysis.  I was afraid I would get to 186.   01:52:31

22        Q.    Let's go to paragraph 186.               01:52:31

23        A.    Yes, uh-huh.                             01:52:34

24        Q.    And I'm just focused on the first        01:52:34
```

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | sentence.  I just want to know what you meant when | 01:52:35 |
| 2 | you said, "Mr. Weir has the lowest level of TLO's | 01:52:38 |
| 3 | subscription service." | 01:52:43 |
| 4 | A.    25 bucks a month. | 01:52:43 |
| 5 | Q.    That's a price, but -- | 01:52:44 |
| 6 | A.    That gives you the lowest level of | 01:52:45 |
| 7 | access.  It's one of those -- the databases will | 01:52:47 |
| 8 | charge you a certain amount of per monthly fee and | 01:52:54 |
| 9 | you get to -- you may have an all you can eat. | 01:53:00 |
| 10 | You may have a -- you get this much data and it's | 01:53:05 |
| 11 | cheaper.  So if you can guess the level -- you | 01:53:08 |
| 12 | get -- you pay the least amount based on what you | 01:53:12 |
| 13 | expect is going to be your known level of use. | 01:53:15 |
| 14 | And I'll see if I can unpack that a little bit | 01:53:19 |
| 15 | because I can see I'm confusing you. | 01:53:22 |
| 16 | If you are using these databases on a | 01:53:25 |
| 17 | regular basis -- and this is much like a Westlaw | 01:53:29 |
| 18 | subscription for a law firm, right?  If you're | 01:53:32 |
| 19 | going to use it a lot, you want to pay a certain | 01:53:35 |
| 20 | amount because you want to pay close to the amount | 01:53:38 |
| 21 | that you're going to -- you want to pay for the | 01:53:43 |
| 22 | amount of volume that you know you're going to get | 01:53:46 |
| 23 | in.  Because if you go over that, the price gets | 01:53:48 |
| 24 | really expensive very fast. | 01:53:51 |

Page 172

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1   thing.                                          01:56:28

 2        Q.    And it has nothing to do with the    01:56:28

 3   amount he pays on a per month basis?            01:56:31

 4        A.    No.  It just means his clients are   01:56:31

 5   paying an awful lot of money for it because he  01:56:32

 6   doesn't have a subscription that allows him to --01:56:35

 7   when you pull the data over a -- your           01:56:35

 8   subscription -- your paid prescription [sic]    01:56:41

 9   amount, the price per search is typically much  01:56:42

10   higher.  So the ultimate clients, if he's passing01:56:46

11   that along to them, they're paying a lot more    01:56:50

12   money than if they were going to somebody that had01:56:54

13   a higher -- was paying for more volume.  They'd be01:56:58

14   paying less per search.                         01:57:01

15        Q.    Can you tell me what search tools you 01:57:03

16   have access through TLOxp?                      01:57:10

17        A.    TLOxp?                               01:57:14

18        Q.    Sure.                                01:57:17

19        A.    We have access to everything.  We have01:57:18

20   both -- we have both batch access as well as the 01:57:22

21   ability to pull individual reports.  The         01:57:25

22   individual reports have all the information that  01:57:28

23   they sell.                                      01:57:31

24           There's certain limitations, such as    01:57:35
```

Page 175

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | determine whether or not the data that he was | 02:25:55 |
| 2 | analyzing was complete and accurate.  And I found | 02:25:58 |
| 3 | it very shocking that he didn't think that it was | 02:26:01 |
| 4 | his role to report any errors or to give any | 02:26:06 |
| 5 | feedback or to provide the results for analysis to | 02:26:10 |
| 6 | the person who was giving the opinion on the data. | 02:26:15 |
| 7 | I thought all of that was highly unusual, | 02:26:19 |
| 8 | unscientific and not in keeping with best | 02:26:24 |
| 9 | practices, to say the least. | 02:26:30 |
| 10 | Q.    Do you agree or disagree that | 02:26:31 |
| 11 | Mr. Weir's role was to operationalize Mr. Snyder's | 02:26:35 |
| 12 | instructions? | 02:26:40 |
| 13 | A.    I don't understand honestly what these | 02:26:41 |
| 14 | two were doing, really. | 02:26:43 |
| 15 | You have Mr. Snyder who is giving the | 02:26:45 |
| 16 | opinion, and Mr. Snyder doesn't know anything | 02:26:47 |
| 17 | about the data and can't pull it because he | 02:26:50 |
| 18 | doesn't even have access to it. | 02:26:53 |
| 19 | And then you have Mr. Weir who backs | 02:26:55 |
| 20 | off in his deposition of providing any kind of | 02:26:58 |
| 21 | opinion about the results and then nobody ever | 02:27:00 |
| 22 | looked at it. | 02:27:02 |
| 23 | I have no idea what these two thought | 02:27:03 |
| 24 | they were doing, but it's highly unusual for -- in | 02:27:05 |

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | number.  But it doesn't contain the name of any | 02:43:56 |
| 2 | subsequent carriers, so you're not going to get -- | 02:44:04 |
| 3 | if I ported my cell phone to a landline number, it | 02:44:07 |
| 4 | doesn't -- it's not there. | 02:44:11 |
| 5 | Q.    Which numbers in the set of 176 from | 02:44:14 |
| 6 | the sample set were misidentified as cell phones? | 02:44:18 |
| 7 | A.    I don't know that that -- that they | 02:44:22 |
| 8 | were. | 02:44:25 |
| 9 | Q.    Is there any other area where Mr. Weir, | 02:44:26 |
| 10 | in your view, did not follow Mr. Snyder's | 02:44:42 |
| 11 | instructions? | 02:44:45 |
| 12 | A.    Yes.  He said that if there is | 02:44:45 |
| 13 | inconsistencies in the data, that you would either | 02:44:50 |
| 14 | throw the number out of the class or you would do | 02:44:54 |
| 15 | an individualized investigation. | 02:44:56 |
| 16 | And the methodology that Mr. Weir chose | 02:45:00 |
| 17 | to select the names associations in TLO ignored | 02:45:07 |
| 18 | the complexity and just simply grabbed the most | 02:45:12 |
| 19 | recent first seen date and called it a day and | 02:45:19 |
| 20 | didn't do anything to look at the dates of the | 02:45:24 |
| 21 | calls, didn't do anything to analyze when there | 02:45:26 |
| 22 | were more than one name associated with a | 02:45:29 |
| 23 | telephone number at the same time.  He just | 02:45:32 |
| 24 | ignored all of that and just grabbed the -- the | 02:45:36 |

Page 211

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | most recent first seen date and made that a class | 02:45:41 |
| 2 | member if that particular name didn't match it | 02:45:46 |
| 3 | with the accountholder name.  And that clearly | 02:45:51 |
| 4 | ignores that. | 02:45:59 |
| 5 | And he also talks about first name | 02:46:00 |
| 6 | matches, and Mr. Weir didn't do anything with | 02:46:02 |
| 7 | first names, much to his -- to the detriment of | 02:46:05 |
| 8 | his analysis because we were able to show that | 02:46:11 |
| 9 | there were a number of first name matches based | 02:46:12 |
| 10 | on -- that were actually the same people because | 02:46:14 |
| 11 | women change their name and men change their name | 02:46:17 |
| 12 | and people change their last name.  It's not an | 02:46:21 |
| 13 | exotic thing to have happen. | 02:46:24 |
| 14 | Q.   Was Mr. Snyder asked at his deposition | 02:46:26 |
| 15 | what he meant by the term "inconsistencies in | 02:46:36 |
| 16 | data"? | 02:46:43 |
| 17 | A.   It was an all-day deposition.  I can't | 02:46:43 |
| 18 | tell you at this point whether that specific | 02:46:44 |
| 19 | question was asked. | 02:46:47 |
| 20 | Q.   Do you know what Mr. Snyder meant when | 02:46:47 |
| 21 | he used the term "inconsistencies in data"? | 02:46:51 |
| 22 | A.   I know what I interpreted it to mean. | 02:46:54 |
| 23 | What was inside his head you would have to ask | 02:46:58 |
| 24 | him. | 02:47:02 |

Page 212

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
1           My understanding of it was the              02:47:02

2    inconsistencies would be that which -- those of us  02:47:03

3    who work with this day to day and day -- day in     02:47:07

4    and day out note where more than person is being    02:47:08

5    associated with a telephone number at the same      02:47:12

6    time, only one of those people typically picks up   02:47:16

7    an individual telephone call, you know.             02:47:20

8           So if you've got one -- if you've got        02:47:24

9    two, three, four names being associated with a      02:47:29

10   telephone number at the exact same time, that's an  02:47:32

11   inconsistency.                                       02:47:38

12      Q.    Does that mean the answer to my last       02:47:41

13   question is no?                                      02:47:43

14      A.    I have no idea.  That's my answer.          02:47:44

15      Q.    Do you know what Mr. Snyder meant when      02:47:47

16   he used the term "inconsistent data," yes or no?     02:47:51

17      A.    You're, you know, looking for -- I          02:47:55

18   already answered that.  I know what I interpreted    02:47:58

19   it to mean.  If you want to ask him what he meant,   02:48:00

20   you need to ask him.                                 02:48:04

21      Q.    Because you do not know?                    02:48:05

22      A.    I understand what I took it to mean.        02:48:07

23           This is -- it's his language; it's his       02:48:14

24   head.  You want to know what he thought he meant     02:48:16
```

Page 213

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1        A.      -- because you're going to miss anybody          02:58:07

2    that changes their name.                                     02:58:07

3        Q.      Is there any reason you can think of             02:58:08

4    why the methodology couldn't be modified to                  02:58:11

5    account for first names the way you described?               02:58:16

6        A.      There are certain errors that they made          02:58:18

7    that could be modified, but the entire methodology           02:58:20

8    fails because of a lot of the compound errors,               02:58:26

9    because of the fact that most of the information             02:58:30

10   is embedded in the account records, and because             02:58:33

11   the TLO data is in and of itself irretrievably              02:58:36

12   unreliable.  So you can do some fixing around the           02:58:43

13   edges, but it's essentially putting lipstick on a           02:58:46

14   pig.                                                        02:58:49

15       Q.      Is taking a count of first names one of          02:58:49

16   the ways to improve the methodology?                        02:58:52

17       A.      It certainly would be better than what           02:58:53

18   you had before, but it's not -- you know, you're            02:58:59

19   talking about improving.  You can't improve this            02:59:00

20   methodology to make it reliable without doing an            02:59:02

21   individualized analysis of the account records on           02:59:09

22   an account-by-account basis manually.  And even             02:59:11

23   then I think trying to use TLO is -- is a fail              02:59:16

24   because that data is so bad.                                02:59:19

Page 222

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | Q.    Earlier, a moment ago, you described an | 02:59:22 |
| 2 | issue with the software not catching similarities | 02:59:25 |
| 3 | in names like Nick and Nicholas. | 02:59:29 |
| 4 | A.    Uh-huh. | 02:59:32 |
| 5 | Q.    Do you -- do you recall when you were | 02:59:33 |
| 6 | sitting in on Mr. Weir's deposition he described | 02:59:34 |
| 7 | how the software that matches names can be | 02:59:39 |
| 8 | adjusted to capture a broader range of names and | 02:59:41 |
| 9 | capture that sort of similarity?  Did you hear | 02:59:47 |
| 10 | that testimony? | 02:59:50 |
| 11 | A.    I don't recall it. | 02:59:50 |
| 12 | Q.    Okay.  You don't recall reading that | 02:59:52 |
| 13 | testimony either? | 02:59:58 |
| 14 | A.    It's not -- | 02:59:58 |
| 15 | Q.    Okay. | |
| 16 | A.    I'm not denying that it's there.  I | 03:00:01 |
| 17 | just don't recall it. | 03:00:04 |
| 18 | Q.    And sitting here today, do you have any | 03:00:04 |
| 19 | reason to dispute Mr. Weir's testimony that the | 03:00:06 |
| 20 | software he used for name matching could be | 03:00:10 |
| 21 | modified to -- to address the criticism that you | 03:00:13 |
| 22 | just raised about similar names? | 03:00:16 |
| 23 | THE WITNESS:  Can you read that back. | 03:00:20 |
| 24 | /// | |

Page 223

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | (The reporter read the record as | 03:00:34 |
| 2 | requested.) | |
| 3 | THE WITNESS:  I don't have any | 03:00:35 |
| 4 | knowledge one way or the other.  I'm not | 03:00:36 |
| 5 | familiar with the MatchIt program.  I don't | 03:00:38 |
| 6 | know how configurable it is. | 03:00:40 |
| 7 | BY MR. SMITH: | 03:00:43 |
| 8 | Q.    You've never used the MatchIt program | 03:00:44 |
| 9 | in connection with your work with BRG? | 03:00:46 |
| 10 | A.    This is the first time we've used it. | 03:00:49 |
| 11 | It's not one that we've used -- that plaintiff's | 03:00:53 |
| 12 | experts have used in other cases that we've worked | 03:00:58 |
| 13 | on. | 03:01:01 |
| 14 | Q.    And you don't consider yourself an | 03:01:01 |
| 15 | expert in that software, correct? | 03:01:04 |
| 16 | A.    No, I had to -- I had a Stata expert | 03:01:05 |
| 17 | work on that data at my firm. | 03:01:09 |
| 18 | Q.    What was that Stata expert's name? | 03:01:11 |
| 19 | A.    Sam. | 03:01:20 |
| 20 | Q.    Are there any other examples that you | 03:01:21 |
| 21 | can think of where you believe Mr. Weir failed to | 03:01:23 |
| 22 | follow instructions set forth by Mr. Snyder? | 03:01:27 |
| 23 | (Witness viewed said document.) | 03:02:13 |
| 24 | THE WITNESS:  I don't know whether or | 03:02:13 |

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | the same name, Zoe Diaz, correct? | 03:27:41 |
| 2 | A.    Yes. | 03:27:43 |
| 3 | Q.    And you see the same phone number? | 03:27:43 |
| 4 | A.    Yes. | 03:27:45 |
| 5 | Q.    And it all matches the data that's in | 03:27:45 |
| 6 | Citibank's data, correct, by phone number -- | 03:27:49 |
| 7 | A.    Well, there's -- | |
| 8 | Q.    -- and name I mean? | 03:27:51 |
| 9 | A.    You only got -- yeah, it's just got | 03:27:51 |
| 10 | those two things. | 03:27:53 |
| 11 | I have no idea whether -- you've got | 03:27:55 |
| 12 | the date first seen, date last seen.  You got a | 03:27:58 |
| 13 | phone score.  You got all kinds of other stuff. | 03:28:01 |
| 14 | That TLO data is likely wrong, so I'm | 03:28:04 |
| 15 | never going to sign on to anything of that being | 03:28:07 |
| 16 | accurate or correct.  Maybe it's accurate in some | 03:28:10 |
| 17 | ways.  No way to tell. | 03:28:16 |
| 18 | Q.    Do you think it's more likely than not | 03:28:18 |
| 19 | that the Zoe Diaz with the exact same phone number | 03:28:20 |
| 20 | in the TransUnion data shown on the first row of | 03:28:23 |
| 21 | the first page of Exhibit 60 is the same Zoe Diaz | 03:28:26 |
| 22 | identified in Citibank's records? | 03:28:32 |
| 23 | A.    I think that's probably more likely | 03:28:35 |
| 24 | true than not, yeah. | 03:28:38 |

Page 241

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | Q.   Okay.  Do you know for the 20,000 | 03:28:45 |
| 2 | Citibank customers that were sampled by Mr. Weir | 03:28:57 |
| 3 | how many were accurately matched by name and | 03:29:00 |
| 4 | number through TransUnion? | 03:29:03 |
| 5 | A.   I -- oh, it was a really high number. | 03:29:05 |
| 6 | It was like 98 percent, something like that, which | 03:29:09 |
| 7 | on the flip side it tells you, if you believe that | 03:29:17 |
| 8 | all of those associations are correct, then that | 03:29:22 |
| 9 | means that most of the phone indicator data that | 03:29:26 |
| 10 | there was a wrong number code is wrong. | 03:29:28 |
| 11 | So -- and I put -- in my report there's | 03:29:31 |
| 12 | a notation that they're pulling data -- it's that | 03:29:33 |
| 13 | feedback loop -- they're pulling data from the | 03:29:38 |
| 14 | same sources that the -- in large part, they're | 03:29:41 |
| 15 | pulling data from bank records that may or may not | 03:29:47 |
| 16 | be dated.  There's -- neither is right. | 03:29:50 |
| 17 | Q.   What do you mean "neither is right"? | 03:29:58 |
| 18 | A.   I mean the TLO data isn't right, | 03:30:02 |
| 19 | that -- I doubt that it's correct that 98 percent | 03:30:11 |
| 20 | of those wrong -- those calls that were indicated | 03:30:15 |
| 21 | as wrong numbers were associated with the | 03:30:19 |
| 22 | accountholders, but there's no way to tell which | 03:30:24 |
| 23 | ones were and which ones weren't because I think | 03:30:29 |
| 24 | they're pulling from some of the same data. | 03:30:32 |

Page 242

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | Q.    Are you aware of any method that could | 03:31:56 |
| 2 | be used to identify business names in Citibank | 03:31:59 |
| 3 | records? | 03:32:03 |
| 4 | A.    Am I aware now?  No, I'm not currently | 03:32:03 |
| 5 | aware of anything. | 03:32:11 |
| 6 | Q.    You didn't investigate that issue | 03:32:11 |
| 7 | before? | 03:32:13 |
| 8 | A.    No.  It didn't come up. | 03:32:13 |
| 9 | Q.    Did you rerun Mr. Weir's analysis, do | 03:32:16 |
| 10 | it yourself from scratch? | 03:32:27 |
| 11 | A.    Yes. | 03:32:28 |
| 12 | Q.    And how did you do that? | 03:32:29 |
| 13 | A.    We followed as much as we could before | 03:32:31 |
| 14 | his deposition, his methodology, but it was very | 03:32:36 |
| 15 | difficult to follow.  And we couldn't replicate it | 03:32:39 |
| 16 | entirely.  We had issues. | 03:32:42 |
| 17 | Q.    At what point -- how far down the | 03:32:44 |
| 18 | process were you able to go before you stopped, | 03:32:47 |
| 19 | pending his deposition? | 03:32:52 |
| 20 | A.    I'm trying to remember where we got | 03:32:56 |
| 21 | disparate results. | 03:33:00 |
| 22 | I know that initially when we were | 03:33:04 |
| 23 | looking at the 176, we thought the 120 was an | 03:33:08 |
| 24 | error, that it wasn't purposeful because Mr. Weir | 03:33:17 |

Page 244

| | | |
|---|---|---|
| 1 | didn't disclose in his report that he was relying | 03:33:22 |
| 2 | on the most recent first seen date. | 03:33:27 |
| 3 | So when we got the data for the 176, | 03:33:33 |
| 4 | kind of looked at it and went, wow, this is a huge | 03:33:37 |
| 5 | mistake.  And we had just had that in another case | 03:33:42 |
| 6 | where the plaintiffs' expert just made a whopper | 03:33:45 |
| 7 | of a mistake on the analytics, and we kind of | 03:33:49 |
| 8 | assumed that that's what was going on here. | 03:33:53 |
| 9 | And then one of my staffer's came in | 03:33:55 |
| 10 | and said, "Wait a minute.  I think I know what's | 03:34:01 |
| 11 | going on here."  She showed me.  I went like, | 03:34:03 |
| 12 | "Huh, that's an odd way to do this," but it added | 03:34:09 |
| 13 | up. | 03:34:13 |
| 14 | So we pulled -- we pulled our own TLO | 03:34:13 |
| 15 | data and got the batch reports and did that and | 03:34:21 |
| 16 | tried to replicate it. | 03:34:24 |
| 17 | I'm trying to remember where -- where | 03:34:25 |
| 18 | it went off.  We couldn't match the numbers | 03:34:27 |
| 19 | entirely.  I think it was from the -- I can't | 03:34:29 |
| 20 | recall whether or not it was on the trying to get | 03:34:39 |
| 21 | rid of the cellular numbers versus the landlines, | 03:34:41 |
| 22 | although that's usually not the problem because we | 03:34:48 |
| 23 | usually get the same date -- data.  It might have | 03:34:49 |
| 24 | been because of the portability issue, but we | 03:34:50 |

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | couldn't replicate it. | 03:34:57 |
| 2 | Q.   You could not replicate it? | 03:34:58 |
| 3 | A.   No, we -- I don't know that we ever got | 03:35:00 |
| 4 | to the point where we could replicate it.  I know | 03:35:02 |
| 5 | we hadn't replicated it as of the time of the | 03:35:04 |
| 6 | deposition because we had questions that we wanted | 03:35:08 |
| 7 | asked so that we could figure out how to replicate | 03:35:11 |
| 8 | it. | 03:35:14 |
| 9 | They had -- they had more instructions | 03:35:14 |
| 10 | than we usually see because it's -- typically in | 03:35:19 |
| 11 | these cases you get these sort of big general | 03:35:23 |
| 12 | narratives that are not analytic language, so to | 03:35:26 |
| 13 | speak.  When you're doing data analytics, it | 03:35:33 |
| 14 | should be completely replicable. | 03:35:35 |
| 15 | And Mr. Weir did not produce the | 03:35:38 |
| 16 | numbers and the data reflecting each set.  So | 03:35:43 |
| 17 | here's my 20,000; then I get to 14,000, he didn't | 03:35:47 |
| 18 | produce that.  So you can't tell where it's gone | 03:35:52 |
| 19 | wonky.  So -- and he didn't produce -- he | 03:35:59 |
| 20 | basically said, "I got these 20,000 and here's 176 | 03:36:01 |
| 21 | and good luck getting there."  So we had questions | 03:36:05 |
| 22 | that we wanted answered so we could try and figure | 03:36:09 |
| 23 | out where it was going wrong. | 03:36:12 |
| 24 | But at the end day, I think we might | 03:36:13 |

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | have just stopped trying because the point was to | 03:36:16 |
| 2 | look at the 176.  And there was an awful lot of | 03:36:20 |
| 3 | work to do there to review the account records. | 03:36:25 |
| 4 | And as you may recall, it was Christmas and New | 03:36:28 |
| 5 | Year's.  It was all -- yeah. | 03:36:32 |
| 6 | Q.    So I just want to step back and make | 03:36:34 |
| 7 | sure I understood. | 03:36:40 |
| 8 | You followed as much as you could up to | 03:36:42 |
| 9 | a certain point.  Then there was some uncertainty | 03:36:44 |
| 10 | about using the first seen date or last seen date. | 03:36:47 |
| 11 | At a certain point, you understood that he was | 03:36:50 |
| 12 | using the most recent first seen date. | 03:36:53 |
| 13 | A.    Yeah, we had that before the | 03:36:56 |
| 14 | deposition. | 03:37:00 |
| 15 | Q.    And then you resumed your effort to | 03:37:00 |
| 16 | replicate.  And at some point after that the | 03:37:02 |
| 17 | process got bogged down again. | 03:37:06 |
| 18 | And what I want to know from you is how | 03:37:08 |
| 19 | far further down the process you got once you | 03:37:11 |
| 20 | understood that he was looking at the -- | 03:37:13 |
| 21 | A.    And -- and -- | |
| 22 | Q.    -- most recent first seen date. | 03:37:16 |
| 23 | A.    And the answer is I'm not sure I | 03:37:17 |
| 24 | actually know the answer to that because it was | 03:37:20 |

Page 247

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | probably Lanie Smith on my staff who was tasked | 03:37:25 |
| 2 | with doing the SQL work. | 03:37:30 |
| 3 | And I know that at a certain point we | 03:37:36 |
| 4 | just said it's not important.  We're -- we were | 03:37:38 |
| 5 | off by -- I can't remember even by how much.  But | 03:37:43 |
| 6 | we said it's not important; we can just look at | 03:37:47 |
| 7 | the 176. | 03:37:50 |
| 8 | We know -- he's testified now how he | 03:37:52 |
| 9 | got there, and we understand his articulated | 03:37:53 |
| 10 | process.  And it's really about the 176.  Let's | 03:37:57 |
| 11 | focus -- let's focus on his articulated class and | 03:38:00 |
| 12 | see what we can find there.  The extent to which | 03:38:04 |
| 13 | we couldn't replicate it became really less | 03:38:08 |
| 14 | important. | 03:38:12 |
| 15 | Now, I don't know.  It's possible that | 03:38:16 |
| 16 | she continued on and figured it out and it just | 03:38:19 |
| 17 | didn't bubble up to me.  It certainly wasn't | 03:38:23 |
| 18 | something that made its way into the report. | 03:38:27 |
| 19 | Q.    In terms of how far down the process | 03:38:29 |
| 20 | you got, however far that may have been, do you | 03:38:33 |
| 21 | recall roughly how many telephone numbers you had | 03:38:37 |
| 22 | sort of funneled down to, so to speak? | 03:38:41 |
| 23 | A.    I don't recall.  I'd be speculating at | 03:38:44 |
| 24 | this point. | 03:38:47 |

Page 248

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | deposition he gave his cell phone number? | 03:39:55 |
| 2 | A.    He gave his cell phone -- you mean his | 03:39:57 |
| 3 | cell phone number? | 03:40:00 |
| 4 | Q.    His cell phone number. | 03:40:01 |
| 5 | A.    Yeah, there was some discussion of his | 03:40:02 |
| 6 | cell phone numbers. | 03:40:07 |
| 7 | Q.    Did you ever run that number through | 03:40:07 |
| 8 | TLOxp? | 03:40:09 |
| 9 | A.    We ran Mr. Weir's name, I believe.  And | 03:40:09 |
| 10 | so anything that would have been associated with | 03:40:11 |
| 11 | him would have been on that TLO report, which I | 03:40:13 |
| 12 | believe was a -- an exhibit. | 03:40:15 |
| 13 | Q.    Okay.  So you ran his name prior to the | 03:40:19 |
| 14 | deposition, but after the deposition of Mr. Weir | 03:40:20 |
| 15 | you didn't run any additional reports? | 03:40:23 |
| 16 | A.    No, uh-uh. | 03:40:25 |
| 17 | Q.    And is that because you believed you | 03:40:27 |
| 18 | would not get any additional information other | 03:40:36 |
| 19 | than what you had already obtained from the first | 03:40:38 |
| 20 | report? | 03:40:40 |
| 21 | A.    I didn't care. | 03:40:41 |
| 22 | Q.    Okay. | 03:40:43 |
| 23 | A.    I mean, it just wasn't relevant.  We -- | 03:40:44 |
| 24 | we had the point made, which was Mr. Weir's data | 03:40:46 |

Page 250

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | I presume that these -- I know that the | 03:50:33 |
| 2 | red ones may have been probably the last ones that | 03:50:36 |
| 3 | we were going through or something like here's one | 03:50:38 |
| 4 | that we really need to -- this may be the only one | 03:50:40 |
| 5 | left.  I think that may be it.  And then we did | 03:50:42 |
| 6 | some additional research and were able to find | 03:50:46 |
| 7 | what we did. | 03:50:47 |
| 8 | Q.   Why do you make that assumption about | 03:50:47 |
| 9 | the red line? | 03:50:50 |
| 10 | A.   Because somebody may have told me that. | 03:50:51 |
| 11 | I'm thinking in my head that somebody told me | 03:50:58 |
| 12 | that. | 03:51:00 |
| 13 | Q.   What about the beige line? | 03:51:00 |
| 14 | A.   I don't know. | 03:51:03 |
| 15 | Q.   Don't know. | 03:51:03 |
| 16 | MR. SMITH:  This one is 62 and that one | 03:52:30 |
| 17 | is 63. | 03:52:32 |
| 18 | (Daley Exhibits 62 and 63 was | 03:52:35 |
| 19 | marked for identification.) | 03:52:36 |
| 20 | BY MR. SMITH: | 03:52:36 |
| 21 | Q.   So you've just been handed two | 03:52:37 |
| 22 | documents.  One is marked Exhibit 62 and the other | 03:52:40 |
| 23 | is marked -- | 03:52:43 |
| 24 | A.   Oh, yeah. | 03:52:43 |

Page 256

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | Q.     -- Exhibit 63.  They look very similar. | 03:52:43 |
| 2 | I will just note for the record, | 03:52:49 |
| 3 | Exhibit 62 comes from a native file that was | 03:52:52 |
| 4 | produced with the file name Citi_Revitch176151. | 03:52:55 |
| 5 | And Exhibit 63 had a file name ending in 153. | 03:53:02 |
| 6 | And do you recognize the documents that | 03:53:11 |
| 7 | have been marked as Exhibit 62 and 63? | 03:53:14 |
| 8 | A.    Yes. | 03:53:17 |
| 9 | Q.    What are they? | 03:53:18 |
| 10 | A.    These refer to the same issue that I | 03:53:18 |
| 11 | brought up right at the beginning of the | 03:53:21 |
| 12 | deposition.  I'm trying to look right now for the | 03:53:23 |
| 13 | paragraph.  But it had to do with the analysis we | 03:53:25 |
| 14 | did about how many matches there were to a single | 03:53:30 |
| 15 | match on LexisNexis versus TLO.  I'm trying to see | 03:53:35 |
| 16 | which the single name matches. | 03:53:40 |
| 17 | If you give me a second, I can pull the | 03:53:43 |
| 18 | right paragraph number.  But I referenced it when | 03:53:46 |
| 19 | we first started. | 03:53:57 |
| 20 | (Witness viewed said document.) | 03:55:08 |
| 21 | THE WITNESS:  Sorry, I'm just having a | 03:55:10 |
| 22 | hard time finding it.  If you... | 03:55:12 |
| 23 | (Witness viewed said document.) | 03:56:31 |
| 24 | THE WITNESS:  I found it, 156. | 03:56:31 |

Page 257

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | BY MR. SMITH: | 03:56:34 |
| 2 | Q.    I'm sorry? | 03:56:35 |
| 3 | A.    Paragraph one fifty -- I'm sorry.  Is | 03:56:36 |
| 4 | it 156 or is it 157? | 03:56:37 |
| 5 | 157. | 03:56:41 |
| 6 | The -- the one marked Exhibit 62 is the | 03:56:46 |
| 7 | workpaper that supports the number of -- the | 03:56:53 |
| 8 | number 29 with a single name association.  And as | 03:56:56 |
| 9 | you may recall earlier today, I said this was done | 03:57:01 |
| 10 | without reference to the dates of the calls. | 03:57:05 |
| 11 | And when you put that number in, when | 03:57:09 |
| 12 | you take that into consideration, the number | 03:57:12 |
| 13 | becomes 70 as opposed to 29.  And this is the | 03:57:16 |
| 14 | workpaper for that, and I included both of them. | 03:57:20 |
| 15 | Q.    I see. | 03:57:23 |
| 16 | So are the numbers in Exhibit 62 and 63 | 03:57:44 |
| 17 | derived from the 176 numbers that Mr. Weir -- | 03:57:48 |
| 18 | A.    Yes. | 03:57:53 |
| 19 | Q.    -- produced? | 03:57:53 |
| 20 | Okay. | 03:57:54 |
| 21 | A.    It's just a comparison to LexisNexis | 03:57:59 |
| 22 | what those results would be. | 03:58:03 |
| 23 | Q.    So the first number on -- I'm looking | 03:58:17 |
| 24 | at the top of Exhibit 63.  The very first row | 03:58:22 |

Page 258

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | you've got a phone number and name associated with | 03:58:26 |
| 2 | a number, Carlos Davila or Davila. | 03:58:29 |
| 3 | Do you see that? | 03:58:33 |
| 4 | A.    Yeah. | 03:58:34 |
| 5 | Q.    Did you make any determination whether | 03:58:37 |
| 6 | Mr. Davila received a wrong number phone call from | 03:58:40 |
| 7 | Citibank? | 03:58:45 |
| 8 | A.    Well, the report talks about the fact | 03:58:45 |
| 9 | that there is a purported number of 176 potential | 03:58:49 |
| 10 | class members or numbers. | 03:58:56 |
| 11 | And what I did was go through the | 03:59:00 |
| 12 | database information that was pulled and my own | 03:59:05 |
| 13 | unique additional pulls and show that those names | 03:59:09 |
| 14 | are the same names as the accountholders in almost | 03:59:14 |
| 15 | every set of circumstances.  There was some where | 03:59:17 |
| 16 | there was an address match, et cetera, but they | 03:59:21 |
| 17 | basically relate back to the accountholders. | 03:59:24 |
| 18 | And pursuant to Mr. Snyder's | 03:59:27 |
| 19 | methodology, any -- any matches are not class | 03:59:29 |
| 20 | members.  And so, therefore, according to your own | 03:59:39 |
| 21 | class identification methodology name matching, | 03:59:41 |
| 22 | they aren't class members. | 03:59:47 |
| 23 | Q.    That wasn't my question, though. | 03:59:49 |
| 24 | A.    Well, I understand, but that's what I | 03:59:51 |

Page 259

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | did. | 03:59:53 |
| 2 | Q.    But my question is:  Did you make the | 03:59:55 |
| 3 | determination whether or not Carlos Davila | 03:59:56 |
| 4 | received a wrong number call from Citibank? | 03:59:59 |
| 5 | A.    Nobody made that determination.  I | 04:00:02 |
| 6 | don't even think your own experts have said that. | 04:00:05 |
| 7 | I'm here to analyze what your -- your | 04:00:08 |
| 8 | experts are purporting as a class identification | 04:00:13 |
| 9 | methodology, and I don't believe either of your | 04:00:16 |
| 10 | experts are willing to say that anybody at any | 04:00:19 |
| 11 | particular time got a wrong number call.  They're | 04:00:22 |
| 12 | just saying here's a way we can get some names | 04:00:25 |
| 13 | that may have. | 04:00:29 |
| 14 | Q.    A moment ago when you said nobody made | 04:00:30 |
| 15 | that determination, were you referring just to | 04:00:32 |
| 16 | Carlos Davila specifically or all the names on -- | 04:00:35 |
| 17 | itemized on Exhibit 63? | 04:00:42 |
| 18 | A.    I think all of them.  There's a section | 04:00:42 |
| 19 | in my report where I believe both -- neither of | 04:00:44 |
| 20 | your experts are willing to -- certainly Mr. Weir | 04:00:49 |
| 21 | isn't saying that anybody particularly got a wrong | 04:00:53 |
| 22 | number call. | 04:00:55 |
| 23 | This is just simply your -- your whole | 04:00:58 |
| 24 | proposal to identify these class members is to | 04:01:03 |

Page 260

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | name match or to exclude names from the | 04:01:08 |
| 2 | accountholders.  That's -- that's as far as I | 04:01:12 |
| 3 | understand you're going, not that anybody in | 04:01:15 |
| 4 | particular got a wrong number call at any given | 04:01:18 |
| 5 | time.  Nobody can tell who picked up a phone | 04:01:22 |
| 6 | unless you get into the account records. | 04:01:26 |
| 7 | Q.    Looking again at Exhibit 63, the first | 04:01:30 |
| 8 | row -- I'm sorry, the first column is labeled "BRG | 04:02:07 |
| 9 | Matched Numbers," and then there are either 1s or | 04:02:14 |
| 10 | zeros that follow. | 04:02:20 |
| 11 | What do the 1s or zeros signify? | 04:02:21 |
| 12 | A.    I'm not sure I know if there are -- I | 04:02:26 |
| 13 | have to count up to see if they come up to 29 or | 04:02:41 |
| 14 | 70. | 04:02:44 |
| 15 | Usually that's the counter for the yes | 04:02:48 |
| 16 | or no of the analytic, a 1 equals yes and a zero | 04:02:51 |
| 17 | equals no, when you have the total at the bottom | 04:02:56 |
| 18 | typically. | 04:03:03 |
| 19 | My guess would be that if you counted | 04:03:07 |
| 20 | all of these up, you would probably get -- for | 04:03:08 |
| 21 | this one, for 63, you would probably get 70. | 04:03:12 |
| 22 | Are these the same on either side?  BRG | 04:03:24 |
| 23 | match on the far right. | 04:03:28 |
| 24 | This particular workpaper is not one | 04:03:31 |

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | communication with a customer service rep, but the | 04:33:08 |
| 2 | phone utility database did not keep the historic. | 04:33:11 |
| 3 | As soon as there was a new indicator code, it | 04:33:18 |
| 4 | wrote over the old Phone Indicator Code. | 04:33:21 |
| 5 | Now, that information is available in | 04:33:25 |
| 6 | the account notes, embedded in it.  Historically | 04:33:26 |
| 7 | you can go through and read the account notes and | 04:33:30 |
| 8 | you can find those old indicator codes, but it | 04:33:34 |
| 9 | wasn't maintained historically in an automated | 04:33:39 |
| 10 | database in a -- until November 2017. | 04:33:42 |
| 11 | Q.    So if someone -- if an agent updated a | 04:33:47 |
| 12 | code in the account notes, would that code | 04:33:54 |
| 13 | information end up in another database? | 04:34:01 |
| 14 | A.    When? | 04:34:05 |
| 15 | Q.    At the moment the change was made. | 04:34:05 |
| 16 | A.    But what -- when?  Date? | 04:34:07 |
| 17 | Q.    Let's say prior than November -- prior | 04:34:11 |
| 18 | to November 2017. | 04:34:12 |
| 19 | A.    It would be overwritten.  So the | 04:34:13 |
| 20 | indicator code is an instruction, right?  It | 04:34:18 |
| 21 | instructs the dialer "do this," "don't do this" | 04:34:21 |
| 22 | under these circumstances.  The dialer has this | 04:34:23 |
| 23 | data -- this information about how to treat every | 04:34:26 |
| 24 | particular number that gets uploaded with it. | 04:34:29 |

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1    Q.    And how does the information get                    04:34:32

2    transmitted from the account notes ultimately to          04:34:34

3    the dialer pre-November 2017?                              04:34:38

4    A.    I think it's -- I believe that it's                 04:34:40

5    part of the -- it's part of the operations where          04:34:43

6    the account information is transferred.  I mean, I        04:34:48

7    think the first thing they do is say, "Can we             04:34:53

8    dial?"  So that's an exclusion, right?                     04:34:56

9         So when they're trying to decide what                04:34:59

10   numbers are going to be uploaded to the dialer            04:35:01

11   tomorrow -- and Mr. Kalat has studied this more           04:35:04

12   carefully than have I, so I would defer to him.           04:35:08

13   But it's an exclusion so that those numbers are --        04:35:11

14   if it's a bad number or if it's a no consent, it          04:35:15

15   won't be sent to the predictive, if there's a             04:35:19

16   predictive dialer, or if there's a -- whatever            04:35:22

17   methodology that's going to be used, it won't --          04:35:24

18   the exclusions apply and it's not sent.                    04:35:25

19   Q.    Still focused prior to November 2017,              04:35:30

20   is it the case that there was records of a                04:35:35

21   consent -- the current consent notation, B, N, V,         04:35:40

22   whatever the code may be, but there was just no           04:35:47

23   records of historical changes?                            04:35:51

24        MR. SASSO:  Object to the form.                      04:35:53

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1          THE WITNESS:  I'm sorry.  I didn't        04:35:54

 2     follow.                                        04:35:55

 3  BY MR. SMITH:                                     04:35:56

 4     Q.    Okay.                                    04:35:56

 5     A.    My fault.                                04:35:56

 6     Q.    Let me put this away.                    04:35:57

 7          Let's say the date is January 1st,        04:35:59

 8  2016, and you've got a given number.  It doesn't  04:36:02

 9  matter what number, some number associated with a 04:36:07

10  Citibank customer.  And the consent code is either 04:36:11

11  N or B for that particular number on January 1st, 04:36:24

12  2016.                                             04:36:35

13          Is there some database that holds that    04:36:36

14  data that gets -- that allows that data to be     04:36:39

15  transferred or transmitted to the dialer?         04:36:44

16     A.    My understanding is that that is         04:36:46

17  included in the account notes in the system of    04:36:51

18  record, but it is overwritten over time as it     04:36:54

19  changes.                                          04:36:58

20          And the only place where the changes in   04:36:59

21  an audit log exist is the Contact Utilities        04:37:03

22  Database and only from November 2017 going forward 04:37:07

23  and that there is not a queryable, automated way   04:37:10

24  to find the historical phone indicator data for    04:37:15
```

Page 276

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | You can put that away.  You were asked earlier if | 04:40:50 |
| 2 | plaintiffs' expert modified the methodology to | 04:40:53 |
| 3 | focus on wrong number account information in the | 04:40:56 |
| 4 | account level documents instead of the database | 04:40:58 |
| 5 | and the codes, would that be, in your view, a more | 04:41:01 |
| 6 | reliable method of identifying class members. | 04:41:05 |
| 7 | Do you recall that? | 04:41:09 |
| 8 | A.    Yes. | 04:41:09 |
| 9 | Q.    So you and your team reviewed account | 04:41:10 |
| 10 | level documents, correct? | 04:41:13 |
| 11 | A.    Yes, we did. | 04:41:14 |
| 12 | Q.    And do you have an opinion on the | 04:41:14 |
| 13 | difficulty or viability of reviewing those account | 04:41:17 |
| 14 | records to do the type of analysis that was | 04:41:21 |
| 15 | proposed here in the plaintiffs' methodology? | 04:41:24 |
| 16 | MR. SMITH:  Objection, compound. | 04:41:28 |
| 17 | THE WITNESS:  I do. | 04:41:30 |
| 18 | BY MR. SASSO: | 04:41:31 |
| 19 | Q.    And what's that? | 04:41:31 |
| 20 | A.    There is not a way to review those | 04:41:32 |
| 21 | accounts in any kind of an automated fashion.  The | 04:41:37 |
| 22 | only way that you can tease the information that's | 04:41:43 |
| 23 | relevant out of those account records is by a | 04:41:49 |
| 24 | manual review. | 04:41:50 |

Page 280

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1                      CERTIFICATE
 2                          OF
 3              CERTIFIED SHORTHAND REPORTER
 4
 5              I, JANET L. ROBBINS, a Certified
 6     Shorthand Reporter of the State of Illinois, CSR
 7     License No. 84-2207, do hereby certify:
 8              That previous to the commencement of
 9     the examination of the witness, the witness was
10     duly sworn to testify the whole truth concerning
       the matters herein;
11              That the foregoing deposition
       transcript was stenographically reported by me and
12     was thereafter reduced to typewriting under my
       personal direction and constitutes a true and
13     accurate record of the testimony given and the
       proceedings had at the aforesaid deposition;
14              That the said deposition was taken
       before me at the time and place specified;
15              That I am not a relative or employee or
       attorney or counsel for any of the parties herein,
16     nor a relative or employee of such attorney or
       counsel for any of the parties hereto, nor am I
17     interested directly or indirectly in the outcome
       of this action.
18              IN WITNESS WHEREOF, I do set my hand and
19     affix my seal this 30th day of January, 2019.
20
21
22
23              JANET L. ROBBINS, CSR, RPR
24              CSR License No. 84-2207

                                          Page 291
```

**EXHIBIT 2**

```
 1                IN UNITED STATES DISTRICT COURT
 2                NORTHERN DISTRICT OF CALIFORNIA
 3

 4

 5     JEREMIAH REVITCH, on behalf    )
 6     of himself and all others     )
       similarly situated,           )
 7                                    )
            Plaintiff,                )
 8                                    ) Case No.
            vs.                       ) 3:17-cv-06907-WHA
 9                                    )
       CITIBANK, N.A.,                )
10                                    )
            Defendant.                )
11     _____)
12               DEPOSITION OF RANDALL SNYDER
13
14                  Taken at SLS Las Vegas
15              2535 South Las Vegas Boulevard
16                 Studio 4, Grand Tower
17                Las Vegas, Nevada  89109
18
19              Sunday, December 23, 2018
20                     9:02 a.m.
21
22
23     Reported By: Gale Salerno, RMR, CCR No. 542
24     Job No. 3177667
25     Pages 1- 219
```

Page 1

1          MR. SMITH:  Objection.  Misstates the

2     testimony.  Calls for a legal conclusion.

3          THE WITNESS:  No.  What I did was I applied

4     the concept of wrong party number calls made with an

5     automatic dialing system.  And more specifically, to

6     cell phone numbers, which I understand is what the

7     TCPA provides for.  And based on that, those general

8     factors, that's how I created the methodology in my

9     report.

10    BY MR. SASSO:

11         Q.   And were you asked to take into account

12    whether calls were made to customers versus

13    noncustomers?

14         A.   Yes.

15         Q.   And how did you make the determination

16    whether a particular call was to a customer or

17    noncustomer?

18         A.   Well, in the methodology, if we determine

19    that a number was called that is not -- or that was a

20    wrong party number, which is indicated in the call

21    records, then the further step of obtaining contact

22    information, if the contact information we obtained

23    from one of the data processors matches the name on

24    the account record or is closely matched, then that

25    person is not a member of the class.

Page 71

1          However, if you obtain contact information
2     associated with a phone number, and the date that --
3     usually these data processors will provide a date
4     when -- in their system, that information to their --
5     to the data's best representation, is the date when
6     that first occurred.
7          You can be very sure that that was the
8     wrong -- that was the name and contact information of
9     the wrong number that was called.
10     Q.   You're able to be very sure that's the
11    wrong number called without doing any
12    cross-referencing, for example, to another data
13    source?
14     A.   In my opinion, what we did in the sample or
15    what Colin performed in the sample data is highly
16    reliable.
17          However, if it's deemed to not be reliable
18    enough, for instance -- again, this is an adaptable
19    methodology -- then you can further cross-reference
20    against other data sources.
21          So I have no problem with simply using
22    Transunion.  But, again, it's an open methodology
23    that can be refined if needed.
24     Q.   Did you have any input in defining the
25    class as it was ultimately defined in plaintiff's

                                        Page 72

1      Q.   Is it your understanding that the numbers

2    that Citibank was calling here were numbers that they

3    intended to call their customers at?

4      A.   Well, I can't -- I can't testify to what

5    Citibank's intentions were or are.

6      Q.   Is it your understanding the calls were

7    made here for collection purposes to reach Citibank

8    customers?

9      A.   Generally, yes.  And we have evidence

10   that -- I agree that certainly that's their goal in

11   making these calls, but we have evidence that they

12   called wrong numbers.

13     Q.   You have evidence that they called numbers

14   that you claim were not associated with the customer?

15     A.   No.  They called numbers that Citibank

16   claims were not associated with the customer because

17   they're the ones that testified that they marked

18   things as wrong numbers, and those are considered to

19   be wrong numbers when they marked them as such.

20     Q.   And then you also remember reading the

21   testimony where they said that wrong numbers may get

22   marked as wrong numbers, but then later changed when

23   the customer says they, in fact, were not a wrong

24   number?

25     A.   That's not part of my analysis.  However,

Page 92

1   we did take into account if a record was marked as a

2   wrong number on a certain date, and then marked as

3   not and as a good number at a later date, we filter

4   out those records.  So they're not included in the

5   class.

6       Q.   But the point being, though, so even in

7   that scenario, if you have a phone number that's

8   coded as a wrong number, and then it changes, the

9   coding -- the original coding as a wrong number

10  doesn't necessarily mean that it's actually a wrong

11  number, correct?

12      A.   Well, I can't testify to the thoughts and

13  underlying reasons of Citibank personnel.  All I know

14  is what's in the records, and if it was a wrong

15  number on an earlier date, but then deemed to not be

16  at a later date, and we have evidence of that, which

17  we do in some records, we filter them out; they're

18  not part of the class.

19      Q.   We talked earlier about sequential and --

20  let me make sure I got this right.  You were told by

21  counsel that sequential means one following another.

22          So where in the dialer documentation does

23  it define what sequential means?

24      A.   It doesn't.  I don't know why it would.  It

25  doesn't.

Veritext Legal Solutions
877-955-3855

1    was a wrong party number, and we have deposition

2    testimony that when they -- I think it was

3    Ms. Malahey (phonetic), when a call party says it was

4    a wrong number, they consider that a wrong number and

5    mark it as such.

6         So whatever they discuss that, if they

7    talked about the weather or talked about loans or

8    asked other questions, the fundamental piece of data

9    that we're using is a wrong party indication that's

10   been testified to actually mean Citibank considered

11   that a wrong number.

12   Q.   And you've read Ms. Malahey's (phonetic)

13   testimony where she then said that wrong number codes

14   are subsequently changed when customers indicate that

15   the wrong code was actually inaccurate?

16   A.   Absolutely.  We've already discussed that,

17   and we actually eliminate them from the putative

18   class membership if it turns out that Citibank

19   discovers that a wrong number isn't actually a wrong

20   number.

21        We compare the dates, and we can easily

22   filter those out of the putative class.  In fact, I

23   testified to that in my declaration.

24   Q.   Is there anything about the actual

25   day-to-day usage of the Aspect system by Citibank

Page 114

1     Q.   Well, then why don't we make it clear.  So

2  for step one in paragraph 74, you're looking for the

3  change from the -- I think you said it was -- make

4  sure I got it right -- from IBS we're looking from

5  the change from -- here, J to H, and then for FDR

6  you're looking for B to N.

7     A.   Correct.

8     Q.   Right?

9          Okay.  So then the phone indicator data

10 that has the indicators and the dates of the changes,

11 when you -- you reviewed that data, correct?

12    A.   Yes.

13    Q.   Did you review the entire data set, or just

14 a sample piece of it?

15    A.   Just a sample.  My understanding is there's

16 hundreds of thousands or millions of records, and

17 based on deposition testimony, and what these

18 indicators mean, we can be very sure that those

19 indicators would be consistent as applied to all the

20 records.

21    Q.   Did you observe in that data that it did

22 not contain any records of consent flags for any

23 dates prior to November 2017?

24    A.   I don't recall if we did that step or not.

25 But certainly if that's a required step, as I said

Page 138

1    before, this is an overall methodology that's very

2    adaptable.

3              So we can always filter for additional

4    information if need be.  Or for instance, we're

5    supplying information that there's another indicator

6    that needs to be filtered.  We could certainly

7    perform that step as well.

8         Q.   So let me just clarify.  You don't recall

9    observing that there were no records of consent flags

10   for dates prior to November 2017?

11        A.   No.  As far as I know, and which is

12   immaterial to this methodology, the date ranges for

13   applying this methodology could be any date ranges we

14   choose.

15             So this is the overall methodology, and if

16   we should only look at records in a certain date

17   range, that's certainly something we would add to

18   this.

19        Q.   So can the phone indicator data show

20   whether there was a consent flag on a number as of

21   October 2017?

22        A.   Can it?  Certainly it can.

23        Q.   Do you know -- did you observe in the data

24   in this case whether it did show any indicator,

25   consent indicator codes as of October 2017?

Page 139

1    that number before and after that date, are you

2    including in your class the phone calls that come

3    prior to the date change, or are you including only

4    the calls that come from November 2017 to present?

5        A.   Regardless of whether it's November 2017 or

6    any other date, we're only counting calls after the

7    wrong party number indication is indicated.  And it

8    hasn't changed back at any period of time after that.

9             So we looked at the wrong party number

10   indication, and all automatically dialed calls after

11   that date are counted.

12            Now, whatever cut-off date there is, based

13   on availability of data, or what the class period is,

14   is immaterial to that basic methodology.

15       Q.   But you have to start from the last change

16   date, has to be your starting point?

17       A.   Yes.  You have to start when Citibank knew

18   it was a wrong number.

19       Q.   Okay.  Step 2 in paragraph 75, you say that

20   this step is more important due to abundance of

21   caution, and that's because some wrong codes, wrong

22   number codes, are applied to numbers that may not

23   actually be wrong numbers.

24       A.   That's right.  We're trying to eliminate

25   false positives.  So that even if at some point in

Page 150

1   time it was considered a wrong party, but at some

2   later date it was considered not to be a wrong party,

3   we just don't count it at all.

4       Q.   And the phone indicators are a reflection

5   of sort of the ultimate process of what happened when

6   the agent spoke to somebody at that time?

7       A.   Yeah.  And I don't know if it was that

8   specific behavior or what I gleaned from that

9   information is that that's -- these are the times the

10  calls were made after Citibank -- it was understood

11  by Citibank that this was a wrong party number.

12          Now, what the call center's behavior is or

13  whatever is immaterial to this objective analysis.

14  So we just look at the wrong party number.

15          We know from deposition testimony that that

16  really means they consider it a wrong number.  And

17  then automatic calls are still made after that point

18  in time.

19      Q.   And you're not giving an opinion as to --

20  if we wanted to understand what actually happened

21  that led to the phone indicator changing to a wrong

22  number, you're not providing an opinion on how that

23  can be done to understand what led to that change?

24      A.   That's right.  I'm only objectively looking

25  at what the indicator means based on deposition

Page 151

1   we're pretty sure that's a wrong party call.

2          So if the name and address information are

3   completely different from the name on the account

4   record, and it's indicated as a wrong party number,

5   and calls are continually made to that number after

6   Citibank considered it a wrong number, the analysis

7   of obtaining contact information could tell us

8   whether that name is the name on the account or not.

9   And if it turns out that that name was on the

10  account, we can eliminate that.  That's something we

11  could exclude.

12         So we're really looking at people that

13  appear to have no relationship at all to the account

14  record where, you know, automated calls were made to

15  a wrong number.

16         So there's an extra confirmation step in

17  there when we obtain contact information.

18      Q.   I'm sorry, is it your testimony that the

19  data from Citibank includes the address information

20  for each of these accounts?

21      A.   No.  But we look at the name, primarily.

22      Q.   So when you said that you compare the

23  address or name, that was not accurate?

24      A.   Yeah.  It's really name.  Thank you for --

25  thank you for noticing that I misspoke.  We're really

Page 159

1      looking at the name information, that's right.

2            But there's no reason why we couldn't look

3      at address information and compare that as well.  And

4      we could certainly -- again, this is an adaptable

5      methodology.  If there's additional filtering that

6      needs to be made or comparisons that need to be made,

7      they certainly can be.

8            Q.   So step four, paragraph 77, so what process

9      is used to scrub four cell phones?  Strike that.

10           Let me ask this step four, that's the

11     process where you then try to identify which of the

12     phone numbers are actually cell phones versus land

13     lines?

14           A.   Correct.

15           Q.   So explain to me the process that takes

16     place there.

17           A.   It's all written out in a separate section

18     of my report called identifying cellular telephone

19     numbers.

20           It's actually very simple to do.  It comes

21     from the origination of the ability to port telephone

22     numbers from November 2013.

23           So there's a main realtime database and

24     offline database, and that data is sold to

25     wholesalers that then provide the service.

Page 160

1   here or there.

2          But over all, it's very reliable that

3   almost all of that data is correct.

4      Q.   So if the TLO data reports back a name,

5   number combination where there are multiple names

6   associated with a single phone number, and there is a

7   single date associated with one name, but a broader

8   range of dates associated with a different name,

9   which one of those is more reliable?

10     A.   I don't have that experience using data

11  with that hypothetical.  All I can say is if you get

12  data that looks erroneous for some reason, you can

13  always cross-reference that against another data

14  processor, or you in our case, you can eliminate it

15  from the class if you're not exactly sure.

16         But I know just as a good practice in cases

17  like we have here, we're only trying to use data that

18  we're very sure of.

19         So any conflicting data or any erroneous

20  data that we can see is erroneous or conflicting, we

21  typically just don't count, or we try and confirm it

22  in other ways.

23     Q.   In terms of how TLO is used, are they -- is

24  Mr. Weir performing sort of individual name/number

25  searches, or is he doing a batch search?

Page 189

1    be a business number.  So it's not associated with an

2    individual, it would be a member of the class.  I'm

3    sure he's aware of that, but you would have to ask

4    him specifically.

5         Q.   When you say you exclude business numbers,

6    you exclude business numbers if the defendant's

7    records showed it associated with a business number,

8    or if the TLO reports back a business number?

9         A.   Either one.  What you want to do is try to

10   exclude numbers associated business -- as a business

11   would not be a class member.

12             So if there's a determination on either the

13   account record from Citibank or from Transunion or

14   another data processor's database that comes back as

15   a business name and not an individual name, that

16   certainly can be excluded as not being a member of

17   the class.

18             I'm not aware of that situation happening

19   here, but Colin may be if you question him about

20   that.

21        Q.   And then how does the analysis account for

22   someone who is using their maiden name, for example?

23        A.   There's usually a high likelihood, if you

24   get name and address matching, and the only

25   difference is the last name, for instance, it's easy

Page 196

```
 1    to just to be conservative, eliminate them from the
 2    class.
 3          So if we have potentially a female that had
 4    a maiden name in the Citibank account records, but we
 5    have the same name with a different last name, and
 6    maybe we query for address information, it might
 7    match the address information.  We could do that
 8    step, too.  That's in the account records.  We could
 9    be very sure that that's probably the same person.
10          And again, to be conservative, we try and
11    eliminate them from the class.
12    Q.   And do you know if that was done here to
13    take the additional step to query for address
14    information to eliminate people that may have a
15    similar first name but a different last name?
16    A.   I'm not sure.  I don't think it was done
17    here.  But again, as I said, the methodology we put
18    forth allows for additional filtering confirmation in
19    order to use a software process to determine class
20    membership.
21          So the idea is to try and eliminate false
22    positives as much as possible.
23    Q.   So do you think we need to do those
24    additional steps before we can get to what you guys
25    have coined a final list of wrong numbers, or do we
```

Page 197

1          Same for last names, same with first names.

2          So the idea is that we want to be very sure

3    that truly this wrong party number really did go to a

4    different person than the name on the account record.

5          Q.   So with respect to what was done in this

6    case, is that similarity score analysis, is that the

7    only piece that was done with respect to the TLO

8    data?  Are you aware if Mr. Weir used the TLO data in

9    any other respects to identify class members?

10         A.   I don't know.  You would have to ask him.

11         Q.   And do you know if the TLO data provides a

12   first seen date of a name association with a phone

13   number?

14         A.   I've seen first seen date in lots of these

15   data processors.  I believe it does, but again, Colin

16   would be more of the expert to answer that question.

17         Q.   And do you know if the TLO data provides a

18   last seen date?

19         A.   It may.  Again, Colin is an expert in the

20   usage of this data and the data that's returned based

21   on the queries he makes, so I would defer to him.

22         Q.   So in this case, are you providing any

23   opinion upon the reliability of a first seen date

24   versus a last seen date in the TLO data?

25         A.   No.  I'm providing an opinion on the

Page 201

1    general methodology that can be used to identify or

2    contact potential class members.

3        Q.   So do you have any opinion on whether a

4    first seen date or a last seen date is more reliable

5    for identifying potential class members?

6        A.   It depends what data we're getting back,

7    what those dates are associated with, the dates in

8    the call log records for when the automatic calls

9    were made.  All I can say is that an example of a

10   member who would be in the class is somebody that's

11   indicated by Citibank that they know is a wrong

12   number.  There's no additional indications.

13   Automatic calls were made after that number was

14   marked as a wrong number, and we come up with a name

15   through one of the data processors that is completely

16   different than the name on the accounts.

17        That's the general methodology I'm opining

18   on.  Colin is an expert in all of the individual

19   details of performing the numerical analysis and

20   implementing this basic methodology.

21        Q.   So do you have any opinion on whether or

22   not a person -- if a TLO report provides two names

23   associated with a phone number, and one name has an

24   earlier first seen date, and the latest last seen

25   date, so there's a range of dates that TLO provides

Page 202

```
 1                  CERTIFICATE OF REPORTER

 2            I, the undersigned, a Certified Shorthand

 3       Reporter of the State of Nevada, do hereby certify:

 4            That the foregoing proceedings were taken

 5       before me at the time and place herein set forth;

 6       that any witnesses in the foregoing proceedings,

 7       prior to testifying, were duly sworn; that a record

 8       of the proceedings was made by me using machine

 9       shorthand which was thereafter transcribed under my

10       direction; that the foregoing transcript is a true

11       record of the testimony given to the best of my

12       ability.

13            Further, that before completion of the

14       proceedings, review of the transcript [ X ] was

15       [  ] was not requested pursuant to NRCP 30(e).

16            I further certify I am neither financially

17       interested in the action, nor a relative or employee

18       of any attorney or party to this action.

19            IN WITNESS WHEREOF, I have this date

20       subscribed my name.

21       Dated: December 24, 2018

22

23

24

25            GALE SALERNO, RMR, CCR #542

                                              Page 219
```

**EXHIBIT 3**

```
1   UNITED STATES DISTRICT COURT
2   NORTHERN DISTRICT OF CALIFORNIA
3   Case No. 3:17-CV-06907-WHA
4   -----------------------------------x
5   JEREMIAH REVITCH, on Behalf of
    Himself and all Others
6   Similarly Situated,
7           Plaintiff,
8
9       - against -
10
11  CITIBANK, N.A.,
12          Defendant.
    -----------------------------------x
13              December 28, 2018
                9:28 a.m.
14
15      ** C O N F I D E N T I A L **
16      Deposition of COLIN B. WEIR, taken by
17  Defendant, pursuant to Notice, held at the
18  offices of Ballard Spahr LLP, 1675
19  Broadway, New York, New York, before Todd
20  DeSimone, a Registered Professional
21  Reporter and Notary Public of the State of
22  New York.
23
24
25  Pages 1 - 380
```

                                        Page 1

1        A.        Again, I'm offering an opinion
2    about the general reliability of the data
3    and that my research would show that the
4    data is accurate in the sense that we are
5    generating matches, expected matches
6    between the Citibank data and the
7    TransUnion data, but I would not offer the
8    opinion that the TransUnion data is
9    perfect.
10        Q.        What percentage accuracy would
11   you attribute to the TransUnion data?
12        A.        I haven't been asked to
13   identify that precisely, but in other
14   situations where I have looked at similar
15   data, we wind up with situations where I
16   think in greater than 90 percent of
17   contexts the information is shown to be
18   definitively accurate, and then there is
19   additional data where, for example, it
20   shows a new customary user of the phone, it
21   is very likely that the majority of that
22   data is also accurate.
23        Q.        You said in certain instances
24   90 percent of the time the data is shown to
25   be definitively accurate?

1          A.      Correct.

2          Q.      How?

3          A.      Again, we have an expectation

4    from a company's record that a number would

5    be associated with a person and then that

6    turns out to be the case in the TLOxp data.

7          Q.      Have you personally performed

8    any searches to definitively determine that

9    90 percent accuracy rate?

10         A.      Not in this case, but in

11   general with this type of data.

12         Q.      When?

13         A.      I think the last time I would

14   have done it would have been in the last

15   month or so.

16         Q.      For who?

17         A.      A client in another case.

18         Q.      A TCPA case?

19         A.      Yes.

20         Q.      And you were asked in that case

21   to check to see whether or not the data was

22   right?

23         A.      No.  That was just information

24   that I gleaned through the analysis.

25         Q.      What information did you glean

Page 117

1      A.      Well, I didn't decide myself it
2   was a mobile number.  I decided that the
3   carrier that TLO affiliated with that
4   number was a mobile carrier.
5      Q.      How many phone numbers of the
6   20,000 that you submitted came back with no
7   information at all?
8      A.      I don't have a precise
9   recollection of that.
10      Q.      How many came back as
11   landlines?
12      A.      Something less than 9,000 of
13   them.
14      Q.      Are you aware of the fact that
15   of the 20,000 numbers you submitted, TLO
16   returned results only for 13,344?
17      A.      I'm not aware.
18      Q.      Do you have any reason to
19   dispute the fact that of the 20,000 you
20   submitted only results were returned for
21   13,344?
22      A.      I would have to check, but I
23   don't have any basis as I sit here today to
24   argue with you.
25      Q.      Do you have any reason to

Page 262

1    dispute the fact that TLO didn't return any

2    results at all for 6,656 of the numbers you

3    submitted?

4           A.     Again, not without checking

5    that data.

6           Q.     Do you think that's a

7    significant percentage of 20,000?

8                  MR. MARCHESE:  Objection to

9    form.

10          A.     Again, I hadn't given it any

11   consideration.

12          Q.     You testified that you believed

13   TLO to be generally accurate, correct?

14          A.     Correct.

15          Q.     What do you do when there is no

16   data at all?

17          A.     Those numbers are omitted from

18   the analysis in a conservative way.

19          Q.     Does the fact that TLO doesn't

20   have data for a third of the numbers that

21   you submitted cause you to question at all

22   the accuracy of the data that they have?

23          A.     No.

24          Q.     You still believe it is

25   accurate even though they can't return

                                       Page 263

1       Q.      If they did provide you with

2    names, what would you do?

3       A.      Run them through my matching

4    algorithm.

5       Q.      What is your matching

6    algorithm?

7       A.      It is part of this data program

8    known as Matchit, which does a bigram

9    analysis of two comparable pieces of text

10   and returns a Jaccard similarity score.

11      Q.      What would you do with that

12   information?

13      A.      I would then set a threshold

14   where if the similarity score was above a

15   certain amount, I would deem that as a

16   match of the name, and if it was below a

17   certain amount, I would deem it as a

18   mismatch for that name.

19      Q.      What were the amounts that you

20   set?

21      A.      Based upon my prior experience

22   doing this type of matching, I used a

23   threshold of 0.5.  The Jaccard score ranges

24   basically like a baseball batting average,

25   from 0 to 1, and you would never expect

Page 265

1    matches to all be 1, because what we are

2    trying to do is find, for example, like if

3    you have the middle initial tacked on, we

4    wouldn't want that to kick out a particular

5    name.

6              So I set the score at 0.5.  The

7    method is adaptable, so you could set that

8    at 0.4, if you wanted to be even more

9    conservative than I have already been.

10       Q.      What happens if there is

11   multiple names associated with the phone

12   number?

13       A.      Again, each name is evaluated,

14   and then per the date range discussion we

15   had today, I would look for the latest

16   match and the latest mismatch, and those, I

17   have described them as maximum match dates

18   and maximum mismatch dates, are then fed

19   back in to check the date range on the

20   calls.

21       Q.      Do you perform the -- what did

22   you call the name search again?  I'm sorry.

23       A.      Matchit.

24       Q.      Did you perform the Matchit

25   search for every name that returned

Page 266

1  associated with the phone number?

2       A.     So we would have -- I think

3  that's right.  We would have paired the

4  Citibank data with the TransUnion data and

5  taken the name from Citibank and then

6  compared it with all of the names returned

7  from TransUnion.

8       Q.     And then after you compared it

9  with the names, you would perform your

10 first-seen date analysis?

11      A.     Correct.  Once we had the

12 matching status, I would generate those

13 maximum first-seen dates.

14      Q.     The Matchit search that you

15 performed, did it check last names only?

16      A.     So it compared both the first

17 name and last name for one check and just

18 the last name only for a second check, and

19 either of those that appeared as a match

20 would be considered a match for my

21 analysis.

22            Again, the method is quite

23 adaptable, so if I was instructed to, for

24 example, match only the first name, the

25 method could work that way as well.

Page 267

1      Q.      When you say first name and
2  last name, did both of them have to match
3  for it to be excluded?
4      A.      So I ran a match on the first
5  name and last name and would deem it a
6  match if -- in some ways what I did was
7  basically an extra step that was not
8  necessary, because we accepted as a match
9  anything where just the last name matched.
10             So I matched them first by
11  first name/last name and then I matched
12  them a second time just by the last name.
13  If it matched as a last name, that was
14  accepted as a match.
15      Q.      Did you perform any searches
16  specific to just the first name?
17      A.      Again, I did not do that in
18  this case, but the method would be easily
19  adaptable, since the matching information
20  would be there to look at the first name
21  only and consider as a match any name where
22  the first name matches, but the last name
23  does not.
24      Q.      Mr. Snyder testified that you
25  typically get many results for a single

CONFIDENTIAL

1      A.      We did one with a first and
2  last and then one with a last.
3      Q.      But if the last name didn't
4  match under the fuzzy match, they were
5  included, correct?
6      A.      I'm sorry, say that one more
7  time.
8      Q.      If the last name didn't match
9  Citibank's records, they were included in
10 the list, correct?
11     A.      They were found as a mismatch,
12 and that information was then used as part
13 of the way to generate the list.
14     Q.      So my wife's maiden name is
15 Kristin Kenny.  When we got married, she
16 changed her name to Kristin McKenna.
17             She would be included in this
18 list if Citibank's records showed an
19 attempt to call Kristin Kenny?
20     A.      I would have to run the name
21 search and see if there was sufficient
22 information there for a match.
23             If the Court were to want to
24 see a first name match, we can do that.  If
25 we wanted to see a slightly lower

Page 272

1    threshold, that is also very easy.  It

2    would take, again, five or ten minutes.

3         Q.     But your fuzzy search isn't

4    going to identify maiden name to married

5    name changes?

6         A.     It would depend on the names

7    and the similarity of the names.

8         Q.     You would have to marry someone

9    who has a similar last name to your maiden

10   name, correct?

11        A.     If the names are similar, it is

12   going to find it as a match.

13        Q.     So, Mr. Weir, you can agree

14   with me that we are reaching the

15   ridiculous, right?

16             In order for that fuzzy search

17   to catch the married name, my wife's maiden

18   name and her married name would have to be

19   similar to each other, correct?

20        A.     Correct.

21        Q.     If her maiden name were

22   Fitzpatrick and she married me, McKenna,

23   they wouldn't connect on a fuzzy search?

24        A.     I'm sorry, pairing with you?

25        Q.     I am saying that if Citibank's

1    think so.

2         Q.     Did you see any data from TLO

3    that showed multiple entries for the same

4    person?

5         A.     Yes.

6         Q.     Or date ranges for the same

7    person?

8         A.     Yes.

9         Q.     In those instances, did you use

10   the date range or did you use the

11   first-seen date?

12        A.     So to be conservative, as I

13   explained, I used the latest first-seen

14   dates for matches and the latest first-seen

15   date for mismatches.

16        Q.     And if a later first-seen date

17   contradicted with a date range for another

18   person, how did you deal with that

19   contradiction?

20        A.     When you are looking at the

21   last-seen date?

22        Q.     Yes.

23        A.     Based upon my prior experience,

24   I have relied upon the first-seen dates

25   because it would be very difficult for

Page 275

1   someone to become associated with a phone

2   number before they actually were associated

3   with the phone number.

4           So let's say you are about to

5   go get a cell phone, TransUnion is not

6   going to know what number you are going to

7   get in advance.  So I believe the most

8   accurate information about the most current

9   customary user is the first-seen date data,

10   which is what I used, and in the

11   conservative maximum first-date fashion

12   that we have discussed.

13       Q.    Did you use the last-seen date

14   at all for your analysis?

15       A.    I did not, although it would

16   certainly be possible to incorporate that

17   into the analysis.

18       Q.    When you removed the name

19   matches, you were left with 176 unique

20   phone numbers that did not have last name

21   matches, correct?

22       A.    I think that's right.

23       Q.    In paragraph 15(VII)(4), you

24   state that "The resulting lists shows all

25   wrong number calls made to a cell phone

Page 276

1    an association, a single date, or do you

2    see multiple dates?

3         A.    Again, the first-seen date is

4    always going to be a single date, to the

5    best of my knowledge.

6         Q.    Have you seen an instance where

7    the first-seen date and -- what is the

8    last-seen date?

9         A.    Again, because of the way that

10   I use the data, I haven't given full

11   consideration to the last-seen date and

12   have been warned that that date can reflect

13   basically ongoing apparent affiliation with

14   a number when the number is no longer

15   affiliated with a person.

16            So, for example, you go online

17   and you sign up for a utility and you

18   discontinue your cell phone, but you never

19   changed the number associated with the

20   account, and so, again, I rely upon the

21   first-seen dates since those are going to

22   be more reliable indicia of when a new

23   person is affiliated with a number than the

24   last seen dates.

25         Q.    Who warned you that the

Page 326

```
1   last-seen date is less reliable than the
2   first-seen date?
3        A.     Again, I believe I got that
4   information from my discussions with both
5   TransUnion and with LexisNexis.
6        Q.     Who at TransUnion told you
7   that?
8        A.     I don't have a recollection.
9        Q.     When was your conversation with
10  TransUnion where they told you that?
11       A.     Again, a year or two ago.
12       Q.     Was it a year or two years ago?
13       A.     I don't have a precise
14  recollection.
15       Q.     Was it in 2018?
16       A.     It was either sometime in 2017
17  or 2018.
18       Q.     Would it have been late 2017,
19  early 2017?
20       A.     Probably, again, mid 2017
21  through -- I mean, I didn't have the
22  conversation yesterday, so I'm guessing mid
23  2017 to early 2018.
24       Q.     And someone at Lexis told you
25  that the last-seen date was less reliable
```

Page 327

1     A.     Using a combination of

2  first-seen date for matches and mismatches.

3     Q.     And the matches and mismatches

4  we previously discussed are name matches,

5  correct?

6     A.     They are based on names,

7  correct.

8     Q.     And based on last names?

9     A.     Correct, although they could

10  easily be based on first names only.

11     Q.     I don't want to talk about what

12  you can do, I want to talk about what you

13  did do, and you only did it on last names,

14  right?

15     A.     I did it on last names,

16  although it would be very easy to do on

17  first names.

18     Q.     Does your methodology focusing

19  on last names take into account at all that

20  people change their names?

21     A.     Again, all I'm doing is

22  comparing the customary users with the

23  names identified in Citibank.

24     Q.     I would like to look at a

25  couple of examples of that, if that's okay.

Page 347

1              You will see there are a few

2     calls to Tom's Custom Upholstery.  Do you

3     see that?

4          A.      Yes.

5          Q.      What did you do to account for

6     businesses in your search?

7          A.      I have not been asked to

8     account separately for businesses, but I

9     have given some consideration, again, if I

10    was asked to do this, the Citibank notation

11    for businesses has the business name in the

12    first name and last name field.

13             I would search, again, to match

14    those records where the first and last

15    names match and remove them from the

16    dataset.

17         Q.      But you didn't do that so far,

18    right?

19         A.      I haven't been asked to do

20    that, but I'm aware that I can.

21         Q.      We keep talking about all these

22    things you could do improve the results,

23    but you didn't do any of those things so

24    far, right?

25         A.      I don't know that I would agree

Page 357

```
 1              CERTIFICATION

 2

 3     I,  TODD DeSIMONE, a Notary Public for

 4   and within the State of New York, do hereby

 5   certify:

 6     That the witness whose testimony as

 7   herein set forth, was duly sworn by me; and

 8   that the within transcript is a true record

 9   of the testimony given by said witness.

10     I further certify that I am not related

11   to any of the parties to this action by

12   blood or marriage, and that I am in no way

13   interested in the outcome of this matter.

14     IN WITNESS WHEREOF, I have hereunto set

15   my hand this 31st day of December, 2018.

16

17

18        TODD DESIMONE

19

20            *        *        *

21

22

23

24

25
```

Page 380

**EXHIBIT 4**

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Joel D. Smith (State Bar No. 244902)
Thomas A. Reyda (State Bar No. 312632)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ltfisher@bursor.com
        jsmith@bursor.com
        treyda@bursor.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| JEREMIAH REVITCH, on behalf of himself and all others similarly situated,<br><br>     Plaintiff,<br><br>  v.<br><br>CITIBANK, N.A.<br><br>     Defendant. | Case No. 3:17-cv-06907-WHA<br><br>**REPLY DECLARATION OF RANDALL A. SNYDER**<br><br>Date: February 14, 2019<br>Time: 8:00 a.m.<br>Courtoom: 12, 19th Floor<br><br>The Hon. William H. Alsup |

UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

## REPLY DECLARATION OF RANDALL A. SNYDER

I, Randall A. Snyder, hereby declare as follows:

1.      My name is Randall A. Snyder. I am an adult over the age of 18 and a resident of the state of Nevada. I have personal knowledge of each of the matters stated herein, and if called to testify I could and would testify competently about them.

2.      I am an independent telecommunications technology consultant and reside at 8113 Bay Pines Avenue, Las Vegas, Nevada, 89128. I have been retained by Bursor & Fisher, P.A. to provide my opinions relating to the dialing technology utilized by Citibank, N.A. ("Defendant" or "Citibank") to make outgoing debt collection calls. In particular, I have been asked to determine whether the Defendant utilized equipment that stored or produced telephone numbers to be called, using a random or sequential number generator, and dialed such numbers, and whether the Defendant utilized equipment that dialed telephone numbers from a stored list of numbers automatically. In addition, I have been asked to determine whether identity and contact information for proposed Class members can be correctly obtained based on the produced call log data.

## RELEVANT TRAINING, EXPERIENCE AND CREDENTIALS

3.      I have over 34 years of experience in telecommunications network and system architecture, engineering, design and technology. I have expertise in the fields of both wireline and wireless telecommunications networking technology. I have a Bachelor of Arts degree with a major in mathematics from Franklin and Marshall College. I have been retained as a testifying or consulting expert in over 320 cases regarding cellular telecommunications technology, including over 280 cases regarding the Telephone Consumer Protection Act ("TCPA"). Additionally, I have been retained by both plaintiffs and defendants regarding the TCPA and associated regulations.

4.      I was a software engineer, designing, developing, testing and deploying code for complex real-time database, data communications and telecommunications systems for the first

eight years of my career. This work included designing and developing relational databases, database applications, data communications protocols, telecommunications protocols, signaling protocols, call control and call processing systems and dynamic traffic engineering and overload control systems for the cellular networks. Overall, these software systems were written in assembly computer language (ASM), Pascal and C programming languages.

5.     I have taught many classes and seminars on both wireline and wireless telecommunication network technologies and have been a panelist and speaker at numerous conferences at the Institute of Electrical and Electronics Engineers ("IEEE"), the Personal Communication Society ("PCS"), and the Cellular Telecommunications and Internet Association ("CTIA") as an expert in telecommunication networks. I spent seven years developing standards within the American National Standards Institute's subsidiary organization, the Telecommunications Industry Association ("TIA"), providing technical contributions and authoring and editing telecommunications proposed standards documents. Most notably, I authored and oversaw the standardization of Interim Standard 93, providing interconnection technology between wireline and wireless networks, which is now a fully accredited national standard of the American National Standards Institute ("ANSI").

6.     I am the co-author of the McGraw-Hill books "Mobile Telecommunications Networking with IS-41," and "Wireless Telecommunications Networking with ANSI-41, 2nd edition" published in 1997 and 2001, respectively. I have been issued 40 patents on telecommunications technology. I have been hired as a consultant by the CTIA, as well as by many wireline and wireless telecommunications companies, including Bell Laboratories, McCaw Cellular, AirTouch, AirTouch International, AT&T Wireless, AT&T Mobility, Lucent, Nokia, Ericsson, Motorola, Samsung, Siemens, Nextwave, MCI, Daewoo, Globalstar, T-Mobile, Sprint, U.S. Cellular, Teleglobe Canada, Teledesic and other telecommunications technology vendors and service providers. I was also nominated in 2006 for a National Television Arts Emmy Award for Outstanding Achievement in Advanced Media Technology for unique wireless content

distribution technology I designed while employed at Entriq, Inc. Still more detail, as well as details of publications that I have authored or co-authored within at least the past 10 years, were provided in my *curriculum vitae* (which was attached to my November 28, 2018 Declaration (Doc. No.83-5)) along with a list of cases where I served as a testifying or consulting expert and my standard rate sheet and signed retainer agreement.

7.    I am being compensated at the rate of $485 per hour for my study, analysis and written testimony in this case and $525 per hour for depositions and in-court testimony.

## RESPONSE TO MISCHARACTERIZATIONS OF MY TESTIMONY

8.    As identified in my November 28, 2018 Declaration, it is my opinion, based on my knowledge, education, experience, expertise, training, and the facts described therein, that the identities and contact information of individuals who received wrong-party calls from the Defendant, at any point in time, can be definitively and clearly obtained based on the methodology identified therein.  The ability to do so is a straightforward administrative process.

9.    I have reviewed Mr. Colin Weir's execution of the methodology in his November 28, 2018 Declaration and believe that he correctly implemented the methodology in a reliable and accurate manner.  Nonetheless, Defendant contends that the methodology "was not performed according [to my] expectations[.]"  Daley Report ¶ 56; Opposition of Defendant to Motion for Class Certification ("Opposition") at 12:17-15:15.  This is a mischaracterization of my testimony.

10.    At my deposition I repeatedly identified that "this is an adaptable methodology. If there's additional filtering that needs to be made or comparisons that need to be made, they certainly can be."  Snyder Depo. at 160:4-7.  To that end, I described additional steps that **could** be undertaken to alleviate concerns of "false positives."  *Id.* at 150:25; *see also, e.g.,* 139:3-7; 160:2-7; 197:3-9.  Defendant and Ms. Daley use my candid discussion of the options available to the Court to misrepresent the nature of my directions to Mr. Weir.

11.    For instance, Ms. Daley opines that I "was of the impression that the appropriate

way in which to compare names to find matches to customers was to check both first and last

names." Daley Report ¶ 77[1]; Opposition at 13:21-24 (claiming Mr. Weir did not follow my

instructions for how to handle "Citibank Accountholder name changes"). This is not true. When

asked at my deposition if Mr. Weir "eliminate[d] people that may have a similar first name but a

different last name?" (*id*. at 197:14-15), I correctly responded that "I don't think that it was done

here." *Id*. at 197:16-17. However, I did go to explain the "methodology we put forth allows for

additional filtering confirmation [like comparing first names]." *Id*. at 197:18-20. Indeed, as Mr.

Weir has testified and shown, it is a simple matter to run the name matching software against

first names in addition to last names. Weir Reply Decl. ¶ 61; Weir Dep., 347:15-17. Similarly,

it would also be very simple to adjust the name matching process to eliminate business names.

Weir Reply Decl. ¶ 61; Weir Dep. at 357:7-16.

        12.    Citibank also represents that I "testified that conflicts in the TLOxp data can and

**must** be addressed by 'cross-referenc[ing] against another data processor, or you [sic] in our

case, you can eliminate it from the class if you're not exactly sure.'" Opposition at 13:18-20

(emphasis added) (quoting Snyder Dep. at 189:10-15). In fact, I testified as follows:

> A. I don't have that experience usin_ data with that h_ _othetical.
> All I can sa_ is if _ou _et data that looks erroneous for some
> reason _ou can alwa_s cross-reference that against another data
> _rocessor _or _ in our case, you can eliminate it from the class if
> you're not exactly sure.

Snyder Dep. at 189:10-15. I did not testify how conflicts "must" be resolved, I merely describe

the options available under the methodology with the assumption of "erroneous" data,

        13.    I certainly never testified, as Citibank represents, that "competing 'first seen' and

'last seen' dates associated with multiple names" epresent a conflict that must be resolved in the

---

[1] Ms. Daley's characterization of the "appropriate way" to match names is belied by Citibank's
reliance on only last names to track when a cell phone has been reassigned. *Compare* Daley
Report ¶ 36 *with* ¶ 77.

manner described above.  Opposition at 13:21-22.  Instead I testified as follows:

> _. So in this case  are _ou _rovidin_ an_ o_inion u_on the reliability of a first seen date versus a last seen date in the TLO data?
>
> A. No. I'm _rovidin_ an o_inion on the _eneral methodolo  y that can be used to identify or contact potential class members.

Snyder Dep. at 201:22-202:2; 201:19-21 ("A. … Again, [Mr. Weir] is an expert in the usage of this data and that data that's returned based on the queries he makes, so I would defer to him.").

14.     I have reviewed Mr. Weir's rationale for relying on the most recent "first seen" date included in the TLOxp data (*see, e.g.*, Weir Reply Decl. ¶¶ 31-34; Weir Dep., at 275:23-276:12 and 326:9-327:4) and I am satisfied that Mr. Weir's application of the TLOxp data is consistent with the methodology I proposed in my November 28, 2018 Declaration.

I declare that the foregoing is true and correct subject to the laws of perjury of the United States.

Executed in Las Vegas, Nevada, on this 1st day of February, 2019.

*Randall A. Snyder*

_____

Randall A. Snyder

**EXHIBIT 5**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

JEREMIAH REVITCH, on Behalf of Himself
and all Others Similarly Situated,

Plaintiffs,

v.

CITIBANK, N.A.,

Defendant.

Case No. 17-cv-06907-JCS

Reply Declaration

of

**COLIN B. WEIR**

February 1, 2019

REFERENCES MATERIALS DESIGNATED "CONFIDENTIAL" AND "HIGHLY

CONFIDENTIAL ATTORNEYS' EYES ONLY" UNDER PROTECTIVE ORDER

UNREDACTED DOCUMENT SOUGHT TO BE SEALED

I, Colin B. Weir, declare as follows:

I am Vice President at Economics and Technology, Inc. ("ETI"), One Washington Mall, 15th Floor, Boston, Massachusetts 02108.  ETI is a research and consulting firm specializing in economics, statistics, regulation and public policy.

## I. QUALIFICATIONS, BACKGROUND, AND EXPERIENCE

1.    I hold a Masters of Business Administration, with honors, from the High Technology program at Northeastern University, Boston, Massachusetts.  I hold a Bachelor of Arts degree cum laude in Business Economics from The College of Wooster, Wooster, Ohio.  I have provided expert testimony before federal and state courts, the Federal Communications Commission, and state regulatory commissions, and have contributed research and analysis to numerous ETI publications and expert testimony at the state, federal, and international levels.  I have consulted on a number of cases involving telecommunications issues, including the TCPA, broadband technology and Internet access; technical issues associated with net neutrality; Early Termination Fees (ETFs); Late Fees; wireless handset locking practices, merger/antitrust analysis, determination of Federal Excise Tax burden, ISP-bound traffic studies, area code splits and related numbering policy, Universal Service Fund issues, pricing and regulation of Un-bundled Network Elements, analysis of special access rates and pricing trends, and development of a macroeconomic analysis quantifying the economic impact upon the US economy and job markets of overpricing special access services; wireless pricing; and wireline telecommu-nications tariff and contract pricing.  I have consulted on a variety of consumer and wholesale products cases, calculating damages relating to telecommunications services, food products, household appliances, herbal remedies, health/beauty care products, electronics, and computers. My Statement of Qualifications, which outlines my professional experience, publications, and record of expert testimony, is attached hereto as Exhibit 1.  This includes a list of all cases in



Reply Declaration of Colin B. Weir
February 1, 2019
Page 2 of 22

which, during the previous four years, I have testified as an expert at trial or by deposition.  Prior

to joining ETI, I worked at Stop and Shop Supermarkets for a period of seven years, working as

a cash department head, grocery/receiving clerk, and price-file maintenance head.

## II.  ENGAGEMENT

2.    I provide this declaration in connection with connection with the case filed by

Plaintiff Jeremiah Revitch ("Plaintiff") in the above-captioned action against Defendant

Citibank N. A. ("Defendant").  I have been asked by Counsel for Plaintiff to review the January

11, 2019 Report of Margaret Daley ("Daley Report") and to respond thereto.  I make this

declaration based upon my own personal knowledge and, if called as a witness in this action, I

would be able to competently testify as to the facts and opinions set forth herein.

3.    ETI is being compensated at the rate of $600 per hour for my work on this case.  The

opinions expressed in this declaration are my own, and my compensation is not dependent upon

the substance of these opinions or the outcome of the litigation.

4.    The documents, data and other materials that I relied upon in forming my opinions

are identified throughout my report and in Exhibit 2, attached hereto.  In addition, I have relied

upon my educational background and more than 15 years of experience.

## III.  RESPONSE TO DALEY

**Daley is not in a position to evaluate my effectuation of the Snyder methodology because
she does not understand the method, and does not have any familiarity with components of
the analysis**

5.    The Daley Report focuses on whether or not Snyder's methodology, and my

implementation of that methodology can be used to determine damages in this case.[1]  But Daley

---

[1] *See, generally*, Daley Report.



Reply Declaration of Colin B. Weir
February 1, 2019
Page 3 of 22

is not in a position to evaluate whether my effectuation of the Snyder methodology can

determine damages for a number of reasons.

      6.    First, Daley claims to not understand what it is that Snyder has proposed as a

methodology or how I have effectuated that method. When asked if I had literally

operationalized Snyder's method, Daley testified that she did not know.

> Q.   Do you agree or disagree that Mr. Weir's role was to operationalize Mr.
> Snyder's instructions?
>
> A.   I don't understand honestly what these two were doing, really.[2]

It appears that Daley did not complete all of the investigative work of the methodology that she

wanted to because of the holiday season:

> **So we had questions we wanted answered** so we could try and figure out
> where it's going wrong.  [] **At the end day, I think we might have stopped
> trying** because the point was to look at the 176.  And there was an awful lot of
> work to do there to look at the account records. And, **as you can recall, it was
> Christmas and New Years**.[3]

      7.    Daley is also not familiar with the software used to conduct the analysis, or the

underlying algorithms.

> Q.   Have you ever used Stata prior to this litigation?
>
> A.   No.
>
> …
>
> A.   I'm not an expert on Stata and I did not personally do the work on Stata in
> this matter.

---

[2] Daley Deposition, at 199.

[3] Daley Deposition, at 246-247.


ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Colin B. Weir
February 1, 2019
Page 4 of 22

 …

A.   I'm not familiar with the matchit [name matching] program.  I don't know how configurable it is.[4]

8.   Given these issues, it appears that Daley is not in a position to evaluate my effectuation of Snyder's methodology.

**Daley criticizes Snyder and myself for using a method that Citibank itself relies upon**

9.   Daley is critical of the use prescribed by Snyder of name matches that seek to compare last names.[5]  Yet Daley acknowledges that this is the very method that Citibank uses to guard against calling numbers that are no longer in use by Citibank accountholders.

Citibank subscribes to a service provided by Neustar that assesses a probability "score" that a cellular telephone number is being used by a person with a particular last name.  Citibank consults the Neustar scores on a daily basis in an effort to prevent calling cellular numbers that are no longer in use by its account holders.[6]

10.   Daley applauded Citibank's use of this method.

Q.   Do you have any criticisms of Citibank's use of Neustar?

A.   Well, I think as a bank that's making calls that are potentially subject to the TCPA, it's good that they're trying -- using the best -- trying the best they can to identify reassigned numbers.[7]

---

[4] Daley Deposition, at 27-28, 224.

[5] *See*, *e.g.*, Daley Report, at para. 77.

[6] Daley Report, at para. 36.

[7] Daley Deposition, at 8.



Reply Declaration of Colin B. Weir
February 1, 2019
Page 5 of 22

11.   While Snyder's methodology does not call for the use of first name comparisons, there is nothing that would prevent the available technology and program that I have developed from so doing.  As I testified at deposition, it is possible to adjust algorithm used to match the names to consider the first names as well as last names.

> Q.   Did you perform any searches specific to just the first name?
>
> A.   Again, I did not do that in this case, but the method would be easily adaptable, since the matching information would be there to look at the first name only and consider as a match any name where the first name matches, but the last name does not.[8]

12.   Daley also references my use of a "score" threshold to determine whether the names are a match.[9]  I would note that this is also part of the methodology that Citibank itself uses to try to prevent wrong number calls. As I testified at my deposition, this score threshold is also a flexible part of the methodology that can be adjusted if so required.

> Q.   What is your matching algorithm?
>
> A.   It is part of this data program known as Matchit, which does a bigram analysis of two comparable pieces of text and returns a Jaccard similarity score.
>
> Q.   What would you do with that information?
>
> A.   I would then set a threshold where if the similarity score was above a certain amount, I would deem that as a match of the name, and if it was below a certain amount, I would deem it as a mismatch for that name.
>
> Q.   What were the amounts that you set?
>
> A.   Based upon my prior experience doing this type of matching, I used a threshold of 0.5.  The Jaccard score ranges basically like a baseball batting

---

[8] Weir Deposition, at 268.

[9] Daley Report, at para. 76.



Reply Declaration of Colin B. Weir
February 1, 2019
Page 6 of 22

average, from 0 to 1, and you would never expect matches to all be 1, because what we are trying to do is find, for example, like if you have the middle initial tacked on, we wouldn't want that to kick out a particular name.

So I set the score at 0.5. The method is adaptable, so you could set that at 0.4, if you wanted to be even more conservative than I have already been.[10]

13.   Below, I will discuss the results of rerunning the Snyder methodology with several changes, including matching by first name.

**Daley's claims that TLO data is inaccurate or unreliable are belied by her own long time use of the TLO service**

14.   Daley makes a number of unfounded assertions about the accuracy and reliability of the TLO data.[11]  These accusations are baseless and self-serving, unfounded, and contradicted by Daley's own findings and conclusions.

15.   It is difficult to reconcile Daley's criticisms of the TLO data with her own long term use of the very same data.  Unprompted, Daley notes in her report that:

[Daley] has decades of experience using TLO, LexisNexis, and other data vendors in [her] capacity as a professional investigator and licensed private detective.[12]

16.   Daley testified at deposition that as of her last review of the state of the marketplace, she turns to TLO to associate people with phone numbers.

Q.   When was the last time you researched or looked into current state of technology or services that are available as of 2018, let's say, that might facilitate identifying people, associating people with phone numbers?

---

[10] Weir Deposition, at 265-266.

[11] Daley Report, at 153-172.

[12] Daley Report, at para. 72.



Reply Declaration of Colin B. Weir
February 1, 2019
Page 7 of 22

> A.   We do as a general course of business, we're looking at the TLO and
> LexisNexis data as well as other types of data vendors.[13]

17.   Daley admits that she and her staff use TLO "all the time" and that she herself uses

TLO data at least once a month.

> Q.   Since joining [Berkeley Research Group] have you ever personally used
> TransUnion's TLOxp service, not counting any time where you may have
> directed someone else to do it, but you personally?
>
> A.   Sure, all the time.
>
> Q.   Okay.
>
> A.   Did it yesterday.
>
> Q.   Was that in connection with this case or another case?
>
> A.   Just in general.
>
> Q.   How frequently?  Once a week?  Twice a week?  Every day?
>
> A.   It -- there isn't an average.  It depends upon the need.  So I would just say
> more than not I'm directing other people to pull something in particular and
> they send the report to me.  But I personally use it maybe once a month.[14]

In fact, Daley's employer buys access to every one of the TLO search tools.

> Q.   Can you tell me what search tools you have access through TLOxp?
>
> A.   We have access to everything.  We both -- of both batch access as well as
> the ability to pull individual reports.  The individual reports have all the
> information that they sell.[15]

18.   Daley relied **in this litigation** on TLO data to determine people's identities.

---

[13] Daley Deposition, at 63-64.

[14] Daley Deposition, at 71.

[15] Daley Deposition, at 175.


ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Colin B. Weir
February 1, 2019
Page 8 of 22

> Q.   [Y]ou trust TLO's information for the purposes of determining these two people are the same person?
>
> A.   Well, they've got the data that would show [] over time[.][16]

19.  If the TLO data is as inaccurate as Daley claims, why is she paying for a subscription to every one of TLO's search services and using these services "all the time" to provide services to her clients?

**Daley cannot identify a single instance where TLO incorrectly identified the mobile status of a sample telephone number**

20.  Despite claiming that the TLO data is inaccurate, Daley confirms that, in this litigation, the TLO data correctly identified the mobile status of the telephone numbers that resulted from the Snyder methodology.

> Q.   Which numbers in the set of 176 from the sample set were misidentified as cell phones?
>
> A.   I don't know that that -- that they were.[17]

**Daley confirms that the TLO data correctly identified the Citibank customer 98% of the time**

21.  Daley's criticisms of the accuracy of the TLO data are also belied by other indicia of reliability.

22.  In my deposition, I was asked about the reliability of the TLO data.  I noted that this can be estimated vis a vis a company's customer records.

---

[16] Daley Deposition, at 130.

[17] Daley Deposition, at 211.



Reply Declaration of Colin B. Weir
February 1, 2019
Page 9 of 22

> Q.   What percentage accuracy would you attribute to the TransUnion data?
>
> A.   I haven't been asked to identify that precisely, but in other situations where I have looked at similar data, we wind up with situations where I think in greater than 90 percent of contexts the information is shown to be definitively accurate, and then there is additional data where, for example, it shows a new customary user of the phone, itis very likely that the majority of that data is also accurate.
>
> Q.   You said in certain instances 90 percent of the time the data is shown to be definitively accurate?
>
> A.   Correct.
>
> Q.   How?
>
> A.   Again, we have an expectation from a company's record that a number would be associated with a person and then that turns out to be the case in the TLOxp data.[18]

23.   When Daley was asked about this phenomenon, she confirmed that TLO correctly identified Citibank's customer 98% of the time.

> Q.   Okay.  Do you know for the 20,000 Citibank customers that were sampled by Mr. Weir, how many were accurately matched by name and number through TransUnion?
>
> A.   I -- oh, it was a really high number.  It was like 98 percent, something like that.[19,20]

---

[18] Weir Deposition, at 116-117.

[19] Daley Deposition, at 242.

[20] Daley and Defendant assert that TLO failed to return data associated with nearly 7,000 telephone numbers. (*See, e.g.*, Weir Deposition, at 262-263).  I have re-checked the TLO bacth data, and confirmed that at least one result was returned for all but 458 out of 20,000 numbers.



Reply Declaration of Colin B. Weir
February 1, 2019
Page 10 of 22

**Daley cannot support her claims that TLO is unreliable because she has not tested the data**

24.   As a final rejoinder to Daley's claims that TLO data is not accurate and is unreliable, I will note that any such claims from Daley are pure speculation.  This is because Daley did not independently test the TLO data for accuracy.  Other than the TLO data matching Citibank's records 98% of the time, she is not aware of any other test of the TLO service.

> Q.   Okay.  Have you ever tried to do, independent of any specific litigation, a test with respect to TransUnion data similar or akin to what you did with Lexis in 2016?
>
> A.   No, we have not.
>
> Q.   Are you aware of any other independent testing of the TLOxp service?
>
> A.   No.[21]

**The available date range of the consent change reports is a function of Defendant's spoliation of the consent data--not of Plaintiff's methodology; Plaintiff's method can be run for any specific dates, or re-run without the database**

25.   Daley criticizes the Snyder methodology because the consent change reports only contain data from November 2017 onward.[22]  The available consent change report data is not a function of Plaintiff's methodology, rather the date range limitation is a function of Defendant's spoliation of the consent data by overwriting the consent data in its databases and dialer systems.

26.   As a practical matter, the Snyder methodology can be run for any specified date range.  As an example, the method could be run from the first date of the available consent change data.  In effect, the results of the Weir report already reflect such a date range restriction.

---

[21] Daley Deposition, at 81-82.

[22] Daley Report, at para. 61.


ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Colin B. Weir
February 1, 2019
Page 11 of 22

**Snyder's method only excludes named Plaintiff Revitch because Defendant spoliated its telephone consent data**

27.   Daley attempts to impugn the Snyder methodology by noting that it fails to identify named Plaintiff Revitch.[23]   But this is not a criticism of the Snyder methodology per se, so much as an indication that where Defendant has spoliated its consent records by overwriting them in its databases and dialer systems, the Snyder method conservatively excludes such calls.

28.   As discussed above, the Snyder method can be limited to a particular date range for which records are available, or can be operationalized without the consent change report data.

29.   Daley claims to have run named Plaintiff Revitch through a TLO search.  I have also run this search.  When Plaintiff Revitch's number is searched, TLO correctly identifies him as a customary user of the number and does not identify as a customary user Alan Exelrod, the customer that Citibank was intending to reach when it called Revitch.

**A number of additional data points can be included in the analysis, though it is not clear that it would be prudent to do so**

30.   Daley claims that I should have incorporated a number of additional data points when operationalizing the Snyder methodology, including "last seen" dates and "probability scores" from TLO, and account numbers from Citibank.[24]   As I will discuss in greater detail below, it is certainly technically feasible to incorporate such information into the analysis, though Daley is wrong to suggest that inclusion of all of these factors would improve the analysis.

---

[23] Daley Report, at para. 66.

[24] Daley report, at paras. 80, 91, and 152.

ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Colin B. Weir
February 1, 2019
Page 12 of 22

*"Last Seen" Dates*

31.   The TLO data typically returns both a "first seen" and "last seen" date for each person associated with a telephone number.  The "first seen" date will be a date on or after a person becomes associated with a telephone number.  The first seen date is generated by new data being associated with a number.  In the manner in which I have used the "first seen" date, the analysis is conservative, because a new customary user may become associated with a telephone number before the "first seen" date reported by TLO.  The "last seen" date will operate in the reverse, with the date potentially being reported after the customary user has stopped being associated with that telephone number.  This is because companies, like Citibank, often maintain associations between a customary user and a telephone number after that association has come to an end.[25]  In effect, rather than being based on new data, the "last seen" date can be populated with stale data.

32.   I explained my preference for using the "first seen" data in my deposition.

> Q.    And if a later first-seen date contradicted with a date range for another person, how did you deal with that contradiction?
>
> A.    When you are looking at the last-seen date?
>
> Q.    Yes.
>
> A.    Based upon my prior experience, I have relied upon the first-seen dates because it would be very difficult for someone to become associated with a phone number before they actually were associated with the phone number.
>
> So let's say you are about to go get a cell phone, TransUnion is not going to know what number you are going to get in advance.  So I believe the most accurate information about the most current customary user is the first-seen date data, which is what I used, and in the conservative maximum first-date fashion that we have discussed.

---

[25] Citibank and Daley cannot rebut this.  Daley Deposition, at 140.

ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Colin B. Weir
February 1, 2019
Page 13 of 22

> Q.    Have you seen an instance where the first-seen date and -- what is the last-seen date?
>
> A.    Again, because of the way that I use the data, I haven't given full consideration to the last-seen date and have been warned that that date can reflect basically ongoing apparent affiliation with a number when the number is no longer affiliated with a person.
>
> So, for example, you go online and you sign up for a utility and you discontinue your cell phone, but you never changed the number associated with the account, and so, again, I rely upon the first-seen dates since those are going to be more reliable indicia of when a new person is affiliated with a number than the last seen dates. [26]

33.   Daley curiously insists that it would be better to ignore the "first seen" data in favor of the "last seen" dates.  When asked about the accuracy of these "last seen" dates, Daley was clear: "I do not believe that these dates are accurate, just period, under any circumstances," and that it was "[her] personal view and [her] opinion that those dates are inaccurate in general and unreliable."[27]

34.   Daley elsewhere notes that one of the sources of TLO data are banks (including Citibank!) that maintain outdated data as to phone number associations and that last seen dates can therefore be out of date precisely because companies like Citibank are unaware of when numbers become reassigned.

> Because TLO uses credit card applications as a means to associate a person with a cellular number it is likely drawing from the very same data as Citibank (its account holder data) to determine if a cellular number is associated with a person. Because neither Citibank or TLO is informed when numbers are reassigned they both have outdated information for some people.[28]

---

[26] Weir Deposition, at 275-276, 326.

[27] Daley Deposition, at 108-109.

[28] Daley Report, at para. 80.


ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Colin B. Weir
February 1, 2019
Page 14 of 22

*TLO Probability Scores*

35.   Daley also suggests that I should have considered what she describes as "probability of ownership" scores.  TLO does include a score associated with each record, but it is called "PhoneScore" and is not called "probability of ownership."  These scores do not indicate probabilities in the way people are accustomed to, and I was recommended by TransUnion not to use the scores in the manner proposed by Daley.

36.   First off, Daley admits that she is not an expert in probability:

> Q.   Do you view yourself as an expert in the area of probability?
>
> A.   You mean from a statistical standpoint?  No.[29]

Her lack of expertise was confirmed when she testified that she did not know whether the probability of something could be more than 100%.  She also believes that, when taken together the probability of all possible outcomes could exceed 100%.[30]  In the study of probabilities, something that is certain cannot have a probability of more than 100%--if it is raining outside, the probability that it is raining is 100%.  And if there are various possible uncertain outcomes, together, their probabilities can equal no more than 100%.  If there is a 70% chance of rain, all other possible weather outcomes cannot have a probability greater than 30%.  You cannot have a 70% chance of rain **and** a 70% chance of sun.

37.   It is precisely this lack of expertise that leads Daley to misunderstand the PhoneScore from TLO.  A quick examination of the PhoneScore data indicates that they cannot be probabilities in the way that Daley claims.

---

[29] Daley Deposition, at 23.

[30] Daley Deposition, at 25-26.



Reply Declaration of Colin B. Weir
February 1, 2019
Page 15 of 22

38.   The very first entry in the TLO data is for telephone number: 623-760-5291.  There are five entries from TLO in this data: 87.8, 66.3, 87.8, 1, and 87.8.  Together, these add up to 330 -- an impossibility in probability measurement.  Moreover, TLO gives Justin Miller a PhoneScore of both 87.8% and 1% which is also not a realistic outcome in probability measurement.

39.   The document that Daley relies on to suggest that there is a probability of ownership score does not reference the "PhoneScore" in the TLO data at issue in this litigation.

40.   Daley herself admits that the alleged probability of ownership is a poor measure of the reliability of the phone data.[31]  She states that she hersel "wouldn't use the probability score."[32]

41.   Even though she has used TLO data for decades, she has **never** made use of the "probability" score.

> Q.   Apart from anything you did in connection with this case, have you ever used TransUnion's probability of ownership score
>
> A.   I don't think so.[33]

42.   As such, I stand by the Snyder's original choice to not include the PhoneScore in the analysis.  However, I would assure the Court that, if it were deemed possible it would be feasible to include this data in the analysis.

*Account Data*

43.   Daley Claims that Snyder's methodology is flawed because it does not account for

---

[31] Daley Deposition, at 142.

[32] Daley Deposition, at 145.

[33] Daley Deposition, at 146.


ECONOMICS AND TECHNOLOGY, INC.

Reply Declaration of Colin B. Weir
February 1, 2019
Page 16 of 22

44.   the fact that individuals may have multiple accounts with Citibank with different

levels of consent for each account.[34]

45.   This allegation is contradicted by Daley's own testimony as to how Citibank

manages consent across accounts.

> Significantly, Citibank uses a TCPA compliance mechanism that automatically
> updates some **telephone numbers that appear in multiple accounts** to
> conform them to the lowest common level of consent.[35]

At deposition, Daley confirmed that the lowest common level of consent that Citibank would be

conforming across multiple accounts would in fact be "no consent":

> But in terms of what I meant when I drafted it, the lowest level of consent
> would be "don't call me, you have no consent."
>
> …
>
> So if somebody says "do not call me" or "this is a bad number," that means no
> consent.  No consent would be the lowest level of consent.[36]

46.   In addition, the customer records produced to Plaintiff only contained redacted

account numbers.

47.   While it sounds like Daley has raised yet another red herring, if Citibank has not

destroyed its account number data, it would be possible to adjust the methodology to cross

reference the account numbers from the consent change reports against the account numbers in

the CDRs.

---

[34] Daley Report, at paras. 18 and 102.

[35] Daley Report, at para. 102.

[36] Daley Deposition, at 155-156.



Reply Declaration of Colin B. Weir
February 1, 2019
Page 17 of 22

**Customer account records also contain errors**

48.   Daley makes the case that only a manual review of customer account records can be used to fully understand whether a Citibank customer is a user of a phone and has given consent. But Daley herself admits that these records also contain errors--including the one that led to calls being placed to named Plaintiff Revitch.

> Q.   I mean, is it -- is it -- is it possible that incorrect wrong number codes are also reflected in the account level notes?
>
> A.   Yeah, I think -- I think that is certainly possible because you're dealing with human error.
>
> …
>
> A.   I'd have to look at the dates on the account records, because I recall that there were conversations where Mr. Revitch said "stop calling me," and he was called again because there was an error by the customer service agent where it appears that she should have called it a bad number and didn't.[37]

**TLO's disclaimer of a warranty is a legal protection not a statement of the accuracy of the data**

49.   Daley argues that because TLO does not warrant the accuracy of its data, the data must therefore be inaccurate.[38]  The warranty that Daley references is deep in the legal language of Trans Union's terms and conditions included by reference to the Trans Union website.  This lack of warranty does not speak to, or directly measure the actual accuracy of the underlying data -- it is an attempt by Trans Union to limit their liability.  Indeed, if the data were so demonstrably inaccurate, it is hard to believe that customers, including Daley herself, would continue to purchase it.

---

[37] Daley Deposition, at 113, 90-91.

[38] Daley Report, at para. 176.



Reply Declaration of Colin B. Weir
February 1, 2019
Page 18 of 22

50.   Daley provides as a contrast to the "legalese" of the terms and conditions, a public facing document that Trans Union uses to sell its services.  Daley's document from Trans Union represents to customers:

- TransUnion helps make compliance with the Telephone Consumer Protection Act (TCPA) and verification of your contact data easier;

- With real-time access to carrier data, your organization can quickly confirm the line type and verify ownership of a given phone number;

- Reduce and limit calls to canceled or suspended numbers;

- Verify number ownership of the consenting party;

- Track ported numbers;

- Validate phone type; and

- Improve the accuracy of customer contact details.

51.   This public facing document certainly does not decry the accuracy of the underlying data.

**My access to data from TLO is not "the lowest level"**

52.   Daley seeks to impugn my use of the TLO data by suggesting that I have "the lowest level of TLO's subscription service."[39]  This is a pecuniary sleight of hand.  I say pecuniary because what Daley is describing is **not** the availability of TLO search tools or the quality of the TLO data available to me, but rather the contractual minimum financial commitment that my firm has made to TLO.[40]

---

[39] Daley Report, at 186.

[40] "Q.   Let's go to paragraph 186. [] And I'm just focused on the first sentence.  I just want to know what you meant when you said Mr. Weir has the lowest level of TLO subscription service?  A.   25 bucks a price."  Daley Deposition, at 171-172.



Reply Declaration of Colin B. Weir
February 1, 2019
Page 19 of 22

53.   While it is conceivable that my firm could save money by committing to a higher level of use, the monthly contractual minimum with TLO does not impact the level of services available through my subscription or the quality of the data provided.  I have access to the same batch and individual reports that Daley does (and which she notes includes all of the available TLO search options).

**Daley/Defendant are wrong when they claim that TLO cannot identify my cell phone, and Daley did not care to check**

54.   Daley asserts that TLO does not correctly identify my cell phone number.  This is incorrect.  In advance of my deposition, Daley herself erroneously identified a number that she believed to be my cell phone, but was not.  I provided my cell phone number on the deposition record and Daley could have easily checked to see if TLO correctly identified me as the customary user of that number.

55.  But Daley did not ever conduct that check.  Rather than report the truth, just like her work being interrupted by the holidays, she opted to skip the work, report a falsehood, and not care about it.

> Q.   So you ran his name prior to the deposition, but after the deposition of Mr. Weir you didn't run any additional reports?
>
> A.   No, uh-uh.
>
> Q.   And is that because you believed you would not get any additional information other than what you had already obtained from the first report?
>
> A.   I didn't care.[41]

---

[41] Daley Deposition, at 205.

ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Colin B. Weir
February 1, 2019
Page 20 of 22

56.  I have run my cell phone number through the TLO batch process, and the service correctly identifies me as the customary user of that phone number.

**Daley concedes that she has no idea whether the calls identified by the Snyder methodology were or were not wrong number calls**

57.  Daley makes numerous assertions, as discussed above, about the Snyder methodology, and claims that, after she make several (dubious) changes, she discovers zero plaintiffs.  But this "analysis" is not as it appears, because Daley does not know who received any of the calls and does not believe her own methods can identify wrong number calls.

> Q.   And is it your opinion that the overwhelming majority of calls that were marked as wrong numbers appeared to have been made to accountholders?
>
> A.   I have no idea who actually received those calls. … I don't know who received those calls.[42]

58.  As part of her "analysis," Daley claims to associate certain individuals with each of the 176 telephone numbers identified by the Snyder methodology.  But Daley never determined whether any of those individuals did or did not received a wrong number call:

> Q.   But my question is:  Did you make the determination whether or not Carlos Davila received a wrong number call from Citibank?
>
> A.   Nobody made that determination. …
>
> Q.   A moment ago when you said nobody made that determination, were you referring just to Carlos Davila specifically or all the names on   itemized on Exhibit, 63?
>
> A.   I think all of them.[43]

---

[42] Daley Deposition, at 124.

[43] Daley Deposition, at 260.


ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Colin B. Weir
February 1, 2019
Page 21 of 22

59.  Daley also testified, "I certainly have not been retained to say that any individual consented in any particular situation for any particular call."[44]

60.  Daley also further disclaims having made any affirmative determination as to whether any particular call was a wrong number call.  In her report, Daley notes that Citibank has "outdated information for some people" because it is not informed when numbers are reassigned, and that "[i]t is impossible to determine which numbers are subject to this problem."[45]

61.  Unlike Snyder, Daley has not identified a methodology to determine who was called and whether they received a wrong number call.  Since Daley believes that it is impossible to make such a determination, her analysis suggesting that there are no class members or wrong number calls must be taken for what it is: pure speculation.

**Update of analysis**

62.  I have been asked to rerun my analysis with several changes, both to demonstrate that my operationalization of the Snyder methodology can incorporate the changes discussed above, and to report the results of such changes.  Specifically, I have been asked to:

- Include dialer names that reference "precision";

- Allow for matches based upon first names only;

- Allow for matches when the Jaccard score is greater than .4 instead of .5;

- Eliminate Citibank records where the customer name is the name of a business;

- Confirm that all resulting calls do not have the following coding:

  o  ov_call_connected_time == blank entry;

---

[44] Daley Deposition, at 22.

[45] Daley Report, at para. 80.



Reply Declaration of Colin B. Weir
February 1, 2019
Page 22 of 22

- o  dialer_disposition == blank entry;

- o  response_status == "rr";

- o  dialer_name == "unknown".

63.  I have rerun my analysis of the 20,000 number sample using the above criteria.

64.  In this sample of 20,000 numbers, there were 8,448 calls placed to 133 unique telephone numbers that meet the criteria identified above.  The vast majority of these numbers received multiple calls.  If that sample relationship holds, there would be approximately 506,880 calls to 7,980 unique telephone numbers.

65.  The sample relationship and estimates described above, as well as in my opening declaration, reflects calls to phone numbers identified in Citibank's Contact Utilities Database (recorded since November 2017).

## IV.  RESERVATION OF RIGHTS

My testimony is based upon the information and data presently available to me.  I understand that discovery is ongoing.  Additional, different and/or updated data may be obtained in advance of trial.  I therefore reserve the right to amend or modify my testimony, and anticipate supplementing this testimony when such data becomes available.

## VERIFICATION

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief, and that this declaration was executed at Koloa, Hawaii, this 1st day of February, 2019.

Colin B. Weir



**Exhibit 1**

**Statement of Qualifications**
**of**

**COLIN B. WEIR**

**Statement of Qualifications**

**COLIN B. WEIR**

Colin B. Weir is Vice President at Economics and Technology, Inc.  Mr. Weir conducts economic, statistical, and regulatory research and analysis, and testifies as an expert witness. Mr. Weir's work involves econometric and statistical analysis, multiple regression, surveys, statistical sampling, micro- and macroeconomic modeling, accounting and other economic analysis.  Such analysis often involves analysis of databases, call detail records, and other voluminous business records.  Mr. Weir is familiar with common statistical and econometric software packages such as STATA and Sawtooth Software.  Mr. Weir assists with analysis of economic, statistical and other evidence; and preparation for depositions, trial and oral examinations.  Mr. Weir has provided expert testimony before federal and state courts, the FCC, and state regulatory commissions, and has contributed research and analysis to numerous ETI publications and testimony at the state, federal, and international levels.  Prior to joining ETI, Mr. Weir worked at Stop and Shop Supermarkets as a cash department head, grocery/receiving clerk, and price-file maintenance head.

Mr. Weir's experience includes work on a variety of issues, including: economic harm and damage calculation; liquidated damages provisions; lost profits; false claims; diminution in value; merger/antitrust analysis; Early Termination Fees (ETFs); Late Fees; determination of Federal Excise Tax burden; and development of macroeconomic analyses quantifying the economic impact of corporate actions upon the US economy and job markets.

Mr. Weir has conducted research and analysis in numerous litigation and regulatory matters on behalf of corporate, government and individual clients, including AT&T, MTS Allstream (Canada), The US Department of Justice, Office of the Attorney General of Illinois, Pennsylvania Department of Revenue,  Thomas v. Global Vision, (class action litigation, Superior Court, County of Alameda), Ayyad v. Sprint (class action litigation,  Superior Court, County of Alameda), Forcellati v. Hylands (class action, U.S. District Court, Central District of California), and Ebin v. Kangadis Foods (class action, U.S. District Court, Southern District of New York).

Mr. Weir holds an MBA with honors from Northeastern University.  He also holds a Bachelor of Arts degree *cum laude* in Business Economics from The College of Wooster.

Mr. Weir is a member of the Boston Economic Club, a business member of the Boston Bar Association, serves on the Board of Trustees of the Waring School, and serves as the comptroller for the Sybaris Investment Partnership.

ECONOMICS AND TECHNOLOGY, INC.

**Publications and Testimony of Colin B. Weir**

Mr. Weir has co-authored the following:

*Interoperability and Spectrum Efficiency: Achieving a Competitive Outcome in the US Wireless Market* (with Lee L. Selwyn) Economics and Technology, Inc., prepared on behalf of United States Cellular Corporation, July 2012.

*The Price Cap LECs' "Broadband Connectivity Plan": Protecting Their Past, Hijacking the Nation's Future* (with Lee L. Selwyn and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of United States Cellular Corporation, September 2011.

*Regulation, Investment and Jobs: How Regulation of Wholesale Markets Can Stimulate Private Sector Broadband Investment and Create Jobs* (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of Cbeyond, Inc., Covad Communications Company, Integra Telecom, Inc., PAETEC Holding Corp, and tw telecom inc., February 2010.

*Revisiting Us Broadband Policy: How Re-regulation of Wholesale Services Will Encourage Investment and Stimulate Competition and Innovation in Enterprise Broadband Markets*, (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of MTS Allstream, February 2010.

*Longstanding Regulatory Tools Confirm BOC Market Power: A Defense of ARMIS* (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of the AdHoc Telecommunications Users Committee, January 2010.

*Choosing Broadband Competition over Unconstrained Incumbent Market Power: A Response to Bell and TELUS* (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of MTS Allstream, April 2009.

*The Role of Regulation in a Competitive Telecom Environment: How Smart Regulation of Essential Wholesale Facilities Stimulates Investment and Promotes Competition* (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of MTS Allstream, March 2009.

*Special Access Overpricing and the US Economy: How Unchecked RBOC Market Power is Costing US Jobs and Impairing US Competitiveness* (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of the AdHoc Telecommunications Users Committee, August 2007.

*The AWS Spectrum Auction: A One-Time Opportunity to Introduce Real Competition for Wireless Services in Canada* (with Lee L. Selwyn and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of MTS Allstream, June 2007.

*Comparison of Wireless Service Price Levels in the US and Canada* (with Lee L. Selwyn) Economics and Technology, Inc., prepared on behalf of MTS Allstream, May 2007.



*Hold the Phone! Debunking the Myth of Intermodal Alternatives for Business Telecom Users In New York*  (with Susan M. Gately and Lee L. Selwyn) Economics and Technology, Inc., prepared for the UNE-L CLEC Coalition, August 2005.


Mr. Weir has submitted the following testimony:

**United States District Court, Northern District of California,** Debbie Krommenhock and Stephen Hadley, on behalf of themselves, all others similarly situated, and the general public, v. Post Foods, LLC, Case No. 3:16-cv-04958-WHO (JSC), on behalf of Law Offices of Jack Fitzgerald, PC, Declaration submitted January 11, 2019.

**United States District Court, Southern District of New York,** Leona Hunter and Anne Marie Villa, on behalf of themselves and all others similarly situated, v. Time Warner Cable Inc., Case No. 15-cv-06445-JPO (JLC), on behalf of Bursor & Fisher, P.A. Declaration submitted on November 30, 2018; Deposition on December 21, 2018.

**United States District Court, Northern District of California,** *Jeremiah Revitch, on Behalf of Himself and all Others Similarly Situated, v. Citibank, N.A.*, Case No. 17-cv-06907-JCS, on behalf of Bursor & Fisher, P.A. Declaration submitted on November 27, 2018; Deposition on December 28, 2018.

**United States District Court, Central District of California,** *Kaylee Browning and Sarah Basile, on behalf of themselves and all others similarly situated, v. Unilever United States Inc.*, Case No. 8:16-cv-02210, on behalf of Bursor & Fisher, P.A., Declaration submitted on October 22, 2018; Deposition on November 1, 2018; Reply Declaration submitted on November 23, 2018.

**United States District Court, Southern District of New York,** *Lori Canale, individually, and on behalf of all others similarly situated, v. Colgate-Palmolive Co.,* Case No. 7:16-CV-03308-CS, on behalf of Bursor & Fisher, P.A., Declaration submitted on September 19, 2018.

**Superior Court for the State of California, In and for the County of San Francisco,** *Michelle Gyorke-Takatri and Katie Silver on behalf of themselves and all others similarly situated, v. Nestlé USA, Inc. and Gerber Products Company,* Case No. CGC 15-546850, on behalf of Stanley Law Group, Declaration submitted on September 7, 2018.

**United States District Court, Northern District of Illinois, Eastern Division,** *Ryan Porter and Haarin Kwon, individually and on behalf of all others similarly situated, NBTY, Inc., United States Nutrition Inc., Healthwatchers (DE), Inc., and MET-RX Nutrition, Inc.*, Case No. 15-cv-11459, on behalf of Bursor & Fisher, P.A., Declaration submitted on August 15, 2018; Deposition on October 12, 2018; Reply Declaration on December 21, 2018.



**Superior Court of the State of California, For The County of San Francisco,** *Deanna Gastelum and Heather Bryden individually and on behalf of all other persons similarly situated, v. Frontier California Inc.*, Case No. CGC-11-511467, on behalf of Bramson, Plutzik, Mahler and Birkhaeuser; Declaration submitted on July 31, 2018, Declaration submitted August 13, 2018.

**United States District Court, For the Southern District of New York,** *Suzanna Bowling, individually and on behalf of all others similarly situated, v. Johnson & Johnson and McNeil Nutritionals, LLC*, Case No. 1:17-cv-03982-AJN, on behalf of Bursor & Fisher, P.A., Declaration submitted on July 30, 2018, Deposition on September 6, 2018; Reply Declaration submitted on November 16, 2018.

**United States District Court, Southern District of New York,** *Anne De Lacour, Andrea Wright, and Loree Moran individually and on behalf of all others similarly situated, v. Colgate-Palmolive Co., and Tom's of Maine Inc.*, Case No. 1:16-cv-08364-RA, on behalf of Bursor & Fisher, P.A., Declaration submitted on June 15, 2018; Deposition on August 28, 2018; Reply Declaration submitted on November 21, 2018.

**United States District Court, Northern District of California, San Francisco Division,** *In re: Chrysler-Dodge-Jeep EcoDiesel® Marketing, Sales Practices, and Products Liability Litigation Dorun Bali, et al., v. Fiat Chrysler Automobiles N.V., FCA US LLC, Sergio Marchionne, VM Motori S.p.A., VM North America, Inc., Robert Bosch GmbH, Robert Bosch LLC, and Volkmar Denner*, Case No. MDL 2777-EMC, on behalf of Lieff Cabraser Heimann & Bernstein, Declaration submitted on June 6, 2018, Deposition on July 18, 2018, Reply Declaration submitted on September 4, 2018.

**United States District Court, Northern District of California,** *Stephen Hadley, on behalf of himself, all others similarly situated, and the general public, v. Kellogg Sales Company*, Case No. 5:16-cv-04955-LHK-HRL, on behalf of Law Offices of Jack Fitzgerald, PC, Declaration submitted April 30, 2018, Deposition on May 31, 2018; Reply Declaration submitted June 25, 2018; Declaration submitted on September 20, 2018; Deposition on September 28, 2018.

**United States District Court, Northern District of Illinois, Eastern Division,** *Teresa Elward, Dennis Keesler, Leasa Brittenham, Kathy Beck and Nathaniel Beck, Angelia East, Sarah LaVergne, Tony And Lauren Fitzgerald, Gregory Gray, Bethany Williams, John McLaughlin, Stacy Cisco, and William Ferguson and Cheryl Ferguson, individually and on behalf of all others similarly situated, v. Electrolux Home Products, Inc.*, Case No. 1:15-cv-09882-JZL, on behalf of Greg Coleman Law, Declaration submitted April 20, 2018; Reply Declaration submitted on July 13, 2018; Deposition on August 17, 2018.



**United States District Court for the Northern District of California,** *Jackie Fitzhenry-Russell, an individual, on behalf of herself, the general public and those similarly situated v. The Coca Cola Company, and Does 1-50,* Case No. 5:17-CV-00603-EJD, on behalf of Gutride Safier, LLP, Declaration submitted April 16, 2018; Deposition on October 3, 2018.

**United States District Court for the Southern District of New York,** *Josephine James Edwards, individually and on behalf of all others similarly situated, v. Hearst Communications, Inc.*, Case No. 15-cv-09279-AT, on behalf of Bursor & Fisher, P.A., Declaration submitted April 16, 2018; Deposition on June 7, 2018.

**United States District Court, Northern District of California,** *Jackie Fitzhenry-Russell, Robin Dale, and Gegham Margaryan, as individuals, on behalf of themselves, the general public and those similarly situated, v. Dr. Pepper Snapple Group, Inc., Dr Pepper/Seven Up, Inc., and Does 1-50,* Case No. 5:17-cv-00564-NC (lead); Case No. 5:17-cv-02341-NC (consolidated); Case No. 5:17-cv-04435-NC (consolidated)*,* on behalf of Gutride Safier, LLP, Declaration submitted April 9, 2018; Deposition on April 19, 2018; Reply Declaration submitted June 6, 2018; Supplemental Declaration submitted on November 19, 2018.

**United States District Court for the Western District of Texas, Austin Division,** *Sylvia Morris, on behalf of herself and all others similarly situated, v. Modernize Inc.*, Case No. 17:-cv-963-SS, on behalf of Bursor & Fisher, P.A., Declaration submitted March 13, 2018; Deposition on June 14, 2018.

**United States District Court, Northern District of California, San Jose Division,** *In re: Arris Cable Modem Consumer Litigation*, Case No. 17-cv-1834-LHK, on behalf of Schubert Jonckheer & Kolbe, Declaration submitted on March 9, 2018; Reply Declaration submitted April 9, 2018; Deposition on April 11, 2018; Declaration submitted June 13, 2018; Declaration submitted January 31, 2019.

**United States District Court, Southern District of New York,** *In re: Amla Litigation*, Case No. 1:16-cv-06593-JSR, on behalf of Levi & Korsinsky LLP, Declaration submitted on March 5, 2018; Declaration submitted November 14, 2018; Deposition on November 28, 2018.

**United States District Court, Eastern District of Michigan,** *Toby Schechner, Barbara Barnes, Laura Bliss, Kathleen Jordan, Kathryn Limpede, Louise Miljenovic, Candace Oliarny, Beverly Simmons, Richard Thome And Mary Ellen Thome, V. Whirlpool Corporation,* Case No. 16-cv-12409-SJM, on behalf of Robbins Geller Rudman & Dowd, LLP, Declaration submitted February 12, 2018; Deposition on May 15, 2018; Reply Declaration submitted May 17, 2018.

**United States District Court, Southern District of California,** *Jose Conde, et al., v. Sensa, et al.*, Case No. 14-cv-51 JLS (WVG), on behalf of Bursor & Fisher, P.A., Declaration submitted February 6, 2018.



**United States District Court, Northern District Of Illinois, Eastern Division,** *Angel Bakov, Julie Herrera, and Kinaya Hewlett, individually and on behalf of all others similarly situated, v.Consolidated World Travel, Inc. d/b/a Holiday Cruise Line, a Florida corporation,* Case No. 15-cv-02980-HDL SEC, on behalf of Bursor & Fisher, P.A., Declaration submitted February 6, 2018; Deposition on April 25, 2018.

**United States District Court, Northern District of Illinois,** *Jennifer Beardsall, Daniel Brown, Jennifer Carlsson, Deborah Cartnick, Amy Connor-Slaybaugh, Phyllis Czapski, Raelee Dallacqua, Autumn Dean, Skye Doucette, Christopher Draus, Gerald Gordon, Alexandra Groffsky, Emma Groffsky, Joyce Ivy, La Tanya James, Michelle Jessop, Joy Judge, Kathy Mellody, Susan Nazari, Megan Norsworthy, Deborah Ostrander, Martina Osley, Dana Phillips, Thomas Ramon, Jr., Nancy Reeves, Matthew Robertson, Shelley Waitzman, Jamilla Wang, and Amber Wimberly, Individually and on Behalf of All Others Similarly Situated, v. CVS Pharmacy, Inc., Target Corporation, Walgreen Co., Wal-Mart Stores, Inc., and Fruit of the Earth, Inc.*, Case No. 1:16-cv-06103, on behalf of Greg Coleman Law, Declaration submitted December 22, 2017; Reply Declaration on May 4, 2018.

**United States District Court, Southern District of New York,** *Jaish Markos, individually and on behalf of all others similarly situated, v. Russell Brands, LLC*, Case No. 16-CV-04362(CS), on behalf of The Sultzer Law Group, Declaration submitted on December 1, 2017, Deposition on January 4, 2018.

**United States District Court, Northern District of California,** *Siera Strumlauf, Benjamin Robles, and Brittany Crittenden, individually and on behalf of all others similarly situated, v. Starbucks Corporation,* Case No. 16-CV-01306-YGR, on behalf of Bursor & Fisher, P.A., Declaration submitted on October 31, 2017, Deposition on December 13, 2017.

**United States District Court, Southern District of California,** *Sheila Dashnaw, William Meier, and Sherryl Jones, individually, and on behalf of all others similarly situated, v. New Balance Athletics, Inc., a corporation; and DOES 1 through 50, inclusive,* Case No. 3:17-cv-00159-L-JLB, on Behalf of The Wand Law Firm, Declaration submitted on September 8, 2017; Deposition on October 5, 2017; Rebuttal Declaration submitted December 11, 2017.

**United States District Court, Central District of California,** *Veronica Brenner, on behalf of herself and all others similarly situated, v. Procter & Gamble Co.*, Case No. 8:16-1093-JLS-JCG, on behalf of Bursor & Fisher, P.A., Declaration submitted September 5, 2017; Deposition on October 10, 2016.

**United States District Court, Eastern District of California,** *Joann Martinelli, individually and on behalf of all others similarly situated, v. Johnson & Johnson And McNeil Nutritionals, LLC*, Case No. 2:15-cv-01733-MCE-DB, on behalf of Bursor & Fisher, P.A., Declaration submitted August 28, 2017, Deposition on December 20, 2017; Reply Declaration submitted on January 5, 2018.



**United States District Court, Northern District of California, San Francisco Division,** *Martin Schneider, Sarah Deigert, Laurie Reese, Theresa Gamage, Tiffanie Zangwill, and Nadia Parikka, Individually and on Behalf of All Others Similarly Situated, v. Chipotle Mexican Grill, Inc.*, Case No. 3:16-cv-02200-HSG, on behalf of Kaplan Fox & Kilsheimer LLP, Declaration submitted August 11, 2017; Deposition on September 22, 2017.

**United States District Court, Southern District of Ohio,** *Tom Kondash, on behalf of himself and all others similarly situated, v. Kia Motors America, Inc., and Kia Motors Corporation*, Case No. 1:15-cv-00506-SJD, on behalf of Gibbs Law Group, LLP, Declaration submitted July 10, 2017, Deposition on November 29, 2017.

**United States District Court, Northern District of Illinois, Eastern Division,** *Ryan Porter and Haarin Kwon, individually and on behalf of all others similarly situated, v. NBTY, Inc., United States Nutrition Inc., Healthwatchers (DE), Inc., and MET-RX Nutrition, Inc.*, Case No. 15-cv-11459, on behalf of Bursor & Fisher, P.A., Settlement Declaration submitted June 22, 2017; Declaration submitted on August 15, 2018; Deposition on October 12, 2018.

**United States District Court, Northern District of California,** *Sandra McMillion, Jessica Adekoya And Ignacio Perez, on Behalf of Themselves and all Others Similarly Situated, v. Rash Curtis & Associates*, Case No. 16-cv-03396-YGR, on behalf of Bursor & Fisher, P.A., Declaration submitted May 30, 2017, Declaration submitted August 25, 2017, Declaration submitted on October 16, 2017; Declaration submitted on August 10, 2018; Declaration submitted on November 6, 2018; Declaration submitted on November 12, 2018; Deposition on December 11, 2018.

**United States District Court, Northern District of California,** *Vincent D. Mullins, et al., v. Premier Nutrition Corporation,* Case No. 13-cv-01271-RS, on behalf of Blood, Hurst, & O'Reardon, LLP, Reply Declaration submitted May 19, 2017; Deposition on July 20, 2017.

**United States District Court, Southern District of California,** *Preston Jones and Shirin Delalat, on behalf of themselves, all others similarly situated, and the general public, v. Nutiva Inc.*, Case No. 16-cv-00711 HSG, on behalf of Law Offices of Jack Fitzgerald, PC, Declaration submitted May 9, 2016; Deposition on August 23, 2017; Reply Declaration submitted January 12, 2018; Reply Declaration submitted March 2, 2018.

**United States District Court, Central District of California, Southern Division,** *Billy Glenn, Kathy Warburton, Kim Fama, and Corinne Kane, on behalf of themselves and all others similarly situated, v. Hyundai Motor America And Hyundai Motor Company,* Case No. 15-cv-02052-DOC-KES, on behalf of Gibbs Law Group, LLP, Declaration submitted May 1, 2017; Deposition on July 27, 2017; Reply Declaration submitted on October 2, 2017; Reply Declaration submitted on October 6, 2017; Declaration submitted on March 23, 2018.



**United States District Court, Southern District of California,** *Sherry Hunter, on behalf of herself, all others similarly situated, and the general public, v. Nature's Way Products, LLC, and Schwabe North America, Inc.,* Case No. 3:16-cv-00532-WQH-BLM, on behalf of Law offices of Jack Fitzgerald, PC, Declaration submitted March 24, 2017; Reply Declaration submitted May 26, 2017; Reply Declaration submitted on July 11, 2017.

**United States District Court, Southern District Of New York,** *Joanne Hart, and Sandra Bueno, on behalf of themselves and all others similarly situated, v. BHH, LLC d/b/a Bell + Howell and Van Hauser LLC,* Case No. 1:15-cv-04804-WHP, on behalf of Bursor & Fisher, P.A., Declaration submitted March 16, 2017; Deposition on January 10, 2018; Supplemental Declaration submitted January 30, 2018; Declaration submitted on March 2, 2018; Supplemental Declaration submitted on March 30, 2018; Supplemental Declaration submitted on November 26, 2018; Deposition on December 20, 2018.

**United States District Court, Eastern District Of New York, Brooklyn Division,** *Reply All Corp., v. Gimlet Media, Inc.,* Case No. 15-cv-04950-WFK-PK, on behalf of Wolf, Greenfield & Sacks, P.C., Declaration submitted March 15, 2017; Deposition on April 26, 2017.

**United States District Court, Northern District of California,** *James P. Brickman, individually and as a representative of all others similarly situated, v. Fitbit, Inc.,* Case No. 3:15-cv-02077-JD, on behalf of Dworken & Bernstein LPA, Declaration submitted February 28, 2017; Deposition on March 8, 2017.

**United States District Court, Northern District of California,** *Jamie Pettit, an individual, on behalf of herself, the general public and those similarly situated, v. Procter & Gamble Company; and Does 1 Through 50,* Case No. 15-cv-02150-RGS, on behalf of Gutride Safier LLP, Declaration submitted February 14, 2017; Deposition on March 3, 2017; Reply Declaration submitted May 11, 2017.

**United States District Court, Southern District of New York,** *Alan Gulkis, individually and on behalf of all others similarly situated, Zicam LLC and Matrixx Initiatives, Inc.,* Case No. 7:15-cv-09843-CS, on behalf of Bursor & Fisher, P.A., Declaration submitted on February 8, 2017; Deposition on July 14, 2017.

**United States District Court, Central District of California,** *Elisabeth Martin, on behalf of herself, all others similarly situated, and the general public, v. Monsanto Company,* Case No. 16-02168-JFW (SPx), on behalf of the Law Office of Jack Fitzgerald, PC, Declaration submitted February 6, 2017; Deposition on February 9, 2017; Reply Declaration on February 27, 2017.

**United States District Court, Southern District of New York,** *Walt Famular, on behalf of himself and all others similarly situated, v. Whirlpool Corporation,* Case No. 16-cv-00944, on behalf of Bursor & Fisher, P.A., Declaration submitted February 3, 2017, Deposition on August 15, 2017, Rebuttal Declaration on March 20, 2018.

8



**United States District Court, Central District of California,** *In re: 5-Hour Energy Marketing and Sales Practices Litigation*, Case No. 2:13-ml-02438 PSG, on behalf of Bursor & Fisher, P.A., Declaration submitted September 26, 2016; Reply Declaration submitted October 14, 2016; Deposition on October 27, 2016; Declaration submitted on December 22, 2016; Rebuttal Declaration submitted on March 15, 2017.

**United States District Court, Southern District of Florida,** *Benjamin Hankinson, James Guerra, Jeanette Gandolfo, Lisa Palmer, Donald Anderson, Catherine Long, and Lisa Prihoda, individually and on behalf of others similarly situated, v. R.T.G. Furniture Corp., d/b/a Rooms to Go, RTG America, LLC, The Jeffrey Seaman 2009 Annuity Trust, RTG Furniture Corp. of Georgia, d/b/a Rooms to Go, Rooms to Go North Carolina Corp., d/b/a Rooms to Go, RTG Furniture of Texas, L.P., d/b/a Rooms to Go, RTG Texas Holdings, Inc., and R.T.G. Furniture Corp. of Texas*, Case No. 9:15-cv-81139-COHN/SELTZER, on behalf of Cohen Milstein, Declaration submitted September 1, 2016; Declaration submitted October 3, 2016; Deposition on November 4, 2016; Declaration submitted on January 5, 2017.

**Circuit Court Of Cook County, Illinois County Department, Chancery Division,** *Amy Joseph, individually and on behalf of all others similarly situated, Benjamin Perez, individually and on behalf of all others similarly situated, Intervening Plaintiff, v. Monster Inc., a Delaware Corporation, and Best Buy Co., Inc., a Minnesota Corporation*, Case No. 2015 CH 13991, on behalf of Interveners, Declaration submitted August 8, 2016; Supplemental Declaration submitted January 22, 2018.

**United States District Court, Central District of California, Eastern Division,** *Jeff Looper, Michael Bright, Scott Johnson, individuals on behalf of themselves and all others similarly situated, v. FCA US LLC, f/k/a Chrysler Group LLC, a Delaware limited liability company, and DOES 1-100 inclusive*, Case No. 14-cv-00700-VAP-DTB, on behalf of Gibbs Law Group, LLP; Declaration submitted August 7, 2016; Deposition on September 29, 2016.

**United States District Court, Eastern District of California,** *Chad Herron, individually, on behalf of himself and all others similarly situation, v. Best Buy Stores, LP, a Virginia limited partnership*, Case No. 12-cv-02103-TLN-CKD, on behalf of Stonebarger Law, A Professional Corporation; Declaration submitted June 24, 2016; Deposition on July 29, 2016; Supplemental Declaration submitted September 8, 2016.

**United States District Court for the Southern District of Florida,** *Angela Sanchez-Knutson v. Ford Motor Company*, Case No. 14:61344-CIV DIMITROULEAS, on behalf of Kelley Uustal Trial Attorneys; Deposition on June 1, 2016.

**United States District Court, Central District of California,** *Jacqueline Dean, on behalf of herself and all others similarly situated, v. Colgate-Palmolive Co.*, Case No. 5:15-cv-00107, on behalf of Bursor & Fisher, P.A.; Declaration submitted April 29, 2016; Deposition on July 13, 2016; Reply Declaration submitted on May 2, 2017; Declaration submitted on October 2, 2016; Reply Declaration submitted on December 14, 2017.



**United States District Court, District of New Jersey,** *In re: AZEK Decking Marketing & Sales Practices Litigation*, Case No. 12-cv-06627-MCA-MAH, on behalf of Seeger Weiss, LLP; Declaration submitted February 26, 2016; Declaration submitted May 16, 2016; Deposition on July 6, 2016; Reply Declaration submitted August 29, 2016.

**United States District Court. Northern District of California,** *In re: Nest Labs Litigation*, Case No. 5:14-cv-01363-BLF, on behalf of Bursor & Fisher, P.A.; Declaration submitted on January 22, 2016; Deposition on March 2, 2016; Reply Declaration submitted on June 3, 2016.

**United States District Court, Northern District of California,** *Rohini Kumar, an individual, on behalf of herself, the general public and those similarly situated, v. Salov North America Corp.; And Italfoods, Inc.*, Case No. 4:14-cv-02411-YGR, on behalf of Gutride Safier LLP; Declaration submitted on January 19, 2016; Deposition on February 24, 2016; Reply Declaration submitted on May 10, 2016; Declaration submitted on April 11, 2017, Declaration submitted on May 16, 2017.

**United States District Court, Northern District of Ohio, Eastern Division,** *Christopher Meta, On Behalf Of Himself And All Others Similarly Situated v. Target Corporation, et al.*, Case No. 4:14-0832-DCN, on behalf of Tycko & Zavareei, LLP, Declaration submitted January 6, 2016; Deposition on March 15, 2016; Reply Declaration submitted on March 18, 2016.

**United States District Court, District of New Jersey,** *Charlene Dzielak, Shelley Baker, Francis Angelone, Brian Maxwell, Jeffery Reid, Kari Parsons, Charles Beyer, Jonathan Cohen, Jennifer Schramm, and Aspasia Christy on behalf of themselves and all others similarly situated, v. Whirlpool Corporation, Lowe's Home Center, Sears Holdings Corporation, The Home Depot, Inc., Fry's Electronics, Inc., And Appliance Recycling Centers Of America, Inc.*, Case No. 12-cv-0089-KM-JBC, on behalf of Bursor & Fisher, P.A., Declaration submitted December 28, 2015; Deposition on April 22, 2016; Rebuttal Declaration submitted June 10, 2016; Responding Declaration submitted July 6, 2018; Rebuttal Declaration submitted on August 10, 2018.

**United States District Court, District of New Jersey,** *In re: Tropicana Orange Juice Marketing and Sales Practices Litigation,* Case No. 12-cv-7382-WJM-JBC, on behalf of Carella, Byrne, Cecchi, Olstein, Brody & Agnello, PC.; Declaration submitted on November 6, 2015; Deposition on January 28, 2016.

**United States District Court, Northern District of California**, *Scott Koller, an individual, on behalf of himself, the general public and those similarly situated v. Deoleo USA, Inc. and Med Foods, Inc.*, Case No. 3:14-cv-02400-RS, on behalf of Gutride Safier LLP; Declaration submitted on October 29, 2015; Deposition on December 21, 2015; Reply Declaration submitted on April 3, 2017.

**United States District Court, Eastern District Of New York,** *Patrick Hughes and Nafisé Nina Hodjat, individually and on behalf of others similarly situated, v. The Ester C Company; NBTY, Inc.; and Naturesmart, LLC*, Case No. 12-cv-00041-JFB-ETB, on behalf of Reese LLP and WhatleyKallas LLP; Declaration submitted October 22, 2015; Deposition on December 1, 2015; Reply Declaration submitted on January 28, 2016; Surrebuttal Declaration submitted on April 20, 2016; oral testimony and cross examination on September 20, 2016.



*Statement of Qualifications – Colin B. Weir*

**United States District Court, District Of Connecticut,** *Glen Grayson, and Doreen Mazzanti, individually and on behalf of themselves and all others similarly situated, v. General Electric Company*, Case No. 3:13-cv-01799-WWE, on behalf of Izard Nobel LLP; Declaration submitted October 15, 2015; Deposition on November 17, 2015; Rebuttal Declaration submitted March 23, 2016.

**United States District Court, District of New Jersey,** *Lynne Avram, on behalf of herself and all others similarly situated, v. Samsung Electronics America Inc., and Lowe's Home Centers, Inc.*, Case No. 11-cv-6973-KM-MCA, on behalf of Faruqi & Faruqi LLP; Declaration filed July 15, 2015; Deposition September 29, 2015.

**United States District Court, District of Connecticut,** *Heidi Langan, on behalf of herself and all others similarly situated, v. Johnson & Johnson Consumer Companies, Inc.*, Case No. 3:13-cv-01471-RNC, on behalf of Izard Nobel LLP; Declaration filed June 23, 2015; Deposition on July 21, 2015; Reply Declaration filed October 15, 2015.

**United States District Court, Eastern District of California,** *Yesenia Melgar, on behalf of herself and all others similarly situated, v. Zicam LLC, and Matrixx Initiatives, Inc.*, Case No. 2:14-cv-00160-MCE-AC, on behalf of Bursor & Fisher, PA; Declaration filed June 8, 2015.

**United States District Court, Central District of California, Eastern Division-Riverside** *Michael J. Otto, individually, and on behalf of other members of the general public similarly situated, v. Abbott Laboratories, Inc.*, Case No. 12-01411-SVW(DTBx), on behalf of Baron & Budd; Declaration filed May 25, 2015; Deposition on June 2, 2015; Supplemental Declaration filed July 6, 2015.

**United States District Court, Central District of California,** *Russell Minoru Ono, individually and on behalf of others similarly situated, v. Head Racquet Sports USA, a corp. and Head USA Inc.*, Case No. 13-04222-FMO, on behalf of Baron & Budd; Declaration filed April 24, 2015, Deposition on June 30, 2015; Reply Declaration filed July 2, 2015.

**United States District Court, Southern District of Florida,** *Vanessa Lombardo, on behalf of herself and all others similarly situated, v. Johnson & Johnson Consumer Companies and Neutrogena Corporation*, Case No. 13-60536-SCOLA, on behalf of Morgan & Morgan; Declaration filed March 31, 2015.

**United States District Court, Eastern District of New York,** *D. Joseph Kurtz, individually and on behalf all others similarly situated, v. Kimberly-Clark Corporation and Costco Corporation*, Case No. 14-01142-JBW, on behalf of Robbins Geller Rudman & Dowd LLP; Declaration filed February 27, 2015; Rebuttal Declaration filed March 27, 2015.

**United States District Court, Eastern District of New York,** *Anthony Belfiore, on behalf of himself and all others similarly situated, v. Procter & Gamble*, Case No. 14-04090-JBR, on behalf of Wolf Popper LLP; Declaration filed February 27, 2015; Rebuttal Declaration filed April 30, 2015.



**United States District Court, Northern District of California,** *Patrick Hendricks, individually and on behalf of all others similarly situated, v. StarKist Co.*, Case No. 13-0729-YGR, on behalf of Bursor & Fisher, PA; Declaration filed January 20, 2015; Deposition on February 10, 2015; Reply Declaration filed April 7, 2015.

**United States District Court, Northern District of California, San Francisco Division,** *Scott Miller and Steve Leyton, individually and on behalf themselves, the general public and those similarly situated v. Ghirardelli Chocolate Company*, Case No. 12-04936-LB, on behalf of Gutride Safier LLP, Declaration filed January 8, 2015; Reply Declaration filed February 5, 2015.

**United States Bankruptcy Court, Eastern District of New York,** *In re: Kangadis Food Inc., d/b/a The Gourmet Factory, Debtor*, Case No. 14-72649-REG, on behalf of Bursor & Fisher, PA; Declaration filed August 5th, 2014; Oral testimony on November 24, 2014.

**United States District Court, Southern District of New York,** *Joseph Ebin and Yeruchum Jenkins, individually and on behalf of all others similarly situated v. Kangadis Family Management LLC, Aristidia Kangadis a/k/a "Mr. Aris," Andromahi Kangadis a/k/a "Mrs. Mahi," and Themis Kangadis*, Case No. 14-cv-1324-JSR, on behalf of Bursor & Fisher, PA; Declaration filed August 5, 2014; Deposition on October 9, 2014.

**United States District Court, Northern District of California, San Francisco Division,** *Erin Allen, on behalf of herself and all others similarly situated, v. Con Agra Foods, Inc.*, Case No. 13-cv-01279-VC, on behalf of Hagens Berman Sobol Shapiro LLP and The Eureka Law Firm; Declaration submitted August 11, 2014; Deposition on September 30, 2014; Declaration submitted July 9, 2018.

**United States District Court, Eastern District of California,** *Kyle Dei Rossi and Mark Linthicum, on behalf of themselves and those similarly situated, v. Whirlpool Corporation*, Case No. 12-cv-00125-TLN-CKD, on behalf of Bursor & Fisher, P.A.; Declaration filed July 31, 2014, Deposition on August 20, 2014.

**United States District Court, Northern District of Illinois, Eastern Division,** *In re: Southwest Airlines Voucher Litigation.*, Case No. 11-cv-8176, Hon. Matthew Kennelly, on behalf of Siprut PC; Declaration filed June 4, 2014; Oral testimony and cross examination on June 16, 2014.

**United States District Court, Central District of California, Western Division,** *In re: ConAgra Foods, Inc.*, Case No. 11-cv-05379-MMM, MDL No. 2291, on behalf of Milberg LLP and Grant & Eisenhofer, P.A.; Declaration filed May 5, 2014; Deposition on May 23, 2014; Declaration filed June 30, 2014; Declaration filed September 8, 2014; Deposition on September 16, 2014, Declaration filed October 27, 2014.

**United States District Court, Southern District of New York,** *In re: Scotts EZ Seed Litigation*, Case No. 12-cv-4727-VB, on behalf of Bursor & Fisher, PA; Declaration filed March 31, 2014; Deposition on May 21, 2014; Declaration filed on January 8, 2016; Deposition on February 10, 2016; Reply Declaration submitted June 30, 2016; Declaration submitted September 1, 2016; Declaration submitted on October 20, 2016.



*Statement of Qualifications – Colin B. Weir*

**United States District Court, Central District of California,** *Julie Fagan, Michael Fagan, Melissa Pennalatore, Amy Sapeika and Shelley Trinchero, individually and on behalf of all others similarly situated v. Neutrogena Corporation*, Case No. 13-cv-01316-SVW, on behalf of Izard Nobel LLP; Declaration filed March 21, 2014; Deposition on April 3, 2014; Supplemental Declaration filed August 4, 2014; Deposition on August 13, 2014; Declaration filed September 9, 2014.

**United States District Court, Central District of California,** *Enzo Forcellati and Lisa Roemmich, individually and on behalf of all others similarly situated v. Hyland's Inc., Standard Homeopathic Laboratories, Inc. and Standard Homeopathic Company*, Case No. 12-cv-01983-GHK, on behalf of Faruqi and Faruqi; Declaration filed December 13, 2013; Deposition on February 27, 2014.

**United States District Court, Southern District of Florida,** *Adam Karhu, on behalf of himself and all others similarly situated, v. Vital Pharmaceuticals, Inc., d/b/a VPX Sports*, Case No. 13-cv-60768-JIC, on behalf of Thornton, Davis, & Fein, P.A., Declaration filed December 13, 2013; Declaration filed January 6, 2014; Declaration filed March 31, 2014.

**Trial Court of Massachusetts, District of Edgartown,** *Schepici v. JetBlue Airways Corp.,* on behalf of plaintiff; Mediation on December 4, 2013.

**Superior Court of California, County of Alameda,** *In re: Cellphone Termination Fee Cases, Ramzy Ayyad, et al, v. Sprint Spectrum, L.P.,* JCCP No. 4332, Case No. RG03-121510, on behalf of the Executive Committee; Declaration filed September 18, 2013.

**United States District Court, Northern District of California,** *Maria Torres, Gabriel Rojas, and Ian Kerner, individually and on behalf of all others similarly situated v. JC Penney Corporation, Inc.; and JC Penney Company, Inc.,*, Case No. cv-12-01105-RS, on behalf of Bramson, Plutzik, Mahler and Birkhaeuser; Declaration filed September 13, 2013; Deposition on October 2, 2013.

**United States District Court, Southern District of New York,** *Joseph Ebin and Yeruchum Jenkins, individually and on behalf of all others similarly situated v. Kangadis Foods Inc*, Case No. 13-cv-02311-JSR, on behalf of Bursor & Fisher, PA; Declaration filed August 26, 2013; Deposition on October 21, 2013.

**United States District Court, Northern District of California,** *Desiree Moore, on behalf of themselves, the general public, and all those similarly situated, v. Verizon Communications*, Case No. 4:09-cv-01823-SBA, on behalf of David Schachman and Associates PC, Jacobs Kolton Chtd., and Keller Grover, LLP; Declaration filed June 24, 2013.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant; Oral testimony and cross examination on March 1, 2013.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant; Oral testimony and cross examination on February 20, 2013.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant; Oral testimony and cross examination on February 19, 2013.



**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant; Oral testimony and cross examination on February 13, 2013.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant; Oral testimony and cross examination on February 7, 2013.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant; Oral testimony and cross examination on February 4, 2013.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant; Oral testimony and cross examination on January 24, 2013.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant; Oral testimony and cross examination on December 12, 2012.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant; Oral testimony and cross examination on December 10, 2012.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant; Oral testimony and cross examination on November 28, 2012.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant, Declarations filed October 4, 2012 and November 5, 2012; Oral testimony and cross examination on November 27, 2012.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant, Declaration filed April 16, 2012; Oral testimony and cross examination on May 11, 2012.

**United States District Court, District of Massachusetts,** *Marcy Cruz v. Justin Kagan, Arthur Hegarty, Ronald Teachman, and the City of New Bedford*, Case No. 1:09-cv-11793-RGS, on behalf of Marcy Cruz, Expert Report filed February 28, 2011; Oral testimony and cross examination on December 1, 2011.

**United States District Court, Southern District of New York,** *Bursor & Fisher P.A., v. Federal Communications Commission*, Case No. 1:11-cv-05457-LAK, on behalf of Bursor & Fisher P.A., Declaration filed August 17, 2011.

**United States District Court, District of New Jersey,** *In Re: Sprint Premium Data Plan Marketing and Sales Practices Litigation,* Master Case No. 10-6334 (SDW) MDL No. 2228, on behalf of Thornton, Davis, & Fein, P.A., Declaration filed August 11, 2011.

**United States District Court, Northern District of California,** *Patrick Hendricks, on behalf of himself and all others similarly situated, v. AT&T Mobility LLC,* Case No. C11-00409, on behalf of Bursor & Fisher, P.A., Declaration filed August 7, 2011.

**Federal Communications Commission,** *In the Matter of Applications of AT&T Inc. & Deutsche Telekom AG for Consent to Assign or Transfer Control of Licenses and Authorizations*, WT Docket No. 11-65, on behalf of Butch Watson, Declaration filed June 20, 2011.



**California Public Utilities Commission,** *Pacific Bell Telephone Company d/b/a AT&T California (U1001C) Complainant, vs. O1 Communication, Inc. (U 6065 C), Defendant*, Case No. C.08-03-001, on behalf of the O1 Communications, Inc., Reply Testimony filed November 6, 2009; Oral testimony and cross examination on November 16, 2009.

**Superior Court of California, County of Alameda**, *James Thomas, on behalf of themselves, the general public, and all those similarly situated, v. Global Vision Products, Inc., Anthony Imbriolo, Derrike Cope, David L. Gordon, Powertel Technologies, Inc., Craig Dix, Henry Edelson and Robert Debenedictis,* Case No. RG03-091195, on behalf of the Law Offices Of Scott A. Bursor, Oral testimony and cross examination on November 9, 2009.

**United States District Court, District of New Jersey,** *Judy Larson, Barry Hall, Joe Milliron, Tessie Robb, and Willie Davis, individually and on behalf of all others similarly situated, v. AT&T Mobility LLC f/k/a Cingular Wireless LLC and Sprint Nextel Corporation and Sprint Spectrum L.P. d/b/a Sprint Nextel and Nextel Finance Company, Civ. Act. No. 07-5325 (JLL)*, on behalf of PinilisHalpern, LLP and Law Offices of Scott A. Bursor, Declaration filed *under seal* October 19, 2009.

**California Public Utilities Commission,** *Pacific Bell Telephone Company d/b/a AT&T California (U1001C) Complainant, vs. Pac-West Telecomm, Inc. (U 5266 C), Defendant*, Case No. C.08-09-017, on behalf of the Pac-West Telecomm, Inc., Rebuttal Testimony filed May 1, 2009.

**Illinois Commerce Commission,** Illinois Bell Telephone Company Annual Rate Filing for Non-Competitive Services Under an Alternative Form of Regulation, Ill. C. C. Docket No. 08-0249, on behalf of the People of the State of Illinois, Declaration filed May 2, 2008.

**Federal Communications Commission,** Qwest Petition for Forbearance Under 47 U.S.C. §160(c) From Title II and *Computer Inquiry Rules* with Respect to Broadband Services, Petition of AT&T Inc, For Forbearance Under 47 U.S.C. §160(c) From Title II and *Computer Inquiry Rules* with Respect to Broadband Services, Petition of BellSouth Corporation For Forbearance Under 47 U.S.C. §160(c) From Title II and *Computer Inquiry Rules* with Respect to Broadband Services, Petition of the Embarq Local Operating Companies for Forbearance Under 47 U.S.C. §160(c) From Application of *Computer Inquiry* and certain Title II Common Carriage Requirements; WC Docket Nos. 06-125 and 06-147, on behalf of the AdHoc Telecommunications Users Committee, Declaration filed October 9, 2007.

**Superior Court of California, County of Alameda**, *James Thomas, on behalf of themselves, the general public, and all those similarly situated, v. Global Vision Products, Inc., Anthony Imbriolo, Derrike Cope, David L. Gordon, Powertel Technologies, Inc., Craig Dix, Henry Edelson and Robert Debenedictis,* Case No. RG03-091195, on behalf of the Law Offices Of Scott A. Bursor, Declaration filed January 5, 2007; Deposition on November 13, 2007; Oral testimony and cross-examination on December 19, 2007; Oral testimony on January 9, 2008.

Mr. Weir has served as a consultative expert in numerous proceedings that did not result in testimony, and has contributed research and analysis to numerous additional publications and testimony at the state, federal, and international levels.



**Exhibit 2**

**Documents Reviewed**

- Class Action Complaint, filed December 4, 2017

- 47 U.S. Code  227

- November 27, 2018 Declaration of Randall Snyder

- January 11, 2019 Report of Margaret Daley (and associated exhibits and workpapers)

- January 24, 2019 Deposition of Margaret Daley

- December 28, 2018 Deposition of Colin B. Weir

- December 23, 2018 Deposition of Randall Snyder

- Defendant's call detail records

- Defendant's wrong number account data

- http://www.stata.com/products/

- *In re: Cellphone Termination Fee Cases*,  *Ayyad, et al.,  v. Sprint Spectrum, L.P*.,  JCCP No. 4332, Case No. RG03-121510

- *In re: ConAgra Foods Inc.,* 90 F. Supp. 3d 919,  (C.D. Cal. February 23, 2015)

**EXHIBIT 6**



TransUnion® TLOxp.

INDUSTRY

# TLOxp for Law Enforcement

Pinpoint actionable and accurate investigative resources with the power of TransUnion

**Start a free trial**

## The proven customized search and locate tool for law enforcement agents

Built on a foundation of hundreds of millions of records, the elite search and locate technology in TransUnion's TLOxp® solution and advanced linking algorithms produce actionable data through a customized, user-friendly interface in a matter of seconds. Fragments of data can turn into concrete information as you dig deeper into leads you've identified. This TransUnion solution aggregates data from over 10,000 sources to create the most robust public and proprietary records database, delivering instant access to fresh and pertinent multi-jurisdictional information about people, businesses and assets.

Industry's *most comprehensive 360-degree view* into a subject's identity, assets and relationships

**Equips you with vital information so you can:**
- Uncover multi-jurisdictional associations between people, businesses and assets
- Identify non-obvious relationships with unique public record data
- Leverage advanced analytics with TransUnion and customer supplied data

**Speed and efficiency are *paramount* when the clock is ticking.**

**TLOxp positions you for optimum, timely and cost-effective investigative workflow:**
- Interface designed specifically for law enforcement needs
- 60 variables to link & rank person-address associations
- Best in class phone data including up to date carrier information

Did you know?

Over 90% of investigators from a TransUnion survey agree or strongly agree that TLOxp makes their jobs easier.

*\* The TLOxp database suppresses information on people 17 years of age and younger.*

⬆ **Share This Page (http://www.addthis.com/bookmark.php?v=250)**

**TLOXP PROVIDES ACCESS TO:**

- Data on over 95% of the U.S. population

- 350 million Social Security numbers

- Over 225 million employment records

- 4 billion phone records

- 4 billion address records

- 90 million adult Millennials age 18–36*

- 50 million people with so-called "thin files" who don't have traditional credit reports

**RESOURCES**



**Asset Sheet**
Right Party Contact
(http://app.e.transunion.com/e/er?s=1834591578&lid=1295&elq=<span class=eloquaemail>recipientid</span>)



**Asset Sheet**
TLOxp for Law Enforcement

(/resources/tlo/doc/industry/resources/industry-law-enforcement-as.pdf)

# SOLUTIONS FOR LAW ENFORCEMENT

Featured

4 of 7

## Batch Processing and API

Our data solutions can increase productivity and enhance user performance to save you time and money
(/batch-and-api-solutions)

▲

## Pricing

Choose from three pricing structures designed to meet your search volume and organization's needs
(/pricing)

▲

## Relationship Report

Save investigation time by running one report connecting multiple people.
(/relationship)

▲

## Searches and Reports

Instantly access a 360º profile of people, businesses and locations
(/searches-and-reports)

5/11

## INSIGHTS AND EVENTS



**BLOG**

Improve Efficiency and Reduce Risk with Inventory Segmentation

**READ NOW ▸**

(https://www.transunion.com/blog/improve-efficiency-and-reduce-risk-with-inventory-segmentation)



**BLOG POST**

Three Ways Data-Driven Law
Firms Keep Winning

**LEARN MORE ▸**

(/blog/three-ways-data-driven-law-
firms-keep-winning)



**BLOG POST**

Managing Risk – and Protecting
Your Bottom Line – With
Smarter Segmentation

**READ NOW ▸**

(https://www.transunion.com/blog/managing-
risk-and-protecting-your-bottom-
line-with-smarter-segmentation)



**VIDEO**

Discover how TLOxp for Law Enforcement can help solve cases faster

**WATCH NOW ▸**

(/videos/tloxp-for-law-enforcement)

View All (/INSIGHTS-EVENTS)

**CONTACT US**

* Required field

8/11

https://www.tlo.com/law-enforcement

First Name:*

Last Name:*

Email:*

Phone:*

Company:*

Title:*

State:*

Industry:*

Number of employees:*

How can we help you?:*

Current TLOxp customer

REQUEST MORE INFORMATION

About Us

Who uses TLOxp

Get to know TLOxp

Contact Us

(https://www.facebook.com/TransUnionTLOxp).

(https://twitter.com/TLO_xp).

(https://www.youtube.com/channel/UCP332SfcUVdNK7_HVwO2MbA).

12/17/2018

| User Login (https://tloxp.tlo.com/login) | Privacy (/privacy) | Terms & Conditions (/terms-conditions) | Tax FAQ (/faq-tax) | Sitemap (/sitemap) | Signup (/signup) |
|---|---|---|---|---|---|

in  (https://www.linkedin.com/company/tloxp?trk=nmp_rec_act_company_photo)

g+  (https://plus.google.com/+TU-TLOxp/posts)   (http://blog.transunion.com/)

© Copyright 2018 TransUnion Risk and Alternative Data Solutions, Inc. All Rights Reserved.

Free trial offer is for new customers only, may be limited to certain services in our sole discretion, and subject to additional Terms and Conditions. TLOxp contains data governed by law and is subject to new account credentialing, which may include a site inspection and end user terms and conditions. Customer is responsible for the site inspection fee. The length of the free trial will be indicated at the time of the account approval. While unlikely, there may be instances where results may not be delivered instantly or in seconds, including but not limited to factors outside of our reasonable control, such as any force majeure event or internet access or related problems beyond the demarcation point of TransUnion Risk and Alternative Data Solutions, Inc. The TLOxp solution is not provided by a consumer reporting agency and does not constitute a consumer report as these terms are defined by the Fair Credit Reporting Act, 15 U.S.C Section 1651 et seq ("FCRA"). The TLOxp solution may not be used in whole or in part as a factor in establishing an individual's credit worthiness or eligibility for credit or insurance or employment not for any other purpose under the FCRA.

**EXHIBIT 7**



**TransUnion**

# Powerful technology and data to help improve your TCPA compliance and contact strategy

TransUnion helps make compliance with the Telephone Consumer Protection Act (TCPA) and verification of your contact data easier.

## With real-time* access to carrier data, your organization can quickly confirm the line type and verify ownership of a given phone number.

**Right Data. Better Results. Right Now.**

Through more accurate information and solutions that help you better navigate evolving phone technologies, you can also enhance your customer contact strategy and mitigate costly fines resulting from non-compliance.

Our batch solutions can simplify your compliance efforts while helping streamline your operational workflow. What's more, Batch Monitoring allows for daily updates to track status changes, including whether a number has been ported to a major carrier, helping you avoid regulatory violations. Available carriers include Verizon, T-Mobile, Sprint and AT&T**.

**LEARN MORE**

For more information and to schedule a demo, visit tlo.com/TCPA-phone-and-contact-data-verification or call 800-856-5599.

### KEY BENEFITS

- Reduce and limit calls to canceled or suspended numbers
- Verify number ownership of the consenting party
- Track ported numbers
- Validate phone type
- Improve the accuracy of customer contact details

**AVAILABLE CARRIERS INCLUDE VERIZON, T-MOBILE, SPRINT AND AT&T****

# TransUnion equips you with powerful information to help improve the results of your contact strategy

**Non-compliance with TCPA laws can result in penalties ranging from $500 – $1,500 per violation**, which includes individual calls and texts messages.[1]  Consent is required to send a text message or use an autodialer to make contact with a mobile phone.[2]

**Access the right data to drive better results with intuitive TCPA and contact data solutions.**

## TCPA Phone Verification

This product provides verification of phone ownership details direct from carrier billing data.

### INPUTS

- Correlation ID: *An identifier for each record in the file, and returned in the output*
- Phone number
- First and last name
- Address
- Email address
- Last successful contact date

### OUTPUTS

- Correlation ID
- Service type: *Wireless, landline*
- Account status:
    - → *10 = Active*
    - → *9 = Suspended*
    - → *0 = Cancelled*
- Verification score: *Probability of phone ownership by provided name*

## Contact Data Verification

This product delivers additional information about the ownership of a phone number to our customers looking to verify their customer data.

### INPUTS

- Correlation ID: *An identifier for each record in the file, and returned in the output*
- Phone number
- First and last name
- Address
- Email address
- Last successful contact date

### OUTPUTS

- First and last name score
- Address score
- Email address score
- Service type & provider: *Wireless, landline*
- Account type: *Pre-paid or post-paid*
- Account status: *Active, suspended, cancelled*
- Primary owner verification
- Last reassignment date
- Verification score: *Probability of provided name owning phone*

**LEARN MORE**

For more information and to schedule a demo,
visit **www.tlo.com/TCPA-phone-and-contact-data-verification** or call **800-856-5599**.

4530 Conference Way South, Boca Raton, FL 33431
© 2018 TransUnion Risk and Alternative Data Solutions, Inc All Rights Reserved
TLOxp is available to qualified Subscribers for permitted uses  Subject to individual Subscriber data permissions
*Free trial offer is for new customers only, may be limited to certain services in our sole discretion, and subject to additional Terms and Conditions  TLOxp contains data governed by law and is subject to new account credentialing, which may include a site inspection and end user terms and conditions  Customer is responsible for the site inspection fee  The length of the free trial will be indicated at the time of the account approval  While unlikely, there may be instances where results may not be delivered instantly, in real-time or in seconds, including but not limited to factors outside of our reasonable control, such as any force majeure event or internet access or related problems beyond the demarcation point of TransUnion Risk and Alternative Data Solutions, Inc  The TLOxp solution is not provided by a consumer reporting agency and does not constitute a consumer report as these terms are defined by the Fair Credit Reporting Act  15 U S C Section 1651 et seq ("FCRA")  The TLOxp solution may not be used in whole or in part as a factor in establishing an individual's credit worthiness or eligibility for credit or insurance or employment not for any other purpose under the FCRA
** Subject to change
1: United States Code, 2006 Edition, Supplement 5, Title 47 - TELEGRAPHS, TELEPHONES, AND RADIOTELEGRAPHS (47 U S C § 227) (2018)
2: See Id



**EXHIBIT 8**



(/)

SOLUTION

# TCPA Phone and Contact Data Verification

Improve your TCPA compliance and contact strategy with powerful technology and data

REQUEST MORE INFORMATION

Effectively verifying contact data and remaining compliant with the Telephone Consumer Protection Act (TCPA) is vital to mitigating costly fines that can severely impact your business and reputation. To optimize your customer contact strategies, TransUnion offers real-time access to carrier data allowing you to quickly confirm the line type and ownership of a given phone number.
Implementing our batch monitoring solutions can streamline your compliance efforts and overall operational flow. Plus, you can receive daily updates that allow you to track status changes like whether a number has been ported to a major carrier – again helping you avoid regulatory violations.

**TCPA Phone Verification** provides verification of phone ownership details direct from carrier billing data.

Using inputs, such as correlation ID, phone number, first and last names, etc., you can receive information as to service type, wireless or landline, account status and a verification score with the probability of ownership by the name provided.

**Contact Data Verification** delivers deeper information regarding ownership of a phone number.

Again, with the inputs you provide, you can receive detailed information regarding name, address, service type, provider, pre or post-paid account, account status, verification score of probability of ownership and more.

⬀ SHARE THIS PAGE (HTTP://WWW.ADDTHIS.COM/BOOKMARK.PHP?V=250)

PRODUCT HIGHLIGHTS:

- ✓ **Reduce and limit calls to canceled or suspended numbers**

- ✓ **Verify number ownership of the consenting party**

- ✓ **Track ported numbers**






phone type

(4)   Improve the accuracy of customer contact details

## RESOURCES



**Asset Sheet**

Learn more about how we can help make compliance with the Telephone Consumer Protection Act (TCPA) and verification of your contact data easier.

(/resources/tlo/doc/solutions/resources/solution-phone-verification-and-contact-data-verification-asset-sheet.pdf)

## CONTACT US

* Required field

First Name:*

Last Name:*

Email:*

Phone:*

Company:*

Title:*

State:*                                                                                  ▼

Industry:*                                                                               ▼

Number of employees:*

TransUnion TLOxp

*How can we help you?:*
(2)

Current TLOxp customer ☐

REQUEST MORE INFORMATION

---

About Us

Who uses TLOxp

Get to know TLOxp

Contact Us

(https://www.facebook.com/TransUnionTLOxp)    (https://twitter.com/TLO_xp)

(https://www.youtube.com/channel/UCP332SfcUVdNK7_HVwO2MbA)

(https://www.linkedin.com/company/tloxp?trk=nmp_rec_act_company_photo)    (http://blog.transu

| User Login (https://tloxp.tlo.com/login) | Privacy (/privacy) | Terms & Conditions (/terms-conditions) | Tax FAQ (/faq-tax) | Sitemap (/sitemap) | Signup (/signup) |

© Copyright 2019 TransUnion Risk and Alternative Data Solutions, Inc. All Rights Reserved.

TLOxp is provided "as-is", with no warranties, including without limitation, those as to quality, non-infringement, accuracy, completeness, timeliness, currentness, merchantability and fitness for a particular purpose. Free trial offer is for new customers only, may be limited to certain services in our sole discretion, and subject to additional Terms and Conditions. TLOxp contains data governed by law and is subject to new account credentialing, which may include a site inspection and end user terms and conditions. Customer is responsible for the site inspection fee. The length of the free trial will be indicated at the time of the account approval. While unlikely, there may be instances where results may not be delivered instantly or in seconds, including but not limited to factors outside of our reasonable control, such as any force majeure event or internet access or related problems beyond the demarcation point of TransUnion Risk and Alternative Data Solutions, Inc. The TLOxp solution is not provided by a consumer reporting agency and does not constitute a consumer report as these terms are defined by the Fair Credit Reporting Act, 15 U.S.C Section 1681 et seq ("FCRA"). The TLOxp solution may not be used in whole or in part as a factor in establishing an individual's credit worthiness or eligibility for credit or insurance or employment not for any other purpose under the FCRA.